UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                                        Case No.: 13-20853-BKC-PGH

TLFO, LLC,                                                    Chapter 11

     Debtor(s).
_____/
TransUnion Risk and Alternative                              Adv. No.:14-01793-BKC-PGH-A
Data Solutions, Inc.

     Plaintiff,

v.

The Best One, Inc. and
Ole Poulsen,

     Defendants.
_____/

## NOTICE OF APPEAL

Pursuant to 28 U.S.C. § 158(a) and Rule 8002 of the Federal Rules of Bankruptcy

Procedure, defendants, The Best One, Inc. ("TBO") and Ole Poulsen ("Poulsen"), appeal from:

    a.  Trial Order [ADV ECF No. 473] entered on August 18, 2016 (Exh. A attached hereto); and

    b.  Final Judgment [ADV ECF No. 474] entered on August 18, 2016 (Exh. B attached hereto); and

    c.  Order Denying (I) TBO's Motion (1) to Amend Findings in Trial Order and Final Judgment; (2) Alternative Motion for New Trial to Open the Judgment; and (3) Alternative Motion to Correct Clerical Mistake; and (II) TBO and Poulsen's Motion for Rehearing or New Trial or, Alternatively, Motion for Relief Under Rule 9024 [Adv. ECF No. 511] entered on September 23, 2016 (Exh. C attached hereto).

The names of all parties to the judgment, order or decree appealed from and the names, addresses and telephone numbers of their respective attorneys are as follows:

**TransUnion Risk and Alternative Data Solutions, Inc.**
c/o Philip D. Anker, Esq.
7 World Trade Center
250 Greenwich Street
New York, NY 10007
philip.anker@wilmerhale.com
212-230-8800

Ross F. Firsenbaum, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212-295-6323

Paul Steven Singerman, Esq.
1450 Brickell Ave., #1900
Miami, FL  33131
singerman@bergersingerman.com
305-755-9500

David L. Gay, Esq.
1450 Brickell Ave., #1900
Miami, FL  33131
dgay@bergersingerman.com

**The Best One, Inc.**
c/o Arthur H. Rice, Esq.
101 NE Third Ave., Suite 1800
Ft. Lauderdale, FL  33301
arice.ecf@rprslaw.com
305-379-3121

Dennis Richard, Esq.
Michael R. Tolley, Esq.
Douglas Giuliano, Esq.
Richard and Richard, P.A.
825 Brickell Bay Drive
Tower III, Suite 1748
Miami, FL 33131
dennis@richardandrichard.com

305-374-6688

**Ole Poulsen**
c/o Luis Salazar, Esq.
Salazar Jackson, LLP
2000 Ponce De Leon Blvd., PH
Coral Gables, FL 33134
salazar@salazarjackson.com
305-374-4848

Respectfully Submitted,

| | |
|---|---|
| **SALAZAR JACKSON, LLP** | **RICE PUGATCH ROBINSON STORFER & COHEN, PLLC** |
| *Attorneys for Defendant Ole Poulsen* | *Attorneys for Appellant, The Best One, Inc.* |
| 2000 Ponce De Leon Boulevard | 101 Northeast Third Avenue |
| Penthouse Suite | Suite 1800 |
| Coral Gables, Florida 33134 | Fort Lauderdale, Florida 33301 |
| Telephone: (305) 374-4848 | Telephone (305) 379-3121 |
| Facsimile: (305) 397-1021 | Facsimile (954) 462-4300 |

By:    /s/  Luis Salazar
LUIS SALAZAR
Florida Bar No. 147788
Jesse R. Cloyd
Florida Bar No. 058388
Email: Salazar@SalazarJackson.com
Email: Cloyd@SalazarJackson.com

By: /s/ Arthur Halsey Rice
ARTHUR HALSEY RICE
Florida Bar No. 224723
arice@rprslaw.com

-and-

By: /s/ Dennis Richard
DENNIS RICHARD
Florida Bar No:  148730
dennis@richardandrichard.com
LAUREL W. MARC-CHARLES
Florida Bar No.  319491
laurel@richardandrichard.com
MICHAEL R.TOLLEY
Florida Bar No. 002715
michael@richardandrichard.com
RICHARD AND RICHARD, P.A.
825 Brickell Bay Drive
Tower III, Suite 1748
Miami, FL  33131
Telephone:  (305) 374-6688
Facsimile:  (305) 374-0384

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by CM/ECF to all parties listed below this 3rd day of October, 2016.

## SERVICE LIST

### VIA CM/ECF

Philip D. Anker on behalf of Plaintiff TransUnion Risk and Alternative Data Solutions, Inc.
philip.anker@wilmerhale.com,
Douglas.Curtis@wilmerhale.com;Marc.Allon@wilmerhale.com;ryanne.perio@wilmerhale.com;
michael.guippone@wilmerhale.com;yolande.thompson@wilmerhale.com;ross.firsenbaum@wil
merhale.com;Lauren.Hume@wilmerhale.com

Mark D. Bloom, Esq. on behalf of Interested Party IDI, Inc.
bloomm@gtlaw.com, MiaLitDock@gtlaw.com;miaecfbky@gtlaw.com

David L Gay, Esq. on behalf of Plaintiff TransUnion Risk and Alternative Data Solutions, Inc.
dgay@bergersingerman.com,
efile@bergersingerman.com;efile@ecf.inforuptcy.com;mvega@bergersingerman.com

Alvin S. Goldstein, Esq on behalf of Interested Party TLFO, LLC
agoldstein@furrcohen.com, atty_furrcohen@bluestylus.com;mortman@furrcohen.com

Scott M. Grossman, Esq. on behalf of Interested Party IDI, Inc.
grossmansm@gtlaw.com,
scottla@gtlaw.com;MiaLitDock@gtlaw.com;FTLLitDock@GTLaw.com;miaecfbky@gtlaw.co
m

Laurel W Marc-Charles on behalf of Defendant The Best One, Inc.
laurel@richardandrichard.com,
dennis@richardandrichard.com;Michael@richardandrichard.com;douglas@richardandrichard.co
m;jennin@richardandrichard.com;Elizabeth@richardandrichard.com

Arthur H Rice, Esq on behalf of Counter-Claimant The Best One, Inc.
arice.ecf@rprslaw.com

Arthur H Rice, Esq on behalf of Defendant The Best One, Inc.

arice.ecf@rprslaw.com

Jason S Rigoli, Esq. on behalf of Interested Party TLFO, LLC
jrigoli@furrcohen.com, sscott@furrcohen.com;atty_furrcohen@bluestylus.com

Luis Salazar, Esq. on behalf of Defendant Ole Poulsen
salazar@salazarjackson.com,
jackson@salazarjackson.com;cloyd@salazarjackson.com;aguilar@salazarjackson.com;davila@salazarjackson.com;lee-sin@salazarjackson.com

Paul Steven Singerman, Esq on behalf of Plaintiff TransUnion Risk and Alternative Data Solutions, Inc.
singerman@bergersingerman.com,
mdiaz@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

w:\wdox\clients\512\4416\00097992.docx



**ORDERED in the Southern District of Florida on August 18, 2016.**

Paul G. Hyman, Jr.
**Chief United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | CASE NO.: 13-20853-BKC-PGH |
| TLFO, LLC, | Chapter 11 |
|     Debtor(s). | |

_____/

| | |
|---|---|
| TransUnion Risk and Alternative | ADV. NO.: 14-01793-BKC-PGH-A |
| Data Solutions, Inc., | |
|     Plaintiff, | |
| v. | |
| The Best One, Inc. and | |
| Ole Poulsen, | |
|     Defendants. | |

_____/

## <u>TRIAL ORDER</u>

**THIS MATTER** came before the Court for trial (the "Trial") on May 16 and

17, 2016, and June 15, 22, 23, 24, and 27, 2016, upon (1) the *Second Amended*

*Complaint* (the "Complaint") (ECF No. 61) and the *Motion to Enforce Sale Order and*

1

**EXHIBIT A**

to Hold The Best One, Inc. in Contempt (the "Motion to Enforce Sale Order") (ECF No. 1282, Case No. 13-20853-BKC-PGH)[1] filed by Plaintiff TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"); (2) the *Answer, Affirmative Defenses, and Counterclaim* (the "TBO Counterclaim") (ECF Nos. 333 and 334) filed by Defendant The Best One, Inc. ("TBO"); and (3) the *Answer, Affirmative Defenses, and Counterclaim* (the "Poulsen Counterclaim") (ECF Nos. 335 and 336) filed by Ole Poulsen ("Poulsen," and together with TBO, the "Defendants"). For the reasons discussed in detail below, the Court finds in favor of Plaintiff TRADS.

## FINDINGS OF FACT AND PROCEDURAL BACKGROUND

### I.    The Parties

Plaintiff TRADS is a Delaware corporation and a subsidiary of TransUnion Corp. ("TransUnion"). For simplicity's sake, the Court will refer collectively to TRADS and TransUnion as "TransUnion-TRADS." Defendant TBO, now known as IDI, Inc.,[2] is a Florida corporation, which was formed by Michael Brauser in 2014. Mr. Brauser now serves as TBO's executive chairman. Defendant Poulsen is an individual currently living in Oregon. TLO, LLC ("TLO")[3] is the entity whose chapter 11

---

[1] TransUnion-TRADS filed the Motion to Enforce Sale Order in the underlying TLO, LLC bankruptcy proceeding. *See* Case No. 13-20853-BKC-PGH. On January 28, 2015, the Court entered an Order on the Motion to Enforce Sale Order, in which the Court held that the Motion alleged substantially the same facts as those alleged in this adversary proceeding and that as a result, the Motion to Enforce Sale Order would be consolidated with this adversary proceeding. *See Order* (ECF No. 1297, Case No. 13-20853-BKC-PGH).

[2] Even though TBO is now known as IDI, in order to avoid confusion, the Court will refer to IDI as TBO throughout the Order.

[3] As reflected in the caption for this proceeding, after filing for chapter 11 bankruptcy relief and going through the reorganization process, TLO became known as TLFO, LLC. However, the Court will refer to TLFO, LLC as TLO throughout this Opinion for simplicity's sake.

bankruptcy filing prompted the events which led to the litigation now before the Court.

## II.    **TLO: Inception through Bankruptcy Filing**

In March 2009, Hank Asher formed TLO with two co-founders, Poulsen and John Walsh. Initially, Poulsen and Mr. Walsh each contributed $100.00 in exchange for each receiving a 10% equity interest in TLO and Mr. Asher contributed $800.00 in exchange for an 80% equity interest in TLO. Mr. Asher served as the *de facto* CEO and Poulsen served as the Chief Science Officer of TLO.

Between its formation in 2009 and its eventual bankruptcy filing in 2013, TLO developed a commercial product known as TLOxp. TLOxp was and is a program which allows users to search for information regarding individuals and entities. TLOxp relies on the ability to obtain data from various sources and more importantly, to process and sort that data. In order to process and sort the data, TLO utilized a computer programming language called BOLT and a computer program called BParser. BOLT was—and still is—a computer programming language which allows programmers to write programs, or scripts, for data processing and sorting. BParser was—and still is—a computer program which converts BOLT scripts into the universal, standard computer language known as C++ so that the BOLT scripts can be executed by a computer. BParser utilizes a "runtime library" to compile BOLT scripts into machine-readable code. For simplicity's sake, the Court will refer collectively to BOLT, BParser, the scripts written in BOLT, the BParser source code, the BParser executable version, and the runtime library as the "BOLT IP." The only

3

commercial entities to have ever used the BOLT IP are TLO and, as discussed in detail later, TransUnion-TRADS.

Throughout its existence, TLO was a financially troubled company. In order to keep it afloat, Mr. Asher, through his corporation Technology Investors Inc., provided more than $88 million in funding to TLO. However, on January 11, 2013, Mr. Asher suddenly and unexpectedly passed away. Thereafter, his daughters Desiree Asher and Carly Asher Yoost (together, the "Asher Sisters") stepped in to manage TLO. At the time, TLO was losing more than $3 million per month and had only 45 days' worth of working capital. Moreover, at some point after Mr. Asher's passing, Poulsen stopped coming into the TLO offices and his employment as Chief Science Officer was eventually terminated by TLO several months later. Shortly thereafter, the Asher Sisters along with TLO's senior management decided that TLO would file for chapter 11 bankruptcy relief and retained bankruptcy attorney Robert C. Furr and his law firm Furr & Cohen, PA ("Furr & Cohen"). On May 9, 2013, TLO filed its voluntary chapter 11 bankruptcy petition (the "Petition Date").

III.  **The § 363 Sale of Substantially All of TLO's Assets**

The Asher Sisters personally provided a total of $6 million in Court-approved debtor-in-possession financing in order for TLO to temporarily stay in business. Ultimately, however, it was determined that the only reasonable course of action was to sell TLO's business and assets. TLO, through its attorney Mr. Furr, engaged a Court-approved investment banker who identified several potential buyers, one of which was TransUnion-TRADS.

4

These potential buyers, including TransUnion-TRADS, signed non-disclosure agreements and conducted due diligence. In October 2013, TransUnion-TRADS made a $105 million "stalking horse" bid for the sale and purchase of substantially all of TLO's assets, including the BOLT IP.[4] TLO chose TransUnion-TRADS as the stalking horse as it had made the highest and best offer at the time. On October 15, 2013, TLO filed a *Motion for Entry of Order: (I) Approving Procedures in Connection with the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Payment of Breakup Fee and Expense Reimbursement, (III) Setting Bid Deadline, Auction and Sale Approval Hearing Dates, (IV) Establishing Notice Procedures and Approving Forms of Notice, and (V) Approving Procedures Related to Assumption and Assignment of Executory Contracts and Unexpired Leases* (the "Bid Procedures Motion").[5] The Bid Procedures Motion (1) disclosed that the sale would be free and clear of all liens, claims, encumbrances and other interests in the acquired assets, with all liens, claims, encumbrances, and other interests to attach to the proceeds of the sale; (2) requested that an auction be held on November 20, 2013 (the "§ 363 Auction") and that a sale hearing be held on November 22, 2013 (the "Sale Hearing"); and (3) sought approval of bidding procedures.

---

[4] A *Notice of Filing of Stalking Horse APA* (ECF No. 389, Case No. 13-20853) was filed on November 1, 2013, in the TLO bankruptcy proceeding and was admitted into evidence at Trial, although not for its truth, as Exhibit 342.

[5] Pl.'s Ex. 291; *see also*, ECF No. 291, Case No. 13-20853 (as a result of an electronic filing error by the filing attorney, the Clerk re-docketed the Bid Procedures Motion at ECF No. 350).

After a hearing on the Bid Procedures Motion, the Court entered an Order on

October 24, 2013, approving the bid procedures, scheduling the § 363 Auction to take

place on November 20, 2013, and setting a hearing on November 22, 2013, to consider

approval of the sale to the successful bidder (the "Bid Procedures Order"). *See* Bid

Procedures Order.[6] The October 24, 2013, Bid Procedures Order also contained, in

pertinent part, the following provisions:

> 7. [TLO] is authorized to enter into an asset purchase agreement, on
> terms it deems reasonable after consultation with the Committee and
> Tech. Inc., with the Proposed Buyer, for the sale, <u>free and clear</u> of all
> liens, claims, liabilities, and other interests, of substantially all assets
> of [TLO] . . . provided, however, . . . the Sale pursuant to the Stalking
> Horse APA to the Proposed Buyer shall occur only if the Bankruptcy
> Court enters an order approving such Sale.
>
> . . .
>
> 13. <u>Objections to the transactions contemplated by the Sale</u> (a "Sale
> Objection") <u>shall (i) be filed with this Court and served on the Notice</u>
> <u>Parties, so as to be received on or before November 18, 2013</u> (the "Sale
> Objection Deadline"), at 5:00 p.m. (prevailing Eastern Time); (ii) be in
> writing and conform to the Federal Rules of Bankruptcy Procedure and
> the Local Rules of the Bankruptcy Court; (iii) set forth the name of the
> objecting party, the nature and amount of any claims or interests held
> or asserted against [TLO's] estate or properties, the basis for the
> objection and the specific grounds therefor; and (iv) be served so as to be
> received by the Sale Objection Deadline on all Notice Parties.
>
> 14. <u>The failure to file and serve a Sale Objection</u> by the Sale Objection
> Deadline <u>shall be a bar to the assertion thereof at the Sale Hearing or</u>
> <u>thereafter</u>.

Bid Procedures Order, ¶¶ 7, 13-14 (emphasis added). The Notice of Bid Deadline,

Auction, and Sale Hearing attached as Exhibit 1 to the Bid Procedures Order further

spelled out that "[TLO] intend[ed] to enter into an asset purchase agreement . . . for

---

[6] Pl.'s Ex. 308; *see also*, ECF No. 351, Case No. 13-20853.

the sale, <u>free and clear of all liens, claims, liabilities, and other interests, to the</u>
<u>maximum extent permitted by section 363 of the Bankruptcy Code</u>, of substantially
all assets of [TLO]." *Id.*, Ex. 1, ¶ 2 (emphasis added).

On November 1, 2013, TLO filed the *Motion for Order (I) Approving the Sale of*
*Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims,*
*Encumbrances and Other Interests (Other than Assumed Liabilities), (II) Approving*
*the Assumption and Assignment of Certain Executory Contracts and Unexpired*
*Leases; and (III) Granting Related Relief* (the "Sale Motion").[7] As Exhibit B to the
Sale Motion, TLO attached the stalking horse asset purchase agreement (the
"Stalking Horse APA") between TLO as the seller and TransUnion-TRADS as the
buyer. The Sale Motion provided that pursuant to the Stalking Horse APA, TLO
would "sell, transfer, convey, assign and deliver to the [successful bidder], at the
Closing . . . , free and clear of all Interests . . . , all of [TLO's] right, title and interest
throughout the world in and to all of the assets of [TLO] existing as of the Closing,
whether tangible or intangible, real, personal or mixed . . . (collectively, the "Acquired
Assets")." Sale Mot., ¶ 18(a). In relevant part, the Sale Motion identified the Acquired
Assets to include:

> ¶ 18(a)(ii). All (A) patents, patent applications, patent disclosures and
> all related continuation, continuation-in-part, divisional, reissue, re-
> examination, utility model, certificate of invention and design patents
> and patent applications, design registrations and applications for design
> registrations, (B) trademarks, service marks, logos, tradenames and
> corporate names and registrations and applications for registration
> thereof, (C) copyrights and registrations and applications for

---

[7] Pl.'s Exs. 341, 343; *see also*, ECF No. 388, Case No. 13-20853 (as a result of an electronic filing error
by the filing attorney, the Clerk re-docketed the Sale Motion at ECF No. 390).

registration thereof, including moral rights of authors, (D) <u>computer software and documentation, including all source code, object code and works-for-hire,</u> (E) trade secrets and confidential business information, whether patentable or non-patentable and whether or not reduced to practice, know-how, manufacturing and product processes and techniques, research and development information, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information, Data (defined below), internet domain name registrations, and internet protocol addresses, (F) <u>other proprietary rights relating to any of the foregoing (including, without limitation, remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions), and (G) copies and tangible embodiments thereof, including all books or records related thereto (collectively, "Intellectual Property"). The Intellectual Property shall include, but not be limited to, the items set forth on Schedule 1.1(a)(ii) to the Stalking Horse APA</u> (the "Intellectual Property Listing") which lists each patent, copyright registration, trademark, service mark, trade name and registration of a trademark, service mark or trade name and any other registration which has been issued to or is otherwise owned by [TLO] with respect to any of its Intellectual Property, identifies each pending patent, copyright, trademark, service mark or trade name application which [TLO] has made or is otherwise owned by [TLO] with respect to any of its Intellectual Property, identifies all computer software owned by [TLO], including names and functional descriptions of each software system and of each material component or module thereof, and identifies each license or other agreement pursuant to which [TLO] has granted any rights to any third party with respect to any of its Intellectual Property.

¶ 18(a)(iii). Any right that [TLO] has to sue for past, present or future infringement, misappropriation or violation of rights relating to the Intellectual Property and to retain any damages and profits due or accrued (the "Intellectual Property Claims").

¶ 18(a)(iv). Any right that [TLO] has (a) to collect royalties and other payments under or on account of any of the Intellectual Property and (b) to collect or receive royalties pursuant to 11 U.S.C. §365(n) . . . .

¶ 18(a)(v). All invention assignment agreements.

¶ 18(a)(vi). All books and records related to the Intellectual Property.

. . .

> ¶ 18(a)(viii). Any and all data and information (collectively, the "Data") licensed, obtained, or otherwise received, developed, generated or recorded, by [TLO], including but not limited to any and all copies, reproductions, embodiments or versions of any information or data (whether in electronic, human or machine readable or executable form or any other format) in the possession, custody or control of [TLO] or its representatives, or that [TLO] or its representatives otherwise has the right to access.

Sale Mot., ¶ 18(a); *see also*, Stalking Horse APA, Section 1.1(a). TLO attached a draft order approving the Sale Motion as Exhibit A to the Sale Motion and specifically requested that the Court's order approving the Sale Motion include the following provisions:

> ¶ 20(a). Technology Investors Inc. ("Tech. Inc.") and Michael Kuzy, as the personal representative of the estate of Hank Asher (the "Personal Representative" of the "Asher Estate") . . . , have acknowledged that all intellectual property or any of the other assets used or useful by [TLO] in the conduct of the Business of [TLO] (the "Business Assets"), which Business Assets were ever owned by Tech. Inc. or Hank Asher, were intended to be contributed to [TLO], and were so contributed. Tech. Inc. and the Personal Representative have further acknowledged that neither Tech. Inc. nor the Personal Representative, respectively, have any claim or interest whatsoever in any Business Assets. Accordingly, the sale of all Business Assets to the Buyer as a component of the Acquired Assets shall be free and clear of all and any interests of Tech. Inc. or the Asher Estate.

> ¶ 20(b). <u>To the extent that Ole Poulsen holds or asserts any interests of any kind in the [BParser code converter software] used or useful by [TLO] in the conduct of the Business (the "BParser Code") or any other Business Assets, such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold to the Buyer free and clear of all such interests</u> pursuant to section 363 (f) and/or 363 (h) of the Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole Poulsen has been provided notice of and an opportunity to object to and be heard with respect to the Sale and [he did not timely file an objection][any timely filed objection has been withdrawn or overruled].

Sale Mot., ¶ 20 (emphasis added). TLO represented in the Sale Motion that these provisions were "appropriate because [TLO] will cause all parties who allege an Interest in the Acquired Assets, including but not limited to the Asher Estate and Ole Poulsen, to be served with a copy of this Motion and the form of [Sale] Order. All such interested parties have also been provided notice of the Sale Hearing and all relevant deadline for objecting to the relief requested in this Motion." *Id.*, ¶ 21.

The Stalking Horse APA, attached to the Sale Motion as Exhibit B, contained extensive representations and warranties by TLO. *See* Sale Mot., Ex. B., Article II. These representations and warranties included, in pertinent part, the following:

> Section 2.5 <u>Ownership of Assets</u>. [TLO] is the true and lawful exclusive owner of, and has good title to, all of the assets (tangible or intangible) purported to be owned by it. [TLO] is now or prior to the Closing will be in possession of and have good title to, have valid leasehold interests in, or have other rights to use, in all rights, assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise, wherever situated) that are used in, or required or necessary for the conduct of the Business as presently conducted. All such rights, assets and properties are included in the Acquired Assets. [TLO] will be able, upon entry of the [Sale] Order, to transfer all right, title and interest in the Acquired Assets to Buyer, free and clear of any Security Interests or other Interests. No direct or indirect subsidiary or other Affiliate of [TLO] will, as of immediately prior to the Closing, own any rights, assets and properties of any kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise, wherever situated) that are used in the conduct of the Business. . . .
>
> Section 2.6 <u>Intellectual Property</u>.
>
> (a) *Ownership; Sufficiency*. Each item of Intellectual Property owned by [TLO], in whole or in part, including each item identified in

the Intellectual Property Listing[8] (the "Seller Owned Intellectual
Property"), and each item of Intellectual Property licensed to [TLO]
by any third party (the "Seller Licensed Intellectual Property" and,
collectively with the Seller Owned Intellectual Property, the "Seller
Intellectual Property") will be available for use by Buyer immediately
following the Closing on substantially identical terms and conditions as
it was immediately prior to the Closing without violating, infringing or
misappropriating any Intellectual Property rights of any Person. The
Seller Intellectual Property assigned to Buyer constitutes all
Intellectual Property necessary for Buyer (i) to develop, design, test,
modify, make, use, sell, have made, used and sold, import, reproduce,
correct, modify, enhance, create derivative works of, support, maintain,
market, distribute, commercialize, and otherwise make available
("Exploit") the Customer Offerings (defined below) in the manner so
done currently by [TLO], (ii) to Exploit the Software and Documentation
(as herein defined) and the computer, communications and network
systems (both desktop and enterprise-wide) used by [TLO] or to develop,
provide, distribute, support, maintain or test the Customer Offerings
("Internal Systems") as currently done by [TLO], and (iii) otherwise to
continue to operate, without interference or limitation, the Business in
the manner so operated currently by [TLO]. The Seller Intellectual
Property assigned and licensed to Buyer includes all systems and tools
required to be maintained by [TLO] pursuant to any Assigned Contract.
"Customer Offerings" shall mean with respect to [TLO] (a) the products
(including Software and Documentation) that [TLO] (i) currently
develops, markets, distributes, makes available, sells or licenses to third
parties, or (ii) currently plans to develop, market, distribute, make
available, sell or license to third parties in the future and (b) the services
and service offerings that [TLO] (i) currently provides or makes
available to third parties, or (ii) currently plans to provide or make
available to third parties in the future. The assets set forth in the
exhibits to the CPS Assignment are not currently used in the operation
of the Business and are used solely by [TLO] to make available to law
enforcement agencies certain internet monitoring services currently
offered by [TLO] without charge to law enforcement to identify and
investigate offenders who victimize children or use the Internet to
distribute child pornography (the "CPS Services").

. . .

(e) *Source Code.* Other than in the Ordinary Course of Business,
[TLO] has not licensed, distributed or disclosed, and Knows of no

---

[8] The Intellectual Property Listing is located at Schedule 1.1(a)(ii) of the Stalking Horse APA. The
Intellectual Property Listing identified TLOxp, the product marketed by TLO to consumers, and
numerous other computer applications and processes, which specifically included BOLT and BParser.

distribution or disclosure by others (including its employees and contractors) of, the Seller Source Code (defined below) to any Person, except pursuant to the agreements listed in Section 2.6(e) of the Disclosure Schedule, and [TLO] has taken all reasonable physical and electronic security measures to prevent disclosure of the Seller Source Code (defined below). No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both) will, or would reasonably be expected to, nor will the consummation of the transactions contemplated hereby, result in the disclosure or release of such Seller Source Code by [TLO] or escrow agent(s) or any other Person to any third party. "Seller Source Code" means the Software (defined below) included in the Customer Offerings or Internal Systems. "Software" means computer software code, applications, utilities, development tools, diagnostics, databases and embedded systems, whether in source code, interpreted code or object code form. "Documentation" means printed, visual or electronic materials, reports, white papers, documentation, specifications, designs, flow charts, code listings, instructions, user manuals, frequently asked questions, release notes, recall notices, error logs, diagnostic reports, marketing materials, packaging, labeling, service manuals and other information describing the use, operation, installation, configuration, features, functionality, pricing, marketing or correction of a product, whether or not provided to end user.

(f) *Authorship*. All of the Seller Intellectual Property assigned to Buyer comprising, incorporated in or bundled with the Customer Offerings or Internal Systems have been designed, authored, tested and debugged by (i) regular employees of [TLO] within the scope of their employment or by independent contractors of [TLO] who have executed valid and binding agreements expressly assigning all right, title and interest in such materials to [TLO], waiving their non-assignable rights (including moral rights) in favor of the Seller and its permitted assigns and licensees, and have no residual claim to such materials or (ii) owners of [TLO] that have executed valid and binding agreements expressly assigning all right, title and interest in such materials to [TLO], waiving their non-assignable rights (including moral rights) in favor of the Seller and its permitted assigns and licensees, and have no residual claim to such materials.

. . .

(h) *Employee and Contractor Assignments*. Each past and present employee of [TLO] and each past and present independent contractor of [TLO] has executed a valid and binding written agreement expressly assigning to [TLO] all right, title and interest in any inventions and works of authorship, whether or not patentable, invented, created,

12

developed, conceived and/or reduced to practice during the term of such
employee's employment or such independent contractor's work for
[TLO], and all Intellectual Property rights therein, and has waived all
moral rights therein to the extent legally permissible.[9]

*See* Sale Mot., Ex. B., Article II. Moreover, the Stalking Horse APA contained

numerous conditions to closing, one of which specifically provided that "the

representations and warranties [TLO] set forth in Article II (other than in Section

2.5) shall be true and correct in all material respects and the representations and

warranties of [TLO] in Section 2.5 <u>shall be true and correct in all respects</u>, in each

case as of the date of this Agreement and as of the Closing as though made as of the

Closing[.]" Sale Mot., Ex. B., Article V, § 5.1(d) (emphasis added).

Attached as Exhibit A to the Sale Motion was a proposed Order (I) Approving

the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens,

Claims, Encumbrances and Other Interests (Other than Assumed Liabilities), (II)

Approving the Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases, and (III) Granting Related Relief (the "Draft Sale Order"). The

Draft Sale Order contains the following provisions, in pertinent part:

S. [TLO] is the sole and lawful owner of the Acquired Assets. The
Acquired Assets constitute property of [TLO's] estate, and title thereto
is vested in [TLO's] estate within the meaning of section 541(a) of the
Bankruptcy Code. The Sale of the Acquired Assets to the Buyer will be,
as of the Closing, a legal, valid and effective transfer of such assets, and
shall, at Closing, vest the Buyer with all right, title and interest to the
Acquired Assets, with any Interests to attach to the consideration to be
received by [TLO] in the same priority and subject to the same defenses
and avoidability, if any, as of the Closing. The Buyer would not enter
into the Stalking Horse APA to acquire the Acquired Assets if the sale

---

[9] Section 2.6(f) of the Disclosure Schedules provided, however, that "Hank Asher (deceased) and Ole
Poulsen, as owners of [TLO] did not execute agreements expressly assigning all right, title and interest
in all materials to [TLO]. Ole Poulsen was an employee of [TLO]." Sale Mot., Ex. B, Disclosure
Schedules.

13

of the Acquired Assets were not free and clear of all Interests (other than the Assumed Liabilities), or if the Buyer would, or in the future could, be liable on account of any such Interests. . . .

T. [TLO] may sell, convey and assign the Acquired Assets to the Buyer free and clear of all Interests, because, with respect to each creditor or entity that holds an Interest in the Acquired Assets, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)-(5) has been satisfied. Those holders of Interests who did not object or who withdrew their objections to the Sale are deemed to have consented to the Sale Motion and Sale of the Acquired Assets to the Buyer pursuant to Bankruptcy Code section 363(f)(2). Those holders of Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f), which subsections [TLO] has satisfied.

. . .

V. Without limiting the generality of the foregoing, <u>to the extent that Ole Poulsen holds or asserts any interests of any kind in the [BParser code converter software] used or useful by [TLO] in the conduct of the Business (the "BParser Code") or any other Business Assets, such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold to the Buyer free and clear of all such interests pursuant to section 363 (f) and/or 363 (h)</u> of the Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole Poulsen has been provided notice of and an opportunity to object to and be heard with respect to the Sale and [he did not timely file an objection] [any timely filed objection has been withdrawn or overruled].

*See* Sale Mot., Ex. A, ¶¶ S − V (emphasis added). TLO and TransUnion-TRADS specifically negotiated for the inclusion of these provisions in the Draft Sale Order, and Mr. Furr and Philip D. Anker, counsel for TLO and TransUnion-TRADS, respectively, discussed the need for these provisions in order to address Poulsen's potential claim of ownership of the BOLT IP.

On November 4, 2013, the Clerk of Court issued a *Notice of Hearing* (ECF No. 391, Case No. 13-20853) with respect to the Sale Motion, scheduling a preliminary hearing for November 5, 2013, at 1:30 PM. Although the November 5, 2013, hearing

was a preliminary hearing, TLO disclosed Poulsen's potential claim of ownership of the BOLT IP to the Court at that hearing.[10] The November 5, 2013, hearing was also scheduled pursuant to the Bid Procedures Order to allow any objections to the Stalking Horse APA to be heard. Poulsen did not appear at the November 5, 2013, hearing, and no objections to the Stalking Horse APA were filed. *Id.*

Thereafter, on November 20 and 21, 2013, the § 363 Auction to sell substantially all of TLO's assets was conducted. After receiving multiple bids over the course of the nearly 24-hour-long auction, TransUnion-TRADS emerged as the bidder who made the highest and best offer, and the final sale price was set at $154 million. The Court conducted a final hearing on the Sale Motion on November 22, 2013. Numerous objections to the Sale Motion were filed, and the Court heard and ruled on those objections at the November 22, 2013, hearing. Poulsen, however, *did not* file an objection to the Sale Motion and did not appear at the November 22, 2013, hearing on the Sale Motion. At the Sale Hearing, the Court received evidence showing that TLO claimed ownership of the BOLT IP and intended to sell the BOLT IP free and clear of any claims or interests.[11] At the end of the Sale Hearing, the Court specifically found that there was no evidence that TransUnion-TRADS acted in bad

---

[10] *See* Ex. 351, Nov. 5, 2013 Hr'g Tr.

[11] The transcript of the November 22, 2013, Sale Hearing was admitted into evidence at Trial as Plaintiff's Exhibit 371. The evidence admitted at the Sale Hearing included separate sworn declarations by Ms. Asher and Ms. Yoost stating that: "The Assets to be sold (the 'Acquired Assets') pursuant to the Sale Motion are generally set forth in Section 1.1(a) of the Stalking Horse APA, which was attached to the Sale Motion." The declarations thus expressly incorporated the Stalking Horse APA, which included several representations that TLO owned the BOLT IP. These declarations were also admitted into evidence at Trial, although not for their truth, as Plaintiff's Exhibits 489 and 480, respectively.

faith and approved the proposed sale as requested, with the only qualification being that the sale be "in accordance with all of the various concessions that [Mr.] Anker made on the record."[12] These concessions related to objections which were raised at the Sale Hearing, none of which were raised by Poulsen or related to TLO's ownership of or ability to sell the BOLT IP.[13] The Court instructed Mr. Furr to circulate the proposed order approving the sale to "all counsel that were raising objections, that were resolved through . . . Mr. Anker's presentation" and to counsel for the backup bidder.[14] Mr. Furr testified at Trial that he did circulate the proposed order in accordance with the Court's instructions and that there were no significant objections to the form of the proposed order.[15] With respect to issues relevant to the Court here, the proposed order ultimately uploaded by Mr. Furr was virtually identical to the Draft Sale Order.

Subsequently, the Court entered the *Order (I) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests (Other than Assumed Liabilities), (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Order") (ECF No. 610, Case No. 13-20853)[16] on December 13, 2013. The Sale Order contains the following relevant

---

[12] Pl.'s Ex. 371, 185:4-14.

[13] The objections raised at the Sale Hearing are reflected in the Plaintiff's Exhibit 371.

[14] Pl.'s Ex. 371, 185:15-18, 186:3-8.

[15] Tr. Vol. I, 147:13-25.

[16] Pl.'s Ex. 374.

findings of fact:

C.      [TLO] has provided timely, adequate, and sufficient notice of the Sale Motion and the relief sought therein[.] . . .

. . .

H.      . . . [TransUnion-TRADS] is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code with respect to the Sale of the Acquired Assets.

. . .

S.      [TLO] is the sole and lawful owner of the Acquired Assets. The Acquired Assets constitute property of [TLO]'s estate, and title thereto is vested in [TLO's] estate within the meaning of section 541(a) of the Bankruptcy Code. . . . [TransUnion-TRADS] would not enter into the Stalking Horse APA to acquire the Acquired Assets if the sale of the Acquired Assets were not free and clear of all Interests[.] . . .

T.      [TLO] may sell, convey and assign the Acquired Assets to [TransUnion-TRADS] free and clear of all Interests, because, with respect to each creditor or entity that holds an Interest in  the Acquired Assets, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)-(5) has been satisfied. Those holders of Interests who did not object or who withdrew their objections to the Sale are deemed to have consented to the Sale Motion and Sale of the Acquired Assets to [TransUnion-TRADS] pursuant to Bankruptcy Code section 363(f)(2).

V.      Without limiting the generality of the foregoing, <u>to the extent that Ole Poulsen holds or asserts any interests of any kind in the BParser code converter software used or useful by [TLO] in the conduct of the Business (the "BParser Code") or any other Business Assets, such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold to [TransUnion-TRADS] free and clear of all such interests</u> pursuant to section 363 (f) and/or 363 (h) of the Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole Poulsen has been provided actual notice of and an opportunity to object to and be heard with respect to the Sale and he did not timely file an objection.

Sale Order, 4, 7, 10-12 (emphasis added). The Sale Order goes on to order and adjudge, in relevant part, that:

1.      The relief requested in the Sale Motion is granted in its entirety.

2.      All objections and responses, whether filed or asserted in open Court, to the Sale Motion, this Order or the relief requested (including the assumption and assignment of all Assigned Contracts) herein that have not been overruled, withdrawn, waived, settled or otherwise resolved, are hereby overruled and denied on the merits with prejudice. . . .

3.      Notice of the Sale Motion, the Auction, and the Sale Hearing (including without limitation, the notice provided by the Sale Notice . . .) was fair and equitable under the circumstances and complied in all respects with Bankruptcy Code sections 102(1), 363 and 365, Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007 and Local Rule 6004-1.

. . .

5.      The Stalking Horse APA and the Sale pursuant to the Stalking Horse APA are hereby approved and authorized in all respects[.] . . .

6.      [TransUnion-TRADS] is a good faith purchaser of the Acquired Assets, free and clear of Interests, and is hereby granted and entitled to all of the protections provided to such a good faith purchaser under section 363 of the Bankruptcy Code, and shall be entitled to such protection even before this Order becomes final and non-appealable. Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of the Sale or any sale, transfer or assignment under the Stalking Horse APA or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing), and notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment shall be governed in all respects by the original provisions of this Order or the Stalking Horse APA, as the case may be.

7.      The Sale approved by this Order is not subject to avoidance or any recovery or damages pursuant to section 363(n) of the Bankruptcy Code.

18

Case 1:14-01739-PGH Doc 473 Filed 08/26/16 Page 19 of 82

. . .

12.     The Sale of the Acquired Assets and the assumption and
assignment of the Assigned Contracts to [TransUnion-TRADS] shall
vest [TransUnion-TRADS] with all right, title and interest of [TLO] to
the Acquired Assets free and clear of any and all Interests and other
liabilities of any kind or nature whatsoever . . . , however imposed, with
any such Interests to attach only to the proceeds of the Sale of the
Acquired Assets with the same priority, validity, force, and effect as they
now have in or against the Acquired Assets.

. . .

14.     The filing of the Sale Motion and the service of the Sale Notice
and the Notice of Assignment and Cure in accordance with the Bidding
Procedures Order shall be deemed to provide sufficient notice as to the
Sale of the Acquired Assets free and clear of all Interests in accordance
with Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1. Following
the Closing, no holder of any Interest with respect to the Acquired Assets
may interfere with [TransUnion-TRADS's] use and enjoyment of the
Acquired Assets based on or related to such Interest, or any actions that
[TLO] may take in the Chapter 11 Case and, after the Closing, no
interested party may take any action to prevent, interfere with or
otherwise enjoin consummation of the Sale or other transactions
contemplated by this Order.

. . .

47.     The Stalking Horse APA shall not be subject to rejection or
avoidance under any circumstances. This Order and the Stalking Horse
APA shall inure to the benefit of [TLO], its estate, creditors,
[TransUnion-TRADS] and its respective successors and assigns.

. . .

51.     This Court shall retain jurisdiction to (a) interpret, implement
and enforce the terms and provisions of this Order, the Bidding
Procedures Order, and the Stalking Horse APA, including all
amendments thereto and any waivers and consents thereunder and each
of the agreements executed in connection therewith, in all respects, and
(b) to decide any disputes concerning this Order, the Bidding Procedures
Order or the Stalking Horse APA, or the rights and duties of the parties
hereunder or thereunder or any issues relating to the Stalking Horse
APA, the Bidding Procedures Order or this Order including, but not

limited to, . . . all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets to [TransUnion-TRADS] free and clear of all Interests.

*Id.* at 16-22, 37, 39. Poulsen has not sought reconsideration of or appealed the Sale Order, and the Sale Order is final.

## IV.    <u>Notice of the § 363 Sale</u>

For the following reasons, the Court finds that Poulsen received adequate notice of every critical motion and hearing in connection with the § 363 sale of substantially all of TLO's assets, including the BOLT IP.

### *A. Poulsen's Address*

Prior to the Petition Date, Mr. Furr sent an email to Derek Dubner,[17] then TLO's General Counsel, requesting the mailing addresses for TLO's equity interest holders. Mr. Dubner forwarded this request to Daniel MacLachlan,[18] then TLO's CFO. Mr. MacLachlan responded, emailing Mr. Furr a list of equity holders, which included Poulsen. According to the list emailed to Mr. Furr by Mr. MacLachlan, Poulsen's mailing address was 2633 South Ocean Boulevard, Highland Beach, Florida 33487.[19] According to their testimony at Trial, neither Mr. Dubner nor Mr. MacLachlan ever provided Mr. Furr or anyone at Furr & Cohen with a different mailing address for Poulsen.

---

[17] Mr. Dubner is now the CEO of TBO.

[18] Mr. MacLachlan is now the CFO of TBO.

[19] Pl.'s Ex. 179.

Mr. Furr and Furr & Cohen used the list provided by Mr. MacLachlan to create both the mailing matrix for TLO's bankruptcy petition and the mailing matrix for TLO's equity holders. Specifically, Barbara Nasralla, a legal assistant at Furr & Cohen, entered the information contained in this list into the Best Case software program[20] to compile the list of equity holders. At Trial, Ms. Nasralla explained that when entering Poulsen's, or any other creditor's or equity holder's, address into the Best Case program, the Best Case program directs you to enter the appropriate zip code immediately after entering the street address without entering the city or the state. After entering the zip code, the Best Case program then automatically populates the city and state portion of the address. Ms. Nasralla explained that for this reason, Poulsen's address on the equity holders mailing matrix is listed as 2633 South Ocean Boulevard, Boca Raton, Florida 33487, rather than Highland Beach, Florida.[21]

In March 2013—more than one month prior to Petition Date and six months before the filing of the Sale Motion—Poulsen moved to Bend, Oregon,[22] where his mailing address was, and still is, 18800 Bull Springs Road, Bend, Oregon 97701. Poulsen, however, did not request that Furr & Cohen update his address from Florida to Oregon until November 13, 2013, when he emailed Alvin Goldstein, an attorney

---

[20] Best Case is a software program used by bankruptcy practitioners throughout the country to prepare bankruptcy petitions and schedules.

[21] Tr. Vol. I, 207:18-209:3, 210:10-18.

[22] Mr. MacLachlan knew prior to the Petition Date that Poulsen moved to Oregon in March 2013. However, Mr. MacLachlan still provided Poulsen's Florida mailing address to Mr. Furr and Furr & Cohen. Mr. MacLachlan never provided Furr & Cohen an updated address for Poulsen.

with the office of Furr & Cohen, requesting that Mr. Goldstein update his mailing address from "2633 S Ocean Blvd" to the Bend, Oregon address listed above.[23] Poulsen never filed an official notice of change of address with the Court pursuant to Bankruptcy Rule 2002(g).

### B. Certificates of Service Regarding Sale-Related Filings

TLO retained two outside vendors to serve documents in the TLO bankruptcy proceeding. These two outside vendors were BK Attorney Services ("BKAS") and Epiq Bankruptcy Solutions, LLC ("Epiq"). According to the testimony at Trial of its owner Jay Jump,[24] BKAS is an authorized and official third-party servicing provider for the Bankruptcy Court system. BKAS acts as a servicing agent in thousands of bankruptcy cases nationwide. Similarly, Epiq is a nationally-known bankruptcy servicing provider.

### i. The Bid Procedures Motion

As discussed above, on October 15, 2013, TLO filed the Bid Procedures Motion. One day later, on October 16, 2013, TLO filed a *Certificate of Service* (the "Bid Procedures Motion COS") (ECF No. 302, Case No. 13-20853) with respect to the Bid Procedures Motion, the *Order Granting Motion to Shorten Time to Notice Hearing on the Bid Procedures Motion* (the "Order Shortening Time") (ECF No. 297, Case No. 13-20853), and several other filings not relevant here. TLO utilized BKAS to serve these

---

[23] *See* Poulsen-Goldstein Email, Pl.'s Ex. 362; Tr. Vol. I, 228:19-229:18.

[24] Mr. Jump testified at Trial *via* a pre-recorded video-taped deposition. TransUnion-TRADS designated certain portions of the deposition as its direct examination of Mr. Jump, and TBO cross-designated certain portions of the deposition as its cross examination of Mr. Jump.

documents. The Bid Procedures Motion COS was signed by Mr. Jump and certified that the Bid Procedures Motion and the Order Shortening Time "were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein." Bid Procedures Mot. COS, 5. Poulsen was not listed on the mailing matrix attached to the Bid Procedures Motion COS.

ii. The Bid Procedures Order

As indicated above, the Bid Procedures Order scheduled, among other things, the § 363 Auction for November 20, 2013, and the final hearing on the Sale Motion for November 22, 2013. TLO filed a *Certificate of Service* (the "Bid Procedures Order COS")[25] with respect to the Bid Procedures Order on October 29, 2013. The Bid Procedures Order COS certified that on October 28, 2013, through BKAS, the Bid Procedures Order "[was] deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein." Bid Procedures Order COS, 5. Poulsen was listed on the mailing matrix at the following address: "2633 SO OCEAN BLVD, BOCA RATON, FL 33487." *Id*. at 9.

According to Mr. Jump's testimony, the return address on each of the envelopes mailed by BKAS in the TLO case was the address of the offices of Furr & Cohen.

---

[25] Pl.'s Exs. 322, 323; *see also*, ECF No. 369, Case No. 13-20853.

Thus, if any mail sent out by BKAS was returned as undeliverable, it would have been returned to the offices of Furr & Cohen. Mr. Goldstein testified at Trial that nothing served on Poulsen by BKAS was returned as undeliverable to Furr & Cohen.[26] The Court finds Mr. Goldstein's testimony to be credible.

### iii. The Sale Motion and the Stalking Horse APA

On November 4, 2013, TLO filed a *Certificate of Service* (the "Sale Motion COS")[27] with respect to the Sale Motion and the Notice of Filing of Stalking Horse APA. The Sale Motion COS certified that through BKAS on November 4, 2013, the Sale Motion, along with its exhibits, and the Notice of Filing of Stalking Horse APA "were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein." Sale Mot. COS, 1. Poulsen was listed on the mailing matrix at the following address: "2633 SO OCEAN BLVD, BOCA RATON, FL 33487." *Id.* at 2.

Mr. Jump identified a copy of the Sale Motion COS, which was kept as a business record[28] of BKAS, and testified that he signed the Sale Motion COS and that he caused the Sale Motion, along with its exhibits, and the Notice of Filing of Stalking Horse APA to be mailed with adequate postage to each person or entity listed on the

---

[26] Tr. Vol. I, 300:23-301:22, 303:3-21.

[27] Pl.'s Ex. 345; *see also*, ECF No. 400, Case No. 13-20853.

[28] Pl.'s Ex. 348. The Sale Motion COS was referred to as Exhibit 16 in the video-taped deposition of Mr. Jump.

mailing matrix. Specifically, Mr. Jump testified that he caused copies of the Sale Motion, along with its exhibits, and the Notice of Filing of Stalking Horse APA to be mailed to Poulsen at 2633 South Ocean Boulevard, Boca Raton, Florida 33487. As noted above, Mr. Goldstein testified at Trial that nothing served on Poulsen by BKAS was returned as undeliverable to Furr & Cohen.[29]

### iv. The Notice of Preliminary Hearing on the Sale Motion

On November 4, 2013, TLO filed a *Certificate of Service* (the "Sale Motion NOH COS")[30] with respect to the Notice of Hearing on the Sale Motion. The Sale Motion NOH COS certified that through BKAS, the Notice of Hearing on the Sale Motion "[was] deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein." Sale Motion NOH COS, 1. Poulsen was listed on the mailing matrix at the following address: "2633 SO OCEAN BLVD, BOCA RATON, FL 33487." *Id.* at 2. At Trial, Mr. Jump identified a copy of the Sale Motion NOH COS as a certificate of service produced by his company BKAS.

### v. The Sale Order

After the Court entered the Sale Order on December 13, 2013, TLO filed a *Certificate of Service* (the "Sale Order COS")[31] with respect to the Sale Order. The

---

[29] Tr. Vol. I, 300:23-201:22.

[30] Pl.'s Ex. 346; *see also,* ECF No. 401, Case No. 13-20853. The Sale Motion NOH COS was referred to as Exhibit 17 in the video-taped deposition of Mr. Jump.

[31] Pl.'s Ex. 391; *see also*, ECF No. 694, Case No. 13-20853. The Sale Order COS was referred to as Exhibit 6 in the video-taped deposition of Regina Amporfro.

Sale Order COS reflects that Epiq served the Sale Order on behalf of TLO on January 17, 2014,[32] and Pete Caris, a Noticing Supervisor at Epiq at the time, certified that he served the Sale Order "by causing true and correct copies to be enclosed securely in separate postage pre-paid envelopes and delivered via first class mail to those parties listed on the annexed Exhibit A." Sale Order COS, 1. Poulsen was listed on Exhibit A at the following address: "18800 BULL SPRINGS ROAD BEND OR 97701." *Id.*, Ex. A., 16. Poulsen was served with the Sale Order at his Oregon address because, as previously noted, during the time between service of the Sale Motion and service of the Sale Order, Poulsen emailed Mr. Goldstein to request that his mailing address be changed from his Florida address to his Oregon address.

At Trial, one of Epiq's employees, senior case manager and team lead Regina Amporfro,[33] identified the Sale Order COS and confirmed that it was signed by Mr. Caris. Ms. Amporfro testified that Mr. Caris was diligent in his work and to her knowledge, never falsely executed a declaration that he effected service of a document. Based on the Sale Order COS and Epiq's procedures, Ms. Amporfro testified that Poulsen was in fact served with the Sale Order at his Oregon address and that the service mailed to Poulsen was not returned as undeliverable.

Mr. Goldstein testified at Trial that although undeliverable mailings sent by BKAS would be returned to Furr & Cohen as Furr & Cohen's address was listed as

---

[32] Mr. Goldstein testified at Trial that due to an intra-office error at Furr & Cohen resulting from the Christmas holidays and staff vacations, the December 13, 2013, Sale Order was not served until January 17, 2014.

[33] Ms. Amporfro testified at Trial *via* a pre-recorded video-taped deposition. TransUnion-TRADS designated certain portions of the deposition as its direct examination of Ms. Amporfro.

the return address, undeliverable mailings sent by Epiq would be returned to Epiq as Epiq used its own mailing address as the return address on its mailings. Mr. Goldstein further testified that he inquired with Epiq on three separate occasions, including in October 2014, as to the existence of any returned mail and that nothing in Epiq's response indicated that the mailing to Poulsen containing the Sale Order was returned as undeliverable.[34]

The Court finds the testimony of Ms. Amporfro and Mr. Goldstein to be credible on this issue despite Poulsen's testimony that he never received the Sale Order.

<u>vi. Summary</u>

The following represent the critical documents related to the § 363 sale. All were mailed to Poulsen at either his Florida address or his Oregon address.

**Sent to 2633 South Ocean Boulevard, Boca Raton, Florida 33487:**

1. <u>The Bid Procedures Order COS</u>

   - Served by BKAS on October 28, 2013;
   - Scheduled a November 5, 2013, hearing to allow any objections to the Stalking Horse APA to be heard;
   - Scheduled the § 363 Auction for November 20, 2013; and
   - Scheduled the final hearing on the Sale Motion for November 22, 2013.

2. <u>The Sale Motion</u>

   - Served by BKAS on November 4, 2013;

---

[34] Tr. Vol. I, 305:21-306:8 (Mr. Goldstein testifying: "We had contacted Epic [sic], I believe on three separate occasions requesting that they advise us on whether or not they received anything back from Ole Poulsen. Over the course of probably close to a year, Epic [sic] consistently told us, no, they had not received anything back."); Tr. Vol. II, 372:3-378:7.

- Identified the assets to be sold, the "Acquired Assets" to include the BOLT IP;[35]
- Contained a summary of the Stalking Horse APA; and
- Included a copy of the Draft Sale Order, which contained a provision specifically addressing Poulsen's potential claim of ownership of the BOLT IP and which provided that the sale would be "free and clear" of any such claim by Poulsen.

3. The Stalking Horse APA

- Served by BKAS on November 4, 2013;
- Attached to the Sale Motion as Exhibit B; and
- Contained extensive representations and warranties by TLO, including that:
    i. TLO owned all of the Acquired Assets, including the Intellectual Property, which encompassed the BOLT IP;
    ii. TLO owned, specifically, all of the Intellectual Property;
    iii. TLO owned, specifically, the Source Code;
    iv. All the Intellectual Property was authored by TLO employees or owners; and
    v. Poulsen was an employee of TLO.

4. The Notice of Preliminary Hearing on the Sale Motion

- Served by BKAS on November 4, 2013;

**Sent to 18800 Bull Springs Road, Bend, Oregon 97701:**

5. The Sale Order

- Served by Epiq on January 17, 2013;
- Made the following relevant findings of fact:
    i. TLO provided timely, adequate, and sufficient notice of the Sale Motion and the relief sought therein;
    ii. TransUnion-TRADS is a "good faith purchaser" entitled to the full benefits and protections of § 363(m) with respect to the Acquired Assets;

---

[35] The Sale Motion, the Stalking Horse APA, and the Sale Order refer to the intellectual property at issue as the "BParser Code." However, as noted earlier, for simplicity's sake, the Court refers collectively to BOLT, BParser, the scripts written in BOLT, the BParser source code, the BParser executable version, and the runtime library as the "BOLT IP."

      iii.  TLO is the sole and lawful owner of the Acquired
Assets (defined to include the BOLT IP);

      iv.  TransUnion-TRADS would not purchase the
Acquired Assets if the sale was not free and clear of
all interests;

      v.  TLO may sell, convey, and assign the Acquired
Assets to TransUnion-TRADS free and clear of all
interests;

      vi.  To the extent Poulsen holds or asserts any interest
in the BOLT IP, the BOLT IP shall be deemed an
Acquired Asset and may be sold free and clear of
Poulsen's interest pursuant to § 363(f) or (h).

- Overruled numerous objections to the sale;
- Concluded that TransUnion-TRADS was a "good faith
purchaser" as a matter of law; and
- Contained the Amended and Restated Asset Purchase
Agreement.

The Certificates of Service with respect to these documents reflect that TLO mailed
Poulsen all of the critical documents related to the § 363 sale. The testimony of Mr.
Goldstein, Mr. Jump, and Ms. Amporfro confirms that, as reflected in the Certificates
of Service, mailings containing these documents were in fact sent to Poulsen.

### C. Poulsen's Receipt of Mail Addressed to Him at the Florida Address

As discussed below, the evidence shows that while living in Oregon, Poulsen
received mail addressed to his Florida address.

### i. Mail Forwarding by the United States Postal Service

On March 20, 2013, Poulsen submitted, *via* an online form located on the
website of the United States Postal Service (the "Postal Service""), a change of
address request. Through this request Poulsen sought a change of address to begin
on March 28, 2013. This request was confirmed *via* email dated March 22, 2013, from

the Postal Service (addresschange@usps.gov) to Poulsen (ole367p@gmail.com).[36] This confirmation email specifically advised Poulsen to "make sure to notify other important parties of [his] change of address" and that "mail forwarding only covers . . . mail for a period of up to 12 months." A declaration (the "First Wilson Declaration") from James D. Wilson, Manager of Address Management for the Postal Service, also confirms that Poulsen requested that his address be changed effective March 28, 2013, from "2633 S Ocean Blvd, Highland Beach, FL 33487 to the new address of 18800 Bull Springs Rd, Bend OR 97701."[37] First Wilson Decl., 1. Finally, Poulsen himself confirmed at Trial that he requested that his address be changed in March 2013 from his Florida address to his Oregon address and that his mail be forwarded accordingly.[38]

The following demonstrate that whether addressed to Highland Beach or Boca Raton, the Postal Service did indeed forward mail which was addressed to Poulsen at his Florida address to his Oregon address.

> *a. The Sale Motion*

As previously discussed, BKAS, on behalf of TLO, served the Sale Motion on all interested parties. *See* Sale Mot. COS. The Sale Motion COS certified that on November 4, 2013, the Sale Motion, along with its exhibits and the Notice of Filing of

---

[36] Pl.'s Ex. 160.

[37] The Pl.'s Ex. 452. Attached to the First Wilson Declaration and acknowledged by Mr. Wilson as a regularly-kept business record is the Postal Service's change of address or forwarding request record regarding Poulsen.

[38] Tr. Vol. VI, 1408:6-1409:1.

Stalking Horse APA, was served on Poulsen at "2633 SO OCEAN BLVD, BOCA RATON, FL 33487." *Id.* at 2. Although by this time Poulsen had moved from Florida to Oregon, the evidence shows that Poulsen presumably received the Sale Motion.

The return address listed on the envelope mailed by BKAS was the address of Furr & Cohen's office, and Mr. Goldstein testified at Trial that the envelope was not returned as undeliverable to Furr & Cohen. Moreover, the evidence shows that Poulsen had mail forwarding in place with the Postal Service at the time the Sale Motion was served. Poulsen's mail forwarding was effective for one year—from March 28, 2013, through March 27, 2014. BKAS served the Sale Motion on November 4, 2013.

At the time it served the Sale Motion, BKAS used—and still uses—a postal sorting system called "the Bell and Howell elevate postal sorting system" (the "B&H System"). According to the testimony of Mr. Jump, the B&H System scans each envelope that BKAS designates for mailing, verifies the address on the envelope against the Postal Service's move-update database, and "sprays"[39] an intelligent mail barcode (an "IMB") on the envelope.[40] The IMB contains, among other information about the mailing, the recipient's address.[41] If the addressee on the envelope had completed a change of address form with the Postal Service, as Poulsen had, it was

---

[39] After being checked by the first camera in the B&H System, the address information is digitized and run through a database. Tr. Vol. II, 461:8-25. The envelope is then sent back to the "print sprayer," and "the print sprayer will print the new or changed address information in [IMB] code format on the front of the envelope." *Id.* at 461:19-25.

[40] Tr. Vol. II, 457:4-24.

[41] Tr. Vol. II, 458:2-459:6.

part of the move-update database, and the IMB sprayed on the envelope would have

reflected the new address:

> Q [Mr. Anker]: . . . Do you . . . have an understanding as to whether, if an individual fills out a change of address form with the postal service, and it is processed by the postal service, that change of address becomes part of the move update database?
>
> A [Mr. Jump]: That is my understanding, yes.
>
> Q: Okay. So let's assume that was the case here, would the envelope then not have gone out with the address as it was on the certificate of service, 263 South Ocean Boulevard, Boca Raton?
>
> A: The address that was on the envelope, that was printed on the envelope by our printer, would have been the Boca Raton address, 26 -- whatever it was, 2633 South something.
>
> Q: South Ocean Boulevard.
>
> A: South Ocean Boulevard. So the envelope that left our office had that address on the front of the envelope as the destination address, that's what came off of our printer.
> When we dropped it into the postal sorting system, at that point it got run through the USPS move update database, and the IMB Code was sprayed on there, and if he had a return of address or a change of address card in the system, then the proper IMB information reflecting that change should have been sprayed on the bottom of the envelope.

Tr. Vol. II, 460:5-461:7. The Postal Service would have then read the IMB on the

envelope and sent the mail directly to Poulsen at his Oregon addrss.[42] Mr. Jump

testified that the B&H System was regularly tested and certified as functioning

properly and that BKAS never received any complaints that the B&H System it used

did not work properly.[43]

---

[42] Tr. Vol. II, 462:5-10.

[43] Tr. Vol. II, 475:1-13.

It is undisputed that BKAS used the B&H System in connection with the mailing of the Sale Motion to Poulsen.[44] Because Poulsen had a mail forwarding request active with the Postal Service in November 2013, the IMB sprayed on the envelope enclosing the Sale Motion would have reflected Poulsen's Oregon address. Therefore, the Postal Office would have scanned the IMB and sent the envelope to Poulsen directly at the Oregon address.

### b. The Disclosure Order

The evidence suggests that after he moved to Oregon, Poulsen received the *Order (I) Setting Hearing to Consider Approval of Disclosure Statement; (II) Setting Deadline for Filing Objections to Disclosure Statement; and (III) Directing Plan Proponent to Serve Notice* (the "Disclosure Order")[45] which was mailed to him at the Boca Raton address on November 6, 2013.

The Disclosure Order directed TLO to serve the Disclosure Order on, among others, "all equity security holders," which included Poulsen. *See* Disclosure Order, 3. Section 3(B) of the Disclosure Order instructed TLO to serve the Disclosure Statement[46] and the Plan[47] on "any party in interest who requests in writing a copy of the [D]isclosure [S]tatement and [P]lan[.]" Disclosure Order, 3. Thus, in accordance with the Disclosure Order, Epiq, on behalf of TLO, mailed Poulsen the Disclosure

---

[44] Tr. Vol. II, 467:17-468:19.

[45] Pl.'s Ex. 344; *see also*, ECF No. 397, Case No. 13-20853.

[46] The "Disclosure Statement" refers to TLO's *Disclosure Statement* (ECF No. 378, Case No. 13-20853).

[47] The "Plan" refers to TLO's *Plan of Liquidation* (the "Plan") (ECF No. 377, Case No. 13-20853).

Order, but did not mail Poulsen the Plan or the Disclosure Statement.[48] Shortly thereafter, on November 13, 2013, Poulsen emailed Mr. Goldstein and requested copies of the Plan and the Disclosure Statement as directed by the Disclosure Order.[49]

Poulsen testified at Trial that he did not receive the Disclosure Order and instead requested the Plan and the Disclosure Statement based on conversations he had with other equity holders.[50] However, when considered in conjunction with the other evidence, the Court does not find Poulsen's testimony on this issue to be credible. Instead, the Court finds that Poulsen received the Disclosure Order in the mail, read the Disclosure Order, noticed that the envelope containing the Disclosure Order was addressed to his Florida address, and subsequently emailed Mr. Goldstein to request copies of the Plan and the Disclosure Statement and to instruct Mr. Goldstein that his address should be changed to the Oregon address.

c. *The Poulsen Chart*

Poulsen's attorney, Luis Salazar, created a spreadsheet purportedly reflecting every document Poulsen received in connection with the TLO bankruptcy proceeding. *See* Poulsen Spreadsheet, Poulsen's Ex. A. Chronologically, the first document on this spreadsheet is an *Order* (ECF No. 598, Case No. 13-20853), unrelated to the § 363

---

[48] The *Certificate of Service* (the "Disclosure COS") (ECF No. 435, Case No. 13-20853) on the Plan, the Disclosure Statement, and the Disclosure Order prepared by Epiq on November 6, 2013 on behalf of TLO indicates that the Plan and the Disclosure Statement were served on the parties listed on Exhibit A and that the Disclosure Order was served on the parties listed on Exhibit B. *See* Disclosure COS, Pl.'s Ex. 354, 1. Exhibit A to the Disclosure COS does not include Poulsen. *Id*. at 4. Exhibit B, however, does include Poulsen. *Id*. at 10.

[49] *See* Poulsen-Goldstein Email, Pl.'s Ex. 362.

[50] Tr. Vol. VII, 1658:15-1660:7.

sale, dated December 11, 2013. *Id*. at 1. This Order was entered nearly one month after Poulsen emailed Mr. Goldstein requesting that his address be changed to the Oregon address. However, Poulsen testified at Trial that he received documents related to the TLO bankruptcy proceeding prior to December 11, 2013, and that he retained every document he received. These documents are not reflected on the Poulsen Spreadsheet, a fact which Poulsen could not explain at Trial:

> Q [by Mr. Anker]: So your testimony is that before . . . December 11, 2013, . . . you didn't throw anything out, you retained it all, it's your testimony under oath, [that] not one single document got forwarded to you? Is that your testimony?
>
> A: No. I just told you that some documents got forwarded and some got sent directly to my address [in Oregon].
>
> . . .
>
> Q: . . . Is it your testimony that before December 11, 2013, not a single piece of paper in this bankruptcy addressed to you in Florida got forwarded to you in Oregon?
>
> A: No. I'm not saying that.
>
> . . .
>
> Q: [referring to the Poulsen Spreadsheet] Do you see that there is not a single date prior to December 11, 2013?
>
> A: I see that.
>
> Q: Did you have any explanation of how it can be that, even though some papers got forwarded to you, and the bankruptcy was filed in May of 2013, there's not a single entry here prior to December 11, 2013?
>
> A: I cannot explain that.

Tr. Vol. VI 1415:3-11, 18-22; 1416:3-14. If Poulsen received TLO-related documents prior to December 11, 2013, and retained those documents, those documents should be reflected in the Poulsen Spreadsheet.

In addition to Poulsen's testimony, a review of the relevant certificates of service filed in the TLO bankruptcy proceeding confirms that Poulsen received TLO-related documents prior to December 11, 2013. Poulsen testified unequivocally that some of the TLO-related documents he received were addressed to his Florida address and forwarded to him by the Postal Service. The certificates of service on the documents in the Poulsen Spreadsheet (all of which are dated December 11, 2013, or later) reflect that as of December 11 2013, at the latest, all TLO-related documents were being served on Poulsen at his Oregon address or on his attorney, Mr. Salazar. *See, e.g.,* Case No. 13-20853, ECF Nos. 616, 808, 965, 990, 1022, 1046, 1103, 1145, 1163, 1193, 1268, and 1290. Thus, the documents he received which bore his Florida address, as he so testified, must have been received prior to December 11, 2013.

For these reasons, the Court questions the accuracy, and thus the persuasiveness, of the Poulsen Spreadsheet. As a result, the Court assigns no weight to the Poulsen Spreadsheet.

ii. Highland Beach vs. Boca Raton

Mr. Wilson, as Manager of Address Management for the Postal Service, provided a second declaration (the "Second Wilson Declaration")[51] explicitly stating

---

[51] Pl.'s Ex. 456. Both the First and the Second Wilson Declarations were also the subject of the *Order Granting Plaintiff's Motion to Admit Declarations* (ECF No. 249), entered in this adversary proceeding on January 22, 2016.

that "mail bearing the address 2633 S Ocean Blvd, <u>Highland Beach</u>, FL 33487 or 2633 SO Ocean Blvd, <u>Boca Raton</u>, FL [33487][52] would be considered to be the same address." Second Wilson Decl., 1 (emphasis added). In support of this statement, Mr. Wilson attached two pages printed from the "Look Up a ZIP code" function located on the Postal Service's website. The first page shows that when "2633 SO OCEAN BLVD, BOCA RATON FL 33487" is entered into the "Look Up a ZIP code" function, the corresponding full address produced by the "Look Up a ZIP code" function is "2633 S OCEAN BLVD, HIGHLAND BEACH FL 33487-1831." The second page shows that when "2633 S OCEAN BLVD, HIGHLAND BEACH FL 33487" is entered into the "Look Up a ZIP code" function, the corresponding full address produced is the same—"2633 S OCEAN BLVD, HIGHLAND BEACH FL 33487-1831."

Based upon the evidence discussed above and notwithstanding the Defendants' arguments to the contrary, as discussed more fully below, the Court finds that for purposes of mail delivery,[53] 2633 South Ocean Boulevard, ***Highland Beach***, Florida 33487 is equivalent to 2633 South Ocean Boulevard, ***Boca Raton***, Florida 33487.

---

[52] The Second Wilson Declaration contains a typographical error in the ZIP code of the Boca Raton address. Instead of 33<u>4</u>87, the ZIP code for the Boca Raton address is listed as "33<u>8</u>47." (emphasis added). The attachments to the Second Wilson Declaration show that the appropriate ZIP code for both the Boca Raton address and the Highland Beach address is "33<u>4</u>87." (emphasis added). Accordingly, the Court is satisfied that "33847" is simply a typographical error, which is why the Court altered and bracketed the ZIP code.

[53] For purposes of this Opinion, it only matters that the Postal Service considered the Boca Raton address and the Highland Beach address to be the same address. However, it is worth noting that Poulsen himself, on at least one occasion, acknowledged the equivalence of the two addresses. On March 8, 2013, Poulsen signed a contract with a moving company to move his belongings from Florida to Oregon. *See* Pl.'s Ex. 156, 2-3. The contract listed his address as "2633 S OCEAN BLVD BOCA RATON, FL 33487." *Id.* at 2. On March 11, 2013, a representative of the moving company sent Poulsen an email and attached a "letter to confirm the details of [his] relocation" from Florida to Oregon. The representative asked Poulsen to "[l]et [her] know if something [was] not correct." *See* Pl.'s Ex. 157. The attached letter listed the loading address for the move as "2633 S Ocean Boulevard, Boca Raton,

### iii. Returned Mail Addressed to Poulsen at the Boca Raton Address

As discussed above, when BKAS served documents in connection with the TLO bankruptcy proceeding, BKAS used Furr & Cohen's address as the return address on every envelope, and Mr. Goldstein testified that Furr & Cohen received no returned mail which was addressed to Poulsen at any address. Mr. Goldstein also testified that he contacted Epiq on three occasions prior to December 2014 as to whether any mail addressed to Poulsen had been returned and that Epiq responded that nothing mailed to Poulsen was returned as undeliverable. Nonetheless, the Defendants still contend that the Boca Raton address is not the same as the Highland Beach address, that as a result, nothing addressed to Poulsen at the Boca Raton address was deliverable or subject to forwarding, and that Poulsen thus never received any documents which were addressed to him at the Boca Raton address. Neither of the Defendants, however, offered evidence to contradict the Second Wilson Declaration, which stated that the Boca Raton address and the Highland Beach address are considered the same address by the Postal Service.

The Defendants offered and the Court admitted into evidence two envelopes addressed and mailed to the Boca Raton address which were stamped as "RETURN TO SENDER," "NOT DELIVERABLE AS ADDRESSED," and "UNABLE TO FORWARD." The first, TBO's Exhibit NNNN, was mailed to Poulsen from his attorney's office on June 11, 2015—more than two years after Poulsen moved to Oregon and submitted his change of address request to the Postal Service. As

---

Miami, FL 33487." *Id.* at 2. Poulsen replied to the representative's email the same day, stating: "This all looks correct." *See* Pl.'s Ex. 158; Tr. Vol. VI, 1404:1-15.

indicated on the confirmation email the Postal Service sent to Poulsen in March 2013, mail forwarding services last for up to one year, not two. In June 2015, Poulsen's mail forwarding service had already expired. It is thus no surprise that the mail was undeliverable as addressed since Poulsen no longer lived there and that the Postal Service was unable to forward it since Poulsen's forwarding service expired in March 2014. The second envelope, Poulsen's Exhibit B, was mailed to "Current Occupant" again from his attorney's office. There is no evidence in the record that at the time the envelope was mailed there was a "Current Occupant" at the Boca Raton address, which would explain why the envelope was not deliverable as addressed. Like the first envelope, the second envelope was sent more than one year after Poulsen moved to Oregon and submitted his change of address request with the Postal Service. More importantly, because the envelope was addressed to "Current Occupant," the Postal Service would never have had any reason to forward it to Poulsen. For these reasons, the Court finds that TBO's Exhibit NNNN and Poulsen's Exhibit B are unpersuasive.

TBO also introduced, and the Court admitted, a July 2015 email chain between Mr. Goldstein and Mark Euler, Senior Legal Counsel at Epiq.[54] Attached to Mr. Euler's July 2015 email was a spreadsheet prepared by Epiq listing the TLO mailings sent by Epiq which were returned to Epiq as undeliverable (the "Epiq Spreadsheet"). *Id.* at 9-12. The Epiq Spreadsheet reflects that five documents sent to Poulsen were returned as undeliverable:

1. The Plan;

---

[54] *See* Euler-Goldstein Email Chain, TBO's Ex. OOOO, 7.

2. The Disclosure Statement;

3. The Disclosure Order;

4. TLO's *Fourth Emergency Motion for Order Authorizing Post-Petition Financing*;[55] and

5. A *Notice of Hearing.*[56]

*Id.* at 3, 12. More particularly, the Epiq Spreadsheet reflects that these five mailings were served on Poulsen on November 8, 2013, that Poulsen's new address is 18800 Bull Springs Road, Bend, OR 97701, and that the returned mail containing these five documents was received and processed by Epiq on December 19, 2014. The Epiq Spreadsheet does not reflect the address to which these five documents were initially sent.

The Defendants' apparent position is that because these five documents were returned as undeliverable after being addressed and mailed to Poulsen at the Boca Raton address, the Court should find that all of the mail sent to the Boca Raton address, including the critical § 363 sale documents, was undeliverable, not subject to forwarding by the Postal Service, and not received by Poulsen. For the following reasons, however, the Epiq Spreadsheet is not persuasive to the Court.

To begin with, Mr. Goldstein testified at Trial that some of the five documents that were purportedly returned as undeliverable were documents that Furr & Cohen did not ask Epiq to serve on Poulsen. Particularly, the Disclosure Order directed TLO to serve the Disclosure Order on, among others, "all equity security holders" (which

---

[55] ECF No. 405, Case No. 13-20853.

[56] ECF No. 408, Case No. 13-20853.

40

included Poulsen), but instructed TLO to serve the Plan and the Disclosure Statement on a more limited group, which did not include "all equity security holders" or any other category of individuals that would have included Poulsen. *See* Disclosure Order, 3. Thus, in accordance with the Disclosure Order, Epiq mailed Poulsen the Disclosure Order, but did not mail Poulsen the Plan or the Disclosure Statement.[57] Ms. Amporfro's testimony confirmed this.[58]

Furthermore, contrary to the Epiq Spreadsheet, the evidence suggests that Poulsen did indeed receive the Disclosure Order, which was mailed to him at the Boca Raton address on November 6, 2013. Section 3(B) of the Disclosure Order provides that TLO must serve the Disclosure Statement and the Plan on "any party in interest who requests in writing a copy of the [D]isclosure [S]tatement and [P]lan[.]" Disclosure Order, 3. As discussed above, Poulsen emailed Mr. Goldstein on November 13, 2013, and requested copies of the Plan and the Disclosure Statement. *See* Ex. 362.

Finally, Poulsen himself testified at Trial that some of the TLO-related documents which he received at his Oregon address were addressed to his Florida address and forwarded to him by the Postal Service. Referring to a list of documents he received after he moved to Oregon, Poulsen testified, "It was like almost every single document [on the list] was addressed to the address in Florida." Tr. Vol. VI,

---

[57] The *Certificate of Service* (the "Disclosure COS") (ECF No. 435, Case No. 13-20853) on the Plan, the Disclosure Statement, and the Disclosure Order prepared by Epiq on November 6, 2013, on behalf of TLO indicates that the Plan and the Disclosure Statement were served on the parties listed on Exhibit A and that the Disclosure Order was served on the parties listed on Exhibit B. *See* Disclosure COS, Pl.'s Ex. 354, 1. Exhibit A to the Disclosure COS does not include Poulsen. *Id*. at 4. Exhibit B, however, does include Poulsen. *Id*. at 10.

[58] Tr. Vol. V, 1214:24-1217:22.

1414:12-14. When asked whether it was his testimony that before December 11, 2013, "not one single document got forwarded to [him]," Poulsen responded, "No. I just told you that some documents got forwarded and some got sent directly to my [Oregon] address." *Id.* at 1415:3-11. In order to make a finding based upon the Epiq Spreadsheet that not a single piece of mail addressed to Poulsen at the Boca Raton address ever reached Poulsen, the Court would have to disregard Poulsen's own testimony and the Second Wilson Declaration.[59]

Accordingly, the Court finds that the Defendants' evidence of returned mail is not persuasive. For this reason and for the additional reasons discussed above, the Court finds that mail sent to Poulsen at the Boca Raton, Florida address was forwarded by the Postal Service to his Oregon address.

## V. TransUnion-TRADS's Good Faith

One of the critical issues before the Court is whether TransUnion-TRADS acted in good faith in connection with the § 363 sale.[60] Prior to the § 363 Auction, the Sale Hearing, and the closing of the sale, TransUnion-TRADS engaged in extensive due diligence. As discussed below, this due diligence led TransUnion-TRADS to believe that TLO owned the BOLT IP and thus that TLO had an absolute right to sell the BOLT IP along with the rest of TLO's assets.

---

[59] As previously noted, the Defendants did not present any evidence contradicting the Second Wilson Declaration, which unequivocally stated that the Postal Service viewed the Boca Raton address to be the same as the Highland Beach address.

[60] Although the Court already made a specific finding at the Sale Hearing that TransUnion-TRADS did indeed act in good faith, the Court will once again consider the issue.

### A. Due Diligence

Lawyers and technology professionals at TransUnion-TRADS obtained adequate information from TLO during the due diligence period that led them to accept TLO's representation that it owned the BOLT IP.

Mick Forde, TransUnion-TRADS's Vice President of Legal and Regulatory, led the legal due diligence effort, which focused in part on the issue of whether TLO owned the BOLT IP. Mr. Forde had several conversations with TLO management, including Ms. Asher, Ms. Yoost, and TLO's Chief Operating Officer Armando Escalante on the issue. Each of these individuals informed Mr. Forde that TLO owned the BOLT IP.[61] Moreover, Ms. Yoost confirmed Mr. Forde's testimony, stating that during the initial due diligence period, she communicated to TransUnion-TRADS her belief that TLO owned the BOLT IP: "So there [were] conversation where, and it would have been during those initial due diligent meetings, where we did discuss that the source code was not in our possession, that it had been taken by an ex-employee, and we felt that it was rightfully owned by TLO. I believe we provided reasons of why we felt that way[.]" Tr. Vol. V, 1169:2-17.

TransUnion-TRADS's technology due diligence team received the same representations from TLO that Mr. Forde received—that TLO owned the BOLT IP. Michael Lynch, a technology professional with TransUnion-TRADS, led the technology due diligence effort. Mr. Lynch testified that through their due diligence efforts, he and the other members of the technology due diligence team "tried to

---

[61] Tr. Vol. VI, 1452:2-1457:8; 1499:25-1501:15.

understand . . . all aspects of the company from a technology and security

perspective":

> . . . We start by understanding the business that the company is in, what products they sell, how they sell them, who their customers are, what lines of business and verticals they're in.
>
> Once we have a grounding and understanding of that, we try to understand the application architecture, what are the various application components that exist in the enterprise, what functions do they do, are they custom developed, are they third party software. Then we move into the infrastructure space, try to understand the data centers, the offices, you know, the hardware, the servers, the storage, and then we also try to understand things like the operations architecture, how do they do operations from an IT perspective, how do they do development of Go (phonetic) from an IT perspective, we do spend some time on IT financials, to understand what the budgets are, the IT organization, where they have people and where the potential needs are, in addition to key projects that are out there. It's a very fast paced project -- or process.

Tr. Vol. IV, 729:7-730:6. Mr. Lynch and Kevin McClowry, another TransUnion-

TRADS technology professional who reported to Lynch, testified that Scott Wagner—

then, the Chief Technology Officer of TLO—was their primary source of information

regarding TLO's technology during the due diligence process[62] and that Mr. Wagner

told them that TLO owned the BOLT IP.[63] Specifically, Mr. Lynch testified as follows:

> Q [by Mr. Firsenbaum]: What information, if any, did you learn about the BOLT system during these meetings?
>
> A [by Mr. Lynch]: So, we learned what BOLT was, and effectively what it does. So it is a proprietary programming language, syntax, it is a set of scripts that are written in that syntax, and then it's also a set of business rules and processes that are executed using those scripts.

---

[62] Tr. Vol. IV, 730:7-13, 813:13-15.

[63] Tr. Vol. IV, 816: 1-16 ("It was certainly conveyed very directly that . . . the entirety of the TLO XP platform, which included [the BOLT IP] and other components, was, in fact, TLO's property.").

Q: When you say that you learned that it was proprietary and homegrown, what do you mean by those terms?

A: That it was developed by TLO associates.

Q: Did you receive any information about whether BOLT was used anywhere outside of TLO?

A: We had understood that it was not used outside of TLO.

Q: What information, if any, did you learn about BParser during these meetings?

A: So during these meetings we had learned that BParser was a code converter, a compiler that would convert BOLT syntax into C++ syntax.

    We also learned that the source code for BParser was not in the possession of TLO, but that TLO owned the source code and the binary form of the BParser application.

. . .

Q: Had you ever seen or heard of BOLT or BParser before your due diligence at TLO?

A: I have not.

Q: What information were you given about TLO  not being in possession of the BParser source code?

A: That while TLO was not in possession of the source code for BParser, that they felt they owned the source code and the application, which is inclusive of the source code and the binary; that they had asked for the return of that source code from [Poulsen], but it was denied.

Q: Who at TLO provided you the information that did not possess the BParser source code?

A: Scott Wagner.

Q: And did Mr. Wagner convey to you his belief regarding ownership of the BOLT language?

A: Yes, he did.

Q: And what did he convey to you?

A: So he conveyed that the BOLT, the BOLT application, inclusive of the Syntax, the programming language, the scripts and the business logic and rules, and algorithm that were created with those scripts were owned by TLO.

Q: And what did he convey to you about his understanding of the ownership interest of the BParser executable and the BParser runtime library, the BParser source code?

A: [Mr. Wagner] conveyed that TLO owned both the BParser source code and the runtime executable, but was not in possession of the source code.

Tr. Vol. IV, 731:12-733:15. Mr. Wagner, who no longer works for TransUnion-TRADS and is not affiliated with any of the parties before the Court, provided testimony at Trial which confirmed the testimony of Mr. Lynch and Mr. McClowry.[64]

Through a company called Black Duck, TransUnion-TRADS conducted an audit of TLO's intellectual property. This audit consisted of Black Duck scanning all of TLO's software, including, but not limited to, the BOLT IP, to see if there were any unaccounted-for licenses attached to any of the software.[65] The Black Duck audit concluded that there were no licenses attached to the BOLT IP.[66] Mr. McClowry testified to the significance of this audit, stating that the audit verified what the due diligence team had been hearing from TLO employees—that TLO owned the BOLT IP—because the fact that there were no licenses attached to the BOLT IP showed

---

[64] Tr. Vol. IV, 594:5-20 (referring to the BOLT IP as a "proprietary language" indicating "that it is one that was built by people at the company for use at that company, and is used only at that location"); 612:17-615:14 (Mr. Wagner explaining his view that TLO owned the BOLT IP).

[65] Tr. Vol. IV, 816:24-818:24.

[66] Tr. Vol. IV, 818:25-819:21.

that TLO owned the BOLT IP because TLO would not need to obtain a license for something that it already owned.[67]

TransUnion-TRADS's due diligence team knew that TLO was in possession of, and was using, all components of the BOLT IP, except for the BParser source code, which Poulsen took with him when he left TLO. Mr. Lynch and Mr. McClowry authored several documents before and after the sale noting the lack of possession of the BParser source code. In certain instances, they wrote that the source code was "not owned" by TLO, and in other instances they wrote that it was "not in TRADS possession."[68] Mr. Lynch and Mr. McClowry both testified at Trial that they used the terms "own" and "possess" interchangeably to convey simply that TLO did not have the source code.[69] Mr. Forde also testified that he understood from these documents, in conjunction with the conversations and meetings he had with TLO employees, that the issue concerned only access to—not ownership of—the source code.[70]

Eventually, Mr. Forde, as the leader of TransUnion-TRADS's legal due diligence effort, became confident that TLO owned the entirety of the BOLT IP:

> A [by Mr. Forde]: . . . To make ourselves comfortable on the piece we could not access [the source code], we focused on ownership, and worked to confirm that TLO did, in fact, own that piece of the [BOLT] IP. To do

---

[67] Tr. Vol. IV, 818:25-820:4.

[68] The documents authored by Mr. Lynch and Mr. McClowry include TBO's Exhibit E, 1-2 (due diligence findings which reflect, among other things, that the source code "is not 'owned' and available to TLO"); TBO's Exhibit Y, 54 (post-sale document reflecting that the source code "is not in TRADS possession"); TBO's Exhibit OO, 1 (post-sale email reflecting that TRADS does not yet "have/own the source code"); TBO's Exhibit UU, 1-2 (post-sale email reflecting that the source code "is not in TRADS possession").

[69] Tr. Vol. IV, 736:14-22; 742:24-743:11; 744:14-21; 835:1-18.

[70] Tr Vol. VI, 1452:7-1453:21.

so, our understanding, or my understanding . . . my understanding is
that IP can be – ownership and IP can be demonstrated either if it is
developed by an employee while in the course of their employment, or if
it could be, or if developed outside employment, but transferred and
assigned into the company.

So we spent a great deal of time – well, we spent time focusing on
. . . Poulsen's employment status with the company, and we were
assured . . . in conversations in the Akerman conference room, Desiree
Asher, Carly Asher was there for a few of the conversations. Both of
them confirmed that Mr. Poulsen was an employee. . . .

So based on those assurances and the information we received, we
determined, we became comfortable he was an employee of TLO, and
therefore, anything he may have developed during his employment with
TLO belonged to TLO.

Tr. Vol. VI, 1459:7-1461:3. Mr. Forde, however, sought to ensure that TLO provided

a written representation in the final asset purchase agreement confirming TLO's

prior oral representations regarding Poulsen's status as an employee of TLO and

TLO's ownership of the BOLT IP:

[W]e made sure that we received appropriate assurance, both in our
communication with the company and their counsel, but also written
confirmation in the form of reps and warranties and assurances in the
asset purchase agreement, that . . . Poulsen was an employee of TLO.

Tr. Vol. VI, 1461:8-13. The final Amended and Restated Asset Purchase Agreement

(the "Executed APA")[71] between TLO and TransUnion-TRADS, which does not differ

materially from the Stalking Horse APA discussed in detail above, contains

significant representations made by TLO that Poulsen was an employee of TLO and

that TLO owned the BOLT IP. The Executed APA defines the "Acquired Assets" to

include, among other things, the BOLT IP and represents and warrants that TLO

---

[71] The Executed APA, dated December 12, 2013, is attached to the Sale Order as Exhibit A. *See* Pl.'s
Ex. 374, Ex. A.

was the "true and lawful exclusive owner" of the BOLT IP. *See* Sale Order, Ex. A, §§ 1.1, 2.5, and 2.6. More specifically, Schedule 2.6(f) of the Executed APA provides that Poulsen, as an owner of TLO, "did not execute [an] agreement[] expressly assigning all right, title and interest in all materials to [TLO]"[72] and that "Poulsen was an employee" of TLO.[73] Mr. Forde testified that this explicit statement that Poulsen was an employee of TLO was critical to TransUnion-TRADS because it "was sort of closing the loop on ownership of the [BOLT] IP for us." Tr. Vol. I, 1476:7-20.

### B. The Significance of the BOLT IP to TransUnion-TRADS

The undisputed testimony at Trial reveals that TransUnion-TRADS would not have paid $154 million for substantially all of the assets of TLO if the assets included in the sale did not include the BOLT IP. Mr. Lynch testified that he understood prior to the sale that each of the individual components of the BOLT IP was integral to TLO's business and that if he believed TLO did not legally own any of the components of the BOLT IP, he would not have recommended that TransUnion-TRADS purchase TLO's assets because those assets would have had substantially limited value.[74] Chris Cartwright, the President of U.S. Information Services at TransUnion-TRADS, also testified unequivocally that TransUnion-TRADS would not have purchased

---

[72] Schedule 2.6(f) explicitly did not "modify or qualify any representation or warranty in any section of the [Executed APA] other than 2.6(f) and 2.6(a)." *See* Sale Order, Ex. A, Schedule 2.6(f). Thus, Schedule 2.6(f) did not alter the representations and warranties made in Section 2.5 of the Executed APA as to the ownership of the BOLT IP.

[73] *See* Sale Order, Ex. A, Schedule 2.6(f).

[74] Tr. Vol. IV, 747:5-749:3 (testifying that "every component within the TLO application architect is important and critical" and that "if [TLO] did not own the BOLT [IP], we would have advised to not buy TLO").

TLO's business if the BOLT IP was not part of the assets to be purchased.[75] He explained that without the BOLT IP, TransUnion-TRADS would have to shut down operations in order to develop a replacement for the BOLT IP, which would take approximately two years, likely causing significant losses both in terms of revenue and customers.[76]

## VI.  Poulsen's Creation of the BOLT IP and His Employment with TLO

TransUnion-TRADS's good faith belief that TLO owned the BOLT IP stemmed primarily from what it learned from TLO employees. The evidence admitted at Trial and discussed below shows that Poulsen was not only an owner of TLO, but that he was also an employee of TLO. Moreover, the evidence admitted at Trial and discussed below also shows that Poulsen created the BOLT IP after the formation of TLO while an employee of TLO.

### A. Testimony of Former TLO Employees

Mr. Wagner, TLO's Chief Technology Officer, testified at Trial that during 2010, 2011, and 2012, Poulsen appeared to be working full-time at TLO's offices in Boca Raton and that as a result, he viewed Poulsen as "a regular full-time employee at TLO." Tr. Vol. IV, 610:14-611:18. Mr. Wagner further testified that he knew that Poulsen was TLO's Chief Science Officer, that he worked with Poulsen using the BOLT IP to create and execute data transformation scripts in the BOLT language,

---

[75] Tr. Vol. III, 521:14-522:17.

[76] Tr. Vol. III, 522:8-523:2.

and that he personally observed Poulsen creating and executing these scripts while is his office at TLO.[77]

Sisidhar Mukkamalla, who worked as a programmer at TLO, similarly testified at Trial as to his belief that Poulsen was an employee of TLO. Mr. Mukkamalla testified that in January 2009, he interviewed with Poulsen, Mr. Asher, and Mr. Wagner for a position as a programmer at TLO and that based, at least partially, on his interview experience, he believed Poulsen was an employee of TLO.[78] Mr. Mukkamalla also testified that it was his understanding that the BOLT IP was created "sometime around January 2010" because "that's when it was introduced to us, to TLO, and there was a lot of excitement, of [a] new language that we [could] use." Tr. Vol. V, 1010:4-24.

Mike Wyman, another programmer at TLO, testified at Trial that it was his understanding that Poulsen developed the BOLT IP while he was an employee of TLO and that while an employee of TLO, anything Poulsen developed belonged to TLO.[79] Mr. Wyman also specifically testified to the timing of Poulsen's creation of the BOLT IP, stating that he understood that the BOLT IP was created "sometime around the end of 2009, the beginning of 2010." Tr. Vol. V, 1053:20-23. Mr. Wyman identified a document marked Plaintiff's Exhibit 23 as an email he received from Poulsen on November 20, 2009, in which Poulsen attached the "syntax definition" of

---

[77] Tr. Vol. IV, 610:8-611:1.

[78] Tr. Vol. V, 1007:14-22.

[79] Tr. Vol. V, 1063:3-1064:1.

the programming language which would eventually become known as "BOLT." According to his testimony, Mr. Wyman had never seen this language prior to the November 20, 2009, email.[80] Mr. Wyman identified a second document marked Plaintiff's Exhibit 38 as an email thread,[81] which included an email he received from Mr. Asher on December 31, 2009:

> Q [by Mr. Firsembaum]: Directing your attention to the bottom email in this email chain from Mr. Asher to . . . Poulsen December 31st, 2009, at 6:20 p.m., and I'd like to direct your attention to the second page now, the carryover to that email, you'll see that there are asterisks listed in the email, and directing your attention to the characters underneath those asterisks, do you recognize those characters?
>
> A: Yes, I do.
>
> Q: What are they?
>
> A: I take those to be programming language for the program Snip-It.
>
> Q: And what understanding, if any, do you have as to the name of that program, as to what that programming language – as to the name that was given to that programming language?
>
> A: It's my understanding this was the programming language that eventually become known as BOLT.
>
> Q: Mr. Asher writes above the asterisks, Ole's new language! Check Ole's new language for reading raw data above that. Do you see those statements?
>
> A: Yes, I do.
>
> Q: What understanding, if any, did you have in the December 2009 period as to whether this language that eventually become known to you as BOLT was a new language?

---

[80] Tr. Vol. V, 1054:6-1055:13.

[81] Tr. Vol. V, 1055:14-20.

A: Basically because I had never seen anything about BOLT prior to this point in time.

Q: What conclusion did you reach . . .

A: I had [come] to the conclusion that it was something brand new, with this, Hank's new language statement in this email.

Tr. Vol. V, 1056:8-1057:14. This email was also sent to Poulsen at his TLO-issued email address and to several other TLO employees.[82]

Finally, when asked at Trial about TBO's Exhibit A, Mr. Wyman testified that it was an email he sent to Poulsen on October 9, 2007—before the formation of TLO—in which he wrote to Poulsen, "So tell me more about your new sorting algorithm." Tr. Vol. V, 1061:6-14; TBO's Ex. A. The Defendants take the position that this email is evidence that Poulsen created the BOLT IP in 2007, prior to the formation of TLO, and that Poulsen thus could not have created the BOLT IP in his capacity as an employee of TLO. However, Mr. Wyman testified that to his knowledge, the BOLT IP is not a sorting algorithm[83] and that in any event, at the time he wrote this email, he was not inquiring about BOLT because he had never heard of BOLT.[84]

Joseph Belden, the head of TLO's Information Technology department, testified at Trial that he worked with Poulsen at TLO from 2009 through 2013[85] and

---

[82] Tr. Vol. V, 1055:14-1056:7; Pl.'s Ex. 38.

[83] Tr. Vol. V, 1060:24-1061:5. Mr. Mukkamalla also testified that he would not characterize BOLT as a "sorting algorithm." Tr. Vol. V., 1009:5-10.

[84] Tr. Vol. V, 1061:15-1062:6.

[85] Tr. Vol. VI, 1319:15-1320:8.

that Poulsen was in the offices at TLO "[e]very day, other than maybe sickness or vacation." Tr. Vol. VI, 1315:18-25.

Poulsen himself admitted at Trial that he was not an independent contractor for TLO.[86] He testified, however, that he was also not an employee of TLO, but instead was simply an owner or partner.[87] Poulsen further testified at Trial that he created the BOLT IP prior to the formation of TLO.[88] As to the timing of the creation of the BOLT IP, the Court does not find Poulsen's testimony credible on this issue in light of the other contradictory evidence.

Accordingly, the Court finds that based upon the evidence discussed above, Poulsen created the BOLT IP in late December 2009 or early January 2010, after the formation of TLO. The question of whether Poulsen was an employee at this time, however, is a question of law which the Court will address below.

### B. Documentation of Poulsen's Employment Status

Poulsen held the title of TLO's Chief Science Officer. As such, Poulsen had numerous responsibilities at TLO beyond his work on the BOLT IP. Poulsen interviewed, supervised, and managed other TLO programmers. Mr. Belden testified: "I interacted with him all the time with decisions concerning the hardware, electrical

---

[86] Tr. Vol. VI, 1341:24-1342:1.

[87] Tr. Vol. VI, 1341:3-7. It is certainly not disputed that Poulsen held an equity interest in TLO, which technically did make him an "owner" of TLO.

[88] Tr. Vol. VI, 1568:16-1572:24; 1602:14-16.

things, data center things, our large scale computing systems, all of those kind of things that related to hardware" on which TLO's computer infrastructure operated.[89]

Poulsen also met with potential investors to discuss TLO's technology with them and was held out to potential investors as a crucial part of TLO's team in his capacity as Chief Science Officer. TLO's October 2011 Business Plan, which was sent to potential investors, described Poulsen as being "responsible for the in-house developed languages and database approaches that have been used to create the speed and unique power of TLO's supercomputer-based knowledge engine and proprietary algorithms."[90]

As compensation, Poulsen received from TLO what TLO considered to be a salary in the form of guaranteed payments paid *via* direct deposit payroll.[91] These payments were substantial and were not a distribution of "profits" to TLO equity owners. TLO never was profitable—it had no profits to distribute—and other equity holders who were not employees of TLO did not receive any such payments.[92] TLO's Operating Agreement stated that any salary paid to TLO equity holders who worked at the company would be in the form of such "guaranteed payments."[93]

---

[89] Tr. Vol. VI, 1314:4-11; 1315:9-17.

[90] Pl.'s Exs. 76 and 77 (the Business Plan is an attachment to the emails between members of TLO's senior management and potential investors).

[91] *See, e.g.*, Tr. Vol. VII, 1720:3-23.

[92] Tr. Vol. IV, 899:16-900:3.

[93] Pl.'s Exs. 20; 117 at 18.

Poulsen also received common employee benefits such as health insurance, a company issued cell phone, and a corporate credit card. Poulsen did not receive a 1099 tax form as an independent contractor would.[94]

Poulsen had an office at TLO's facilities in Boca Raton,[95] and as discussed above, the programmers and IT staff who worked with him testified that he worked there as a regular full-time employee from 2009 until he left in 2013. While he suggested at Trial that he sometimes did not show up for work at TLO, Poulsen admitted at his deposition that from 2008 to the beginning of 2013 he "would spend time in [his TLO] office almost every day." Tr. Vol. VII, 1715:21-1716:13. With the clarification that TLO did not legally exist in 2008, Poulsen testified at trial that "[o]ther than that," his deposition testimony was accurate. *Id*. In addition to office space, TLO issued Poulsen a computer in his office which he used while working at TLO, a TLO email address, and a TLO phone extension.[96]

Finally, there were only two written agreements between Mr. Asher and Poulsen regarding TLO. The first agreement, signed on October 20, 2008, provided that "Hank [Asher] and Ole [Poulsen] agree that what stock they own in their companies collectively is 90% owned by Hank and 10% owned by Ole" (the "Asher-Poulsen Ownership Agreement").[97] The Asher-Poulsen Ownership Agreement

---

[94] Tr. Vol. VII, 1717:13-1719:14.

[95] Tr. Vol. VII, 1714:23-1715:1.

[96] Tr. Vol. VII, 1712:16-1713:1.

[97] *See* Pl.'s Ex. 214 (the Asher-Poulsen Ownership Agreement is attached to the email from Mr. MacLachlan, when he was TLO's CFO, to Mr. Furr and Mr. Goldstein).

provided that it covered "all businesses that Hank and Ole are developing," including "JARI Research, all computer companies in development and that will be in development by Hank and Ole, . . . and all future companies that Hank and Ole develop." As Poulsen admitted, the Asher-Poulsen Ownership Agreement nowhere suggests that Poulsen would be entitled to keep any intellectual property that he created, or helped create, for any such business, which by its terms, would eventually include TLO.[98]

The second written agreement between Mr. Asher and Poulsen was TLO's Operating Agreement.[99] The Operating Agreement contained no provision regarding ownership of intellectual property and contained no provisions regarding license fees or royalties owed to Poulsen for use of the BOLT IP.

## VII.   Poulsen's Actions after Entry of the Sale Order

As the evidence discussed in the preceding section shows, Poulsen received the Sale Motion and the Sale Order. However, even if Poulsen did not receive the Sale Motion or the Sale Order or if Poulsen received the Sale Motion and the Sale Order but failed to review them, at the very least, Poulsen admitted at Trial that he became aware of the sale of TLO's assets within one or two days after the § 363 Auction,[100] which occurred on November 20, 2013. Despite this awareness, Poulsen did nothing

---

[98] Tr. Vol. VI, 1348:4-25.

[99] Pl.'s Ex. 20.

[100] Tr. Vol. VI, 1401:12-18.

57

to determine whether the BOLT IP was part of the sale or to assert his purported rights to ownership of the BOLT IP or to the proceeds of the § 363 sale.

Even though he was aware that a sale of substantially all of the assets of TLO had occurred, Poulsen did not file a motion to reconsider the Sale Order. Poulsen did not appeal the Sale Order. Poulsen did not seek to prevent the sale from closing. Poulsen did not file a claim in the TLO bankruptcy proceeding asserting that he owned the BOLT IP or that he was entitled to any proceeds of the sale. These proceeds, to which Poulsen could have asserted a claim based upon his alleged ownership of the BOLT IP, were in excess of $126,000,000.00 through June 2014.

Poulsen testified at Trial that he did nothing because he did not know the BOLT IP was sold as part of TLO's § 363 sale.[101] The evidence, however, demonstrates that Poulsen knew or should have known that the BOLT IP, which he now claims to own, was part of the sale. According to his own testimony, Poulsen was put on notice as early as June 2013 that TLO claimed ownership of the BOLT IP. In June 2013, Poulsen and his personal counsel Mike Moore attended a meeting at Furr & Cohen's offices with TLO's senior management team and outside bankruptcy counsel. Poulsen testified at Trial that he told Ms. Asher that he owned the BOLT IP and significantly, that Ms. Asher made it clear to him that TLO disputed that assertion. In particular, according to Poulsen, Ms. Asher informed Poulsen at the meeting that "the position of the company is that we own the IP."[102] Thus, according to Poulsen's own testimony,

---

[101] Tr. Vol. VI, 1401:24-1402:5.

[102] Tr. Vol. VII, 1666:2-1667:22.

58

months before the § 363 Auction and the sale, Poulsen knew that TLO's position was that it owned the BOLT IP. Moreover, it is not disputed that a copy of the Sale Order was mailed to Poulsen at his Oregon address. The Defendants offered no evidence that Poulsen failed to receive the Sale Order.[103] Poulsen offered no explanation for why he did not assert his purported ownership of the BOLT IP and challenge the validity of the sale soon after receiving the Sale Order.

Once Poulsen knew about the sale, which the Court finds he did at the time of the sale or soon after the entry of the Sale Order, he should have taken steps to verify whether the BOLT IP was included in the sale. He did not do so and consequently did nothing about the sale of what he claimed was his property, the BOLT IP, until TransUnion-TRADS filed the Motion to Enforce Sale Order and the adversary proceeding now before the Court.

## VIII. __TBO's Post-Sale Actions, the Motion to Enforce Sale Order, and the Adversary Proceeding__

TBO and its principal Mr. Brauser, through his company Data Acquisition Group ("DAG"), actively participated throughout the entirety of the TLO bankruptcy proceeding, and both TBO and Mr. Brauser were fully aware of the sale and its terms before and after it occurred. DAG was served with the Bid Procedures Order, the Sale Motion and Stalking Horse APA, and the Sale Order. *See* Bid Procedures Order COS,

---

[103] At Trial, Poulsen testified that he did not know if he ever received a copy of the Sale Order. Tr. Vol. VI, 1402:5-8.

2;[104] Sale Motion COS, 2; Sale Order COS, 7.[105] DAG appeared through its attorney

Mr. Salazar, who is now Poulsen's attorney, at the November 5, 2013, preliminary

hearing and at the Sale Hearing. *See* Exs. 351, 2:21-24; 371, 2:12-14.

At no point, prior to the closing of the sale, did Mr. Brauser or DAG question

TLO's assertion and representation that TLO owned the BOLT IP. However, even

though Mr. Brauser knew that the BOLT IP was included in the sale of TLO's assets

to TransUnion-TRADS, Mr. Brauser formed a new entity, TBO, and endeavored to

acquire both TransUnion-TRADS's employees and the BOLT IP after the closing of

the sale.[106] Eventually, TBO and Poulsen signed a purchase agreement (the "BOLT

IP Purchase Agreement") on October 14, 2014.[107] Under the BOLT IP Purchase

Agreement, Poulsen purported to sell the "BParser Code converter software,

including a compiler and run-time library," to TBO for $250,000.00 plus a share in

any royalties that might someday be obtained. *See* BOLT IP Purchase Agreement, at

1, 3, and 8. The BOLT IP Purchase Agreement did not make any reference to the

BOLT programming language, which TBO nevertheless now claims to own. *Id*. TBO

indemnified Poulsen for any legal expenses that might arise out of any dispute with

---

[104] Mr. Brauser was specifically served with the Bid Procedures Order as a result of his position with Applied Data Sciences LLC. *See* Bid Procedures Order COS, 2. Applied Data Sciences LLC was served via Mr. Brauser at 4400 Biscayne Blvd #850, Miami FL 33137, which is coincidentally the same address listed for DAG. *Id*.

[105] The Sale Order COS reflects that the Sale Order was served on DAG via Mr. Brauser as "partner/member." *See* Sale Order COS, Ex. A, at 5. The Sale Order COS also reflects that Mr. Brauser was served individually with the Sale Order. *Id*. at 15.
[106] Tr. Vol. VI, 1290:17-1294:10.

[107] Pl.'s Ex. 434.

TransUnion-TRADS. *Id*. Poulsen admitted at Trial that prior to entering into the BOLT IP Purchase Agreement, he did not read the Sale Order, and Mr. Brauser also confirmed that, before signing the BOLT IP Purchase Agreement, he took no steps to review the Sale Order.[108]

Having knowledge of Mr. Brauser's and TBO's actions, TransUnion-TRADS instituted the above-captioned adversary proceeding on October 27, 2014. TransUnion-TRADS's Amended Complaint seeks a declaratory judgment against TBO and Poulsen that TransUnion-TRADS owns the BOLT IP free and clear of any interest of Poulsen or TBO and that Poulsen and TBO violated the Sale Order.[109] Poulsen and TBO asserted Counterclaims against TransUnion-TRADS, seeking declaratory judgments that Poulsen owned the BOLT IP at the time of the sale and that TBO, by virtue of the BOLT IP Purchase Agreement, now owns the BOLT IP.

TransUnion-TRADS also filed the Motion to Enforce Sale Order in the underlying TLO bankruptcy proceeding on January 13, 2015. Through the Motion to Enforce Sale Order, TransUnion-TRADS seeks an order from this Court (1) directing TBO to stop asserting that it owns the BOLT IP and to stop using the BOLT IP; (2) ordering TBO to turn over any and all copies of the BOLT IP which TBO has in its possession; (3) ordering Poulsen to provide TransUnion-TRADS with any and all information related to the BOLT IP; (4) holding TBO in contempt for violating the Sale Order; and (5) issuing sanctions against TBO in the form of damages.

---

[108] Tr. Vol. VI, 1286:15-20.

[109] *See,* Am. Compl., ECF No. 61.

## CONCLUSIONS OF LAW

### I.      Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b).[110] This is a core proceeding under 28 U.S.C. § 157. The Defendants previously filed a *Motion to Dismiss for Lack of Jurisdiction and/or Abstain* (the "Motion to Dismiss") (ECF No. 88), on which the Court deferred ruling until Trial. Because the Court finds that it has jurisdiction over this matter, the Court denies that Motion.

### II.     The Defendants Failed to Establish a Basis for Overturning the Sale Order

An order from a bankruptcy court approving the sale of assets represents a final appealable judicial order and transfers property rights which are good against the world. *See In re Daewoo Motor Co. Ltd., Dealership Litig.*, No. MDL-1510, 2005 WL 8005218, at *6 (M.D. Fla. Jan. 6, 2005); *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 732 (8th Cir. 2004). Accordingly, after a court approves or confirms a sale, that sale may be vacated only when the party seeking to overturn the sale establishes that there was fraud, unfairness, or mistake in the conduct of the sale or establishes some other basis for relief under Federal Rule of Civil Procedure 60(b). *See, Hayes v. Sullivan*, 1992 WL 486914 (D.Mass. 1992); *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 286 (7th Cir. 2002).

---

[110] "While the sale of assets under 11 U.S.C. § 363 is final as to the entire world, including those who were not parties to the sale, . . . the bankruptcy court nonetheless always retains jurisdiction to consider the enforceability of its own orders, including reconsideration of a sale to determine if it was properly conducted." *S. Motor Co. of Dade Cty. Carter-Pritchett-Hodges, Inc.* (*In re MMH Auto. Grp., LLC*, 385 B.R. 347, 355 (Bankr. S.D. Fla. 2008).

In other words, "[f]inal sale orders of bankruptcy courts may not be challenged or collaterally attacked outside of [the proscribed] method of challenges, objections[,] and appeals," and it is considered an impermissible collateral attack to challenge a final sale order "outside of the proscribed method of challenging a final order, generally by way of ancillary proceedings in the same court or in another court." *In re Daewoo Motor Co.*, 2005 WL 8005218, at *7 (noting that "[m]ost tellingly, [p]laintiffs do not seek here, and have not sought in the past, to directly challenge or undo the . . . court's orders approving the [transaction]"); *see also, In re Maxko Petroleum, LLC*, 425 B.R. 852, 874 (Bankr. S.D. Fla. 2010) (subsequently affirmed) (refusing to allow defendants to collaterally attack a final sale order and the finality of the auction sale approved by that order because "it was only in response to litigation commenced by [plaintiff] months after the fact that [defendants] formally raised this issue"). The Defendants here never filed an appeal of the Sale Order. The Defendants never filed a motion to reconsider or to otherwise vacate the Sale Order. Neither of the Defendants even filed a claim in the TLO bankruptcy proceeding. In the two and a half years since the entry of the Sale Order, the Defendants have not instituted any proceeding challenging the validity of the Sale Order with respect to the BOLT IP.

Instead, TransUnion-TRADS instituted this adversary proceeding seeking a declaratory judgment and filed the Motion to Enforce Sale Order in the underlying bankruptcy proceeding after learning that the Defendants were claiming ownership of the BOLT IP in violation of the Sale Order. Only then did the Defendants seek to

establish their purported ownership of the BOLT IP, and even then, the Defendants merely filed Counterclaims seeking declaratory judgments—they did not seek to actually overturn the Sale Order.[111] The Courts believes this constitutes an impermissible collateral attack of the Sale Order.[112] Nevertheless, the Court will fully address the issues and arguments raised by the Defendants in their pleadings and at Trial.

### A. Rule 60(b)

In the absence of an appeal of a final sale order, the only manner in which a sale order may be challenged is through Rule 60(b). *S. Motor Co. of Dade Cty. v. Carter-Pritchett-Hodges, Inc. (In re MMH Auto. Grp., LLC)*, 385 B.R. 347, 355 (Bankr. S.D. Fla. 2008). Rule 60(b) provides that the Court may relieve a party from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

---

[111] The Defendants' prayers for relief request that the Court enter judgment declaring that: (1) Poulsen owned the BOLT IP; (2) Poulsen did not execute agreements expressly assigning all right, title, and interest in the BOLT IP to TLO; (3) Poulsen assigned his right, title, and interest in the BOLT IP to TBO; and (4) at most, TLO had a non-exclusive revocable implied license to use the BOLT IP.

[112] TransUnion-TRADS asserts that the Sale Order is *res judicata*. Application of the doctrine of *res judicata*, however, is not appropriate here. "*Res judicata* normally only applies against parties who participated in the prior proceedings and 'had a full and fair opportunity to litigate the matter in the proceeding that is to be given preclusive effect.'" *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 731 (8th Cir. 2004) (citation omitted); *see also, Schafler v. Indian Spring Maint. Ass'n*, 139 F. App'x 147, 150 (11th Cir. 2005) (discussing the general applicability of the *res judicata* doctrine). Poulsen had notice of the Sale Motion, but neither Poulsen nor TBO actively participated in the sale process. "Normal principals of *res judicata*, however, are not necessary" for the Sale Order to bar the Defendants' challenges to the sale—"[a] bankruptcy sale under 11 U.S.C. § 363, free and clear of all liens, is a judgment that is good as against the world, not merely as against parties to the proceedings." *Regions Bank*, 387 F.3d at 731 (emphasis added). The Sale Order, therefore, is shielded from collateral attack not by *res judicata*, but by virtue of the nature of rights transferred under § 363. *Id.* at 733.

(3) fraud, misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

*See* Fed. R. Civ. P. 60(b). In the context of reviewing whether an order or judgment should be set aside, it is also appropriate to consider whether the party against whom the order or judgment was entered received proper notice of the relief sought. *In re MMH Auto. Grp., LLC*, 385 B.R. at 356.

Based upon the evidence received at Trial and discussed above, the Court finds that the Defendants did not establish any basis which would justify granting relief from the Sale Order. Specifically, the Defendants did not establish any fraud, misrepresentation, or misconduct by either TLO or TransUnion-TRADS. Moreover, as discussed in the next section, the evidence shows that Poulsen was served with notice of and received due process as to the sale of substantially all of TLO's assets, which included the BOLT IP.

### B. Notice and Due Process

According to the Defendants, one of the grounds upon which reconsideration of the Sale Order is appropriate is that Poulsen failed to receive proper notice and due process. However, for the following reasons, the Defendants did not establish that Poulsen failed to receive proper notice of and due process as to the § 363 sale.

As courts have long recognized, the requirement of "[n]otice is the cornerstone underpinning Bankruptcy Code procedure." *Western Auto Supply Co. v. Savage Arms,*

*Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 (1st Cir. 1994). Provisions mandating

that bankruptcy courts may only take actions which affect parties' rights "after notice

and a hearing" appear throughout the Bankruptcy Code, including in the context of

§ 363 sales. *See Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*,

467 B.R. 694, 706 (S.D.N.Y. 2012) (noting that "[c]ourts have held in general that, for

due process reasons, a party that did not receive adequate notice of bankruptcy

proceedings could not be bound by orders issued during those proceedings"). Section

363(b)(1) provides, in part, that a trustee or a debtor-in-possession may sell assets

other than in the ordinary course of business only after notice and a hearing.

"Undoubtedly, parties holding known liens or asserting known interests in property

to be sold are entitled to actual notice of a debtor's intent to sell such property free

and clear of those interests."[113] *Unaatuq, LLC v. Green (In re Catholic Bishop of N.*

*Alaska)*, 509 B.R. 229, 241-42 (Bankr. D. Alaska 2014), *aff'd*, 525 B.R. 723 (D. Alaska

2015), *and aff'd*, No. 4:14-CV-0012-HRH, 2015 WL 632185 (D. Alaska Feb. 12, 2015);

*see also, In re MMH Auto. Grp., LLC*, 385 B.R. at 357.

In the Bankruptcy Code, "after notice and a hearing" means "after such notice

as is appropriate in the particular circumstances, and such opportunity for a hearing

as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). The Federal

Rules of Bankruptcy Procedure also provide specific rules which relate to serving

---

[113] It is true that "a party whose interest is hidden, whether by design or failure to do what is necessary to protect or disclose such interest, cannot complain that its interest has been compromised without notice, because, logically, the trustee cannot be expected to know that a 'hidden' interest exists." *In re MMH Auto. Grp., LLC*, 385 B.R. at 357. Although TransUnion-TRADS appears to argue otherwise, the evidence presented at trial shows that TLO was on notice prior to the sale that Poulsen had asserted or would assert in the future that he had ownership rights in the BOLT IP.

notice of § 363 sales. Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed

use, sale, or lease of property, other than cash collateral, not in the ordinary course

of business shall be given pursuant to [Bankruptcy] Rule 2002(a)(2),[114] (c)(1),[115] (i),

and (k)[116] and, if applicable, in accordance with § 363(b)(2) of the Code." Bankruptcy

Rule 6004(c) provides that any motion seeking "authority to sell property free and

clear of liens or other interests shall be made in accordance with Rule 9014 and shall

be served on the parties who have liens or other interests in the property to be sold."

Bankruptcy Rule 9014, in turn, directs that any relief to which the rule applies will

be requested by motion, "and reasonable notice and opportunity for hearing shall be

afforded the party against whom relief is sought."

The notice requirements described above are "founded in fundamental notions

of procedural due process." *In re Savage Indus., Inc.*, 43 F.3d at 721; *see also*, *A–Fab

Eng'g, Inc. v. C.W. Mining Co. (In re C.W. Mining Co.)*, 431 B.R. 307 (B.A.P. 10th Cir.

2009). "It is well settled that in order for any proceeding to satisfy due process, there

must be 'notice reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to

present their objections.'" *In re Grumman Olson Indus., Inc.*, 467 B.R. at 706-07

---

[114] Bankruptcy Rule 2002(a)(2) provides that at least 21 days' notice by mail shall be provided for "a proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice[.]"

[115] Bankruptcy Rule 2002(c)(1) provides that "the notice of a proposed use, sale, or lease of property required by subdivision (a)(2) of this rule shall include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections."

[116] Subsections (i) and (k) of Rule 2002 of the Bankruptcy Code relate to service on committees and the United States Trustee, respectively.

(*quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

Whether the requirements of notice and due process were satisfied is a factual inquiry which must be made on a case-by-case basis. *Hadder v. Walker Cty., Ala.*, No. 6:14-CV-00586-LSC, 2014 WL 4957231, at *4 (N.D. Ala. Oct. 2, 2014) (noting that "notice under the Due Process Clause is context-specific"). Indeed, a court may find that notice and due process requirements were met even when the notice mailed was not actually received by the aggrieved party. Due process simply requires that notice must be reasonably calculated to apprise interested parties of the proceedings and the opportunity to objection. Proof of actual receipt of a mailed notice is not required to satisfy due process requirements. *Dusenbery v. U.S.*, 534 U.S. 161, 170, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002); *Sanders v. Henry Cty., Ga.*, 484 F. App'x 395, 397 (11th Cir. 2012); *In re Johns-Manville Corp.*, No. 82 B 11656 (CGM), 2016 WL 3574051, at *14 (Bankr. S.D.N.Y. June 30, 2016). Moreover, if mailed to the appropriate address, "[s]ervice by mail is complete upon mailing." *Green v. Sheppard (In re Sheppard)*, 173 B.R. 799, 805 (Bankr. N.D. Ga. 1994) (*citing* Fed. R. Civ. P. 5(b); Fed. R. Bankr. P. 7005). Thus, there is no requirement that "all risk of non-receipt must be eliminated":

> The Supreme Court has frequently said . . . that, under most circumstances, notice sent by ordinary mail is deemed reasonably calculated to inform interested parties that their property rights are in jeopardy. The mails are an "efficient and inexpensive means of communication" that generally may be relied upon to deliver notice where it is sent. In the context of a wide variety of proceedings that threaten to deprive individuals of their property interests, the Supreme Court has consistently held that mailed notice satisfies the requirements of due process. Though the mails are not one hundred

> percent reliable, none of these cases requires actual receipt of notice that
> is properly mailed.

*Weigner v. City of New York*, 852 F.2d 646, 649-50 (2d Cir. 1988) (internal citations

omitted). Finally, there is a rebuttable presumption that an item which was properly

mailed was received by the addressee. *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851

(11th Cir. 1996). This "presumption of receipt' arises upon proof that the item was

properly addressed, had sufficient postage, and was deposited in the mail." *Anderson

v. Branch Banking & Trust Co.*, 119 F. Supp. 3d 1328, 1341 (S.D. Fla. 2015) (internal

citation and quotation marks omitted). Mere denial of receipt is insufficient to rebut

the presumption. *Id.*

As the Court previously discussed in detail, the evidence shows that TLO

served Poulsen with notice of every motion and hearing which was critical to the sale

process and that every notice was deposited in the mail, addressed to Poulsen's

address in either Florida[117] or Oregon, and contained sufficient postage. The evidence

also shows that the Court conducted multiple hearings throughout the sale process

and allowed any interested party who appeared at those hearings to raise objections.

The Court finds that the notice given and the hearings conducted were reasonable

and appropriate under the circumstances and that every notice satisfied the

requirements of due process as they were reasonably calculated under all the

circumstances to apprise Poulsen of the pendency of the proceedings and to afford

him an opportunity to present his objections. Poulsen is presumed to have received

---

[117] As previously discussed, mail addressed to Poulsen at his Florida address, whether Boca Raton or
Highland Beach, was forwarded by the Postal Service to his Oregon address.

the relevant notices as they were properly mailed to him, and the Defendants did not present any persuasive evidence to rebut that presumption.

### C. TransUnion-TRADS is Entitled to Protection as a Good Faith Purchaser

Notwithstanding whether the requirements of § 363(f) have been met, § 363(m) provides that the reversal or modification of a sale authorized under § 363(b) or (c) "does not affect the validity of [the] sale . . . to an entity that purchased . . . such property in good faith . . . unless such authorization and such sale . . . were stayed pending appeal." 11 U.S.C. § 363(m). Section 363(m) gives purchasers of a debtor's assets an "assurance of finality" with respect to "who has rights to estate property." *FirstBank Puerto Rico v. Barclays Capital Inc. (In re Lehman Bros. Holding Inc.)*, 492 B.R. 191, 201 (Bankr. S.D.N.Y. 2013) (subsequently affirmed) (*quoting Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997)); *see also, In re CHC Indus., Inc.*, 389 B.R. 767, 774 (Bankr. M.D. Fla. 2007). At the time of TLO's § 363 sale, the Court made a finding that TransUnion-TRADS was a good faith purchaser.[118] However, because the Defendants now assert that TransUnion-TRADS did not act in good faith, the Court will once again analyze TransUnion-TRADS's status as a good faith purchaser.

Although the Bankruptcy Code does not define the meaning of "good faith purchaser," most courts have adopted a traditional equitable definition: "one who purchases the assets for value, in good faith and without notice of adverse claims." *23 Jefferson St. LLC v. 636 Assets, Inc.*, No. 14-CV-7150 CBA, 2015 WL 5037343, at *4

---

[118] "Bankruptcy courts routinely make a finding of good faith at the time of the § 363 sale approval." *In re Gucci*, 126 F.3d at 389.

(E.D.N.Y. Aug. 25, 2015). There is no dispute that TranUnion-TRADS purchased the assets for value—$154 million. The issue here is whether TranUnion-TRADS purchased the assets in good faith and without notice of adverse claims. The analysis of whether a purchaser of a debtor's assets acted in good faith is focused on the conduct of the purchaser in the course of the bankruptcy proceedings; this includes the purchaser's actions in preparation for and during the sale itself. *See, e.g., Badami v. Burgess (In re Burgess),* 246 B.R. 352, 356 (B.A.P. 8th Cir. 2000). "Typically, the requisite misconduct necessary to establish a lack of good faith involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* (internal quotations omitted*); see also, Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.),* 415 B.R. 77, 84 (S.D.N.Y. 2009).

The Defendants did not present any evidence at Trial that TransUnion-TRADS engaged in any kind of fraud or collusion. The Defendants presented no evidence that TransUnion-TRADS otherwise failed to act in good faith. Although TransUnion-TRADS knew that TLO did not possess the source code because Poulsen took it with him upon leaving TLO, the Defendants did not present evidence that TransUnion-TRADS had such knowledge of an adverse claim to the BOLT IP which would rise to a level that would negate TransUnion-TRADS's good faith. On the contrary, the Court finds that based upon the evidence discussed above and otherwise presented at Trial, TransUnion-TRADS acted in good faith during the sale process and is thus entitled to the § 363(m) protections afforded to good faith purchasers.

### D. Equitable Mootness

Although most commonly applied to untimely appeals, the doctrine of equitable mootness is equally applicable to motions to reconsider or overturn final orders in bankruptcy proceedings. *See, e.g., Almeroth v. Innovative Clinical Sols., Ltd.* (*In re Innovative Clinical Sols., Ltd.*), 302 B.R. 136, 141 (Bankr. D. Del. 2003); *S.N. Phelps & Co. v. Circle K. Corp. (In re Circle K Corp.)*, 171 B.R. 666, 669 (Bankr. D. Ariz. 1994). "The equitable mootness doctrine . . . applies when appellants 'have failed and neglected diligently to pursue their available remedies to obtain a stay' and circumstances have changed so as to 'render it inequitable to consider the merits of the appeal.'" *Darby v. Zimmerman (In re Popp)*, 323 B.R. 260, 270-71 (B.A.P. 9th Cir. 2005) (*quoting Focus Media Inc. v. Nat'l Broad. Co. Inc. (In re Focus Media, Inc.)*, 378 F.3d 916, 923 (9th Cir. 2004)). Courts have applied the doctrine of equitable mootness when the appellant has failed to obtain a stay and the ensuing transactions are too "complex and difficult to unwind." *Lowenschuss v. Selnick (In re Lowenschuss),* 170 F.3d 923, 933 (9th Cir. 1999). Moreover, "[u]nder this widely recognized and accepted doctrine, the courts have held that [an action] should be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Innovative Clinical Sols., Ltd.*, 302 B.R. at 141. Essentially, "[t]he test for mootness reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him." *In re VOIP, Inc.*, 461 B.R. 899,

72

902 (S.D. Fla. 2011) (*quoting First Union Real Estate Equity and Mortg. Invs. v. Club Assocs. (In re Club Assocs.*), 956 F.2d 1065, 1069 (11th Cir. 1992)).

Here, the evidence discussed clearly above shows that Poulsen sat on his rights and failed to challenge the Sale Order in a timely matter. TransUnion-TRADS paid $154 million to acquire the assets of TLO. Relying on the finality of the Sale Order and its "free and clear" provisions, TransUnion-TRADS has been operating the business acquired from TLO for nearly two years. Moreover, the proceeds of the sale—to which Poulsen could have asserted a claim—were distributed long ago. The evidence shows that Poulsen had actual knowledge of the sale. Poulsen's assertion that he did not know until recently that the BOLT IP was included in the sale is irrelevant because to the extent this assertion is true, Poulsen's lack of knowledge is a result of his own failure to read the pleadings he received and his failure to investigate the terms of the sale. Accordingly, the Defendants' attempt to now challenge the validity of the Sale Order is barred by the doctrine of equitable mootness.

## III.    <u>The Sale of the BOLT IP was Authorized under § 363(f)</u>

Pursuant to § 363(f), the trustee or the debtor-in-possession may sell property under § 363(b) free and clear of any interest in such property only if the trustee or the debtor-in-possession satisfies one of five conditions, two of which are: "such entity consents" or "such interest is in bona fide dispute." *See* 11 U.S.C. § 363(f)(2), (4). The Defendants assert that as to the BOLT IP, TLO failed to establish at the time of the sale that it satisfied one of the conditions outlined in § 363(f). Even though the

Defendants did not establish any grounds for the Court to reconsider the Sale Order, the Court will still address whether there was a legal basis, at the time of the sale, for TLO to sell the BOLT IP free and clear of Poulsen's purported interest. For the reasons that follow, the Court finds that TLO was authorized under § 363(f) to sell the BOLT IP free and clear of Poulsen's purported claims and interests.

### A. Consent

As just discussed, the Bankruptcy Code delineates the conditions under which an interest can be extinguished by a bankruptcy sale. One of those conditions is the consent of the interest holder. Lack of objection to the sale—provided that there has been adequate notice—constitutes consent. *See, e.g., In re Daufuskie Island Props., LLC,* 431 B.R. 626, 647 (Bankr. D. S.C. 2010); *In re Enron Corp.*, 2004 WL 5361245, at *2 (Bankr. S.D.N.Y. 2004) (holding that "[t]hose parties who did not object, or who withdrew their objections, . . . are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code."). "It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold." *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) *cert. denied*, 538 U.S. 962, 123 S. Ct. 1769, 155 L. Ed. 2d 513 (2003).

Here, TLO provided Poulsen with adequate notice of and due process as to the impending sale as discussed above. Poulsen did not appear at any of the hearings and did not object in any way to the sale. Accordingly, the Court finds that Poulsen impliedly consented to the § 363 sale of TLO's assets, including the BOLT IP, free

and clear of any liens and interests. TLO was thus authorized, pursuant to § 363(f)(2), to sell the BOLT IP free and clear of Poulsen's purported interest in the BOLT IP as part of its § 363(b) sale.

### B. Bona Fide Dispute

A trustee or a debtor-in-possession may also sell property under § 363(b) free and clear of any interest in the property if such interest is in bona fide dispute. *See* 11 U.S.C. § 363(f)(4). "Section 363(f)(4) does not contemplate or require that the court resolve or determine any dispute about ownership before a sale hearing, but rather requires only an examination of whether there is an objective basis for either a factual or legal dispute about ownership." *In re Genesys Research Inst., Inc.*, No. 15-12794-JNF, 2016 WL 3583229, at *20 (Bankr. D. Mass. June 24, 2016); *see also, In re MMH Auto. Grp., LLC*, 385 B.R. at 370. "The purpose of § 363(f)(4) is to permit property of the estate to be sold free and clear of interests that are disputed by the estate 'so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.'" *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 507 (Bankr. N.D. Ala. 2002) (*quoting In re Clark*, 266 B.R. 163, 171 (9th Cir. BAP 2001)).

The evidence admitted at Trial and discussed in detail above shows that at the time of the sale, TLO owned the BOLT IP. At the very least, however, there was a bona fide dispute as to who owned the BOLT IP. Accordingly, pursuant to § 363(f)(4), TLO was authorized to sell the BOLT IP free and clear of Poulsen's purported interest in the BOLT IP as part of its § 363(b) sale.

## IV.    TLO Owned the BOLT IP at the Time of the Sale

The ultimate position of the Defendants is that TLO did not own the BOLT IP and thus had no right to sell it as part of its § 363 sale because Poulsen, as the creator of the BOLT IP, was the rightful owner of the BOLT IP. Although the Defendants failed to establish a basis to overturn the Sale Order so as to reconsider TLO's right to sell the BOLT IP, the Court will nonetheless address the issue of the ownership of the BOLT IP. This issue of ownership hinges on whether Poulsen was an "employee" of TLO when he created the BOLT IP. For the reasons that follow, the Court finds that Poulsen was an employee of TLO when he created the BOLT IP and that as a result, TLO did in fact own the BOLT IP at the time of the § 363 sale.

"Computer programs receive copyright protection under the Copyright Act as 'literary works.'" *Woods v. Resnick*, 725 F. Supp. 2d 809, 817 (W.D. Wis. 2010) (*citing* 17 U.S.C. §§ 101 and 102(a)(1)). Generally, the author of a work, including a computer program, is the owner of that work. 17 U.S.C. § 201(a). However, in the case of a "work made for hire," the owner of the work is the entity for whom the work was prepared "unless the parties have expressly agreed otherwise in a written instrument signed by them." 17 U.S.C. § 201(b) (emphasis added). The copyright statute defines a "work made for hire" as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. The Supreme Court of the United States has held that to determine whether an individual was an employee, and whether he created a work within the scope of his employment, courts should look to the general common law of agency. *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 740, 109 S.Ct.

2166, 104 L.Ed.2d 811 (1989); *Carlson v. FedEx Ground Package Sys., Inc.*, 787 F.3d 1313, 1318 (11th Cir. 2015). In addition to looking at control over the manner and means of the work, courts using the common law agency test consider a number of other factors:

> [T]he skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 961 (11th Cir. 2015) (internal quotation marks omitted) (*quoting Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)). "Because the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125–26 (9th Cir. 2010) (internal citations omitted).

At its inception, TLO was a technology start-up company. As previously discussed, Poulsen was one of its founders and owners. Start-up companies often present a unique challenge to courts when attempting to discern whether an individual was an employee, an owner, or both as start-up companies conduct their businesses more informally than established businesses.

For instance, in the context of a dispute over the ownership of source code between an employer and the creator of the source code, the court in *JustMed v. Byce*

77

found that the defendant, Byce, was an employee of the plaintiff, JustMed, when he created the source code because: (1) Byce was not hired for a specific duration or to perform a discrete task; (2) Byce's employment ended because of a dispute, not because his work on the source code ended; (3) Byce had a formal title; (4) Byce earned a regular salary from JustMed; and (5) Byce's work was integral to JustMed's regular business and JustMed sold its primary product by emphasizing that the software could constantly be updated. *See JustMed v. Byce*, 600 F.3d at 1127. The court made this finding even though JustMed "did not exercise much control over the manner and means by which Byce created the source code" as the court found that control "is not as important to a technology start-up as it might be to an established company" and emphasized that "Byce was an inventive computer programmer expected to work independently." *Id.* at 1127-28. The court even discounted Byce's emphasis on JustMed's failure to pay benefits and to fill out appropriate employment and tax forms, reasoning that this failure "is more likely attributable to the start-up nature of the business than to Byce's alleged status as an independent contractor." *Id.* at 1128. Ultimately, the court held that Byce was an employee and that JustMed owned the source code as a work made for hire, stating that although the informal nature of JustMed's business made "it more difficult to decide whether a hired party [was] an employee or an independent contractor," this fact "should not make the company more susceptible to losing control over software integral to its product." *Id.*

The Court finds the *JustMed v. Byce* opinion discussed above to be highly persuasive.[119] The evidence admitted at Trial shows that like Byce, Poulsen, with respect to his work with TLO: (1) was not hired for a specific duration or to perform a discrete task; (2) left TLO not because his work had come to a logical conclusion, but because of a dispute with TLO management; (3) had a formal title, Chief Science Officer; (4) earned a regular salary in the form of guaranteed payments; and (5) performed work and made contributions to TLO which were essential to TLO's business and product. Moreover, Poulsen interviewed and hired perspective TLO employees, received medical benefits from TLO, had a TLO email address and a corporate credit card, and worked "full time" at TLO's offices in Boca Raton from 2009 through 2013. The fact that TLO's management did not exercise significant control over the manner and means by which Poulsen worked is not significant as TLO was a start-up company and more importantly, Poulsen was a high-level, innovative computer programmer who was expected to work independently. The Court finds that for these reasons and based upon the evidence discussed above and presented at Trial, Poulsen was in fact an employee of TLO in late 2009 or early 2010 when he

---

[119] Poulsen's assertion that he was neither an employee nor an independent contractor, but rather an owner is not persuasive. Although it is true that under certain circumstances, an owner cannot be considered an employee of a business, the circumstances necessary for such a finding are not present here. In *Woods v. Resnick*, for instance, the court found that Woods was not an employee of F & I because Woods was an equal partner in F & I with equal voting rights, which meant that "unless both [Woods and his partner] agree[d] to a particular action, deadlock [would ensue]." 725 F. Supp. 2d at 824. The court reasoned that "[i]n other words, the company [did] not have the ability to compel either owner to take action" and under such a scenario, "there [was] no basis for finding that Woods was an employee under the control of F & I." *Id.*; *see also, Heimerdinger v. Collins*, 2009 WL 1743764, *4 (D. Utah 2009) (rejecting similar work-for-hire claim on ground that partners are generally not employees of the partnership). Here, Poulsen was not an equal partner in or a majority owner of TLO. Poulsen was a minority owner of TLO. Accordingly, his assertion that he was not an employee of TLO because he was an owner of TLO is unpersuasive.

created the BOLT IP who did not have an express, written agreement providing that he would retain ownership of anything he created while employed by TLO.

## V.   <u>Conclusion</u>

For the foregoing reasons, the evidence shows that the Defendants failed to establish a basis under Rule 60 for reconsidering or overturning the Sale Order. Poulsen received notice of all of the critical motions and hearings related to the § 363 sale of substantially all of TLO's assets, including the Sale Motion and the Sale Order. Poulsen sat on his rights for years, failing to file a motion to reconsider or to appeal the Sale Order, and accordingly, the Defendants' challenge of the Sale Order and the ownership of the BOLT IP is further barred pursuant to the doctrine of equitable mootness. Additionally, TransUnion-TRADS purchased TLO's assets in good faith and is entitled to the protections that § 363(m) affords to good faith purchasers. Finally, the Court finds that TLO was the owner of the BOLT IP at the time of the § 363 sale and that TLO was in any event entitled to sell the BOLT IP free and clear of Poulsen's purported interest pursuant to § 363(f).

<u>**ORDER**</u>

Based upon the evidence received at Trial and for the reasons discussed in detail above, the Court hereby **ORDERS AND ADJUDGES** that:

1. TransUnion Risk and Alternative Data Solutions, Inc.'s *Motion to Enforce Sale Order and Motion for Contempt* (ECF No. 1282, Case No. 13-20853) is **GRANTED**.

2. The *Motion to Dismiss* (ECF No. 88) filed by Defendants TBO *nka* IDI, Inc. and Ole Poulsen is **DENIED**.

3. Defendants TBO *nka* IDI, Inc. and Ole Poulsen failed to establish any basis for the Court to reconsider or to overturn the Sale Order.

4. TransUnion Risk and Alternative Data Solutions, Inc. is the sole owner of the BOLT IP pursuant to the Sale Order.

5. TLO owned the BOLT IP at the time of the § 363 sale and thus was entitled to sell the BOLT IP to TransUnion Risk and Alternative Data Solutions, Inc. free and clear of Poulsen's purported interest.

6. Defendant TBO *nka* IDI, Inc. is hereby found to have knowingly violated the Sale Order and shall be sanctioned so as to compensate TransUnion Risk and Alternative Data Solutions, Inc. for the attorney's fees and costs incurred in this litigation.

7. The Court will enter a separate final judgment:

   a. Granting the Motion to Enforce Sale Order;

   b. Granting final judgment to TransUnion Risk and Alternative Data Solutions, Inc. and against Defendants TBO *nka* IDI, Inc. and Ole Poulsen with respect to TransUnion Risk and Alternative Data Solutions, Inc.'s Complaint and the Counterclaims filed by Defendants TBO *nka* IDI, Inc. and Ole Poulsen; and

    c.   Issuing an injunction in favor of TransUnion Risk and Alternative Data Solutions, Inc. and against Defendants TBO *nka* IDI, Inc. and Ole Poulsen.

8.   The Court retains jurisdiction to determine the amount of damages and attorney's fees to be awarded in favor of TransUnion Risk and Alternative Data Solutions, Inc. and against Defendant TBO *nka* IDI, Inc.. The parties shall contact Vivian Corrales, Judge Hyman's Courtroom Deputy, to schedule an evidentiary hearing on damages and attorney's fees when discovery is complete on this issue.

###

Copies furnished to:

All interested parties and their attorneys by the Clerk of Court



**ORDERED in the Southern District of Florida on August 18, 2016.**

Paul G. Hyman, Jr.,
**Chief United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

In re:                                                    CASE NO.: 13-20853-BKC-PGH

TLFO, LLC,                                                Chapter 11
     Debtor(s).
_____/

TransUnion Risk and Alternative                           ADV. NO.: 14-01793-BKC-PGH-A
Data Solutions, Inc.,
     Plaintiff,
v.

The Best One, Inc. and
Ole Poulsen,
     Defendants.
_____/

### <u>FINAL JUDGMENT</u>

**THIS MATTER** came before the Court for trial (the "Trial") on May 16 and

17, 2016, and June 15, 22, 23, 24, and 27, 2016, upon (1) the _Second Amended_

_Complaint_ (the "Complaint") (ECF No. 61) and the _Motion to Enforce Sale Order and_

**EXHIBIT B**

*to Hold The Best One, Inc. in Contempt* (the "Motion to Enforce Sale Order") (ECF No. 1282, Case No. 13-20853-BKC-PGH)[1] filed by Plaintiff TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"); (2) the *Answer, Affirmative Defenses, and Counterclaim* (the "TBO Counterclaim") (ECF Nos. 333 and 334) filed by Defendant The Best One, Inc. ("TBO"); and (3) the *Answer, Affirmative Defenses, and Counterclaim* (the "Poulsen Counterclaim") (ECF Nos. 335 and 336) filed by Ole Poulsen ("Poulsen," and together with TBO, the "Defendants"). In accordance with Federal Rule of Bankruptcy Procedure 7058 and based on the findings of fact and conclusions of law contained in the Court's Memorandum Opinion, entered contemporaneously with this Final Judgment, the Court hereby **ORDERS AND ADJUDGES** that:

1. Defendants TBO *nka* IDI, Inc. and Ole Poulsen failed to establish any basis for the Court to reconsider or to overturn the Sale Order.

2. TLO owned the BOLT IP at the time of the § 363 sale and thus was entitled to sell the BOLT IP to TransUnion Risk and Alternative Data Solutions, Inc. free and clear of Ole Poulsen's purported interest.

3. TransUnion Risk and Alternative Data Solutions, Inc. is the sole owner of the BOLT IP.

4. Judgment is entered in favor of TransUnion Risk and Alternative Data

---

[1] TransUnion Risk and Alternative Data Solutions, Inc. filed the Motion to Enforce Sale Order in the underlying TLO, LLC bankruptcy proceeding. *See* Case No. 13-20853-BKC-PGH. On January 28, 2015, the Court entered an Order on the Motion to Enforce Sale Order, in which the Court held that the Motion alleged substantially the same facts as those alleged in this adversary proceeding and that as a result, the Motion to Enforce Sale Order would be consolidated with this adversary proceeding. *See Order* (ECF No. 1297, Case No. 13-20853-BKC-PGH).

**EXHIBIT B**

Solutions, Inc. and against Defendants TBO *nka* IDI, Inc. and Ole Poulsen on the *Motion to Enforce Sale Order and Motion for Contempt* (ECF No. 1282, Case No. 13-20853).

5. Judgment is entered in favor of TransUnion Risk and Alternative Data Solutions, Inc. and against Defendants TBO *nka* IDI, Inc. and Ole Poulsen on the *Motion to Dismiss* (ECF No. 88).

6. Judgment is entered in favor of TransUnion Risk and Alternative Data Solutions, Inc. and against Defendants TBO *nka* IDI, Inc. and Ole Poulsen with respect to TransUnion Risk and Alternative Data Solutions, Inc.'s Complaint and the Counterclaims filed by Defendants TBO *nka* IDI, Inc. and Ole Poulsen.

7. The Counterclaims are dismissed with prejudice.

8. Defendant TBO *nka* IDI, Inc. is hereby found to have knowingly violated the Sale Order and shall be sanctioned so as to compensate TransUnion Risk and Alternative Data Solutions, Inc. for the attorney's fees and costs incurred in this litigation.

9. Defendants TBO *nka* IDI, Inc. and Ole Poulsen are hereby permanently enjoined from using the BOLT IP and claiming ownership of the BOLT IP.

10. Within 21 days of the entry of this Final Judgment, Defendants TBO *nka* IDI, Inc. and Ole Poulsen shall turn over to TransUnion Risk and Alternative Data Solutions, Inc. any and all copies of the BOLT IP, including, but not limited to, the source code, which they have in their

**EXHIBIT B**

possession.

11. Within 21 days of the entry of this Final Judgment, Defendants TBO *nka* IDI, Inc. and Ole Poulsen shall provide TransUnion Risk and Alternative Data Solutions, Inc. with any and all information related to the BOLT IP which they have in their possession.

12. The Court retains jurisdiction to determine the amount of damages and attorney's fees. The parties shall contact Vivian Corrales, Judge Hyman's Courtroom Deputy, to schedule an evidentiary hearing on damages and attorney's fees when discovery is complete on this issue.

### 

Copies Furnished To:

All parties by the Clerk of Court

**EXHIBIT B**



**ORDERED in the Southern District of Florida on September 23, 2016.**

Paul G. Hyman, Jr.,
**Chief United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | CASE NO.: 13-20853-BKC-PGH |
| TLFO, LLC, | Chapter 11 |
|     Debtor(s). | |
| _____/ | |
| TransUnion Risk and Alternative | ADV. NO.: 14-01793-BKC-PGH-A |
| Data Solutions, Inc., | |
|     Plaintiff, | |
| v. | |
| The Best One, Inc. and | |
| Ole Poulsen, | |
|     Defendants. | |
| _____/ | |

### ORDER DENYING (I) TBO'S MOTION TO AMEND (ECF NO. 486) AND (II) TBO AND POULSEN'S MOTION FOR REHEARING (ECF NO. 488)

**THIS MATTER** came before the Court upon the *Motion (1) to Amend Findings*

*in Trial Order and Final Judgment; (2) Alternative Motion for New Trial to Open the*

*Judgment; and (3) Alternative Motion to Correct Clerical Mistake* (the "Motion to

1

**EXHIBIT C**

Amend") (ECF No. 486) filed by Defendant The Best One, Inc. ("TBO") and the *Motion for Rehearing or New Trial or, Alternatively, Motion for Relief Under Rule 9024* (the "Motion for Rehearing") (ECF No. 488) filed by TBO and Defendant Ole Poulsen ("Poulsen"). Both Motions were timely filed.

## I.    The Motion to Amend

In its Motion to Amend, TBO requests the following: (1) an order amending certain findings in the *Trial Order* (ECF No. 473) and the *Final Judgment* (ECF No. 474) pursuant to Federal Rule of Civil Procedure 52, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7052; (2) alternatively, a new trial pursuant to Federal Rule of Civil Procedure 59(a)(2), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 9023; or (3) alternatively, an order correcting a clerical mistake pursuant to Federal Rule of Civil Procedure 60(a), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 9024. Each alternative request is based upon TBO's assertion that the Court erred in finding that TBO is now known as IDI, Inc., rather than IDI Holdings, LLC. The Court, however, does not find that it made an error which would justify granting the relief requested in the Motion to Amend.

On March 24, 2016, TBO filed its operative pleading, the *Amended Answer, Affirmative Defenses, and Counterclaim* (the "Amended Answer") (ECF Nos. 333 and 334). In the first sentence of the Amended Answer, TBO refers to itself as "Defendant, the Best One, Inc., n/k/a IDI, Inc." This is a judicial admission by which TBO is bound.

"Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Langdale Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 110 F. Supp. 3d 1285, 1293-94 (N.D. Ga. 2014) (internal quotation marks and citations omitted), *aff'd*, 609 F. App'x 578 (11th Cir. 2015). "Such statements 'are proof possessing the highest probative value. Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them.'" *Ussery v. Allstate Fire & Cas. Ins. Co.*, 150 F. Supp. 3d 1329, 1344 (M.D. Ga. 2015) (*quoting Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983)). Although TBO's original *Answer, Affirmative Defenses, and Counterclaim* (ECF Nos. 92 and 93) identified TBO's successor as IDI Holdings, LLC, this statement was effectively superceded and/or amended, and thus rendered irrelevant, by the contradictory admission in the Amended Answer. *See, e.g., In re Neighbors*, No. 11-21003, 2016 WL 805906, at *2 (Bankr. D. Kan. Mar. 1, 2016) (noting that "[i]f a pleading is amended, withdrawn, or superceded by a substitute pleading, it ceases to be usable as a conclusive judicial admission").

Accordingly, TBO may not now argue that the Court erred and may not present new evidence in an attempt to show that TBO's successor is not IDI, Inc., but rather is IDI Holdings, LLC. TBO did not argue or present evidence at trial that TBO's successor is IDI Holdings, LLC or that its admission in its Amended Answer—that TBO's successor is IDI, Inc.—was a mistake.[1] The Court, along with Plaintiff

---

[1] "'Where . . . the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight.' . . . When a

TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"), was, and still is, entitled to rely upon TBO's admission in its operative pleading that TBO's successor is IDI, Inc.

As noted above, TBO requests the following relief in its Motion to Amend: (1) an order amending certain findings in Trial Order and Final Judgment pursuant to Rule 52; (2) alternatively, a new trial pursuant to Rule 59(a)(2); or (3) alternatively, an order correcting a clerical mistake pursuant to Rule 60(a). Rule 52(b) provides that a court "may amend its findings—or make additional findings—and may amend the judgment accordingly." "Motions under Rule 52(b) should be used only to correct manifest legal or factual errors or to present *newly discovered* evidence." *Padurjan v. Aventura Limousine & Transp. Serv., Inc.*, No. 08-20128-CIV, 2011 WL 917742, at *2 (S.D. Fla. Jan. 24, 2011) (emphasis added), *report and recommendation adopted*, No. 08-20128-CIV, 2011 WL 917838 (S.D. Fla. Feb. 22, 2011) (internal citation and quotation marks omitted). Rule 59(a)(2) provides that a court may "open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." However, "[a] motion for a new trial in a non-jury case should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." *Reliable Salvage & Towing, Inc. v. 35%2C Sea Ray*, No. 2:09-CV-329-FTM, 2011 WL 2038576, at *1 (M.D. Fla. May 20, 2011) (internal citation

---

plaintiff fails to provide a credible explanation for the error, the court can disregard the contradictory evidence." *Kaur v. Singh*, No. 2:13-CV-00089-KJM, 2014 WL 2208114, at *8 (E.D. Cal. May 28, 2014) (internal citation omitted).

and quotation marks omitted). "Requests pursuant to Rule 52 and Rule 59 are to be granted sparingly." *Id.* Finally, Rule 60(a) provides that a "court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record."

Because, as discussed above, the Court did not err in concluding that TBO's successor in interest is IDI, Inc. and because TBO did not identify any other grounds for altering or amending the Trial Order or Final Judgment under Rules 52, 59, or 60, the Court determines that there is no basis for granting TBO's Motion to Amend.

## II.   <u>The Motion for Rehearing</u>

In their Motion for Rehearing, TBO and Pouslen seek essentially the same relief that TBO seeks in its Motion to Amend: (1) an order granting rehearing pursuant to Rule 59; (2) alternatively, an order granting a new trial pursuant to Rule 59; and (3) alternatively, an order granting relief from the Final Judgment pursuant to Rule 60(b). The Motion for Rehearing "incorporate[s] by reference all of the merits' arguments set forth on the face of the Defendants' Motion to Stay Pending Appeal [(ECF No. 487)]" and contains no further arguments. In their Motion to Stay, the Defendants contend that their appeal will likely be successful for the following reasons:

1. The Court lacked subject matter jurisdiction to enter the Trial Order and Final Judgment;

2. TRADS failed to meet its burden for a contempt finding;

3. The Defendants were deprived of procedural due process; and

4. The Court misapplied the burden as to proof of ownership prior to the sale of the Debtor's assets, particularly the intellectual property.

*See* Mot. to Stay, 2-22. As noted above, in their Motion for Rehearing, the Defendants simply incorporate by reference these arguments, which relate to their Motion to Stay, and do not explain how these arguments provide any basis for relief under Rules 59 or 60(b).[2]

"A motion to alter or amend a judgment [under Rule 59] must demonstrate why the court should reconsider its prior decision and 'set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision.'" *Wendy's Int'l, Inc. v. Nu-Cape Const., Inc.,* 169 F.R.D. 680, 684 (M.D. Fla. 1996) (*quoting Cover v. Wal–Mart Stores, Inc.*, 148 F.R.D. 294 (M.D. Fla. 1993)). There are three recognized grounds justifying reconsideration of an order: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *Id.* (internal citations omitted). Moreover, a motion seeking reconsideration or to alter or amend a judgment "should not be used as a vehicle to reiterate arguments that were previously made." *Abanto v. Hayt, Hayt & Landau, P.L.,* No. 11-24543-CIV, 2012 WL 5058737, at *1 (S.D. Fla. Oct. 18, 2012) (alterations in original) (*quoting Z.K. Marine, Inc. v. M/V Archigetis et al.*, 808 F.Supp. 1561, 1563 (S.D.Fla.1992). A Rule 60(b) motion may be granted upon one of the following grounds:

(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic),

---

[2] Contemporaneously herewith, the Court is entering an Order Denying the Motion to Stay.

> misrepresentation, or other misconduct of an adverse party; (4) the
> judgment is void; (5) the judgment has been satisfied, released, or
> discharged, or a prior judgment upon which it is based has been reversed
> or otherwise vacated, or it is no longer equitable that the judgment
> should have prospective application; or (6) any other reason justifying
> relief from the operation of the judgment.

*Wendy's Int'l, Inc., Inc.*, 169 F.R.D. at 687 (quoting Rule 60(b)). "A motion for [r]elief

under Rule 60(b) must be shaped to the specific grounds for modification or reversal

enumerated in the Rule, and it may not be a mere general plea for relief." *Id.* at 686-

87. With these standards in mind, the reconsideration of a court's prior order is

undoubtedly "an extraordinary remedy to be employed sparingly in the interests of

finality and conservation of scarce judicial resources." *Id.* at 685 (internal citations

omitted).

Because the Defendants did not articulate a single reason for the Court to

grant relief under Rules 59 or 60, the Court finds it appropriate to deny the Motion

for Rehearing.

## <u>ORDER</u>

Accordingly, the Court, being fully advised in the premises and for the reasons

discussed above, hereby **ORDERS AND ADJUDGES** that:

1. The Motion to Amend (ECF No. 486) is **DENIED**.

2. The Motion for Rehearing (ECF No. 488) is **DENIED**.

### ###

Copies furnished to:

All interested parties by the Clerk of Court

7