```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                       Case Nos. 16-81690-CIV-KAM
 3                               16-81691-CIV-KAM

 4   THE BEST ONE, INC., et al.,  )
                                  )
 5        PLAINTIFFS,             )
                                  )
 6        -v-                     )
                                  )
 7   TRANSUNION RISK AND          )
     ALTERNATIVE DATA SOLUTIONS,  )
 8   INC.,                        )
                                  )
 9        DEFENDANT.              )
     ─────────────────────────────)
10
     -and-
11
     IDI, INC.,                   )
12                                )
          PLAINTIFF,              )
13                                )
          -v-                     )
14                                )
     TRANSUNION RISK AND          )
15   ALTERNATIVE DATA SOLUTIONS,  )
     INC.                         )
16                                )
          DEFENDANT.              )   West Palm Beach, Florida
17                                )   November 8, 2016
     ─────────────────────────────)
18

19            TRANSCRIPT OF MOTION HEARING PROCEEDINGS

20          BEFORE THE HONORABLE KENNETH A. MARRA

21               UNITED STATES DISTRICT JUDGE

22   Appearances:  (On Page 2.)

23   Reporter              Stephen W. Franklin, RMR, CRR, CPE
     (561)514-3768         Official Court Reporter
24                         701 Clematis Street
                           West Palm Beach, Florida  33401
25                         E-mail:  SFranklinUSDC@aol.com
```

```
 1   Appearances:

 2   FOR THE APPELLANTS          Mark D. Bloom, ESQ., AND
                                 John R. Dodd, ESQ.
 3                               Greenberg Traurig, P.A.
                                 333 Southeast 2nd Avenue
 4                               Suite 4400
                                 Miami, FL 33131
 5   -and-
                                 Luis Salazar, ESQ.
 6                               Salazar Jackson, LLP
                                 2000 Ponce De Leon Boulevard
 7                               Penthouse
                                 Coral Gables, FL 33134
 8   -and-
                                 Dennis A. Richard, ESQ.
 9                               Richard & Richard
                                 825 Brickell Bay Drive
10                               Suite 1748, Tower III
                                 Miami, FL 33131
11
     FOR THE APPELLEE            Philip D. Anker, ESQ., AND
12                               Ross E. Firsenbaum, ESQ.
                                 Wilmer, Cutler, Pickering,
13                               Hale and Dorr, LLP
                                 7 World Trade Center
14                               250 Greenwich Street
                                 New York, NY 10007
15   -and-
                                 Paul S. Singerman, ESQ.
16                               Berger Singerman, LLP
                                 1450 Brickell Avenue, Suite 1900
17                               Miami, FL 33131

18

19

20

21

22

23

24

25
```

```
 1          (Call to the order of the Court.)

 2               THE COURT:  Good morning, everyone.  Please be

 3    seated.

 4               All right.  We are here in the case of -- I guess

 5    two cases, The Best One, Inc. versus TransUnion Risk and

 6    Alternative Data Solutions, Inc., that's Case Number 16-81690,

 7    and IDI, Inc. versus TransUnion Risk and Alternative Data

 8    Solutions, Inc., that's Case Number 16-81691.

 9               All right.  So you've given your appearances, I

10    believe, to the court reporter, so I don't think I need to

11    hear -- have you repeat them, but when you make your

12    arguments, if you would identify yourself just for my

13    purposes.  I recognize some of you and don't know all of you,

14    so it will be helpful to remind me who you are.

15               All right.  So this is the motion for stay pending

16    the appeal from Judge Hyman's lengthy order, which I've read.

17    So who's going to make the argument?

18               MR. RICHARD:  Your Honor, my name is Dennis Richard.

19    I am here as the attorney for one of the parties, The Best

20    One, Inc.  And The Best One, Inc. and Poulsen filed a joint

21    motion for a stay pending appeal.  I'm going to make that

22    argument.

23               The other appeal, Mr. Bloom will be making the

24    argument for IDI, Inc.

25               THE COURT:  Okay.  I don't mean to kinda cut you off
```

```
 1   before you even get started, but if I might, the first
 2   argument that you've made in support of your motion, that the
 3   bankruptcy court lacked jurisdiction, that's the first
 4   argument, correct?
 5            MR. RICHARD:  Yes, Your Honor.
 6            THE COURT:  Okay.  Was that argument ever made
 7   below?
 8            MR. RICHARD:  Yes, Your Honor.
 9            THE COURT:  Okay.  So -- because I didn't see
10   anything in Judge Hyman's order that dealt with that issue,
11   unless I missed it.  Was there an earlier motion to dismiss
12   that he ruled on and denied the motion and --
13            MR. RICHARD:  The answer is it is in the order.
14            THE COURT:  Okay.
15            MR. RICHARD:  The motion was made early in the
16   proceeding to dismiss for lack of subject matter jurisdiction.
17   The Court -- and alternatively to abstain.
18            Judge Hyman entered an order deferring ruling on
19   that pending a trial on certain limited issues, because he
20   felt that if he decided, for example, that Mr. Poulsen had
21   notice in a trial, but he never had to reach the other issues,
22   and that he believed that he at least had jurisdiction and was
23   the appropriate judge to determine the notice issue is what he
24   said.  And then he later expanded the issues to be tried to
25   several other issues, but very limited number of issues.
```

```
 1              And then he did not issue a ruling on the motion to
 2   dismiss for lack of subject matter jurisdiction until, as you
 3   say, that very lengthy order.  It does say in the order that
 4   he is going to fully address it.  There is a single sentence
 5   in the order in which the Court just says that the Court has
 6   jurisdiction to hear this matter.  It's one sentence.  And
 7   then in the conclusions of law it says that the motion to
 8   dismiss for lack of jurisdiction is denied.
 9              THE COURT:  Okay.  I guess I missed those two
10   sentences.
11              All right.  So I just wanted to know whether this
12   was being raised for the first time on appeal or not.  I mean,
13   subject matter jurisdiction can be raised at any time, so I
14   just want to know whether it had been raised below.  So, thank
15   you, you've answered that question.
16              So go ahead.
17              MR. RICHARD:  Unless the -- I would like to reserve
18   some time for rebuttal, Your Honor, and I'm not exactly sure
19   how much time we have.
20              THE COURT:  We'll have as much time as we need.
21   Okay?
22              MR. RICHARD:  All right.  Unless the Court directs
23   otherwise, I would focus my argument, while touching on all of
24   the issues, but focus it on two predominant areas, the first
25   one being subject matter jurisdiction and the second one being
```

```
1    constitutional due process, which oversees both -- which
2    relates to both Poulsen and to my client, The Best One, Inc.,
3    which I'll refer to as TBO for short.
4         And as far as subject matter jurisdiction is
5    concerned and these other issues, they fall within the factor
6    of substantial likelihood of prevailing on the merits.  We're
7    traveling on two cases on that standard.  One is Garcia-Mir,
8    from the Eleventh Circuit, and the other is Jet Networks, from
9    the Southern District of Florida.  And under the Jet Networks
10   construction of Garcia-Mir, a likelihood of success is shown
11   at this stage of an appeal from a bankruptcy court when the
12   movant has raised questions going to the merits so serious,
13   substantial, difficult and doubtful as to make them a fair
14   ground for litigation and thus more deliberate inquiry.  And
15   we will submit that as to each of these issues that we'll
16   raise, they are genuine, legitimate, serious issues that ought
17   to have the full examination of a full appeal.
18        Insofar as the subject matter jurisdiction, we
19   submit that the Lemco Gypsum case out of the Eleventh Circuit
20   is governing.  It is the lead case not only here, but in large
21   parts of the country.  It's widely cited.
22        In Lemco, the Eleventh Circuit struggled with the
23   issue of how long a bankruptcy court's jurisdiction lasted
24   when all of the debtor's property had already left the estate
25   and when all of the creditors had already been paid.
```

1          Those circumstances are both true here.  When this

2    action was filed by the plaintiff, TRADS, all of the

3    creditors, all of the property had already left the estate,

4    and ultimately, as TRADS acknowledges in its participates, all

5    of the creditors have been paid in full.  So that in Lemco

6    Gypsum --

7          THE COURT:  So if all the -- if all the property had

8    left the estate, did that include the rights to the source

9    code?

10         MR. RICHARD:  No, Your Honor, because it was a

11   quitclaim sale, and this was reflected in a series of places.

12   The court-approved asset purchase agreement says on page 1

13   that the only thing being sold is the debtor's right, title

14   and interest in the assets to be described thereafter.

15         The Court also approved the bill of sale, which, on

16   its face, is limited to the debtor's right, title and

17   interest.  And the while there were -- and the distinction, of

18   course, between a quitclaim sale and a non-quitclaim sale is

19   the instrument of conveyance has warranties that survive the

20   deed, that we warrant that this is what we own.  There were no

21   such warranties.  And, in fact, the representations and

22   warranties in the asset purchase agreement -- then the Court

23   also approved this -- provided that they all terminated as of

24   closing as of the moment that the quitclaim deed was handed

25   over.  TRADS accepted that quitclaim deed.

```
 1              THE COURT:  All right.  Well, even though there may
 2   not have been any warranties as to the ownership of the source
 3   code, at least the documents on their face purported to convey
 4   the source code, yes?
 5              MR. RICHARD:  No, the documents actually never
 6   mentioned the B-Parser source code.
 7              THE COURT:  Well, I mean, they may not have
 8   mentioned it specifically, but in terms of the general
 9   description of what was being conveyed, the source code would
10   have fallen under the general description it wasn't being
11   conveyed, yes?
12              MR. RICHARD:  There are other source codes.  In
13   other words, there are general source codes which TRADS, which
14   the buyer has, that relate -- what the buyer has and has been
15   operating its business on since the closing is the program
16   that's read by the computers, the ones and the zeros, and so
17   that it's operating all of the programs.  It just doesn't have
18   the source code to one program, which is the source code to
19   B-Parser.
20              THE COURT:  I understand that, but what I'm asking
21   you is, though, on the face of the documents that -- where the
22   conveyance of all of the assets of the entity --
23              MR. RICHARD:  I understand.
24              THE COURT:  -- were being conveyed, the description
25   of what was being conveyed included the source code, even
```

1   though it wasn't specifically listed as an item to be

2   conveyed.  Am I correct or not?

3          MR. RICHARD:  The description of what was being

4   conveyed was a defined term, two words, capital "A", Acquired,

5   capital "A", Assets.  That was it.

6          And "Acquired Assets" is defined in the asset

7   purchase agreement as the debtor's right, title and interest

8   in.  So that if I could put a little meat on that bone, it's,

9   for example, prior to the closing, TRADS prepared due

10   diligence reports in which they acknowledge that the binary,

11   which is what the seller had in its computers, was on its

12   computers under a license, so that when the -- and that they

13   didn't own it and they did not own the source code.  And they

14   actually record this.

15          THE COURT:  But didn't Judge Hyman, after

16   considering the evidence, come to a different conclusion, that

17   they actually did own it?

18          MR. RICHARD:  He did.  He did it in an adversary

19   proceeding after the fact.  And now I think we're talking

20   about the deprivation of due process.  And I would say two

21   things.  That, number one, a adversary proceeding held after

22   the sale cannot cure a deprivation of due process before the

23   sale.  That's number one.

24          Number two, Judge Hyman also bifurcated from this

25   trial issues of ownership.  And, yes, the findings of fact and

1    conclusions of law that were submitted to Judge Hyman by TRADS

2    adjudicated ownership, and he adopted those findings.

3           The fact is that we weren't trying ownership.  At

4    most, we were trying the five issues that he listed, which did

5    not include ownership, and, in fact, we set forth in the

6    brief, where he understands that we're not going into

7    ownership.  We didn't even submit a expert witness on the

8    issues of ownership, only on certain defined terms, so that,

9    yes, Judge Hyman adjudicated ownership by having an

10   evidentiary hearing three years after the sale on issues that

11   no evidence was received on, were never considered and were

12   never teed up before the sale.

13          Keep in mind, Your Honor, that a bankruptcy judge,

14   in authorizing a Section 363 sale, that what the parameters of

15   the bankruptcy judge's job are under Section 363 is to

16   determine whether or not -- not ownership, but right on the

17   face of the statute, whether or not there is a bona fide

18   dispute over ownership.  And the cases say that a bona fide

19   dispute doesn't exist just because the debtor says it does.

20   There has to be evidence.  Without that, you cannot authorize

21   a 363 sale.

22          What the Judge did here is, first of all, in this

23   hearing after the sale, he found there was a bona fide dispute

24   based upon a receipt of evidence, which he did not have before

25   the order that they're seeking to enforce, and then the Court

```
 1   went beyond that and decided all kinds of issues relating to

 2   notice -- relating to ownership, which, in fact, is not within

 3   the bailiwick of a Section 363 sale.  And all of those issues

 4   had been bifurcated, because this trial was limited to certain

 5   issues.  Therefore, we had no procedural due process even

 6   within this trial to determine the issue of ownership, as

 7   opposed to a bona fide dispute, or, for example, exclusivity.

 8            For example, in the Buxton case which we cite in the

 9   brief, which follows Lemco, Judge Kimball points out, in a

10   case that's on the proverbial all fours of our case, in that

11   he was faced with a motion to enforce the sale order and for

12   contempt, the assets, as here, had already left the estate,

13   and there was a dispute over who owned what intellectual

14   property.  And Judge -- in following Buxton and finding that

15   the Court had no jurisdiction, he pointed out this was a

16   quitclaim sale, and that exclusive use -- in that case, the

17   intellectual property was use of a name, Buxton Funeral Homes.

18   And he said the purchaser has come in and sued to enforce the

19   sale order and for contempt, and they say they have the

20   exclusive use of the intellectual property, and this other

21   entity, which was related to the debtor, says that they don't

22   have the exclusive use, we have the right to use the name, as

23   well.

24            And he said this is a decision that relates to state

25   law, particularly when you're dealing with a quitclaim deed,
```

```
 1   that is only transferring the right, title and interest.  And
 2   then we've also cited the case in our brief that says that
 3   when one takes a conveyance of a quitclaim and takes the risk
 4   of who owns what -- and under Florida law, when you accept a
 5   quitclaim deed you take that type of risk -- that any party
 6   can litigate after the bankruptcy what was included in right,
 7   title and interest.
 8           Keep in mind that before the bankruptcy, as well as
 9   15 months after the bankruptcy, even after it filed this
10   lawsuit, TRADS was internally recording that it did not own
11   the source code -- its words -- and that this was a risk known
12   before closing.  So that the order that Judge -- this very
13   lengthy order is a very lengthy order, almost as lengthy as
14   the submission by TRADS, in the findings of fact, what it says
15   is that TRADS has the exclusive rights to the source code and
16   all of the other intellectual property.
17           That is an adjudication, where the Court is
18   converting after the fact a quitclaim sale, which was approved
19   by the bankruptcy court into something more.  And then the
20   Court is going beyond that and adjudicating matters beyond the
21   363 sale:  Whether Mr. Poulsen was an employee, when it was
22   invented, where he was when he thought it up, and all of these
23   issues, which had been bifurcated, none of them were teed up
24   or presented at the time of the presale motion.
25           Now, the other factor that the Court doesn't say a
```

```
 1    word about in the order is the following, is that -- and we --
 2    and let me tie this in.  The -- my client, The Best One, Inc.,
 3    takes its interest through Poulsen.  And so the issue of
 4    whether Poulsen was deprived of due process because he was not
 5    informed that his interests were targeted started in a hearing
 6    before Judge Hyman about a month and a half before the sale.
 7    And at that hearing, the debtor's counsel calls to the Court's
 8    attention the fact that Poulsen's interests are targeted.  And
 9    when that is called to the Court's attention, Judge Hyman
10    pronounces, well, if that's the case, someone should have told
11    me this.  And then he instructs the attorneys for both the
12    debtor and the purchaser do not include in the sale order any
13    findings concerning Poulsen's interest without an extensive
14    evidentiary hearing -- his words -- extensive evidentiary
15    hearing before the sale.
16            And so what happens?  Is there such a hearing?
17    None.  The dozens of footnotes that are in TRADS' brief, not
18    one of them show a single evidentiary hearing with any
19    evidence about Poulsen's interests.  Why not?  Well, they
20    elected to take a quitclaim deed, and they wrote "accepted" on
21    it.  So that by virtue of taking a quitclaim deed they were
22    taking the risk.  And they wrote in their papers that they
23    were taking this risk before closing, and that they knew they
24    took the risk before closing by accepting.  And it's not just
25    that they accepted the quitclaim deed.  It necessary all
```

```
 1    capital letters "accepted," and then it's signed by TRADS'

 2    general counsel.

 3              So that in disregarding Judge Hyman's instructions

 4    to schedule such a hearing, he even said, let me look at my

 5    calendar, I only have a half day set aside for the sale

 6    hearing.  And then he said, whatever you do, do not include a

 7    carte blanche finding concerning the interests of Mr. Poulsen.

 8              And so that we have these absolute givens that

 9    Mr. Poulsen never had a hearing prior to the sale of his

10    purported interests.  His interests were targeted.  And then

11    we cite two cases out of bankruptcy courts in Florida that say

12    that when a person's bankruptcy -- when a person's property

13    interests are targeted -- we actually cite three cases.  Under

14    the Fifth Amendment due process, no person shall be deprived

15    of property without due process of law.  The due process of

16    law in a 363 sale means that you can't just file a motion and

17    have negative notice.  It means you have to actually have what

18    the judge was referring to, an adversary hearing in which the

19    defendant, or the person whose property you want to deprive

20    him of, receives a document with his name on it, Debtor versus

21    Poulsen, in which it says:  We are targeting your interests.

22    Both cases say that.  Both cases say an adversary proceeding

23    was required.  That without it, the order as to Poulsen only

24    is void.  And neither case is mentioned in TRADS' response,

25    just completely ignored.
```

```
 1              And the next issue on notice is TRADS says, well, he

 2   was mailed this -- the 300-page sale motion in which his name

 3   is mentioned inside this document.  Well, first of all, that's

 4   not a adversary proceeding.  Second of all, he was mailed that

 5   to an address in South Florida by a debtor that had paid his

 6   moving expenses eight months before -- and this is

 7   undisputed -- to move him to Bend, Oregon.  In September of

 8   2013, the same debtor sent Mr. Poulsen the sale -- sent

 9   Mr. Poulsen his IRS form.  He was a member of the debtor.

10              THE COURT:  But didn't Judge Hyman, you know, make

11   factual findings that he received the notice, the mail was

12   forwarded to him in Oregon, and et cetera, et cetera?  So

13   . . .

14              MR. RICHARD:  He did it, but he did it based upon

15   erroneous legal conclusions.  Put the factual findings aside

16   for a minute.  What was the erroneous legal conclusions on

17   which those findings were based?

18              Number one, at the very beginning of notice, Judge

19   Hyman says that the defendants failed to prove that Poulsen

20   did not receive notice.  So the first thing he does is he

21   reverses the burden, which is reversible error under Eleventh

22   Circuit court.  The proponent of a 363 sale has the burden of

23   proving the notice was received.

24              So number one, a hundred percent of those findings

25   come after the Judge puts the burden on the defendants to
```

```
 1   prove the negative.

 2          THE COURT:  Where is that in the order where he says

 3   the burden's on the defendant to prove that he didn't receive

 4   notice versus -- because my reading of the order, he finds

 5   that Mr. Poulsen did receive notice.  I don't know -- I don't

 6   remember the provision where he said and it was his burden to

 7   prove --

 8          MR. RICHARD:  Yeah, I'll give you exactly where that

 9   provision is, Your Honor.  It's on page 65 of the trial order.

10   It's the beginning of the analysis of notice and -- to

11   Poulsen.  And what the Court says, page 65, is defendants did

12   not establish that Poulsen failed to receive proper notice and

13   due process of the 363 sale.

14          THE COURT:  Well, he may have -- I don't know if

15   he -- that means he's putting the burden on the defendant to

16   prove that he didn't receive notice, as opposed to that's his

17   conclusion, that he -- he didn't receive notice based upon the

18   evidence that's been presented.  I -- so I can see that

19   you're -- how you could argue that he's putting the burden

20   there, but I'm not sure that's what he meant by that.

21          MR. RICHARD:  If there's any doubt about that, what

22   the bankruptcy judge next (sic) blows the doubt out of the

23   room.  What he does was he applies a presumption that properly

24   addressed mail was received by the addressee, a presumption

25   that only applies when it is correctly addressed.  And we've
```

```
 1    cited a series of cases on this.

 2          It is undisputed, number one, that the mail was sent

 3    to Florida eight months after Poulsen moved to Oregon.  It is

 4    undisputed that the debtor knew he had moved to Oregon.  The

 5    debtor had sent him his IRS forms to his Oregon address three

 6    months before.

 7          THE COURT:  But didn't he also find that under the

 8    standard operating procedures of the post office, and I

 9    believe there was evidence from postal employees that mail is

10    forwarded for up to one year to the -- to the new address?

11          MR. RICHARD:  He also did that based upon a clear

12    error of law, in that he made that finding based upon an

13    opinion of a Postal Service manager on the face of an ex parte

14    affidavit in which -- and this is what he cites -- in which

15    the Postal Service manager attaches two documents for

16    authentication.

17          And what the Eleventh Circuit says -- and they also

18    say this is reversible error -- is that an extraneous opinion

19    beyond authentication on the face of such a declaration or

20    affidavit is inadmissible, and to rely on it is reversible

21    error.

22          What does the postal manager say in that extraneous

23    opinion?  He says:  Attached are authentic documents from the

24    Postal Service.  And then in the extraneous opinion he says

25    something that's not in either one of those documents.  He
```

```
 1   expresses the opinion that while the envelope was addressed to
 2   Poulsen at an address in Boca Raton, Florida -- whereas he
 3   didn't live in Boca Raton.  His address was Highland Beach,
 4   Florida -- that -- that would be --
 5            THE COURT:  But it was the same zip code, wasn't it?
 6   Wasn't it the same zip code?
 7            MR. RICHARD:  Same zip code, but the presumption --
 8   and we've cited the cases in the brief.  It's a very, very
 9   bright-line presumption, and the presumption only applies if
10   you address something completely correct, for example, to --
11   and the address is Dr. Hicks Boulevard -- and we have cited
12   this in the brief -- and instead it was addressed to Drive
13   Hicks boulevard, because somebody misread the "DR" for doctor
14   as "drive" and spelled it out, then the Court held the
15   presumption does not apply.  All right.  This is just black
16   and white.  And that when it's not like there are shades of
17   gray in the application of the presumption.
18            And so that when the manager in an ex parte
19   affidavit, not subject to cross-examination, not subject to
20   communications that we have any knowledge about between him
21   and TRADS, expresses an opinion that they're the same address,
22   two things arise from that.  Number one, the document that is
23   authenticated and was admissible that's attached shows that
24   when you punch in the address as Boca Raton, the Postal
25   Service system corrects it to Highland Beach, to a different
```

```
 1   city.

 2            And number three -- and this is a mixed issue of law

 3   and fact, which Your Honor has ruled in prior appeals is

 4   reviewed de novo.  And the fact is the only documentary

 5   evidence in the entire trial record of anything that was ever

 6   mailed to the wrong Boca Raton address, addressed to Poulsen,

 7   within two days of the sale motion was returned to the sender

 8   13 months later, after this lawsuit was brought, as

 9   undeliverable.  That's it.  That's the only evidence that is

10   documentary evidence in the record.

11            Yes, we have the opinion of the Postal Service

12   manager in which he says it's the same address.  That opinion

13   is rank hearsay, and it is not admissible, and admitting it --

14   and the Court entirely relies on that opinion, which we

15   objected to as rank hearsay at the trial, we objected to it

16   coming in, and we actually objected to it in advance.  It was

17   kind of like a motion in limine before we even got to the

18   trial on the issue.

19            And so that without those two things, what are we

20   left with?  We're left with a legally erroneous conclusion

21   based upon the assumption that a presumption applied that did

22   not.  And, you know, merely because one can argue it was the

23   same zip code doesn't mean the presumption applies.  The

24   presumption only applies if it's the same address.  And in the

25   two cases that we cite, there's actually another one that is
```

1    quite illustrative of it, and that's the Burton case, where

2    the envelope was addressed to 6514 Sandy York, but the address

3    was actually 6514 Sandy Oak, and the presumption did not

4    apply.

5          So the presumption has narrow application.  It did

6    not apply here.  And even if it did apply, it still doesn't

7    overcome the failure to have the evidentiary proceeding

8    directed by the bankruptcy court and the failure to bring a

9    declare -- an adversary proceeding before the sale.  There's

10   no question that that didn't happen.  All he would have

11   gotten, at most, which he didn't get, was a motion that was

12   sent to an address that the debtor knew he had moved out of

13   eight months before.

14         And I can't overemphasize this.  And they serve that

15   motion on November 8th or November 6th of 2013.  In September

16   of 2000' -- and the debtor did it.  In September of 2013, the

17   debtor sent Poulsen his IRS form, the one for him being a

18   member, compensation, I think it's called the K-1, and he sent

19   that to the precise address in Bend, Orlando, which they knew

20   he was at.

21         And so that when you combine these things, what I

22   would submit is that there are substantial, real, legitimate

23   questions here as to whether he was denied of his Fifth

24   Amendment due process.

25         Whether -- and not the legal issues.  I'm not going

1    to challenge -- and I know they want to turn this into a fact

2    issue.  And for that reason, in the response, TRADS never

3    mentions our objection to the admissible of the opinion.  It's

4    not mentioned in their brief, even though we cite the cases.

5    They never mention the reversal of the burden.  And, of

6    course, the reason it's not mentioned, because they would

7    prefer to say, well, this was a trial, and the Court made

8    these findings.

9            Well, each of these findings were based on erroneous

10   applications of law that had been urged by TRADS.  And so that

11   without the adversary proceeding, which they can't say was --

12   occurred -- and we've cited the cases that a motion to enforce

13   a sale order against a specific person is void as to that

14   person if there was a deprivation of constitutional due

15   process.

16           And the Court made a very interesting finding in the

17   trial order, and this one is on page 64, Footnote 112.  And

18   the Court rejected TRADS' position on page 64, that -- where

19   TRADS was arguing that the defendants, Poulsen and TBO, had a

20   full opportunity to litigate this and participate in the

21   bankruptcy at the time of the sale.  He rejects that.  He says

22   neither one actively participated in the sale proceedings, and

23   neither one had a full and fair opportunity to participate in

24   those proceedings, and rejects the concept of res judicata,

25   which takes us back to the Buxton case and Judge Kimball,

1    where that count points out that when you're dealing with a

2    quitclaim sale, as here, and where there is no res judicata

3    issue, where they were bound by this order of the bankruptcy

4    court, it's neither appropriate, nor the place of, nor within

5    the jurisdiction of a bankruptcy court to suddenly convene a

6    proceeding after the assets have left the estate, even though

7    in Buxton, as well, there was a retention of jurisdiction

8    clause to interpret the sale order.

9            He goes, wait a minute, this was a quitclaim sale,

10   the property has gone from the estate, the Eleventh Circuit in

11   Lemco says it's too late, and we shouldn't -- that the Court

12   does not stay forever involved in the affairs of its organized

13   debtor -- reorganized debtors.

14           And so that when one looks at these errors, that --

15   and there's another issue that I think I need to point out

16   here.  I'm sorry to interrupt myself, but I missed it, and it

17   just lit up in my head.  And that is the sale order, that

18   first the sale motion was served to the wrong state and the

19   wrong address.  Second, there was no adversary pleading before

20   the sale.  And then, third, the sale order was entered on

21   December 13th of 2013, and it provided for the sale to take

22   place three days later.

23           And the debtor's counsel admitted during the trial

24   that the sale order was not served on Poulsen, or anybody else

25   for that matter, until January 17th of 2014, 35 days after the

```
 1    entry of the order, which is appealable, under bankruptcy
 2    rules, for -- within 14 days.  The debtor's counsel said the
 3    reason for the error was that one of his secretaries went on
 4    vacation, thought the other secretary served it, she came
 5    back, and nobody figured it out that they hadn't served it
 6    until January 17th.  Nobody ever called this to the attention
 7    of the Court until our case arose.
 8            And the first time an adversary proceeding was ever
 9    brought naming Poulsen was in March of 2015 by TRADS.  TRADS
10    waited too long to fulfill his due process.  Why?  Because
11    this is a motion to enforce a sale order.  If the sale order
12    was void -- and we do have the cases here, and I'll find them
13    without breaking up my argument -- you can't cure a
14    deprivation of due process even if, for example, the best case
15    is where an individual is terminated from a position which
16    requires a hearing before a due process, a government
17    employee.  And what the courts of appeal have said, you
18    can't -- even if, even if the termination was entirely correct
19    and was based on good merits, if you violated the due process
20    by taking the action and taking away the rights you did when
21    you did, that order is not enforceable.  And that's basically
22    what it comes down to here as to -- as to Mr. Poulsen and TBO,
23    through whom Mr. Poulsen takes.
24            The MMH case that was decided by now-Chief Judge
25    Isicoff, then bankruptcy judge Isicoff, in MMH, she faced an
```

1   interesting question similar to what we faced here, in that

2   there was an owner of a billboard that was on land that was

3   sold through a bankruptcy sale, and the owner had not been

4   given adequate notice of the sale, and all of the property,

5   and the way the sale order read, a hundred percent of the

6   property and everything on it was being sold to the purchaser

7   in bankruptcy.  And what -- and like here, the owner of the

8   billboard wasn't trying to set aside the sale.  Which was

9   another problem here is TRADS always recasts our argument as

10  if we're trying to set aside the sale.  And the Court, in

11  fact, devotes an entire section of the trial order adopted

12  from TRADS' proposal saying that we've not sufficiently proved

13  enough to set aside the sale.

14          And so what Judge Isicoff says in that case is what

15  do you do with a flaw -- a final but flawed sale order?

16  Because you can't argue that the integrity of bankruptcy needs

17  to be preserved to the extent that you could deprive someone

18  of their right not to be deprived under the Fifth Amendment

19  with adequate due process, which in this case meant if he's

20  being targeted, you gotta name him in a pleading called an

21  adversary proceeding.  And what she said is the bankruptcy

22  courts are inherently courts of equity, and we need to fashion

23  a remedy.

24          The Court does not rule on that argument.  The Court

25  here is just black and white.  If this is what the order says,

1    this is what I need to do.  And whereas in Judge Isicoff's

2    case, she says we need to fashion a remedy.  What's the remedy

3    she fashions in that case?  She says, well, that provision is

4    not going to apply.  I'm not going to set aside the sale, but

5    that provision is not going to apply to this individual.

6         It happened.  In that case the billboard had a

7    buyout provision, you know, that created a solution.  But all

8    we've ever asked is that the -- that to the extent that the

9    provision, even though it is limited to right, title and

10   interest, relates to Poulsen, that having been deprived of

11   that right, title and interest, that that sale order should

12   not relate to him.

13        Does that -- just to talk about the balance of harms

14   for a moment.  Does that somehow -- because in the balance of

15   harms, there has to be -- you know, one of the factors is is

16   there substantial damage to the purchaser, to TRADS in this

17   case.

18        Well, prior to the sale, TRADS acknowledged

19   repeatedly that it had learned that the seller did not own the

20   B-Parser source code.  Prior to the sale, TRADS elected not to

21   have the evidentiary hearing required by the Judge.  Prior to

22   the sale, TRADS went forward and agreed to a quitclaim sale.

23   And after the sale, six, seven months after the sale -- and

24   we've cited this in our brief -- TRADS doesn't ask for the

25   source code.  They document in January -- the sale's in

1    December.  They documented in January, we don't have, and we

2    don't own the source code.  They document in February, we

3    don't have, we don't own the course code.  Those words, "do

4    not own."  Document it again in March.  And then they say

5    Poulsen has it.  Somebody needs to request it.  Let's see if

6    we can get it from Poulsen.

7            In March of 2013 -- and all of this is undisputed --

8    TRADS' internal general counsel drafts a letter to Poulsen to

9    request the source code.  Admits they never sent it.  They

10   just elected not to send it.  Didn't ask for it in April, May,

11   June, July.  Every month they have a report saying, do not

12   own, do not own.

13           Then ultimately after this lawsuit is filed, they

14   actually create a document concerning our lack of ownership of

15   the source code and how we'd really like to have it in order

16   to operate -- you know, why do they want it?  Well, the reason

17   they give for wanting it is what if something breaks in the

18   binary, for example?  In order to fix it -- which, nothing

19   ever has, and there's no evidence that anything ever has, and

20   it's running on their computers -- they would need the source

21   code.

22           Well, the source code is a trade secret, and the law

23   is clear that once a trade secret is lost, it's lost forever,

24   and that is the definition of irreparable harm.

25           So what is the status quo that we have today while

1     these legitimate legal issues need to be considered?  We have

2     a status quo where TRADS, the purchaser, has the binary,

3     which, in their own documents they admitted that the seller

4     didn't own and they only had a license on, that we would like

5     them to pay a royalty on it if they're going to continue using

6     it under the license.  They're going to continue using that.

7     We're not trying to stop them from using it, the binary that

8     runs these programs.  They don't have the source code, which

9     they don't need to run the binary.

10          TRADS makes this point that we're not using the

11    source code.  Our client, he says you don't need the source

12    code.  And by doing so ignores two things, that the same month

13    in which our client bought the software from Poulsen,

14    October 2014, within 10 to 14 days before they did anything

15    with it, TRADS brought this adversary proceeding in October,

16    same month, of 2014.

17          And what our client testified to is, no, we're not

18    using it, and we don't need it for our current product.  Why?

19    Because you're claiming ownership of it, and we want this

20    sorted out in a court of law before that.  Not in the

21    bankruptcy court, wherever it's decided what a -- what the

22    right, title and interest was as to these -- about the source

23    code and the binary.

24          So that maintaining the status quo, Your Honor,

25    while these proceedings -- while we get the chance to have a

```
1    plenary appeal -- which is not a long time in district court
2    from bankruptcy.  We're not going to ask for any extensions.
3    I mean, I know that one brief comes due right after
4    Thanksgiving, another Christmas.  Maybe between the lawyers
5    we'll adjust it by a couple of days here or there.  But this
6    is a relatively quick process.  And, in fact, we're even
7    willing to expedite the appeal and file the full brief sooner
8    than it's due, before Thanksgiving.  And then they can file
9    their response before Thanksgiving.  That way -- it's not like
10   we haven't briefed these issues before.  And that way we get
11   to have a plenary appeal, we get to lay out each of these
12   issues of law, and we get to have full consideration of these
13   issues of law.
14           And I cannot emphasize more strongly -- and I'm
15   about to sit, if I haven't addressed anything.  If I may just
16   check my notes, Your Honor?
17           THE COURT:  Yeah, but I'm going to have a few more
18   questions, but go ahead and check your notes first.
19           MR. RICHARD:  Do you want me to answer the questions
20   now?
21           THE COURT:  No, no.  Go check and see if there's
22   anything else you want to say before I ask any questions.
23           MR. RICHARD:  Yes, there's one area that I have not
24   covered, and that is the contempt under the substantial
25   likelihood of prevailing.  And, of course, I'd like to comment
```

```
 1    on the public interest.
 2            On the contempt, what happened here is the
 3    bankruptcy judge, three years after the sale, converted a
 4    quitclaim sale into something much more.  He converted it into
 5    a warranty sale.
 6            THE COURT:  Well, why is that so, if all he was
 7    deciding was what was conveyed in the first instance?
 8            MR. RICHARD:  Well --
 9            THE COURT:  I mean, he's saying that it was owned by
10    TRADS, and so -- and that was what was conveyed.  He's not
11    saying it was a warranty deal.
12            MR. RICHARD:  Let me say it a different way, because
13    obviously I wasn't articulating it well.
14            Our clients have been -- our client, TBO, has been
15    adjudicated in contempt of buying something that had never
16    been defined before it was defined in that lengthy order,
17    whereas there was no prior order saying what the right, title
18    and interest was.  All there was was an order saying that the
19    seller owns whatever the -- that defined term "Acquired
20    Assets" are as defined in the contract.  And the way they were
21    defined in the contract was right, title and interest.
22            So that's what we had at the time of the sale order.
23    And when you couple that with the fact that he finds that TBO
24    and Poulsen neither had a fair and full opportunity to
25    litigate at that time, and then three years later has a
```

```
1    plenary -- has the extensive evidentiary hearing and considers
2    and decides for the first time things that were never teed up
3    at the time of the sale order and there was no evidence on,
4    and to say, okay, I'm going to decide that Poulsen was an
5    employee, I'm going to decide that -- because I've heard
6    evidence on that for the first time, I'm going to decide that
7    the BOLT was created by Poulsen while he was working as an
8    employee, first time, I'm going to decide that BOLT IP
9    includes the following things, one, two, three, four and
10   five -- that's the defined term -- none of which existed in
11   the order at the time of the sale, and then say he could --
12   and then he could say, I'm going to order you now to turn that
13   stuff over, but instead he said, I'm going to find you in
14   contempt of the order issued three years before, without an
15   evidentiary hearing and without the specificity required for
16   any contempt, you know, is granted, Your Honor, and you
17   pointed out earlier, that there are some very broad language
18   in the scale order, you know, and everything else that has
19   anything to do with it.
20           But the only thing that's described in the asset
21   purchase agreement, which the sale order ever even comes back
22   to, even in a carte blanche paragraph which the Court told
23   TRADS not to put in there, and TRADS required that it be in
24   there, and the Court was never informed, sign verbatim, what
25   does the carte blanche paragraph say?  It says, that to the
```

1    extent that Ole Poulsen holds any interest of any kind in

2    B-Parser or anything else that he has ever had an interest in

3    that could be useful -- and actually says this -- that could

4    be useful in the business of the debtor shall be deemed an

5    acquired asset.

6            All right.  But then it goes on.  It says, as

7    defined.  And the asset purchase agreement defines "Acquired

8    Asset" as the debtor's right, title and interest in these

9    items.  And then when you get to the items that are listed in

10   a schedule, what does it define?  And this is a good

11   illustration as to what we did not get to try.  What it

12   defines are what it called the -- and it says this very

13   precisely, the application components of B-Parser and the

14   application components of BOLT.

15           Well, application components are the binary, and

16   that was an issue that had been bifurcated.  We didn't present

17   an expert on it.  In other words, when it says what we're

18   defining here is the application components, that's what's

19   running on their computer.  That does not include the source

20   code.  And, in fact, there is an exclusion on the face of the

21   asset purchase agreement that says excluded assets, that says

22   we're excluding any licenses that are not listed in the

23   schedule of licenses, and this is not listed on the schedule

24   of licenses.

25           So these are all fundamental and legitimate

1    questions as far as the public interest is concerned, Your

2    Honor, which I think is the only thing I haven't commented on.

3    I would say the following, that -- oh, and by the way, Judge

4    Hyman recognizes that -- he actually acknowledged that if we

5    have to deliver the source code, that the defendants may very

6    well be, in his words, irreparably harmed.

7         So that on the public interest, I would respectfully

8    submit that there is no interest greater than deprivation of

9    property without due process of law.  I would submit that

10   under the Ex-Cel case, which we cite, it says that the

11   exigency of a bankruptcy proceeding can never -- have to use a

12   word other than "trump" -- can never transcend the

13   requirements of constitutional due process.

14        And what's interesting here is all of the basic

15   functions of the bankruptcy court have been completed.  All

16   the creditors have been paid.  There's only a few thousand

17   dollars in the account of the debtor.

18        Why does the bankruptcy still exist?  It's a matter

19   of record.  The debtor moved to extend so that TRADS could

20   litigate this issue in the bankruptcy court.  There is no

21   further labor of the bankruptcy court on any of the basic

22   responsibilities to reorganize the debtor, which was done.

23   The confirmation was entered before this lawsuit was even

24   brought and the creditors were paid in full.  The debtor

25   doesn't even exist anymore.  It was dissolved.

```
 1              And so that the bankruptcy court is being used as a
 2    vehicle to adjudicate issues that are beyond and outside of
 3    its jurisdiction, and that's when TRADS accepted a quitclaim
 4    deed, what were its right, title and interest at that time.
 5    Those are state law issues that should not have been -- number
 6    one.  And, number two, if the bankruptcy court was going to
 7    adjudicate those issues, we should have been told that the
 8    bankruptcy court was going to reach issues beyond the five
 9    issues, and I would like to set forth those five issues that
10    he had limited these proceedings to.
11              One was notice to Poulsen, which was the only issue
12    to begin with.
13              THE COURT:  Notice to Poulsen about the sale?
14              MR. RICHARD:  That's right.
15              THE COURT:  All right.  And didn't he adjudicate
16    that?
17              MR. RICHARD:  He did.
18              THE COURT:  All right.  Adverse to your client.
19              MR. RICHARD:  He did, based on the --
20              THE COURT:  Incorrect --
21              MR. RICHARD:  -- misapplication of the burdens.
22              THE COURT:  Oh, okay.
23              MR. RICHARD:  All right.  And --
24              THE COURT:  But that's an issue that he said at the
25    outset --
```

```
 1             MR. RICHARD:  Said at the outset.

 2             As a matter of fact, at the outset, TRADS succeeded

 3     in shutting down all discovery on virtually everything else,

 4     because he said, first I'm going to decide if Mr. Poulsen was

 5     served with notice, because if he served -- and we'll have an

 6     evidentiary hearing.  If he was served with notice, we may not

 7     have to go any further.

 8             And then a document surfaced from the debtor from

 9     March of 2013 in which the debtor's chief technology officer

10     acknowledges in the face of the document that TLO, the debtor,

11     has no interest in BOLT, as that's intellectual property

12     that's owned by Poulsen.  And then a few more documents

13     surfaced, and the Judge said, you know what, now that I've

14     seen these documents, I am opening up discovery on another

15     issue that was raised sua sponte by the Court, not by us.  And

16     that issue was fraud on the Court.  Because when he looked at

17     this document that said "not owned by," he said, look, that --

18     and we presented the transcript where the Judge said don't

19     insert a finding concerning Poulsen without an evidentiary

20     hearing, the combination of those things, the Judge issued a

21     new order, and he said, I'm going to open it up on fraud on

22     the Court.  I want to know what TRADS knew and when they knew

23     it and whether they were a good-faith purchaser.

24             And then three weeks before the trial, pretrial

25     hearing, TRADS finally produced these smoking gun documents in
```

```
 1   which it says we knew the source code was not owned.  The
 2   Judge never reached those issues in his order, never mentions
 3   them.  Never reaches the issue of unclean hands, and --
 4          THE COURT:  Well, he says they're a good-faith
 5   purchaser, doesn't he?
 6          MR. RICHARD:  I'm sorry?
 7          THE COURT:  Doesn't Judge Hyman say TRADS was a
 8   good-faith purchaser?
 9          MR. RICHARD:  He does say that, but he never
10   issues -- he never reaches the issue of unclean hands.  And
11   what I mean by that is --
12          THE COURT:  Isn't that kind of -- you know, if
13   you're a good-faith purchaser, you don't have unclean hands.
14   I mean, doesn't that kind of go hand and hand, so to speak?
15   No pun intended?
16          MR. RICHARD:  A good-faith purchaser, based on Judge
17   Hyman's own definition, is one that has no knowledge of the
18   interest of the other party that wasn't litigated before the
19   sale.  It's~-- the fact is it's undisputed that they knew
20   about it.  In fact, they targeted it in that carte blanche
21   finding, saying we want to take free and clear of Poulsen's
22   interests.
23          THE COURT:  But the Judge opened up the hearing for
24   a determination of whether -- what they knew and when, and
25   after hearing the evidence, what you say, you know, was
```

```
 1   undisputed or not, and even if -- even though it's something
 2   that you're telling me he, on his own, after seeing some
 3   documentation that suggested to him that maybe Mr. Poulsen
 4   owned it and TRADS didn't -- I mean TBO didn't, he came to a
 5   conclusion that there was good faith, there was due diligence,
 6   and doesn't that by implication mean there was no unclean
 7   hands, and he resolved that issue against you, and then you
 8   just don't agree with his conclusion?
 9          MR. RICHARD:  Well, I don't want to get into the
10   facts, Judge, because I've got the legal issues.  And, yes, I
11   can stand here and say there's not a whit of evidence to
12   support that.  However, I'm not going to say that.  And the
13   reason I'm not going to say that, because the legal issues --
14          THE COURT:  Because you have a harder burden to
15   overcome the factual findings.
16          MR. RICHARD:  Well, I do.  But I believe that on a
17   plenary appeal, Your Honor will see that there is no -- that
18   there are mixed questions of law and fact there that were
19   never reached.
20          But what the Judge did not open for trial is he did
21   not open for trial who owned what, and he actually says in
22   the -- during this proceeding, in connection with the fact
23   that it was a quitclaim sale, the Court actually says a
24   quitclaim sale is one in which the bankruptcy court is not
25   deciding who owns what.  You can sort all that out later.  And
```

1   the case that we cite says you can sort all that out later.

2   And anybody -- you know, that's not an issue for the

3   bankruptcy court.  So that when the bankruptcy court approved

4   this quitclaim sale, and we're held in contempt based upon

5   something more than a quitclaim in which all these things are

6   adjudicated, and number 3 -- that's one and two.  And

7   number 3, when the Court says, I'm not going to be deciding

8   the issues of ownership, I'm not going to be reaching the

9   expert witness issues --

10          Keep in mind, Your Honor, that these -- that this

11   software is not clearly layman understandable.  It is complex

12   computer software.  To be able to understand who owned what,

13   one needs expert witnesses here.  And we specifically asked

14   the Court, when he opened it up to the five issues, Judge, are

15   we going to reach the issue of ownership?  If so, we're going

16   to need to put on an expert, a computer expert, on those

17   issues.  And he said, no, we're not going to reach the issue

18   at this proceeding.

19          And later on, we did put on an expert that was a

20   computer expert, but not on those issues.  It was a 15-minute

21   testimony just to understand certain terms, and we didn't

22   present any evidence on that.

23          So not having reached those -- so by going ahead and

24   signing a proposed findings of fact and conclusions of law

25   that includes -- modified, granted -- but that includes an

1   adjudication of issues that we did not, again, have notice and

2   an opportunity to properly try, was a secondary basis of due

3   process, and finding TBO --

4          And keep in mind, Your Honor, each one of these

5   issues of law -- forget all of the fact disputes for a minute.

6   If we were deprived of due process by reaching and

7   adjudicating issues that were not among what had been opened

8   up to, that alone is reversible error that meets the element

9   of substantial likelihood of prevailing.  If the Court

10  inverted the burden improperly and improperly applied the

11  presumption of mailing, that alone is reversible error.

12         If the Court, in fact, did not -- and it did not --

13  afford an adversary proceeding, as required by the case law

14  that's been ignored by TRADS, and require it before the sale,

15  that alone is reversible error.

16         So that each of those, plus all of the issues that

17  are in our detailed briefing, provide a series of independent

18  reversible errors, what does that leave?  That leaves is our

19  client going to suffer irreparable harm.  No one can -- no one

20  claims that anyone on Earth, any human being on Earth has the

21  source code other than Mr. Poulsen, and in which our clients

22  has some control over by virtue of our having purchased it

23  from him.  And no one can claim that if -- once lost, it's

24  lost forever.  Irreparable harm.  That's why the Judge agreed

25  that there may very well be irreparable harm.

```
 1              So what else does that leave then?  It leaves the
 2    balance of the harms, the fact that TRADS never asked for it
 3    for a year after the closing -- it didn't ask for it, in fact,
 4    until March 2015, when they first brought the action against
 5    Poulsen, the fact that TRADS internally recorded that it was a
 6    risk known before closing, and we know we have a lack of
 7    ownership of this, but we'd kinda like to have it -- I
 8    understand why they'd like to have it -- and just for -- and
 9    this I did put at the very beginning of my brief, and I would
10    repeat it now, because it will help put this all in context.
11    And I was citing Black's Law Dictionary for this, and that
12    is -- and a couple of other things -- the difference between
13    the binary and the source code.  And we cited a computer
14    journal and some -- a legal dictionary on this (sic) type of
15    computer things, is that all of us use Outlook everyday.  I
16    mean, those of us who use Outlook on Microsoft computers.  And
17    we keep our calenders, and we run all of these programs, and
18    we send our e-mails, and we keep our contacts.  None of us
19    have the source code for Microsoft Outlook, and we all have a
20    license to use it, just like TRADS documented it had a license
21    to use that binary that's on its computer.  We don't have the
22    Microsoft source code.
23              And these issues that we're raising are serious,
24    substantial, genuine issues of law.  I would submit that
25    before we reach the plenary appeal oral argument, Your Honor,
```

```
 1   that we will also -- and we've touched on this, and although

 2   it will be for a motion for stay pending appeal, we don't want

 3   to get too deeply into it as a full appellate brief -- that

 4   there is not only no evidence in the record, but only opposite

 5   evidence as to certain findings, and they are mixed questions

 6   of law and fact.  And I will give you the -- a single example

 7   of that.

 8          When the Court found that TRADS owned the source

 9   code, the finding in the trial order is -- and all of the BOLT

10   IP is based upon testimony of three witnesses who testified

11   that, in their opinion, that Poulsen was an employee of TRADS

12   when he invented it.  And then all three of them admitted that

13   they actually had no knowledge as to what his relationship was

14   with the company and whether he was an employee or not, that

15   they didn't have any idea.  All of them admitted this.  And he

16   didn't even get a W-2.  He was a -- so that that type of thing

17   will come out in the full plenary appeal, Your Honor.

18          THE COURT:  Well, I thought he -- you know, there

19   was evidence that he received salary, and none of the other

20   equity members of the firm, you know, didn't receive the

21   salary.  There was other evidence other than these people

22   saying that they thought he was an employee, wasn't there?

23          MR. RICHARD:  There was other evidence that was

24   received on issues that were not to be tried at that hearing.

25          THE COURT:  All right.  But you told me there was no
```

```
 1   evidence about the employee -- him being employee other than

 2   these three people, but there was other evidence.

 3            MR. RICHARD:  The other evidence has similar legal

 4   factual issues that will come out in the full brief.

 5            THE COURT:  All right.

 6            MR. RICHARD:  Your Honor had some other questions

 7   for me.

 8            THE COURT:  I probably forgot them by now, but let

 9   me try and summarize your argument and make sure I have a good

10   grasp of it.

11            So on the jurisdictional issue, you're saying that

12   because the sale took place and the creditors were all paid,

13   and basically -- was there a confirmation?

14            MR. RICHARD:  Yes, and the confirmation was approved

15   in, I think, March or April of 2014, months and months before

16   this proceeding was brought.

17            THE COURT:  All right.  So all of those things have

18   taken place.

19            And so you're saying, as a result, there's no

20   continuing jurisdiction for the bankruptcy court to get into

21   these issues.  There's a cutoff of somewhere.  So where's the

22   cutoff?  At what point?  When the confirmation is approved

23   that's it, you can't have these kind of hearings anymore?  So

24   I want to -- need to understand where's the cutoff, and how do

25   you decide when the jurisdiction ends?
```

```
 1            MR. RICHARD:  What the Eleventh Circuit says in

 2   Lemco Gypsum, the one that we believe is governing, is that

 3   even if the bankruptcy court in the sale order -- which is the

 4   subject of a motion to enforce and was in that case -- I

 5   retain jurisdiction to enforce, construe, interpret this

 6   order, that even that will not give the bankruptcy court

 7   continuing jurisdiction.  And the Eleventh Circuit sets forth

 8   two components.  After the property has left the estate, the

 9   estate has no further interest in that property.  It's no

10   longer part of the bankruptcy estate, and you're no longer

11   deciding what the debtor owns.

12            And the second component that Lemco sets forth is

13   once all the creditors have been paid in full, it's no longer

14   an issue for purposes of the bankruptcy court.  And then --

15   that's the first two of three factors that is our position

16   there.

17            THE COURT:  All right.  So I don't think there's any

18   dispute about the creditors as being paid.  Maybe I'm wrong,

19   but that doesn't seem to be the issue.  So you said there's no

20   longer what the debtor -- say that again?  Something about

21   what the debtor owns.

22            MR. RICHARD:  Yes.  What I said, Your Honor, was

23   that the cases that discuss this issue point out that the

24   reason -- when the Eleventh Circuit, in Lemco Gypsum, says

25   that the estate has no continuing interest in property that
```

```
 1    has left the estate by sale and is now in the hands of the

 2    purchaser, and it says the bankruptcy court should not be

 3    getting into what it calls an internecine contest between the

 4    purchaser and some third party.  Which is exactly what this is

 5    here, because Judge Hyman found that we were a third party,

 6    that both Poulsen and TBO were not subject to res judicata,

 7    because they did not have a full and fair opportunity to

 8    participate in the proceedings.  So that what Lemco -- and it

 9    actually has, towards the very end of Lemco, the paragraph

10    that says that the bankruptcy court has no continuing

11    jurisdiction to adjudicate a contest between the purchase -- a

12    purchaser of assets that have left the estate -- they're no

13    longer in the estate, therefore we're no longer deciding who

14    has what -- and a third party.  And the -- and the other

15    prominent part of Lemco is where the creditor's been paid in

16    full.  And then there's a third component that we add to that,

17    Your Honor.

18              THE COURT:  So the bankruptcy court doesn't have

19    continuing jurisdiction to adjudicate issues that relate to

20    ownership of the debtor's property or the estate's property

21    after the property leaves the debtor's estate, is that what

22    you said?

23              MR. RICHARD:  Yes, Your Honor, because it's no

24    longer the debtor's property.

25              THE COURT:  All right.  And -- but you're claiming
```

```
1    that the source code was never the debtor's property.  You're

2    claiming it's Poulsen's property, and he sold it to IDI, Inc.

3    or the holding company.  I don't know what -- I keep getting

4    mixed up which one he sold it to, supposedly.

5            MR. RICHARD:  Yeah, but Poulsen sold it to The Best

6    One, Inc.  The Best One, Inc. was not even owned by IDI, Inc.

7    when it purchased -- or it was later acquired by IDI, Inc.

8            THE COURT:  Okay.  All right.

9            MR. RICHARD:  All right.  And so that's -- yes.

10           And, Your Honor, just for clarity, we're claiming

11   more than that.  We're claiming that all the debtor had and

12   all -- what its right, title and interest was at the time of

13   that quitclaim deed was a license to use the binary.  It

14   didn't own any part of the BOLT IP, not just the source code,

15   Your Honor.

16           THE COURT:  So this source code never left the

17   estate, because the -- from your standpoint, because it never

18   owned the property, the source code.

19           MR. RICHARD:  The source code was not in the

20   possession of the debtor.  They -- that's undisputed.  They

21   weren't using it.  TRADS has never had the source code.

22   They're not using it.

23           I see what you're getting at, but if I could comment

24   on it, Your Honor, it's -- it's -- I keep trying to use a word

25   other than "trump".  It's transcended by the fact that all
```

```
 1   that was sold was right, title and interest, and that when the

 2   Eleventh Circuit -- when Lemco says that -- what they actually

 3   say is whatever property the debtor owned, whatever their

 4   right, title and interest was, has left the estate and all the

 5   creditors have been paid, the proceeds of the sale have been

 6   received, they've been distributed, we don't have anything

 7   else to sell here, and if there is a battle between the

 8   purchaser -- just like in Buxton, where there was a dispute

 9   over whether there was an exclusive right to use the

10   intellectual property, where Judge Kimball said, well, that's

11   not for me to decide jurisdictionally under Lemco, and because

12   it was also a quitclaim deed, and any party can come in now,

13   and if they elected to take the risk of a quitclaim deed,

14   that's not for the bankruptcy court to suddenly assert

15   jurisdiction to resolve.

16            THE COURT:  Well, TRADS' position, I assume, is that

17   the debtor did own the source code, and it was conveyed with

18   the sale, am I correct?  I mean, that's -- their position is

19   that --

20            MR. RICHARD:  That's TRADS' -- that is.

21            THE COURT:  And your position is that it never had

22   it.

23            MR. RICHARD:  Well, they admit that it didn't have

24   access to it.  They just say that it owned it.

25            THE COURT:  Ownership, right.
```

```
 1              MR. RICHARD:  Yeah.

 2              THE COURT:  Their position is that the debtor

 3     actually, at the time of the sale, owned the source code, and

 4     it was conveyed in conjunction with the sale, yes?

 5              MR. RICHARD:  That is their position.

 6              THE COURT:  Okay.  And your position is that, no,

 7     they didn't own the source code.

 8              MR. RICHARD:  That is correct.

 9              THE COURT:  And it was never part of the estate.

10     Poulsen owned it.

11              MR. RICHARD:  That is correct.

12              THE COURT:  So from their standpoint, the property

13     left the estate at the time of the sale, it went to them, from

14     the estate to them, and from your standpoint it was never part

15     of the estate, the source code.  Am I correct?

16              MR. RICHARD:  That's correct, Your Honor.

17              THE COURT:  Okay.

18              MR. RICHARD:  And the estate has been administered.

19              And the answer to this question is helped a lot by

20     Judge Kimball's decision in Buxton in which he says, whether

21     the intellectual property in Buxton left the estate and is

22     wholly owned by the purchaser is not for the bankruptcy court

23     to decide, because they elected to accept a quitclaim deed,

24     which is not, by the way, a function of Lemco, in which Lemco

25     just draws a line in which they say that the bankruptcy
```

1    court -- and they actually express a policy concern of

2    bankruptcy courts in Lemco.  They talk about it, about

3    indefinitely exercising jurisdiction based upon retention of

4    jurisdiction clauses.  And Judge Kimball, in Buxton, says when

5    does the jurisdiction of the bankruptcy court end?  What if

6    this issue arose two years from now, or five years from now,

7    or seven years from now?

8          Keep in mind that no one had -- as of the date of

9    this proceeding, no one had requested the source code from

10   Poulsen.  And what the sale order actually says is -- the

11   turnover order and the sale order says turn over possession of

12   things that you know to be assets of the estate, or turn over

13   possession when requested by the purchaser.  What if the

14   purchaser didn't request it -- in this case they didn't

15   request it 'til March of 2015 from Poulsen.  What if they

16   didn't request it 'til 2020?

17         THE COURT:  All right.  So then let's get to the

18   issue of the contempt motion, the sanction motion.  So make

19   sure I understand this correctly.

20         The sanction motion is brought on the basis that the

21   source code was sold -- from TRADS' standpoint, the source

22   code was sold as part of the sale of the assets.  Mr. Poulsen,

23   you knew this, and I guess TBO, you knew this, and now, by

24   Poulsen trying to sell it to another entity or license it to

25   another entity, you're interfering with the sale that took

```
 1    place, and the confirmation, and the administration of the
 2    bankruptcy estate, and so I'm going to sanction you or hold
 3    you in contempt for interfering with property that was
 4    transferred to TRADS, you knew about it, you had no right to
 5    it, and you shouldn't be trying to muddy up the waters here
 6    with claiming ownership, and trying to sell it, and
 7    interfering with their ownership rights.  Am I kind of --
 8              MR. RICHARD:  No, Your Honor, that is correct.
 9              THE COURT:  All right.  So then from a
10    jurisdictional standpoint, when does jurisdiction to do that
11    type of thing end in the bankruptcy court?
12              MR. RICHARD:  Both -- I believe both Lemco and
13    Buxton involved contempt motions and enforcing the sale order,
14    both of them, so that the jurisdictional holdings of the
15    Eleventh Circuit in Lemco and its interpretation in Buxton
16    both --
17              What happened in Lemco is the bankruptcy judge
18    found --
19              THE COURT:  I don't mean to cut off, but you're
20    basically saying it applies to both.
21              MR. RICHARD:  It applies.
22              THE COURT:  It applies to both.
23              MR. RICHARD:  That's right.
24              And the bankruptcy judge found the defendant in
25    contempt, the district court affirmed, the Eleventh Circuit
```

1    reversed, said no jurisdiction for the contempt.

2         THE COURT:  Okay.  All right.  And then one more, I

3    think, question before we take a break.  I'm sorry to --

4         MR. RICHARD:  I've got all the time on this.  It's

5    your time, Your Honor.

6         THE COURT:  On the bifurcation issues.  Again,

7    you're saying that the Judge started off saying these are the

8    only things we're going to litigate, and then he kind of

9    opened it up.  So what were the issues you claim he said he

10   was going to litigate initially and then opened it up to what,

11   and . . .

12        MR. RICHARD:  He -- initially, the Court said he was

13   going to have a evidentiary hearing on notice to Poulsen.

14        THE COURT:  All right.

15        MR. RICHARD:  That was it.

16        His comment was TBO is taken through Poulsen.  If

17   Poulsen had notice, then there's no title for them to take

18   through Poulsen, and he was going to limit it to notice.

19   There wasn't even a motion for contempt.

20        The action that was filed in October of 2014 was a

21   declaratory judgment with a single count, and it's the single

22   count that asks the Court to hear all of this evidence and to

23   declare what was owned or what wasn't owned, that was it.

24        THE COURT:  And you say he didn't have jurisdiction

25   to do any of that?

1    MR. RICHARD:  No, he did not.

2    THE COURT:  Okay.

3    MR. RICHARD:  And then in the -- several months

4    later, TRADS filed a motion to -- in -- you know, I think in

5    January they filed a motion to enforce the sale order and a

6    contempt, of 2014, and in March -- I'm sorry, January of 2015,

7    and in March of 2015, they, for the first time, named Poulsen

8    in an adversary proceeding to say that you are an employee,

9    all of these things the Judge decided for the first time after

10   the fact.

11   THE COURT:  But I thought they filed an adversary

12   proceeding alleging these things.

13   MR. RICHARD:  In March of 2000' -- yes, after the

14   sale.

15   THE COURT:  After the sale, but before the

16   evidentiary hearing.

17   MR. RICHARD:  Yes, Your Honor.  But the order that

18   our client, TBO, was found in contempt of, was an order issued

19   in December of 2014, before all of this evidence was heard and

20   all of these issues were adjudicated.

21   THE COURT:  But didn't he have to hear the evidence

22   in order to decide whether there was contempt of that earlier

23   order?

24   MR. RICHARD:  Well, no, because the law on contempt

25   is very precise, that if you're to be held in a contempt of an

1   order for engaging in a specific act, that exactly what it is

2   you're not supposed to touch or you're supposed to turn over

3   in an injunction is precisely set forth in the order.

4          THE COURT:  But that gets to whether or not the

5   contempt order is valid, as opposed to whether there's

6   jurisdiction to consider it.

7          MR. RICHARD:  Oh, yes, Your Honor.

8          THE COURT:  Or whether you were on notice that this

9   was going to be adjudicated.  And I got the impression you

10  were saying, well, he decided things that weren't ever -- you

11  used the word "teed up," these things weren't teed up.  What

12  wasn't teed up?

13         MR. RICHARD:  What wasn't teed up is when the

14  Judge -- was what the Judge directed.  He said, have an

15  evidentiary hearing on Poulsen's interests before you put any

16  findings in my order.  There was never such an evidentiary

17  hearing.  There was never any evidence presented to the Court

18  as to who owned any of this before the sale order.

19         THE COURT:  But that was before the sale order.  I'm

20  talking about at the evidentiary hearing that resulted in this

21  order that's being appealed, you said he decided things that

22  weren't teed up.

23         MR. RICHARD:  They hadn't been teed up when the sale

24  order was entered.

25         THE COURT:  Okay.  I thought you were saying they

1   weren't teed up for the hearing, and he just decided things

2   that weren't part of the pleadings or part of the issues to be

3   decided.

4            MR. RICHARD:  Oh, I'm sorry.  That's a separate

5   issue, and I am saying that, as well.  And let me see if I can

6   make the dichotomy to make that clear, is the Court scheduled

7   a -- said for this particular proceeding -- this is after the

8   sale for our proceeding, he issued an order, I'm only going to

9   consider notice on an evidentiary hearing.  He later had a

10  hearing that we actually lay out -- and both sides agree,

11  because we quote TRADS agreeing as to what was laid out and

12  what was available, in which he says, I'm going to open this

13  to four other issues.  And he delineates those other issues:

14  Fraud on the Court, what TRAD knew, whether it was a

15  good-faith purchaser, and whether it was a bona fide dispute,

16  and there was evidence of the bona fide dispute at the time of

17  the sale.  Those are the five issues he opens it to.

18            I asked him at that hearing, are we going to reach

19  issues such as ownership.  Because for purposes of a bona fide

20  dispute, what Section 363 says is you only have to present

21  evidence that there is a genuine dispute as to who owns it in

22  order to allow it to be sold.  Are we going to reach

23  ownership?  Do we need to go ahead and engage in expert

24  computer scientists on the ownership interest?  The Judge

25  says, no, we're not going to reach those issues.  And that's

1    in this adversary proceeding.

2           And what we cite in our brief is TRADS actually

3    filed a prior brief in which they described what the Judge

4    said, and they agree with us on that.  And now they're taking

5    the position that nothing was bifurcated, and that everything

6    was tried.

7           You know, we file pleadings subject to the

8    bifurcation saying, if and when we get there, we'll then

9    litigate these things.  But they were litigated.  They were

10   adjudicated.

11          THE COURT:  So it's the ownership issue that you say

12   that Judge Hyman indicated he was not going to adjudicate, but

13   then he went ahead and did so.

14          MR. RICHARD:  And by virtue of that, we were

15   deprived of procedural due process.

16          THE COURT:  All right.  That's what I was trying to

17   understand.  Okay.

18          MR. RICHARD:  There's another side to that, and that

19   is we're also saying that the issues from a jurisdictional

20   standpoint that he decided in this adversary proceeding about

21   who owned property that had left the estate, we're saying it

22   was also beyond his jurisdiction.

23          THE COURT:  Well, I understand.

24          All right.  Thank you.

25          Let's take a 15-minute recess, and then we'll move

1    on.  All right?  Thanks.

2         (A recess was taken from 10:47 a.m. to 10:59 a.m., after

3    which the following proceedings were had:)

4              THE COURT:  Please be seated, everyone.

5              We're waiting for Mr. Bloom to get back?

6              MR. RICHARD:  The other lawyers are out there.

7              THE COURT:  Okay.  All right.  Mr. Bloom, did you

8    want to --

9              MR. BLOOM:  Yes, I'm happy to, Your Honor.

10             Good morning, Your Honor.  Mark Bloom on behalf of

11   IDI, Inc., now known as Cogent, Inc., a nonparty to the

12   proceedings about which the Court heard at great length before

13   the bankruptcy court, and an appellate before this Court in

14   Case Number 81691.

15             The facts that are material to our appeal and the

16   grounds for the entry of a stay in respect of IDI, Inc. are

17   separate and distinct from and greatly narrower than those

18   that are raised by appellants TBO and Poulsen in Case 81690.

19   Indeed, both appeals arise from the same trial order and final

20   judgment that was entered by Judge Hyman in the bankruptcy

21   court, which disposed both of the adversary proceeding about

22   which the Court engaged in colloquy with Mr. Richard, and also

23   of the contested matter that was commenced by the motion to

24   enforce the sale order and for contempt.

25             But what is critical to our appeal and

1    differentiates it from 81690, is that IDI, Inc. was never

2    named as a defendant in the adversary proceeding, nor was any

3    relief ever sought against it in the motion to enforce the

4    sale order and for contempt.  For those reasons, Your Honor,

5    IDI, Inc. never appeared in or defended any of the claims

6    asserted by TRADS.

7              THE COURT:  Well, what about the answer that was

8    filed by the subsidiary, your client's subsidiary?

9              MR. BLOOM:  Yes, Your Honor.  That is the hat on

10   which Judge Hyman hung his ruling, his posttrial ruling,

11   post-judgment ruling, that there had been a judicial

12   admission.  That is, I believe, Docket Entry Number 333 of a

13   docket that has more than 475 entries before the bankruptcy

14   court.  And in that answer, there is a passing reference,

15   important I think to the applicability or non-applicability,

16   we would say, of the doctrine of judicial admission, is that

17   this was not an admission of an alleged fact in the second

18   amended complaint, it was simply a passing reference in the

19   preamble.  Sorry for the alphabet, Your Honor, but it said

20   Defendant TBO, Inc., N/K/A IDI, Inc., and that was an error.

21             In fact, in the motion to alter or amend, counsel

22   for TBO indicated that it was simply a clerical error, it was

23   a mistake.

24             In addition to that --

25             THE COURT:  The motion to amend --

```
 1              MR. BLOOM:  The motion to amend or alter -- alter or

 2     amend the trial order and final judgment.

 3              Counsel indicated in that motion that it was in

 4     error, it was an erroneous reference.  Not only was it

 5     erroneous -- was it an erroneous reference, Your Honor, but it

 6     also was contrary to really the only evidence on the point,

 7     the uncontradicted evidence in the form of the testimony

 8     elicited by TRADS, by the plaintiff, from Dan MacLachlan, who

 9     was -- who is the chief financial officer, where the plaintiff

10     sought to establish the identity of TBO and IDI, Inc. in the

11     questioning, and Mr. MacLachlan in his answers clearly

12     differentiated that IDI, Inc. was the owner, the parent, of

13     IDI Holdings, and TBO is now known as IDI Holdings.

14              THE COURT:  Well, couldn't Judge Hyman have come to

15     a factual determination inconsistent with the testimony if he

16     believed that the testimony was, again, not worthy of belief?

17              MR. BLOOM:  He could have come to that factual

18     conclusion.  If so, we believe it was clearly erroneous,

19     because there is no evidence to the contrary in the record.

20              THE COURT:  What about the admission?  I mean, was

21     he -- was Judge Hyman obligated to accept the representation

22     of counsel that it was an error?

23              MR. BLOOM:  I think that we had more than simply a

24     representation of counsel that it was an error, because in the

25     motion to alter or amend -- and we believe that in denying
```

1    that, Judge Hyman compounded precisely the error of which I'm

2    complaining right now.  In the motion to alter or amend, we

3    asked that Judge Hyman -- I should say TBO and Poulsen asked

4    that Judge Hyman take judicial notice, mandatory judicial

5    notice, under Federal Rule of Evidence 201(c)(2), of documents

6    that came from the public records of the Secretary of State of

7    Delaware that conclusively establish, consistent with, but

8    even more broadly than Mr. MacLachlan's testimony, that IDI,

9    Inc. and IDI Holdings are separate entities, that IDI, Inc. is

10   the parent of IDI Holdings, and that through a series of

11   transactions that are described and shown step by step in the

12   public records of which Judge Hyman was asked to take judicial

13   notice, TBO, Inc. became IDI Holdings, Inc. and not the

14   parent.

15          Now, what Judge Hyman did in refusing to take

16   judicial notice without comment was not in a vacuum.  In

17   addition, we think that he misapplied the doctrine of judicial

18   admission.  We certainly don't question that the doctrine

19   exists, and in proper circumstances it can be applied as an

20   admission, but here, I mean, a judicial admission has to be,

21   Your Honor, an admission of a party.  IDI, Inc. was never a

22   party.  This purported judicial admission was, again, a

23   passing reference made by its subsidiary, TBO, Inc., now known

24   as IDI Holdings.

25          And so we never made that admission.  IDI, Inc.

1    never made that admission.  To the extent that there was even

2    that indication, even that passing reference, it was

3    determined by counsel, it was advanced by counsel, look, this

4    was in error.

5           Rule 8(e) of the Federal Rules of Civil Procedure,

6    well known to the Court, is applicable before bankruptcy

7    courts under Rule 7008, and that requires that pleadings be

8    construed in a manner to do justice.  It doesn't do justice

9    when a passing reference by a non -- or by a party is then

10   used against a nonparty in an attempt to bind the nonparty to

11   that admission, and moreover, in a circumstance where this,

12   again, was not a fact that was alleged, it was not a fact that

13   was put into issue by the complaint.  There was an allegation

14   in the complaint about TBO, Inc. being a Florida corporation,

15   and that allegation was denied.  But this is not as if

16   paragraph 3 of an answer corresponding to paragraph 3 of a

17   complaint admitted, for better or worse, a fact that should

18   have been denied.

19          THE COURT:  Well, let me ask you this.  Why can't

20   your client, as opposed to the other entity that's involved,

21   and Mr. Poulsen -- why do you need a stay?  Why can't you wait

22   for the full appeal to be aired in order to -- what's the

23   irreparable harm that you're going to suffer --

24          MR. BLOOM:  Sure.

25          THE COURT:  -- if this -- if you don't get a stay?

```
 1            MR. BLOOM:  First, Your Honor, we have a different
 2   and I think even more clear denial of due process, in terms of
 3   having had our name brought into a judgment with no greater of
 4   an explanation than Footnote 2 of Judge Hyman's trial order
 5   that simply reflects that he's going to refer to TBO as IDI,
 6   Inc., because that's what it is.  There's no rationale behind
 7   that finding.
 8            But effectively, Your Honor, we've been determined
 9   to be in contempt, even though no relief was ever sought
10   against us in the motion to enforce and for contempt.  We've
11   also been made subject to a final judgment in an adversary
12   proceeding.  But that's --
13            THE COURT:  But why isn't that the same in any case,
14   that you lose a case, and you're saying you didn't lose
15   because you weren't a party --
16            MR. BLOOM:  Right.
17            THE COURT:  But have a judgment entered against you
18   that you don't agree with that you believe is erroneous,
19   should be set aside, why can't you wait for the full appeal to
20   have that determination made?  Why do you need a stay?
21            MR. BLOOM:  Because Judge Hyman's not going to wait,
22   Your Honor.  The answer is that Judge Hyman already had
23   scheduled, I believe two weeks ago, and rescheduled down the
24   road at my request, further proceedings, post-judgment
25   proceedings, on TRADS' motion that seeks to assess fees and
```

1   costs as a sanction flowing from the trial order and final

2   judgment in the amount of as much as $9 million and counting.

3   And our client, IDI, Inc., that, again, was never a party and

4   never served, will have to incur substantial expense in

5   defending against those claims, and we'll have no recourse

6   back against TRADS for those expenses.

7         There are only three ways that we could get our fees

8   and expenses back.  If Your Honor decides on appeal that the

9   judgment should be vacated -- and, in fact, we think that's

10  the proper remedy as to IDI, Inc.  But if Your Honor finds

11  that Judge Hyman's final judgment should be vacated, and we've

12  already spent this money in defense of the $9 million claim

13  against us, or if they've sought to execute on that $9 million

14  claim because Judge Hyman has gone ahead and granted them that

15  award, we can't get the defense costs back.  We probably could

16  get the $9 million back, but we can't get our defense costs

17  back.  The only three ways that we can recover fees would be

18  if there's a contract between the parties -- there is none --

19  a statute -- there is none -- or if we were to seek sanctions

20  against them.

21        THE COURT:  But why is that different than any other

22  case where a party loses, they have to pay full attorney's

23  fees, they have to go through the posttrial proceedings, they

24  have to wait for an appeal to be exhausted?  Why wouldn't --

25  if your argument is to be the basis for a stay in this appeal,

1    why, in every appeal of every money judgment in every case

2    there shouldn't be a stay until the appeal's exhausted?

3              MR. BLOOM:  I think Your Honor's question, the way

4    Your Honor formulated the question provides a part of the

5    answer, and that's why are we like -- why are we unlike any

6    other party.  And the answer is we were not a party.  We never

7    had an opportunity to appear and defend.  The Supreme Court,

8    unanimous Supreme Court, even back in the day when they

9    actually had nine justices, held in the Nelson versus Adams

10   case that the post-judgment addition of a corporate parent --

11   and there it was an individual shareholder, the sole

12   shareholder of the company -- that the post-judgment addition

13   of a corporate parent didn't comply with due process.

14             We think that Nelson versus Adams is almost on all

15   fours with our case.  I say "almost", because our case is even

16   more starkly an illustration of denial of due process.

17   Because in Nelson versus Adams, what Adams did -- or, I'm

18   sorry, what was done there was that there was a post-judgment

19   Rule 15 amendment of the pleadings, so as to add this sole

20   shareholder as a defendant in the action to recover fees and

21   costs associated with a patent infringement lawsuit.  And what

22   the Supreme Court held unanimously in that case was that the

23   simultaneous entry of judgment at the same time that the

24   corporate shareholder was alerted through the amendment of the

25   pleadings that he was going to be added as a party didn't

1    comport with due process.

2            THE COURT:  But that gets to the merits of your

3    appeal.  I mean, that --

4            MR. BLOOM:  Yes, Your Honor.  And the likelihood of

5    success on those.

6            THE COURT:  Right.  I'm assuming here for purposes

7    of our discussion right now you're going to win, and that you

8    have a likelihood of success on the merits, et cetera, but,

9    you know, what about all the other factors?

10           MR. BLOOM:  Sure.

11           All right.  So that's success on the merits.  I

12   won't deal with that.

13           In terms of the irreparable harm to us, the case

14   that I would offer -- and I regret to tell the Court it's not

15   in our papers, but I can give the name and the cite -- it's a

16   case called Brenntag, spelled B-r-e-n-n-t-a-g, International

17   Chemicals.  It's a Second Circuit decision from 1999 that can

18   be found at 175 F.3d 245.  And in that case, the Second

19   Circuit held that what TRADS has referred to and what I think

20   the Court may be alluding to is mere economic harm to us

21   associated with defense of the proceedings before Judge Hyman,

22   mere economic harm can be enough to constitute irreparable

23   harm when, according to the Second Circuit, quote, there is a

24   substantial chance that, upon final resolution, the parties

25   cannot be returned to the position that they previously

1    occupied.

2           If we have to spend money to defend against these

3    sanctions, sanctions that are being sought against us even

4    though we were never sued, nor served, nor afforded any

5    semblance of due process whatsoever, then we will suffer

6    irreparable harm on that basis.

7           But I'll concede for the Court readily that the

8    irreparable harm prong, one of the four, is not our strongest

9    position, and it's for that reason why we rely not only on

10   Judge Gold's decision in the Jet Engine (sic) case, but also

11   on two different decisions of the former Fifth Circuit for the

12   fact that the four-part Garcia-Mir test is really something of

13   a sliding scale, and the former Fifth Circuit, in a case

14   called Florida Medical Association versus the United States

15   Department of Health, Education and Welfare -- that's at 601

16   F.2d 199, page 203, a 1979 pre-Bonner decision of the former

17   Fifth Circuit -- said that a sliding scale can be employed,

18   balancing the hardships associated with the issuance or denial

19   of what in that case was a preliminary injunction, but the

20   four-part test is the same, with a degree of likelihood of

21   success on the merits.

22          So as we look at the four-part test, Your Honor, we

23   put the meter way over on our end in terms of likelihood of

24   success on the merits.

25          Similarly, in terms of the absence of harm to TRADS

1    from the grant of a stay, we think it axiomatic that a party

2    that determines to sue and seek relief only against "A" and

3    "B" cannot be said to suffer any harm whatsoever when it is

4    stayed from pursuing that judgment against Party "C" whom it

5    never sued.

6           If you look at Judge Hyman's trial order and final

7    judgment as they are, they represent, at least to my way of

8    thinking, pretty much a total victory for TRADS before the

9    bankruptcy court.  And so how a party that obtains a total

10   victory in the trial court can then contend that it's being

11   harmed when it's not permitted to enforce that victory against

12   a party that it never elected to sue, serve, name, and to

13   which the Court never afforded due process, to me, it's a

14   self-evident proposition.

15          That same proposition, Your Honor, carries over to

16   the public policy issues.  Indeed, there can be no greater

17   public policy than procedural due process precisely of the

18   type that we were denied here.

19          As a matter of public interest, TRADS' interest in

20   attempting to enforce the sale order surely pale in comparison

21   to these due process considerations, and, in fact, this is

22   really a problem of their own making.  All that they had to do

23   was to have sued IDI, Inc. in the first instance, or to have

24   named, added IDI, Inc. at some stage of the proceedings where

25   it was still possible for IDI, Inc. to appear and participate

```
 1   and to get the benefit of due process, and they didn't do
 2   that.  And if that's not a public interest, Your Honor, that
 3   requires vindication, I'm not really sure of one.
 4           So I will admit to the Court that our position on
 5   irreparable harm, I think it's, frankly, less compelling than
 6   TBO and Poulsen's, because we can't play, if Your Honor will
 7   forgive me, what I've referred to in our discussions as the
 8   virginity card, that with intellectual property, once it's
 9   gone, it's gone, the secret's out, and you can't get it back.
10   It's not our intellectual property, it's TBO's intellectual
11   property, our subsidiary's.  And the idea that they could
12   simply pierce the corporate veil without any allegation to
13   pierce the corporate veil, without suing, or naming, or
14   providing notice to the public company parent against which
15   they now seek, by osmosis, to pierce that corporate veil, it
16   doesn't seem right, and it's not right, and it doesn't survive
17   analysis under Nelson v. Adams.  It gives us, I think, a
18   compelling case on at least three, and a colorable case, more
19   than colorable case, on the fourth of the Garcia-Mir factors
20   and under the tests that I think were properly applied by
21   Judge Gold in Jet Networks in the context of a motion for stay
22   pending an appeal, as derived from the Fifth Circuit's
23   application of the same standard on a sliding scale basis.  I
24   should say former Fifth Circuit's application of the same
25   four-part test on a sliding scale basis in the preliminary
```

```
 1    injunction context, we think we have a compelling case to get

 2    a stay here.

 3            THE COURT:  All right.  Thank you.

 4            MR. BLOOM:  Thank you, Your Honor.

 5            MR. ANKER:  Good morning, I think, Your Honor.

 6    Philip Anker from Wilmer, Cutler, Pickering, Hale and Dorr.

 7    I've never appeared before Your Honor and appreciate the

 8    courtesy of being able to do so.  You did grant our pro hac

 9    motion.

10            Your Honor, I would propose to start with the TBO

11    motion, but I'm happy to start with the IDI one, if you want.

12    Whatever would be most helpful.

13            THE COURT:  Whatever you feel more comfortable, it's

14    fine.

15            MR. ANKER:  I feel comfortable with either, but it

16    seemed to me I'll go in the same order that the defendants did

17    today.

18            THE COURT:  That's fine.

19            MR. ANKER:  Let me start with what I think, if I

20    read Your Honor correctly, was the issue of most interest to

21    the Court, which was subject matter jurisdiction.  I want to

22    try to answer your question, first a specific question, did

23    Judge Hyman reach subject matter jurisdiction, and then your

24    more broader question, what is the test.  And I think the case

25    law that is cited answers what is the test.
```

```
 1              But just for the Court's edification, just as a

 2    matter of process, the Court addressed subject matter

 3    jurisdiction on page 62 of its opinion, and in particular,

 4    Your Honor, Footnote 110, which appears on page 62.  It's the

 5    beginning of the conclusions of law in the decision, and

 6    you'll see in the footnote the Court states that -- the Court

 7    states that -- and quotes a decision, or cites a decision in

 8    quotes.  It says, quote, the bankruptcy court always retains

 9    jurisdiction to consider the enforceability of its own orders,

10    including reconsideration of a sale if it was properly

11    conducted -- to determine if it was properly conducted.  So

12    the Court did address the issue.

13              Let me try to answer --

14              THE COURT:  Well, was this a -- what was the

15    language you mentioned?  What was the page?  Sixty-four did

16    you say?

17              MR. ANKER:  Sixty-two, Your Honor.

18              THE COURT:  Sixty-two, I'm sorry.

19              MR. ANKER:  And I believe it's quoting from a

20    decision from --

21              THE COURT:  I'm sorry, reconsideration of a sale.

22    Was this a reconsideration of a sale?

23              MR. ANKER:  I think Judge Hyman perceived that what

24    the defendants were asking him to do here was to invalidate

25    the sale that he had approved, which I think goes very much --
```

```
 1    in other words, he had determined that the property in
 2    question was property of the estate.  He had determined in his
 3    original sale order that it was sold exclusively to us.  He
 4    had determined that TRADS had acted in good faith, and he
 5    therefore perceived, I think correctly, that the defendants
 6    were challenging the validity of the sale, much like a Rule 60
 7    motion before Your Honor.
 8              Let me go to the --
 9              THE COURT:  But what was the adversary complaint
10    about?  It wasn't a reconsideration of the sale.
11              MR. ANKER:  It was a motion on our part to enforce.
12    So we were sale the sale order is valid, it's good, enforce
13    it.  And they were saying, no, it's not good, no, it's not
14    enforceable, at least as against them.  So you're right, we
15    were not seeking reconsideration.  It seems to me they were.
16    They were attacking it.
17              So let --
18              THE COURT:  So can you create jurisdiction by
19    defense?  I mean --
20              MR. ANKER:  I don't think we need to do that, Your
21    Honor.  Can you?  I suspect the answer to that is "yes", but
22    I'm not going to argue that today.  Let me go to the
23    jurisdiction question and answer it for you.
24              I submit that the law, properly understood, is
25    exactly what we cited in our principal brief, and we quoted
```

```
1    from -- this is on page 7 of our brief in response to TBO.  We
2    cited from a District Court, Southern District of New York
3    case.  The Second Circuit just recently re-enforced this
4    principle in the GM litigation, where it held that the
5    bankruptcy court had jurisdiction to enforce its order and
6    hold parties in contempt if they violated its order when GM
7    sold its assets to the newly created entity several years ago.
8           And the Court in Lothian said the figure, where,
9    quote, the resolution of a dispute depends, at least in part,
10   on rights created by a bankruptcy court sale order, and where
11   relief depends on the interpretation of the terms of the sale
12   order, including the representations and warranties made by
13   the debtor to the purchaser, these considerations are more
14   than sufficient to establish core "arising in" jurisdiction.
15   That's a term of art in bankruptcy for the highest form of
16   jurisdiction.
17          The question becomes -- Your Honor, the proposition,
18   I would submit, is really as straightforward as this:  Did
19   Judge Hyman have jurisdiction to enter his sale order?  Of
20   course he did.  Bankruptcy courts enter sale orders every day.
21   Selling assets in an insolvent bankrupt estate is what the
22   business of bankruptcy frankly is more these days than
23   actually reorganizing standing companies.  Section 363 of the
24   bankruptcy code expressly provides that a debtor may sell its
25   property out of the ordinary course, with, following notice
```

```
 1    and hearing, upon order of the bankruptcy court.  So did it

 2    have jurisdiction to enter its original order?  Of course it

 3    did, and it would be revolutionary to stay it didn't.

 4              THE COURT:  I don't think anyone's challenging that.

 5              MR. ANKER:  Correct, Your Honor.

 6              And that leads a fortiori to the answer.  Any court

 7    that has jurisdiction to enter an order has jurisdiction to

 8    enforce that order and hold someone in contempt for violation

 9    of the order.

10              And what is different about their cases is their

11    cases were cases where the order didn't speak to the issue.

12    That is what was the critical point in Lemco Gypsum, and it's

13    the critical distinction here.  Let's turn to Lemco Gypsum.

14    If I can have one moment, I can just get it out for Your

15    Honor.

16              In Lemco Gypsum was a dispute following a sale of

17    property that the debtor owned.  It was personal property.  It

18    was on a landlord's property.  And the landlord said, you, the

19    buyer, need to remove that property.

20              And what the Eleventh Circuit held, in holding that

21    there was not jurisdiction -- and the Court was very explicit

22    on this -- is that while there had been language in an early

23    order about removal, the sale order didn't provide that.  I'm

24    quoting the Eleventh Circuit decision at page 788:  However,

25    the removal requirement was not included in the final order of
```

```
 1   sale entered on November 23rd, 1987.

 2            And the Court then went on to say, and again I

 3   quote:  We agree that courts should retain jurisdiction to

 4   enforce their orders.  That's a direct quote.  But it said

 5   that principle wasn't controlling, because the order didn't

 6   provide or require removal.  Indeed, the Court goes on to

 7   say -- and, again, I'm quoting from the decision.  This is on

 8   page 789.  Quote:  Only when federal law supplies the rule of

 9   decision or an interpretation of a federal right is an

10   essential ingredient of a claim does the dispute present a

11   federal question.  In other words, this dispute -- now

12   talking -- and the Court goes on to say:  New disputes arising

13   after the property's been sold by the trustee to a third party

14   must be resolved through the processes available for the

15   resolution of such independent disputes.  In other words, this

16   dispute is about rights incident to the ownership of real

17   property, a question of state law.  Such disputes should be

18   decided by state court.  State law supplies the rule of

19   decision.

20            That's not the case here.  What supplies the rule of

21   decision here is Judge Hyman's original order.  What Judge

22   Hyman said in that original order and decreed and ordered was

23   that the debtor did own this property.  Mr. Richard can stand

24   up and say as long as he wants that this was a quitclaim deed,

25   but Paragraph "V" of the order -- and we made it clear we were
```

1    not going to go forward with the sale without this provision.

2    Paragraph "V" of the order explicitly says that the B-Parser

3    source code is an acquired asset owned by the debtor that can

4    be sold to us.  It's not a quitclaim.  We insisted on, and we

5    weren't going to pay $154 million without an absolute

6    black-and-white, no-if-ands-or-buts order that said this was

7    our property, and we got it.

8             I'm flipping for Paragraph "V".

9             THE COURT:  Well, I'm sorry.  The fact that you

10   specify an asset that's going to be transferred, does that

11   make it a warranty deed?

12            MR. ANKER:  It makes it an order of the Court.  The

13   question becomes -- let's go back to the jurisdictional

14   question, as opposed to the merits.  As a jurisdictional

15   question, the question is is there an order that the

16   bankruptcy court is seeking to enforce.  If it is, then the

17   bankruptcy court has jurisdiction.  This order decreed that --

18   and I quote:  To the extent that Ole Poulsen holds or asserts

19   any interest of any kind in the B-Parser code converter

20   software, used or useful by the debtor in the conduct of the

21   business or any other --

22            THE COURT:  You need to slow down for the reporter.

23   You're going very quickly.  So can you --

24            MR. ANKER:  I am.  I have the problem of having

25   grown up in New York and lived there most of my life.  Let me

```
 1   start and go slowly.  My apologies.
 2          Without limiting the generality of the foregoing, to
 3   the extent that Ole Poulsen holds or asserts any interest of
 4   any kind in the B-Parser code converter software used or
 5   useful by the debtor in the conduct of the business, defined
 6   the B-Parser code, or any other business assets, such B-Parser
 7   code and other business assets shall be deemed an acquired
 8   asset and may be sold by the buyer free and clear of all such
 9   interests pursuant to Section 363(f) and 363(h) of the
10   bankruptcy code, and it goes on to explain why.
11          The order goes on to provide -- and this goes to the
12   enforcement of the order -- it goes on to provide in
13   paragraph 19, quote:  All persons or entities presently or
14   after the closing in possession or control of any of the
15   acquired assets are directed to surrender possession or
16   control of them to the buyer as of closing or at such time
17   thereafter as buyer may request.
18          It goes on to say in a separate provision, it
19   contains an explicit injunction against any interference with
20   TRADS' use.  Paragraph 25 of the order, starting on page 27,
21   continuing on page 28.  And, Your Honor, this is a very long
22   provision.  I'm going to put ellipsis in it.
23          Except with respect to the assumed assets, all
24   persons and entities, including but not limited to the debtor,
25   its employee, former employees, debt securities holders,
```

1    equity holders -- now goes on.

2           There's no dispute that Mr. Poulsen was, at a

3    minimum, an equity holder, and, of course, Judge Hyman held he

4    was also a former employee.

5           And then there's a whole series of other categories,

6    and I'll pick up.  Quote:  Shall be and hereby are forever

7    barred, estopped and permanently enjoined from asserting,

8    prosecuting, commencing, continuing or otherwise pursuing in

9    any manner any action, claim or other proceeding of any kind,

10   directly or indirectly, against the buyer, their property or

11   the acquired assets.

12          The answer to the jurisdictional question is you ask

13   yourself the question:  Did the bankruptcy court have

14   jurisdiction to enter the order.  Of course it did.  It then

15   had jurisdiction to enforce it.

16          Was this an action to enforce the order?

17   Absolutely, it was, because this order determined that we

18   owned this asset.  This order enjoined them from threatening

19   us with an injunction, which they threatened us with when they

20   called up and TBO said, we now own the asset, and this order

21   required them to turn it over us to.

22          And that distinguishes the case from Lemco Gypsum,

23   and it distinguish this case from the other case that

24   Mr. Richard cited, the Buxton case.

25          In that case --

```
 1              THE COURT:  Is that Judge Kimball's case?

 2              MR. ANKER:  Judge Kimball's case.

 3              And let me, Your Honor -- it's not reported.  It's

 4    only reported in Westlaw, so I'm going to give you the Star

 5    cite.  I think the most relevant point is Star 3.

 6              Judge Kimball writes:  Paragraph 7 includes the

 7    following language, quote, from and after the date of entry of

 8    this order, no creditor or other party in interest shall take,

 9    or cause to be taken, any action that would interfere with the

10    transfer of the acquired assets to the successful bidder.

11              Judge Kimball goes on, then, to write, no longer

12    quoting the order:  This provision prohibits interference with

13    the transfer of the acquired assets to the purchaser.  It does

14    not prohibit interference with the use or enjoyment of the

15    acquired assets after closing.  This is an important

16    distinction.  Paragraph 7 of the sale order is intended to

17    facilitate the closing of a sale, consistent with the asset

18    purchase agreement.  Paragraph 7 does not contain an

19    injunction against post-closing actions related to the

20    acquired assets.

21              That was the basis of his decision.  He's saying the

22    same thing Lemco Gypsum is saying.  Where the order does not

23    speak to the question, and what you're talking about is a

24    post-sale conduct, then the bankruptcy court lacks

25    jurisdiction.
```

1          Let me give a concrete example.

2          Imagine one of the assets TRADS acquired here was

3   the leasehold right that TLO had where it operated its

4   offices.  Imagine that tomorrow a dispute arose between TRADS

5   on the one hand and the landlord on the other hand over rent,

6   was it appropriate, did the landlord have the right under the

7   lease to escalate the rent or not.  That's not an issue --

8   that's an issue arising out of a dispute today, not involving

9   the transfer of assets.  It's a dispute that Judge Hyman's

10  sale order never spoke to.  I would never claim that Judge

11  Hyman has continuing jurisdiction over that dispute.

12          But where the dispute is what does the sale order

13  say, and can we enforce the sale order, I submit Judge Hyman's

14  jurisdiction is every bit as broad as yours and every judge in

15  the United States of America.  If you can enter the underlying

16  order, you can enforce that underlying order, including

17  holding parties in contempt.  And there is not one case ever

18  that holds to the contrary.

19          It would revolutionize the law of bankruptcy to say

20  that when I, as a buyer, and my client pays $154 million, and

21  I heavily negotiate an order, I can't go back to the judge

22  that entered that order, who knows what happened, to get it

23  enforced.  I have -- indeed, I think, Your Honor -- I think

24  I'm right on this -- I don't think you can seek contempt of

25  court from anyone other than the judge who entered the

1    contempt.

2            I know, for example, in the bankruptcy context

3    there's been a whole body of case law as to whether, for

4    violation of, for example, in consumer cases, discharge

5    injunctions you can have a nationwide class action for

6    contempt, and there is case law authority saying no.  I don't

7    know that it's uniform, but no on the theory that the only

8    judge who has the power to hold someone in contempt of court

9    is the judge or the court that entered the order.

10           THE COURT:  All right.  So, you know, you're making

11   distinctions between the Lemco case and the -- Judge Kimball's

12   case, and they're arguing to the contrary, and I have to kind

13   of sort all this out, and I can't tell you sitting here that

14   I, you know, know the answer to the question, and you're both

15   vigorously arguing your positions and both sound like you're

16   very credible when you're asserting them.  Shouldn't I just

17   keep things on hold until I have a chance to really sort this

18   all out?

19           MR. ANKER:  No, Your Honor.  And I say "no" for

20   several reasons.

21           First, I don't think the jurisdictional issue, with

22   all due respect, is hard.  I think it's an easy question, and

23   I think the argument on the other side is -- it's not an

24   argument I could make and stand up as an officer of the court

25   and make with a straight face.  But put that aside.  The law

```
 1    on a stay is not that you preserve the status quo.  The basic
 2    law in this country is that when a party wins a judgment, it's
 3    entitled to enforce it, and that the entry of a stay is an
 4    extraordinary remedy.
 5            To put the standard exactly right -- and this is
 6    quoting from another district -- this district, Southern
 7    District of Florida, not a bankruptcy case, the Jet Networks
 8    case we cited on page 3.  Quote:  A motion for a stay pending
 9    appeal is an extraordinary remedy and requires a substantial
10    showing on the part of the movant.
11            So it is anything but right that the basic rule is
12    to preserve the status quo.  The basic rule here when we win
13    is that we get to enforce.
14            THE COURT:  Well, I think -- I think you're correct
15    in saying that, but don't you have to balance --
16            MR. ANKER:  Yes.
17            THE COURT:  -- the potential irreparable harm --
18            MR. ANKER:  Yes.
19            THE COURT:  -- against all those other factors, and
20    if it's, you know, something that, hey, once it's -- you know,
21    the barn door's open and you can't close it again, doesn't
22    that kind of weigh --
23            MR. ANKER:  Your Honor, it would, except those facts
24    are so divorced from our facts on this record.
25            Let's talk about irreparable harm.  It's really
```

```
1    where I wanted to start the argument, but because you asked

2    about jurisdiction, I wanted to go to it first.

3              At trial, TBO's -- IDI, Inc.'s actual president,

4    Mr. Brauser, took the stand, and we asked him is TBO using

5    this intellectual property, and the answer was "no".

6              And let me back up, Your Honor.  I think this was at

7    trial.  This may have been deposition testimony.  I don't want

8    to misstate the record.  I genuinely don't -- I think it is

9    actually deposition.

10             So I asked Mr. Brauser the following.  Quote:  Let's

11   conversely -- conversely, if there is such a word -- let's

12   conversely assume that TransUnion wins this lawsuit.  I take

13   it since you are not using BOLT, or B-Parser, or the Runtime

14   library or any of the intellectual property that Mr. Poulsen

15   purported to sell you, it will have no effect on IDI.

16             His answer -- this is quoted on page 6 (sic) of our

17   brief, no equivocation:  That is correct.

18             At trial I asked Mr. Poulsen:  Is it accurate that

19   your client you're now working for, TBO, is not using any of

20   this intellectual profit?

21             ANSWER:  Yes.

22             Mr. Richards said, well, we might use it if we won

23   the lawsuit.

24             THE COURT:  But isn't there a difference between

25   using or not use and getting access to the source code, which
```

1    you don't have at this point?  I mean, let's assume they have

2    some, you know, secret formula that will cure cancer, and --

3    but they're just sitting and keeping it -- keeping it hidden

4    from the world, and once you get it, you know, you're going to

5    go and use it.

6           MR. ANKER:  Well, let's posit that, Your Honor.

7           So let's first talk about the injury we're talking

8    about now.  We're no longer talking about deprivation of a

9    property right to them, because they're not use its.  We're

10   talking about maybe my client, which paid $154,000,000 three

11   years ago, finally gets to enforce its rights.  We get to use

12   what we're entitled to.  Extraordinarily different form of

13   injury.

14          But let's talk about the evidence on that injury.

15   As they have championed for years, we have not had access to

16   it.  They've said we don't need it.  What my client has said

17   is -- and goes to Mr. Richard's point about why we didn't

18   demand it early on -- here's the testimony on the record.  The

19   testimony in the record is that my client didn't need it

20   immediately, because you only need the source code to correct

21   bugs in the underlying operation.  Initially it operated well.

22   We're now three years later, and there are problems, and we

23   need it, and we need it to fix the system.

24          Judge Hyman expressly held on the motion for stay

25   filed below that we would be, in fact, harmed if we did not

```
 1   get the intellectual property, and he cited not to what

 2   Mr. Richard cites to, which is lawyer argument, he cited to

 3   actual testimony in the record.  And I'll find that for you,

 4   Your Honor, in one second.

 5           This is his order on TBO's motion for stay.  He says

 6   on page 9:  First, the Court finds that TRADS will suffer

 7   irreparable injury if a stay is granted.  TRADS purchased the

 8   BOLT IP nearly three years ago and has never been able to

 9   access the source code.  The Court has received testimony that

10   without the source code, TRADS cannot update any software

11   included within the BOLT IP.  An inability to update this

12   software, which is TRADS' primary asset, is highly detrimental

13   to TRADS' business.

14           That's a determination.  Not a conclusion of law,

15   but a finding of fact by a trial judge who heard six days of

16   testimony, took 528 exhibits into evidence, heard 18

17   witnesses.  It's based on testimony on the witness stand of

18   our employees.  So the harm us to would be severe.

19           And they cite a case.  Let's talk about their case

20   on trade secrets, because it's emblematic of the failure to

21   deal with what really are the facts in the case.  That was a

22   case in which the plaintiff had won below.  The plaintiff was

23   suing one of its former employees who had access to a customer

24   list.  That employee had signed a employment agreement saying,

25   quote, if I ever use that employment list, that will cause you
```

```
 1    irreparable harm.  And the plaintiff won on the merits and got
 2    an injunction preventing the defendant employee from taking
 3    that customer list and calling up and soliciting new business.
 4           Totally different here.  They didn't win below, we
 5    won below.  The status quo is it's our property, not his
 6    property.  We won a judgment.  We're not asking for a
 7    prejudgment relief, we're asking for the lifting of a stay
 8    post judgment to allow what every party can do in litigation,
 9    which is enforce their judgment.  And there will be massive
10    injury to my client if it doesn't get to use this property
11    that it paid $154 million for, and it will most assuredly harm
12    the public interest.
13           Your Honor, let me tell you a little bit about this
14    bankruptcy case, and it goes a little bit to the merits
15    arguments that I've heard from the other side.
16           They would have you believe that there should have
17    been an adversary proceeding here.  The evidence
18    uncontroverted in the record, both at the time of sale and at
19    trial, is that this debtor was running out of money.  It had
20    45 days to live on when it completed the sale.  But for that
21    sale, creditors would have gotten zero.  But for that sale,
22    Mr. Poulsen, who walked away with $6 million, an equity
23    holder, would have gotten zero.
24           As a result of the sale, $154 million went into this
25    estate.  Every creditor received 100 cents on the dollar plus
```

1    interest.  Equity received tens upon tens of millions of

2    dollars.  I don't remember the exact amount, but Mr. Poulsen

3    received over 6 million.

4           The bankruptcy code says sales can occur by motion.

5    I'm a bankruptcy litigator.  I'll represent to you, I've been

6    doing this 30 years, I have not once filed an adversary

7    proceeding in relation to a sale, not once.  You do it by

8    motion.  And the bankruptcy code has an extraordinary

9    provision from it.  It says that you can sell property free

10   and clear of a third party's interest without even deciding

11   whether that third party's interest is valid or not, as long

12   as there's a bona fide dispute.  And you might say that's

13   extraordinary.  How can you take someone's interest away

14   without even adjudicating it?

15          Well, there's two reasons for that.  One is because

16   if you had to adjudicate it, there'd be nothing to adjudicate.

17   Bankruptcy -- and this case is an example -- is the proverbial

18   meting ice cube.  This debtor was going to fail in 45 days.

19   The other answer is the sale doesn't deprive the other side of

20   any economics.  It simply takes its economics, if it has a

21   valid interest in the property, and changes it from the

22   property -- I'm holding up my glasses -- and puts it in this,

23   Your Honor, the cash that's paid.

24          The order here said any interest, including

25   Mr. Poulsen's, that is ever asserted and turns out to be valid

```
 1    attaches to the proceeds with the same force, validity and

 2    effect as it had to the property.

 3            And so the whole point of bankruptcy is you get to

 4    do the sale, the buyer is incented to pay the full amount

 5    possible, because if it turns out there's some third party out

 6    there with an interest, it's not the buyer's problem.  A

 7    separate section of the bankruptcy code, 363(m), says if you

 8    buy in good faith, even if it's reversed on appeal, you get to

 9    keep the property and nothing changes.  And if the third party

10    has an interest, it can assert it against the property.

11            Some of that 154 million went out the door very

12    quickly.  There were attorney's fees to pay, there were

13    banker's fees to pay, and the Asher sisters, who had kept this

14    company afloat, had 6 million of their own money, just about

15    every cent they had, in this company.  But what stayed on hand

16    was $120 -- Your Honor, I remember it was $126, $127,

17    $128 million.  And it stayed in the estate for nine months,

18    and it stayed in the estate for nine months because

19    Mr. Poulsen, among others, said, I'm entitled to a bigger

20    share of that money, not because he said this was by

21    intellectual property that got sold, but because he said that

22    a secured creditor really shouldn't be treated as a secured

23    creditor but should have its debt recharacterized as equity,

24    and then they would just be equal with me.

25            And during that entire nine-month period,
```

1    Mr. Poulsen, represented by counsel, Mr. Salazar sitting right

2    there, never once said this is my intellectual property.  He

3    knew about the sale.  The whole purpose of the lawsuit was

4    about the sale.  He had gotten the sale order.  It went to him

5    directly in Oregon.  He had been told before the sale by

6    Ms. Asher, we take the position that all this intellectual

7    property is TLOs.

8            And I asked Mr. Poulsen at trial, Mr. Poulsen, there

9    was $126 million sitting around in a bank account.  Was that

10   sufficient to satisfy any interest you claim in the B-Parser

11   source code and any other intellectual property?  And I think

12   what I'm about to say, Your Honor, is not on the record, but

13   he laughed and he smiled, and then what is on the record is

14   the following, the answer was "yes".  He sold the property for

15   $250,000.  The single most important determination in this

16   case is that he slept on his rights.

17           And now let me talk about the second most important

18   determination of this case.  When they came around to --

19   you're talking about balancing harm -- selling the

20   intellectual property, Mr. Poulsen to TBO, here's what

21   happened.  Mr. Brauser had been perhaps the single most active

22   participant in the bankruptcy.  He formed companies.  He tried

23   to get -- to do a pre-bankruptcy arranged loan during the

24   bankruptcy that was a lend to own scheme, where he'd then

25   become the owner.  That's the way he would get repaid.  He

1    made, the record is replete, offer, after offer, after offer,

2    and attempt, after attempt, after attempt to get control of

3    this company.  But there's one thing he wasn't willing to do,

4    pay $154 million.  When he was asked that question, he said, I

5    didn't think it was worth that, I wasn't going to pay that

6    much.  And so the sale went through.

7          But he then said, what I'm going to do is start

8    taking employees.  And Your Honor dealt with one of these

9    pieces of litigation, I believe the MacLachlan litigation.  He

10   took -- he started taking very senior employees, formerly of

11   TLO, who had gone to TRADS, and they had noncompetition

12   agreements.  And TRADS wrote to them and said, you have a

13   noncompetition agreement.

14         Well, what happened around very much the same time

15   is he hired Mr. Poulsen, and Mr. Poulsen was not subject to a

16   noncompetition agreement at this point.  He had left TLO

17   months earlier.  And Mr. Poulsen said, I, by the way, own the

18   intellectual property.  And Mr. Brauser, according to his

19   sworn testimony, immediately saw an opportunity and jumped on

20   it and said, let me get that from you.  And the next day,

21   after getting the -- signing the contract, a contract that

22   says, whereas, there was a bankruptcy, whereas, in the

23   bankruptcy the property was sold to TRADS, whereas, TRADS

24   claims under the sale order it's its, there's no question he

25   knows about the sale -- the very next day he calls up

```
 1   TransUnion and says, by the way, I own your intellectual
 2   property, by the way your non-competes are not enforceable,
 3   make a deal with me or I'm going to get an injunction.
 4           And I asked Mr. Poulsen -- I'm sorry, Mr. Brauser at
 5   deposition, and then I asked him again at trial, you were
 6   aware of the sale order, weren't you, sir?  Yes.  In fact,
 7   here's the certificate of service of the sale order from
 8   months earlier.  You had gotten it, hadn't you, directly?
 9   Because you had been an active participant in the bankruptcy.
10   Yes.  You had gotten the sale motion?  Yes.
11           Did you bother to look at it?  He said, oh, I didn't
12   care.  And this is a direct quote, I didn't care what the
13   bankruptcy court had to say.  That is the height of contempt.
14   That is the definition of contempt.
15           So when you balance harms here, understand that you
16   are dealing with people who knowingly said to the bankruptcy
17   court, I don't care what you say, I don't care what you've
18   ordered.  He didn't bother to read the sale order.
19           And so when Mr. Richard says to you there's
20   ambiguity in the sale order, there is isn't.  When he says
21   there's ambiguity in the sale asset purchase agreement, there
22   isn't.  But none of that matters.  I could understand an
23   argument if the record was there, I read the sale order, Your
24   Honor, I didn't think it covered B-Parser, I thought it
25   covered something else, that would raise an interesting issue
```

1    about contempt, about how clear the sale order was, whether

2    that testimony was credible.  That wasn't the testimony.  The

3    testimony out of their witness' mouth was he didn't read the

4    sale order because he didn't care what it said.

5            So when you balance harms here, Your Honor, the harm

6    to us is extraordinary, and it's in the record.  It's not

7    legal arguments.  It's in the record.  The public interest is

8    extraordinary, because this is not a normal money judgment.

9    It's contempt of court.  And the harm to them, they've

10   testified they're not using this stuff, and they've testified

11   they don't think it will give us any advantage at all.

12           Let me say one other thing about balancing harm.

13   There are two parts to the underlying order.  One is the

14   turnover of the intellectual property that remains, which we

15   paid for and haven't gotten in three years.  The other is that

16   the bankruptcy court is going to proceed, assuming Your Honor

17   lifts the stay, with proceedings to quantify the legal fees

18   that are owed to my client.  There's no irreparable harm to

19   them now, because there's not even -- first off, there's no

20   specific money judgment extant, right?  I'm going to follow up

21   on your questions that you asked Mr. Bloom.  All they've got

22   to do is participate on a series of proceedings to determine

23   that.  They can be as active or inactive as they want to be.

24           If, at the end of the day, there is a determination

25   that we're owed "X" million dollars in legal fees, and Your

1    Honor ultimately reverses it, we'll have to pay that money

2    back.  The only thing they will have lost in the interim is

3    the legal fees they incur in defending that order.  I defy

4    them to cite a case that holds in any context that the

5    incurrence of legal fees is in and of itself irreparable

6    injury.  If it were, the American rule, which is that each

7    side pays its own legal fees unless there's a contract or a

8    statute, as Mr. Bloom said, or unless it's Rule 11 sanctions

9    or contempt of court, wouldn't exist.

10           The case they cited, I happened to look it up.  It

11   was not -- Mr. Bloom had not cited it in his brief, and he was

12   candid enough to acknowledge that.  The Second Circuit case

13   was a case in which the Court found that the party from whom

14   monetary relieve was being sought -- it was a preliminary

15   injunction, not relief on appeal, not a stay on appeal.  The

16   party from whom a preliminary injunction was being sought was

17   insolvent.  That's what the Court went off on and therefore

18   would not have an ability to repay money.

19           My client has never been alleged a wholly owned

20   subsidiary of TransUnion Corp., one of the three leading

21   credit bureaus in the country to be insolvent.  If we get

22   ultimately a money award and that money award gets reversed,

23   we will be obligated to repay it.

24           If Your Honor requires that the source code be paid

25   over to us, they speculate we will destroy it or harm it.

1    It's utter speculation.  Why would we do that?  There's not a

2    shred of evidence.  And if at the end of the day we're ordered

3    to return it, we will return it, as simple as that.

4            THE COURT:  Answer their issues regarding notice,

5    the mailing presumption --

6            MR. ANKER:  Sure.

7            THE COURT:  -- Judge Hyman incorrectly putting the

8    burden on the defense, and the issue about IDI, Inc. not being

9    a party.  Can you address those for me?

10           MR. ANKER:  Notice, IDI, Inc.  Was there a third in

11   there, Your Honor?  I want to make sure I answer your --

12           THE COURT:  The mail, the mail burden of proof

13   shifting, that they claim that Judge Hyman put the burden of

14   proof on the receipt of notice on the wrong party.

15           MR. ANKER:  The Court did -- first off, there is a

16   presumption of mailing being proper, and their statement that

17   the mail was addressed to the wrong address -- let me -- let

18   me, not before getting the evidence.  I think when you read

19   the opinion there is no shifting of any burden, though

20   shifting would be appropriate.  The bankruptcy court held and

21   found that the overwhelming evidence -- it's not that he found

22   the evidence is in equipoise, and therefore, because the

23   burden is on them, they lose.  The Court held that the

24   overwhelming body of evidence was that there was adequate

25   notice of the sale.  That notice, that -- those findings go

1  on, Your Honor, I believe for 20 full pages in the decision of

2  the Court.

3          In so holding, there's three separate forms of

4  notice, Your Honor.  First -- and, Your Honor, I think the

5  notice part of the findings of fact begins on page 20 of the

6  opinion, under the heading "notice of the 363 sale," and if

7  I'm right, goes through page 42.  You'll see Roman IV on

8  page 20, notice of a 363 sale.  Roman V, changing subjects,

9  isn't until page 42.  So 21 -- 23 pages of findings of fact.

10 Three different forms of notice here.

11          First, the sale motion was on the envelope addressed

12 to him in Boca Raton, Florida, but there's uncontroverted

13 testimony in the record that the agent -- that he had served

14 a -- or filed, rather, a change of address form with the

15 Postal Service, and that under standard procedures used by the

16 service agent here, they put a bar code, run it through a

17 database, put a bar code on the envelope that says this person

18 has moved, they are now in Oregon.  Direct uncontroverted

19 testimony.

20          Similar testimony.  The return address on that

21 mailing was not the service firm.  It put down the law firm,

22 the debtor's law firm, TLO's law firm:  Attention Alvin

23 Goldstein, one of the two partners running matter.

24 Mr. Goldstein took the witness stand, testified

25 uncontroverted, it never came back to me.  Nothing came back

1    returned undeliverable.

2            Mr. Poulsen testified, contrary to what Mr. Richard

3    just said, that lots of mail got forwarded to him from the

4    bankruptcy to his house in Oregon.  He just claimed that this

5    particular piece he didn't recall getting.

6            So the evidence on the mailing of the notice is

7    overwhelming, and there are findings of fact.  More than

8    findings of fact.  Judge Hyman acknowledges in his opinion

9    that Mr. Poulsen testified they didn't get it and says, I

10   looked him in the eye when he took the witness stand.  That

11   testimony I find not credible.  That's a credibility

12   determination that simply didn't get reversed on appeal.

13           Second, the sale order.  The order went directly to

14   Oregon.  Why did it go directly to Oregon?  Because after the

15   sale motion and after the filing of a plan of reorganization

16   that described the sale, Mr. Poulsen called up Mr. Goldstein

17   and sent him an e-mail and said, my new address is Oregon,

18   change your records.  Mr. Goldstein immediately did so and so

19   testified.  So that's why the sale order goes directly to

20   Mr. Poulsen at exactly the right street name, exactly the

21   right city, Bend, exactly the right state, Oregon, exactly the

22   right zip code.  The sale -- that mailing was done by a

23   different sale notification firm.  Their representative also

24   testified at trial and said, we put our own return address.

25   It did not come back undelivered.

```
 1              Mr. Richard says, well, it didn't get served for 18
 2    days, and therefore he couldn't appeal it.  I feel like I'm
 3    living in a fantasy land, where sort of facts don't matter at
 4    all.  Did Mr. Poulsen take the stand and say, I got the sale
 5    order, I read it, I consulted with a lawyer, I was told I was
 6    out of time to appeal?  No.  He says, I don't remember ever
 7    getting the sale order.  If I got it, I never read it.  I had
 8    no idea what any appeal period was.  But I knew about the sale
 9    because -- I said there were three; there's actually four.
10              He testified that prior to the filing of the sale
11    motion, prior to the delivery of the sale order, he got notice
12    that there was going to be an auction.  We won this at
13    $154 million over the bids of two competing bidders.  Not
14    Mr. Brauser, who wasn't willing to pay anywhere near as much,
15    but two major companies, Warburg Pincus, one of the leading
16    private equity firm, and Reed Elsevier, which owns LexisNexus,
17    and we ended up being what was determined to be the highest
18    and best bid.
19              He said he was aware of the auction.  He said that
20    even before then, he had attended a meeting in Boca at TLO's
21    offices following the filing of the bankruptcy, in which he
22    was told by the then co-CEO of the company, Desiree Asher, we
23    own all the intellectual property, that's our position.
24              So he knew the sale had occurred, and he knew that
25    it was the debtor's position.  He didn't -- nevertheless
```

1   claims that he never bothered to get a copy of the sale motion

2   or sale order, and he claims that somehow they didn't get

3   them, even though the order went directly to them.

4          Fourth piece of notice.  It's the one I've already

5   described.  Within days of the sale -- I think it's a matter

6   of like four days -- he retains Mr. Salazar to bring a lawsuit

7   in the bankruptcy court for the purpose of challenging the

8   claim of the secured lender so that it can be recharacterized

9   as equity.  That lawsuit has as its predicate the fact that

10  $154 million has come in.  There's pleadings in the case filed

11  by Mr. Poulsen on his behalf, there was a sale, $154 million

12  has been paid.  $120' -- he knows about that.  He knows about

13  it to a moral certainty.  And $126 million stays in the

14  estate, and he does nothing for nine months.

15         So, no, there was no shifting of the burden.  The

16  Court doesn't find -- if you look at his opinion, the Court

17  does not find, I find that Mr. Poulsen or TBO has not met the

18  burden.  The Court finds -- and I want to find the exact spot.

19  The Court finds, for purposes of mailing, the 2633 South Ocean

20  Boulevard, Highland Beach, in Boca Raton, are one and the

21  same.  But there's a broader finding I'm trying to find, and I

22  hopefully will find it or one of my colleagues will get it to

23  me, where the Court specifically finds that the evidence shows

24  that he got notice of all of -- of everything.  I'll try to

25  find that.

```
1              THE COURT:  You don't need to find it.

2              MR. ANKER:  Let me go to your other two points, or

3     your other point, which was the IDI issue.

4              THE COURT:  Yes.

5              MR. ANKER:  Let's talk about two things on the IDI

6     issue.

7              One is precisely the one you raise, which is

8     irreparable harm.  If Mr. Bloom is to be -- his statements are

9     going to be accepted as true, IDI, Inc. is a separate entity

10    from TBO, contrary to the bankruptcy court's findings.  IDI,

11    Inc. doesn't own and doesn't control the source code, its

12    subsidiary does.  So it won't be burdened if it has to turn

13    over the source code, because its subsidiary is the one that

14    will have to turn over the source code.  So that's not

15    irreparable injury to him.

16             He says that the irreparable injury is he'll have to

17    participate in legal proceedings.

18             THE COURT:  I'm not interested in that issue.  I'm

19    interested in the issue that he wasn't a party --

20             MR. ANKER:  Okay.

21             THE COURT:  -- and therefore they've been denied due

22    process.

23             MR. ANKER:  Okay.  Let's -- it goes to the merits,

24    Your Honor, but let me raise it as a --

25             THE COURT:  Well, they have to show a likelihood of
```

1   success on the merits, and he made an argument that this is an

2   easy one.

3          MR. ANKER:  Let's talk about that, Your Honor.  But

4   may I predicate it with a preliminary argument that I think is

5   dispositive, and it feed into the merits?  And it hasn't been

6   discussed.

7          Rule 8007 of the Federal Rules of Bankruptcy

8   Procedure, which deal with appeal, Rule 8007(a)(1) says,

9   quote:  Ordinarily, a party must move first in the bankruptcy

10  court for the following relief:  A, a stay of a judgment order

11  or decree of the bankruptcy court pending appeal.

12         TBO filed such a motion, but he says he's not TBO,

13  and IDI did not file such a motion.  And IDI knew about this

14  judgment.  Mr. Bloom showed up in court in front of Judge

15  Hyman and entered an appearance but didn't file a motion.

16         And his answer is, well, look, we know that the

17  motion filed by TBO for a stay was denied.  We know the motion

18  filed by TBO, not IDI, to amend findings was denied.  If I

19  filed my own motion, that would be the same result.

20         First, that's not the standard.  The standard is

21  whether it would be impossible for you to file your own

22  motion, not whether you're likely to win or lose.

23         Second, his whole argument -- I was paying attention

24  when I read his papers, I was paying attention when he made

25  his argument today.  His argument is this wasn't a judicial

1   admission by IDI.  The party that filed the amended answer was

2   TBO.

3          Well, look at what Judge Hyman said on the motion to

4   amend the findings.  He said, this is a motion filed by TBO in

5   front of me.  TBO filed this answer.  TBO made an admission.

6          If Mr. Bloom wanted to, and his client, argue that

7   the judicial admission may be binding on TBO but isn't binding

8   on its purported parent, IDI, then he had to go into court and

9   make that argument to Judge Hyman.  And his failure to do

10  so -- and we've cited the cases.  Court, after court, after

11  court, district court, after district court has held that that

12  alone is grounds for denial of a stay, which brings me to the

13  merits.

14         Let's talk about denial of due process.  Was IDI

15  aware of this lawsuit?  It owned -- if he is to be believed,

16  that TBO is not the same entity, it owned TBO.  Who is IDI,

17  Inc.'s -- when IDI -- when TBO filed that answer, there's no

18  separate president of TBO, no separate chairman of the board.

19  It's run by Michael Brauser.  It's run by Derek Dubner.  It's

20  run by Dan MacLachlan, all the same people.  They directed

21  that.  They caused --

22         THE COURT:  Is there -- is this part of the record,

23  or are you telling me?

24         MR. ANKER:  No.  Well, did they direct it?  No.  Are

25  they the CEO of both companies?  Absolutely, absolutely, Your

1    Honor.

2           Michael Brauser signs the contract for the purchase

3    of the intellectual property from Poulsen on behalf of TBO.

4    Michael Brauser took the witness stand in the trial and said

5    that he was the chairman of the board of IDI, Inc.  Dan

6    MacLachlan, who was a TLO employee and left -- you know him --

7    testified that he is now the chief financial officer of IDI,

8    Inc.  That is absolutely in the record.

9           So this is -- you know, they give the example of

10   what if the judgment had been entered against Microsoft.

11   Couldn't Microsoft -- you know, IDI files -- IDI, Inc. now

12   known as Microsoft, Incorporated.  I think Microsoft would

13   have a pretty good argument.  One of its arguments would be,

14   we had no idea about these legal proceedings.  IDI, Inc. can't

15   say that.  When TBO files the pleading, it's its own

16   wholly-owned subsidiary, point one.

17          Point two, Michael Brauser, Dan MacLachlan, Ole

18   Poulsen, all purported employees of IDI, Inc., took the stand.

19   They testified at this trial.  Mr. Brauser -- and this is not

20   in the record, Your Honor, but I think -- I'm confident

21   opposing counsel will be candid and acknowledge this -- was in

22   the courtroom every single day of the trial.

23          Third, they -- Michael Brauser -- I deposed Michael

24   Brauser during the litigation, and I asked Mr. Brauser about

25   the relationship of TBO to IDI, Inc, and what Mr. Brauser

```
 1  said --

 2          THE COURT:  Well, again, I think there's a

 3  difference between what you deposed and what's in the trial

 4  record.

 5          MR. ANKER:  It is a deposition, Your Honor, but I'm

 6  saying for purposes of a motion for stay, you certainly can

 7  consider it.  But you're right, it isn't in a deposition.  It

 8  is a deposition.  What is in the trial record is the

 9  admission.  This is in the trial record, the admission in the

10  amended answer.

11          Let me get to the fifth point.  Mr. Bloom argued to

12  Your Honor it's all our fault.  We should have named IDI, Inc.

13  And he raises with you the U.S. Supreme Court case, the Nelson

14  case.  Why would we have named IDI, Inc. when we had a

15  pleading filed by our adversary that began TBO, now known as

16  IDI, Inc.?  We have the other side saying to us, we are IDI,

17  Inc.  And prior to trial, the only deposition testimony was

18  Mr. Brauser's testimony saying, yep, that's exactly right, TBO

19  and IDI, Inc. are one and the same.

20          And, by the way, in case you think this should be so

21  black and white, IDI, Inc. seems to change its name every

22  three weeks.  It's now Cogent, Inc.  God knows what it will be

23  in two weeks.  This is not before the Court, but someday we

24  may be before this Court on fraudulent transfer litigation

25  about what I suspect are enormous shenanigans going on to make
```

1   this company judgment-proof, but that's another for day.

2          What is in the record is that IDI, Inc. was the

3   wholly -- was, at a minimum, if not the same entity, the

4   parent.  Two, in answer to your question what should we have

5   done, it filed an answer, TBO, saying we are IDI, Inc.  The

6   deposition testimony was consistent with that.

7          The Nelson case in the U.S. Supreme Court is a case

8   in which the plaintiff knows it's suing let's call it Nelson,

9   Incorporated, a legal entity, and it knows Nelson,

10  Incorporated is owned by -- and I don't know his first name,

11  I'm just going to say Joe Nelson.  It knows darn well the

12  difference between Nelson, Inc. and Joe Nelson, and it never

13  names Joe Nelson personally as a defendant.

14         It then gets judgment owns against Nelson, Inc., and

15  it says after getting judgment against Nelson, Inc., please

16  just add the judgment to be against Joe Nelson, even though

17  I've never sued him, and I knew there was a difference.  And

18  the district court did that, and ultimately the U.S. Supreme

19  Court reversed.

20         Now, let's talk about our facts.  We're not talking

21  about an individual Joe Nelson, who's obviously different from

22  a legal entity, Nelson, Inc.  We're talking about IDI and TBO,

23  if they are different companies, two companies.  We're talking

24  about where TBO files a pleading before judgment saying, we

25  are IDI, Inc.  That didn't happen in the Nelson case.

1           And we're talking about a case where, after trial,

2    the plaintiff, having gotten a judgment only against Nelson,

3    Inc., says, I want to change it so it's against Joe Nelson

4    personally.  We didn't do that.  We have no need to do that.

5    The judgment in the first instance was against IDI, Inc., and

6    it was against IDI, Inc. because they appeared.

7           So the answer to Your Honor's question is there's

8    enormous evidence in this record that they are one and the

9    same thing.  There's enormous evidence in this record that if

10   they are not -- I keep -- let's talk about irreparable -- I

11   haven't gotten to this point, Your Honor, and I want to raise

12   it in both.  And I apologize I've been disjointed.

13          There's a way to deal with motions for stay, which

14   is -- and it's a way where you get a stay, frankly, in my

15   experience, almost invariably.  The plaintiff posts a bond.

16   I'm sorry, the defendant, the judgment debtor posts a bond.

17   They've never offered to post a bond.  This is in the record

18   because it's attached to the motion papers.

19          When they contacted me, TBO, Mr. Richard, the first

20   time after judgment and said, oh, by the way, we want to make

21   this change, having never raised it prejudgment, but when I

22   could have asked questions in trial and gotten a record, I

23   said to Mr. Richard -- and it's all in the e-mails, what is

24   IDI Holdings?  Why are you seeking to do this?  Are you

25   willing to provide a bond and collateral?  Are you willing to

```
 1   give me comfort that IDI Holdings isn't some shell you've
 2   created in the last week for the purpose of making yourself
 3   judgment proof?  And his answer was, it's none of your
 4   business.  His answer wasn't, I'm posting a bond.  His answer
 5   was, it's none of your business.
 6            If they want to have a judgment against IDI, Inc.,
 7   or they want to have a stay pending appeal, or TBO does, then
 8   post a bond.  I don't know why you need to post a bond right
 9   now for the legal fees, because there's no specific dollar
10   amount.  But once we get those legal fees determined, let's
11   assume those legal fees are the full amount we sought,
12   9 million, plus all the ongoing fees.  Let's assume it's
13   10 million.  They post a bond for 10 million with a credible
14   agency.  They will have a stay pending appeal.  They can keep
15   that stay until we go to -- if they want to keep the stay in
16   place~-- the bond in place, maybe they can have it all the way
17   to the Eleventh Circuit.  But that's the way you avoid harm to
18   the defendant.
19            And on the other injury, which is our not being able
20   to get the source code, there was a proceeding before the
21   bankruptcy court where they could have created an evidentiary
22   record, TBO's motion for stay.  IDI could have joined.  But at
23   that place they could have said, let's have an evidentiary
24   hearing on what the harm to TransUnion, to TRADS will be, if
25   it doesn't get access to this source code now, and we will
```

1    post a bond in that amount.  I invited them to post a bond.

2    They declined.  They never offered to post a bond.  That alone

3    should be dispositive.  There are cases saying it is a

4    requirement to get a stay that you post a bond to make the

5    winning party avoid harm.

6            So I apologize for taking that point out of order,

7    but it applies both as to IDI and as to TBO.

8            Your Honor, I'd like to look at my notes, but do you

9    have further questions, or have I answered --

10           THE COURT:  I think you've answered my questions.

11           MR. ANKER:  May I have one moment, Your Honor, just

12   to look?

13           THE COURT:  Sure.

14           MR. ANKER:  Oh, Your Honor, one thing I wanted to

15   raise.  I thought Your Honor asked, and I may be wrong about

16   this, the ownership question and bifurcation.

17           THE COURT:  Uh-huh.

18           MR. ANKER:  It is true that at the outset of this

19   litigation, we, TRADS, argued that the sale order was

20   dispositive, and the only question was whether

21   constitutionally adequate notice had been given to

22   Mr. Poulsen.

23           And to be candid with Your Honor, I didn't envision

24   appearing before you today, on November 8th, 2016.  I

25   envisioned a one-month process and being up on appeal, if

```
 1   there was going to be an appeal, in February of 2015, perhaps.
 2   But our adversaries had different ideas, and they sought to
 3   expand the process.  And there was a bunch of motions,
 4   protective order motions, motions to quash, motions to compel.
 5   And ultimately Judge Hyman changed his mind and said that he
 6   was going to open up discovery on all issues, on whether we
 7   had acted in good faith, even though we had found it once, on
 8   whether there was a legitimate bona fide dispute, at a
 9   minimum, over who owned the property, which he found once and
10   now found again, and over whether there had been alleged fraud
11   on the Court and everything.
12            And Mr. Richard stood up at trial -- in front of
13   Judge Hyman and said, what about ownership.  And I think this
14   is Exhibit A to our response to TBO's motion, Your Honor.  So
15   it's Docket 17.  Exhibit A is the transcript from June of
16   earlier this year.  I'm sorry, Your Honor, I gave you the
17   wrong date.  It's Docket Number 166 in the bankruptcy court,
18   but it is, I believe, Tab A to our opposition to the motion.
19   It's the June 3rd, 2015, hearing in front of Judge Hyman.
20            And the Court says -- and this is on page 11 and
21   continues on to page 12 of the transcript:  One thing, going
22   back to what I think it was Mr. Richard mentioned, frankly, I
23   hadn't thought about this issue of what was being sold.  It is
24   clear, while I believe what is alleged vis-a-vis the fraud on
25   the Court may go into what may involve whether the trustee
```

1    knew, or should have known, or the debtor knew, or should not

2    have known, or should have known whether they could have sold

3    this asset, i.e. whether it was property of the estate, that's

4    all part and parcel of the bona fide dispute, was there a bona

5    fide dispute concerning ownership, et cetera.  So I tend to

6    think that discovery should be open on that issue.

7           I lived this litigation.  2000 hours of lawyer time,

8    maybe, combined sides was spent on ownership, tons of

9    depositions, witnesses who testified, legal arguments and

10   findings on the other side that went on for pages and pages

11   and pages on ownership.  There was -- it goes to the whole

12   notion of denial of due process.  He got a second bite at the

13   apple.  The trial, it was a six-day evidentiary hearing, and

14   the defendants got to put on any evidence on any issue

15   whatsoever they wanted, and it went six days after Judge Hyman

16   said on the record, I think this should take two days, but he

17   let it go six days, he took in the evidence, 528 exhibits, he

18   heard 18 witnesses.  They, over our objection -- and we fought

19   it, but we lost.  They were allowed to put on an expert

20   witness, and they said to the Court, as they were concluding

21   their case, Your Honor, we've decided not to call him.  He was

22   their expert on computers.  We had to incur the cost of

23   getting our own expert.

24          So the answer on bifurcation is, first, the Court

25   changed its mind at their urging and opened this case up to be

1    a full and complete trial.

2           Second, the bankruptcy code, as I said earlier, says

3    that property can be sold free and clear of a third party's

4    interest without determining whether that interest is valid or

5    not.  All there has to be is a bona fide dispute.  And I think

6    Mr. Richard conceded that one of the issues opened up was bona

7    fide dispute, and I don't think there's any dispute, no pun

8    intended.  The Court found that there was at least a bona fide

9    dispute basis for the debtor dispute, Mr. Poulsen's claimed

10   interest.

11          That's dispositive.  As I said to you earlier, the

12   consequences of their being a bona fide dispute is Mr. Poulsen

13   loses any claim to the underlying intellectual property

14   without an adjudication of whether it's his or not, because

15   his claim attaches to the proceeds.  And we know, because it's

16   a competitive process, that the highest and best price was

17   paid, and he testified that money was orders of magnitude more

18   than sufficient to make him whole.

19          So for both of those reasons, the denial of due

20   process claim is extraordinary.  Indeed, Your Honor -- and I

21   meant what I said, and I'll close here unless Your Honor has

22   questions -- I think in front of many judges -- I practice in

23   New York, and I will be fair to say what I think would have

24   happened in almost any judge in the Southern District of New

25   York in bankruptcy court.  Motion for contempt, it's Monday,

```
1   we're having a trial Friday.  We're having a trial in a week
2   from now.  That's a serious charge, and if someone's engaged
3   in contempt, I'm going to enforce my order.  And it would have
4   been a short truncated simple proceeding.  They got two years
5   to take discovery, six days to put on a trial.  It was due
6   process, if I can use the phrase, on steroids, and they got it
7   all, and they tried the case, and the Court made findings and
8   credibility determinations that are not clearly erroneous.
9        We would ask the Court to lift the stay so that,
10  having prevailed, we can finally get the property that is
11  ours.  And if, at the end of the day, on the merits we have to
12  return it, we'll return it.  And we surely ask that this Court
13  not enjoin the bankruptcy court from completing its business,
14  which is holding a evidentiary hearing on the amount of the
15  fees so we can get the close our that, and if there's going to
16  be another appeal in relation of that, we can get it going and
17  hopefully resolve this issue before many of us retire or do
18  something else with our lives.
19       Thank you, Your Honor.
20       THE COURT:  Thank you.
21       Counsel?
22       I don't want to cut you off, but I think I've given
23  both sides a good bit of time, so I don't want to have another
24  hour discussion.
25       MR. RICHARD:  Your Honor, I do not intend to rebut
```

1    more than 10 minutes, probably not five.

2              THE COURT:  Okay.  That's fine.

3              MR. RICHARD:  All right.

4              Number one, Mr. Anker, in the heat of argument, has

5    made lots of assertions that are outside the record, in fact,

6    outside anywhere, and are -- and outside the issues.  And I'm

7    not going to sit here and try to rebut each of these alleged

8    things that I said or he said.

9              For example, I never said that anything was none of

10   his business.  And so that in the excitement of argument, he's

11   made these asserts.  I would reflect that the briefs themself

12   with the citations are where the assertions are.

13             Number two, on the bifurcation -- and that's one of

14   the places we just heard a lot of factual assertions and

15   arguments as to who said what.  I'm just going to read one

16   paragraph to the Court, and it's not my words, it's

17   Mr. Anker's words.  And it's in my brief on page 12 of the

18   motion, and it's particularly significant here.  After I

19   pointed out that it was limited to five issues, I pointed out

20   this is not just the defendant's view, it is also TRADS' view,

21   whose counsel wrote -- and these are Mr. Anchor's words, and

22   I've cited it, and I included it in the appendix -- at the

23   June 3rd hearing, counsel for TBO -- this is when the Judge

24   opened it up to the total of five issues -- inquired of the

25   Court whether it intended to allow expert testimony from a

1    computer scientist as to what was actually sold, if, in fact,

2    it's ultimately determined that there was notice, that there

3    was a bona fide dispute, that TRADS was in good faith,

4    et cetera, et cetera.  The Court responded:  By this order, I

5    did not intend to open discovery on that issue, because if

6    I -- but I frankly hadn't thought about the issue other than

7    in the context, I think these issues need to be resolved

8    first.  The Court later clarified, Mr. Anchor's words, that

9    there is no reason to start discovery on the experts until we

10   resolve these other issues, the five issues.

11        We never tendered an expert on what was sold for

12   that reason.  The only expert that we tendered was a 15-minute

13   expert on a tutorial on what defined certain terms meant,

14   nothing else.  These are his words, not mine.

15        Number two, the argument that Lemco Gypsum says

16   something other than what we argued, I just want to read two

17   sentences from Lemco Gypsum and the Eleventh Circuit, and this

18   is the holding, quote:  The fact that property was once owned

19   by a bankrupt does not supply federal jurisdiction of all

20   future disputes concerning a property.  The broad

21   jurisdictional provisions set forth in Section 1334 grant the

22   power to supervise the entire restructuring of the debtor's

23   estate.  However, once property is sold, further disputes have

24   nothing to do with the debtor's estates.  That sentence is in

25   the context of why the Court rejected the notion that a

1   retention of jurisdiction in a sale order allowed the Court to

2   later construe and enforce the order.

3            And then the Court concludes with this paragraph,

4   that two third parties, as here, the two third parties are the

5   purchaser and another, have a conflict concerning debtor's

6   property is of no moment once all disputes concerning the

7   creditor's stakes in the bankruptcy have been resolved,

8   period.  No jurisdiction, contempt order, district court order

9   affirming contempt order reversed, no jurisdiction.  Both

10  those things are true here, and we actually have a finding

11  here that our client -- and I'm not going to get into all of

12  these allegations about Brauser.  They're not in the record.

13  They're not anywhere.  And if we were to actually~-- the only

14  thing in the record is what are in the briefs.

15           The bottom line is TBO bought the stuff in October

16  of 2014.  I'm the one, my office, that filed the answer in

17  which the mistake was made, and what it says -- and IDI didn't

18  even exist.  TBO was later acquired by a public company that

19  is ultimately called IDI, Inc., and the mistake that was made

20  in that pleading did not say IDI, Inc., the successor to TBO.

21  What it said was TBO -- the mistake was now known as IDI.

22           And we also filed a corporate disclosure statement,

23  as required by the rules, in which we laid out exactly who

24  owned who and who held what, and the corporate disclosure

25  statement said that IDI, Inc., was the parent of The Best One,

1    Inc.  And there was -- and the reason that TBO filed the

2    motion to correct the judgment is because there was no veil

3    piercing claim anywhere in that declaratory judgment action,

4    not one, not even hinted at, not even a between-the-lines

5    suggestion.

6            Your Honor asked Mr. Anker why was the declaratory

7    judgment brought.  And what it is, he's saying, well, it was a

8    motion to enforce the sale.  Huh-uh.  The motion to enforce

9    the sale came months later.  The declaratory judgment, which

10   it is the pleading that gave rise to all of these

11   adjudications, was filed with a single count seeking a

12   declaration by the Court on evidence that, among other things,

13   to declare that -- who owns what, to declare the property was

14   made for hire, that it was a work made for hire, to declare

15   that it was exclusive.  All of these things in a declaratory

16   judgment action filed for the first time and then used as a

17   basis for contempt.

18           The other two agencies that I would read are from

19   the Buxton case, in the effort to distinguish it.  Actually,

20   just one sentence.  In citing Lemco Gypsum, Judge~-- the

21   Buxton judge, Kimball, said:  Buyer has no claim against the

22   estate.  This is in rejecting a motion to enforce the sale

23   order with a retention of jurisdiction.  It is not necessary

24   or appropriate for the bankruptcy court to determine post-sale

25   the extent of a buyer's property interest vis-a-vis any third

1    parties.

2            Here, in our case, the bankruptcy court has

3    adjudicated that TBO and Poulsen were third parties.  It's not

4    res judicata as to them, and they did not have a fair and full

5    opportunity to litigate the issue before, notwithstanding all

6    of these oral arguments that we just heard about what the

7    actual facts are.

8            The quitclaim deed.  Your Honor asked counsel a

9    question about the quitclaim deed.  The quitclaim deed is a

10   bill of sale.  It says right on its face that it conveys only

11   the seller's right, title and interest.  And, in fact, the

12   Court, just prior to the sale -- and we cite this in our

13   brief -- asked debtor's counsel, in the presence of TRADS'

14   counsel, is this just a quitclaim deed, and the debtor's

15   counsel says, that's what it is, Judge.  And the Judge says,

16   is it just right, title and interest?  They said, that's what

17   it is, Judge.  And that's what the Judge approved.

18           And during our proceeding, in commenting on the fact

19   that it was a quitclaim deed, in the transcript of hearing,

20   it's in our supplemental appendix at page 7, the Judge

21   explains -- this is Judge Hyman during our proceeding -- that

22   with a quitclaim sale, the Court was not making,

23   quote-unquote, was not making a determination on the assets.

24   You're only selling what you have a right, title and interest

25   in.

1          TRADS, in its proposed findings of fact, asked Judge

2    Hyman to find that it was not a quitclaim sale.  That was

3    removed.  That finding is not in there, and it was declined.

4          As far as whether or not the Court depended on

5    presumptions, I'm reading from the trial order on page 31:

6    Although, by this time Poulsen had moved from Florida on to

7    Oregon -- and these are the keywords -- the evidence shows

8    that Poulsen presumably received the sale motion,

9    quote-unquote.  That's the first time in the findings of fact

10   that the Court bases it on a presumption, presumably.  That's

11   a leaded word there.  It's a qualifier, and it's a key

12   qualifier.

13         He doesn't talk about the law there.  He talks about

14   the law when he reaches the conclusions of law.  But even

15   before he gets to that, he bases the finding that it was

16   correctly addressed in order to address -- in order to find

17   the presumption that mail sent with the correct address was

18   received.  He addresses that on page 36 and 37, underneath the

19   Highland Beach versus Boca Raton in which he says:  The Postal

20   Service manager expressed the opinion that Highland Beach and

21   Boca Raton would, open quote, would be considered the same

22   address.

23         Counsel did not respond, and I would submit for the

24   same reason he didn't respond in the brief, that it is just

25   black letter law that that statement, an extraneous statement

```
 1   of opinion in an authentication document is inadmissible

 2   hearsay, and the Eleventh Circuit says that alone is

 3   reversible error.

 4         I only have a couple more things here.

 5         THE COURT:  Well, the only thing I would ask you,

 6   and I don't want to drag this out, is if that was the only

 7   evidence in the record to support the finding of notice, then

 8   maybe it would be reversible.  But if there's other evidence

 9   that corroborates the finding, then maybe there's one bit of

10   inadmissible evidence that's also admitted, would that

11   necessarily be reversible just because, well, he let one thing

12   in, but there's all this other evidence that is consistent or

13   corroborates the finding?  Is that automatically reversible?

14         MR. RICHARD:  It is, because there's another

15   presumption -- I'm sorry, there's another inversion of burden

16   that the Judge engages in, and that is at the very beginning

17   of the discussion of whether or not Poulsen received notice,

18   the Judge says -- puts -- places on the defendants the burden

19   to prove the negative, that he did not receive notice, and

20   every other conclusion follows that sentence.

21         And also, that is superseded by the failure to have

22   a -- an adversary proceeding.  I understand that Mr. Anker can

23   say, we don't do it this way in New York, or I've been a

24   bankruptcy lawyer for so many years, and all I've ever filed

25   is a motion, we filed case law that says that when you target
```

```
 1    an interest, that an adversary proceeding is required.  If you

 2    don't have it, any order that deals with that interest is

 3    void.  There's been no response to that case law, not in their

 4    response, not at this lectern.

 5            And the case law actually in those two case explains

 6    why, because if you're going to target a specific interest of

 7    a specific person, you've got to let that person know in a

 8    proceeding in which that person is named and that person just

 9    shows up.  Judge offered to have a hearing.  He said, I'll do

10    it before the sale.  I have half a day.  I can create more

11    time.  They elected not to have a hearing when they elected to

12    take by quitclaim.

13            The other argument that Mr. Anker made was an

14    argument that is in his brief, and that is that Poulsen's

15    general knowledge of the bankruptcy is sufficient, and that

16    puts him on notice that he should have inquired.  The very

17    case that he cites says the opposite, in that the case that's

18    cited for that proposition is Ford's Business Forms, for the

19    proposition the Eleventh Circuit has ruled the general

20    knowledge of a bankruptcy proceeding is sufficient to satisfy

21    constitutional due process requirements.  The very next

22    sentence in Ford says:  This rule only applies in an

23    individual personal bankruptcy.  It does not apply in a

24    corporate bankruptcy.

25            And the Eleventh Circuit has held, and we've cited
```

```
 1   this case in the brief, Spring Valley, that general knowledge
 2   of a bankruptcy does not put an interest holder on inquiry
 3   notice.
 4           The argument about Mr. Salazar is, to say the least,
 5   a total non sequitur.  First of all, it was factually
 6   incorrect.  The document that's cited in the response shows
 7   that Mr. Salazar -- because it has his retention agreement --
 8   was not retained by Mr. Poulsen until 2014, after the sale
 9   order, after the motion and after all these notice issues
10   occur.
11           And it also shows that Mr. Salazar was retained to
12   represent Mr. Poulsen on a totally discrete matter, and it
13   says right on the face of it, and no other matters.  And that
14   discrete matter was a matter that Mr. Salazar was already
15   handling on behalf of other members to convert certain debt
16   into equity.  It has absolutely nothing whatsoever to do with
17   this issue.
18           And when one takes the law, the general knowledge of
19   the bankruptcy is not enough, and inquiry notice is not enough
20   to avoid a constitutional Fifth Amendment due process, one
21   also has to take into account the explicit finding by Judge
22   Hyman that Poulsen did not participate in the sale process and
23   did not have, his words, a full and fair opportunity to
24   litigate the matter, and that therefore the sale order was not
25   preclusive as to Poulsen or as to TBO, for which he made the
```

 1    same finding.

 2          The argument that Mr. Poulsen slept on his rights.

 3    Mr. Poulsen -- the entity that slept on their rights here was

 4    TRADS.  You didn't hear Mr. Anker denying that after the

 5    bankruptcy we went in, we said, Mr. Poulsen, we sent you this

 6    letter demanding the source code, which we own.  He can't say

 7    that because they admit they wrote the letter within 90 days,

 8    but they never sent it.  You did not hear Mr. Anker saying

 9    that we ever asked Mr. Poulsen for the source code before we

10    filed this proceeding in March of 2015 -- March of -- yeah,

11    until we filed the proceeding adding Poulsen as a defendant in

12    March of 2015.

13          And why it's so critical now, you heard some

14    evidence from counsel that's just not in the record that we

15    have problems now.  They can't cite anything to this Court

16    that says that.  They've been doing business with the binary,

17    and they can continue to business with the binary and preserve

18    the status quo.

19          The comment that Poulsen should have looked to the

20    proceeds, and that the proceeds may or may not have been

21    enough to cover what his property was worth.  What Judge

22    Isicoff points out and what some of the other case points

23    out -- case we cited in MMH -- is you can't sell what you

24    don't own, and that -- and a bankruptcy court does not have

25    the power to do that.  The bankruptcy court has to take

1    evidence in order to establish before the sale, and without

2    that evidence, and without that due process, then the order is

3    void.  You can't say, I'm going to sell your house, and now

4    you have to look to the proceeds.  The fact is there was no

5    evidence.  We've heard no response from Mr. Anker as to where

6    there's a cite to the evidentiary hearing in which any

7    evidence concerning Mr. Poulsen's interests was presented,

8    Your Honor.

9              THE COURT:  All right.  Thank you.

10             Mr. Bloom, do you have anything that you want to add

11   very quickly?

12             MR. BLOOM:  Very quickly, Your Honor.

13             First, I think I speak for all counsel in expressing

14   our gratitude to the Court, because Your Honor's been

15   extremely generous with the time afforded this morning.

16             For my own part I just want very quickly, and not

17   more than five minutes I hope, to hit four quick points that

18   were raised by Mr. Anker that I think require some rebuttal.

19             First, he makes the point that there's no denial of

20   due process to IDI, Inc., because it shares corporate

21   officers, management with TBO, now known as IDI Holdings, and

22   that those people sat at the trial.  And then he goes off and

23   makes what I think are wholly improper references to potential

24   fraudulent transfers or other I believe he referred to them as

25   shenanigans.  This is a further attempt by TRADs to pierce the

1   corporate veil, here by innuendo, without any allegations

2   going to that issue, without affording due process. It's just

3   a further iteration of the denial of due process that they

4   would come in today and make the argument.

5          And, in fact, I think that's exactly what the

6   Supreme Court talked about in Nelson versus Adams, that

7   judicial predictions about the outcome of hypothesized

8   litigation cannot substitute for the actual opportunity to

9   defend that due process affords every party against whom a

10  claim is stated. That's in the Nelson v. Adams case at

11  page 471. The idea that he can simply retroactively justify

12  the piercing of the corporate veil without due process in this

13  court or in the bankruptcy court doesn't pass constitutional

14  muster.

15         There's another commonality with Nelson v. Adams,

16  though, that I think is behind his request that we simply post

17  the bond for $10 million to get a stay, even though there's

18  been no money judgment. And this is the second of my four

19  points, so I am moving along, Your Honor.

20         Earlier in the Supreme Court's decision at pages 462

21  and 463, it notes that the reason that Adams sought to add

22  Nelson individually is that a counter-party against whom it

23  could get fees and costs is because it feared that the Nelson

24  corporation, Ohio Cellular Products, might be unable to pay

25  the fee award and therefore sought a means to recover from

1    petitioner Nelson, who was the president and sole shareholder.

2    So that common fact is clear between both cases.

3            And if you look at it collectively, we ought not be

4    required to post a bond because there's no judgment, and

5    they're really just trying to get us to post a bond as part of

6    this piercing of the corporate veil by innuendo without due

7    process.

8            Point three, just to deal with what I think is a

9    somewhat diversionary argument regarding the failure of IDI,

10   Inc. to seek a stay first in the bankruptcy court, Mr. Anker

11   accurately quotes the language of 8007(a), which begins:

12   Ordinarily, a party must move first in the bankruptcy court

13   for a stay pending appeal.  And I can't think of very many, if

14   any, other federal rules, Your Honor, that begin with the word

15   "ordinarily", but that word suggests to me that there's

16   another shoe to drop, and there is, and it's 8007(b), which,

17   as part of the same rule, says that relief can be sought

18   initially in the district court if it is impracticable to seek

19   it in the bankruptcy court.

20           I believe Mr. Anker used the word "impossible", and

21   I expect he would accept my correction that, in fact, 8007(b)

22   says "impracticable".  Where really TRADS, at the very first

23   page of its response to our motion for stay in this court,

24   makes the first part of the impracticability argument for us

25   in pointing out that the bankruptcy court considered and

```
 1    rejected in the form of TBO's motion to alter or amend, all or
 2    many of the same arguments that are on our motion for relief
 3    from stay.  But there's another piece of the impracticability
 4    feature that Mr. Anker, I think, omitted to mention to the
 5    Court, and that is that as a means of being able to get all of
 6    these things put together and placed before the Court on
 7    appeal, knowing that there would be an appeal, there was an
 8    agreement among the parties for a short -- I believe it was a
 9    10- to 14-day stay of enforcement, stay of further proceedings
10    in respect to the final judgment.  Mr. Anker agreed to that,
11    but I think it expired on October the 27th.
12          And while I don't have all of the dates exactly
13    right, clearly that factor made it impractical for us to go
14    and seek, first in the bankruptcy court a stay based upon
15    arguments that when made by TBO already had been rejected, and
16    the bankruptcy court, as I mentioned earlier, had compounded
17    its error.  And, second, we had this expiring short-term
18    agreed stay between the parties.  We had to come to a new
19    court.  It was impracticable to go back to the old one, and
20    that's really all that I think I need to say about that.
21          And then, finally, on this issue of irreparable
22    harm, I think we heard Mr. Anker say that he went back and he
23    looked at Brenntag case that we cite from the Second Circuit,
24    and that that applies only to a very narrow proposition, where
25    the party against whom a recovery might be sought is
```

1    insolvent, and TRADS, he assures us is not insolvent.

2          That case actually stands for a broader proposition.

3    It does recognize the so-called insolvency exception, but it

4    says that where circumstances exist, that but for the grant of

5    equitable relief, there's a substantial chance that, upon

6    final resolution, the parties can't be returned to the

7    positions that they occupied, that's enough to show

8    irreparable harm.

9          And of the three cases that it cited for that

10   proposition, a Seventh Circuit case and two Second Circuit

11   cases, two of them did deal with that insolvency exception,

12   but the lasted one did not.  It's a case that is cited at

13   page -- Westlaw page 250 of the Brenntag decision, and that's

14   the Rockwell International Systems case versus Citibank, from

15   the Second Circuit.

16         There, the damage, the irreparable harm, came from

17   the fact that there had been a revolution in Iran that made it

18   uncertain about whether any legal remedies had been available.

19         So we don't have an insolvency situation here, we

20   don't have a revolutionary situation here, but we do have a

21   circumstance where, if TRADs is proceeding under the color of

22   a presumptively valid unstayed final judgment, and we are

23   required to incur, I think, the substantial fees that my firm

24   would have to incur in going back to comb over a lengthy

25   record, 475 docket entries, I think six, or eight, or 10 days

1    of trial testimony, in order to be able to make -- to defend

2    against these $9 million of claims, we're going to run up a

3    bill, and we have no ability to recover that from them.  No

4    contract, no statute and no ability to recover that from them

5    as sanctions, because they're simply proceeding, absent a

6    stay, to do what they can do to enforce the judgment.

7            So that's all I have.  And, again, I thank Your

8    Honor very much for the time today.

9            THE COURT:  All right.  Thank all of you.

10           MR. ANKER:  Your Honor, may I just give you the

11   cites?  Just take 30 seconds, just to complete the record.  It

12   may be helpful to the Court.

13           THE COURT:  Very quickly, please.

14           MR. ANKER:  I will be really quick, Your Honor.

15           Your Honor, I said earlier that there were explicit

16   findings on notice.  Page 20 of Judge Hyman's trial order,

17   under 4, quote:  For the following reasons, the Court finds

18   that Poulsen received adequate notice of every motion and

19   hearing in connection with the Section 363 sale of

20   substantially all of TLO's assets, including the BOLT IP.

21           And then on page 74, Judge Poulsen -- Judge Hyman

22   underscores the point at the bottom of the page:  Here, TLO

23   provided Poulsen with adequate notice of and due process as to

24   the impending sale, as discussed above.

25           And, finally, on the point about whether there was

```
 1   evidence of ownership, I would urge the Court to just look at
 2   page 15, Footnote 11, where Judge Hyman notes that the
 3   transcript of the sale hearing was admitted into evidence at
 4   this trial, and the evidence at the sale hearing included
 5   sworn affidavit bias Ms. Asher and Ms. Yoast (phonetic), that
 6   the assets to be sold were set forth in the APA.  And Judge
 7   Hyman goes on to say -- and this is one last sentence -- the
 8   declarations thus expressly incorporated the stalking horse
 9   APA, which included several representations that TLO owned the
10   BOLT IP.  Those declarations were also admitted into evidence
11   at trial, although not for their truth.
12           Thank you, Your Honor.
13           THE COURT:  All right.  Thank all of you, and I'll
14   try and get a ruling out as soon as I can.
15       (Proceedings concluded.)
16                        *  *  *  *  *
17
18
19
20
21
22
23
24
25
```

```
1                        * * * * *

2                      I N D E X

3   Motion Hearing                                    3

4                        * * * * *

5                  E X H I B I T S

6   (None.)

7                        * * * * *

8                     CERTIFICATE

9

10       I, Stephen W. Franklin, Registered Merit Reporter, and

11   Certified Realtime Reporter, certify that the foregoing is a

12   correct transcript from the record of proceedings in the

13   above-entitled matter.

14       Dated this 13th day of NOVEMBER, 2016.

15

16       /s/Stephen W. Franklin
         _____
17       Stephen W. Franklin, RMR, CRR

18

19

20

21

22

23

24

25
```

**MR. ANKER: [32]**
66/4 66/14 66/18 67/16
67/18 67/22 68/10 68/19
70/4 72/11 72/23 75/1
77/18 78/15 78/17 78/22
80/5 90/5 90/9 90/14
95/1 95/4 95/19 95/22
96/2 97/23 99/4 103/10
103/13 103/17 123/9
123/13
**MR. BLOOM: [14]**
54/8 55/8 55/25 56/16
56/22 58/23 58/25 59/15
59/20 61/2 62/3 62/9
66/3 118/11
**MR. RICHARD: [73]**
3/17 4/4 4/7 4/12 4/14
5/16 5/21 7/9 8/4 8/11
8/22 9/2 9/17 15/13 16/7
16/20 17/10 18/6 28/18
28/22 29/7 29/11 33/13
33/16 33/18 33/20 33/22
33/25 35/5 35/8 35/15
36/8 36/15 40/22 41/2
41/5 41/13 41/25 42/21
43/22 44/4 44/8 44/18
45/19 45/22 45/25 46/4
46/7 46/10 46/15 46/17
48/7 48/11 48/20 48/22
49/3 49/11 49/14 49/25
50/2 50/12 50/16 50/23
51/6 51/12 51/22 52/3
53/13 53/17 54/5 107/24
108/2 114/13
**THE COURT: [120]**
3/1 3/24 4/5 4/8 4/13 5/8
5/19 7/6 7/25 8/6 8/19
8/23 9/14 15/9 16/1
16/13 17/6 18/4 28/16
28/20 29/5 29/8 33/12
33/14 33/17 33/19 33/21
33/23 35/3 35/6 35/11
35/22 36/13 40/17 40/24
41/4 41/7 41/16 42/16
43/17 43/24 44/7 44/15
45/15 45/20 45/24 46/1
46/5 46/8 46/11 46/16
47/16 48/8 48/18 48/21
49/1 49/5 49/13 49/23
50/1 50/10 50/14 50/20
51/3 51/7 51/18 51/24
53/10 53/15 53/22 54/3
54/6 55/6 55/24 56/13
56/19 58/18 58/24 59/12
59/16 60/20 62/1 62/5
66/2 66/12 66/17 67/13
67/17 67/20 68/8 68/17
70/3 72/8 72/21 74/25
77/9 78/13 78/16 78/18
79/23 90/3 90/6 90/11
94/25 95/3 95/17 95/20
103/12 103/16 107/19
108/1 114/4 118/8 123/8
123/12 124/12

**$**
**$10 [1]** 119/17
**$10 million [1]** 119/17
**$120 [1]** 84/16
**$120' [1]** 94/12
**$126 [3]** 84/16 85/9
94/13
**$126 million [2]** 85/9
94/13
**$127 [1]** 84/16
**$128 [1]** 84/17
**$128 million [1]** 84/17
**$154 [8]** 72/5 76/20
82/11 82/24 86/4 93/13
94/10 94/11
**$154 million [8]** 72/5
76/20 82/11 82/24 86/4
93/13 94/10 94/11
**$154,000,000 [1]** 80/10
**$250,000 [1]** 85/15
**$6 [1]** 82/22
**$6 million [1]** 82/22
**$9 [5]** 60/2 60/12 60/13
60/16 123/2
**$9 million [5]** 60/2 60/12
60/16 123/2

**'**
**'til [2]** 47/15 47/16

**-**
**-and [4]** 1/10 2/5 2/8
2/15
**-v [2]** 1/6 1/13

**/**
**/s/Stephen [1]** 125/16

**1**
**10 [4]** 27/14 108/1 112/9
122/25
**10 million [2]** 102/13
102/13
**100 [1]** 82/25
**10007 [1]** 2/14
**10:47 [1]** 54/2
**10:59 [1]** 54/2
**11 [3]** 89/8 104/20 124/2
**110 [1]** 67/4
**112 [1]** 21/17
**12 [2]** 104/21 108/17
**13 [1]** 19/8
**1334 [1]** 109/21
**13th [2]** 22/21 125/14
**14 [2]** 23/2 27/14
**14-day [1]** 121/9
**1450 [1]** 2/16
**15 [3]** 12/9 61/19 124/2
**15-minute [3]** 37/20
53/25 109/12
**154 million [1]** 84/11
**16-81690-CIV-KAM [1]**
1/2
**16-81691-CIV-KAM [1]**
1/3
**166 [1]** 104/17

**17 [1]** 104/15
**1748 [1]** 2/10
**175 [1]** 62/18
**17th [2]** 22/25 23/6
**18 [3]** 81/16 93/1 105/18
**19 [1]** 73/13
**1900 [1]** 2/16
**1979 [1]** 63/16
**1987 [1]** 71/1
**199 [1]** 63/16
**1999 [1]** 62/17

**2**
**20 [4]** 91/1 91/5 91/8
123/16
**2000 [2]** 2/6 105/7
**2000' [2]** 20/16 50/13
**201 [1]** 57/5
**2013 [6]** 15/8 20/15
20/16 22/21 26/7 34/9
**2014 [9]** 22/25 27/14
27/16 41/15 49/20 50/6
50/19 110/16 116/8
**2015 [9]** 23/9 39/4 47/15
50/6 50/7 104/1 104/19
117/10 117/12
**2016 [3]** 1/17 103/24
125/14
**2020 [1]** 47/18
**203 [1]** 63/16
**21 [1]** 91/9
**23 [1]** 91/9
**23rd [1]** 71/1
**245 [1]** 62/18
**25 [1]** 73/20
**250 [2]** 2/14 122/13
**2633 [1]** 94/19
**27 [1]** 73/20
**27th [1]** 121/11
**28 [1]** 73/21
**2nd [1]** 2/3

**3**
**30 [2]** 83/6 123/11
**300-page [1]** 15/2
**31 [1]** 113/5
**33131 [3]** 2/4 2/10 2/17
**33134 [1]** 2/7
**333 [2]** 2/3 55/12
**33401 [1]** 1/24
**35 [1]** 2/25
**36 [1]** 113/18
**363 [16]** 10/14 10/15
10/21 11/3 12/21 14/16
15/22 16/13 52/20 69/23
73/9 73/9 84/7 91/6 91/8
123/19
**37 [1]** 113/18
**3768 [1]** 1/23
**3rd [2]** 104/19 108/23

**4**
**42 [2]** 91/7 91/9
**4400 [1]** 2/4
**45 [2]** 82/20 83/18
**462 [1]** 119/20
**463 [1]** 119/21

**471 [1]** 119/11
**475 [2]** 55/13 122/25

**5**
**514-3768 [1]** 1/23
**528 [2]** 81/16 105/17
**561 [1]** 1/23

**6**
**6 million [2]** 83/3 84/14
**60 [1]** 68/6
**601 [1]** 63/15
**62 [2]** 67/3 67/4
**64 [2]** 21/17 21/18
**65 [2]** 16/9 16/11
**6514 [2]** 20/2 20/3
**6th [1]** 20/15

**7**
**7008 [1]** 58/7
**701 [1]** 1/24
**74 [1]** 123/21
**788 [1]** 70/24
**789 [1]** 71/8

**8**
**8007 [5]** 96/7 96/8
120/11 120/16 120/21
**81690 [3]** 3/6 54/18 55/1
**81691 [2]** 3/8 54/14
**825 [1]** 2/9
**8th [2]** 20/15 103/24

**9**
**9 million [1]** 102/12
**90 [1]** 117/7

**A**
**a.m [2]** 54/2 54/2
**ability [3]** 89/18 123/3
123/4
**able [6]** 37/12 66/8 81/8
102/19 121/5 123/3
**above [2]** 123/24 125/13
**above-entitled [1]**
125/13
**absence [1]** 63/25
**absent [1]** 123/5
**absolute [2]** 14/8 72/5
**absolutely [5]** 74/17
97/25 97/25 98/8 116/16
**abstain [1]** 4/17
**accept [4]** 12/4 46/23
56/21 120/21
**accepted [6]** 7/25 13/20
13/25 14/1 33/3 95/9
**accepting [1]** 13/24
**access [6]** 45/24 79/25
80/15 81/9 81/23 102/25
**according [2]** 62/23
86/18
**account [2]** 32/17 85/9
116/21
**accurate [1]** 79/18
**accurately [1]** 120/11
**acknowledge [2]** 9/10
89/12 98/21

**acknowledged [2]** 25/18
32/4
**acknowledges [3]** 7/4
34/10 92/8
**acquired [16]** 9/4 9/6
29/19 31/5 31/7 44/7
72/3 73/7 73/15 74/11
75/10 75/13 75/15 75/20
76/2 110/18
**act [1]** 51/1
**acted [2]** 68/4 104/7
**action [11]** 7/2 23/20
39/4 49/20 61/20 74/9
74/16 75/9 77/5 111/3
111/16
**actions [1]** 75/19
**active [3]** 85/21 87/9
88/23
**actively [1]** 21/22
**actual [4]** 79/3 81/3
112/7 119/8
**actually [31]** 8/5 9/14
9/17 14/13 14/17 19/16
19/25 20/3 26/14 31/3
32/4 36/21 36/23 40/13
43/9 45/2 46/3 47/1
47/10 52/10 53/2 61/9
69/23 79/9 93/9 109/1
110/10 110/13 111/19
115/5 122/2
**Adams [9]** 61/9 61/14
61/17 61/17 65/17 119/6
119/10 119/15 119/21
**add [5]** 43/16 61/19
100/16 118/10 119/21
**added [2]** 61/25 64/24
**adding [1]** 117/11
**addition [4]** 55/24 57/17
61/10 61/12
**address [27]** 5/4 15/5
17/5 17/10 18/2 18/3
18/10 18/11 18/21 18/24
19/6 19/12 19/24 20/2
20/12 20/19 22/19 67/12
90/9 90/17 91/4 91/20
92/17 92/24 113/16
113/17 113/22
**addressed [11]** 16/24
16/25 18/1 18/12 19/6
20/2 28/15 67/2 90/17
91/11 113/16
**addressee [1]** 16/24
**addresses [1]** 113/18
**adequate [6]** 24/4 24/19
90/24 103/21 123/18
123/23
**adjudicate [8]** 33/2 33/7
33/15 43/11 43/19 53/12
83/16 83/16
**adjudicated [8]** 10/2
10/9 29/15 37/6 50/20
51/9 53/10 112/3
**adjudicating [3]** 12/20
38/7 83/14
**adjudication [3]** 12/17
38/1 106/14

**A**

**adjudications [1]** 111/11
**adjust [1]** 28/5
**administered [1]** 46/18
**administration [1]** 48/1
**admissible [3]** 18/23 19/13 21/3
**admission [17]** 55/12 55/16 55/17 56/20 57/18 57/20 57/20 57/21 57/22 57/25 58/1 58/11 97/1 97/5 97/7 99/9 99/9
**admit [3]** 45/23 65/4 117/7
**Admits [1]** 26/9
**admitted [8]** 22/23 27/3 40/12 40/15 58/17 114/10 124/3 124/10
**admitting [1]** 19/13
**adopted [2]** 10/2 24/11
**advance [1]** 19/16
**advanced [1]** 58/3
**advantage [1]** 88/11
**adversaries [1]** 104/2
**adversary [25]** 9/18 9/21 14/18 14/22 15/4 20/9 21/11 22/19 23/8 24/21 27/15 38/13 50/8 50/11 53/1 53/20 54/21 55/2 59/11 68/9 82/17 83/6 99/15 114/22 115/1
**Adverse [1]** 33/18
**affairs [1]** 22/12
**affidavit [4]** 17/14 17/20 18/19 124/5
**affirmed [1]** 48/25
**affirming [1]** 110/9
**afford [1]** 38/13
**afforded [3]** 63/4 64/13 118/15
**affording [1]** 119/2
**affords [1]** 119/9
**afloat [1]** 84/14
**after [52]** 9/15 9/19 9/21 10/10 10/23 12/6 12/9 12/9 12/18 15/25 17/3 19/8 22/6 22/25 25/23 25/23 26/13 28/3 29/3 35/25 36/2 39/3 42/8 43/21 50/9 50/13 50/15 52/7 54/2 71/13 73/14 75/7 75/15 86/1 86/1 86/2 86/2 86/21 92/14 92/15 97/10 97/10 97/11 100/15 101/1 101/20 105/15 108/18 116/8 116/9 116/9 117/4
**again [15]** 26/4 38/1 42/20 49/6 56/16 57/22 58/12 60/3 71/2 71/7 78/21 87/5 99/2 104/10 123/7
**against [37]** 21/13 36/7 39/4 55/3 58/10 59/10 59/17 60/5 60/6 60/13 60/20 63/2 63/3 64/2

64/4 64/11 65/14 68/14 73/19 74/10 75/19 78/19 84/10 98/10 100/14 100/15 100/16 101/2 101/3 101/5 101/6 102/6 111/21 119/9 119/22 121/25 123/2
**agencies [1]** 111/18
**agency [1]** 102/14
**agent [2]** 91/13 91/16
**ago [4]** 59/23 69/7 80/11 81/8
**agree [5]** 36/8 52/10 53/4 59/18 71/3
**agreed [4]** 25/22 38/24 121/10 121/18
**agreeing [1]** 52/11
**agreement [13]** 7/12 7/22 9/7 30/21 31/7 31/21 75/18 81/24 86/13 86/16 87/21 116/7 121/8
**agreements [1]** 86/12
**ahead [6]** 5/16 28/18 37/23 52/23 53/13 60/14
**aired [1]** 58/22
**al [1]** 1/4
**alerted [1]** 61/24
**allegation [3]** 58/13 58/15 65/12
**allegations [2]** 110/12 119/1
**alleged [6]** 55/17 58/12 89/19 104/10 104/24 108/7
**alleging [1]** 50/12
**allow [3]** 52/22 82/8 108/25
**allowed [2]** 105/19 110/1
**alluding [1]** 62/20
**almost [5]** 12/13 61/14 61/15 101/15 106/24
**alone [6]** 38/8 38/11 38/15 97/12 103/2 114/2
**along [1]** 119/19
**alphabet [1]** 55/19
**already [9]** 6/24 6/25 7/3 11/12 59/22 60/12 94/4 116/14 121/15
**also [24]** 7/15 7/23 9/24 12/2 17/7 17/11 17/17 40/1 45/12 53/19 53/22 54/22 56/6 59/11 63/10 74/4 92/23 108/20 110/22 114/10 114/21 116/11 116/21 124/10
**alter [6]** 55/21 56/1 56/1 56/25 57/2 121/1
**ALTERNATIVE [4]** 1/7 1/15 3/6 3/7
**alternatively [1]** 4/17
**although [3]** 40/1 113/6 124/11
**Alvin [1]** 91/22
**always [2]** 24/9 67/8
**am [9]** 3/19 9/2 34/14

45/18 46/15 48/7 52/5 72/24 119/19
**ambiguity [2]** 87/20 87/21
**amend [9]** 55/21 55/25 56/1 56/2 56/25 57/2 96/18 97/4 121/11
**amended [3]** 55/18 97/1 99/10
**amendment [6]** 14/14 20/24 24/18 61/19 61/24 116/20
**America [1]** 76/15
**American [1]** 89/6
**among [4]** 38/7 84/19 111/12 121/8
**amount [7]** 60/2 83/2 84/4 102/10 102/11 103/1 107/14
**analysis [2]** 16/10 65/17
**Anchor's [2]** 108/21 109/8
**ands [1]** 72/6
**Anker [15]** 2/11 66/6 108/4 111/6 114/22 115/13 117/4 117/8 118/5 118/18 120/10 120/20 121/4 121/10 121/22
**Anker's [1]** 108/17
**another [18]** 19/25 22/15 24/9 28/4 34/14 47/24 47/25 53/18 78/6 100/1 107/16 107/23 110/5 114/14 114/15 119/15 120/16 121/3
**answer [36]** 4/13 28/19 46/19 55/7 55/14 58/16 59/22 61/5 61/6 66/22 67/13 68/21 68/23 70/6 74/12 77/14 79/5 79/16 79/21 83/19 85/14 90/4 90/11 96/16 97/1 97/5 97/17 99/10 100/14 100/5 101/7 102/3 102/4 102/4 105/24 110/16
**answered [3]** 5/15 103/9 103/10
**answers [2]** 56/11 66/25
**any [68]** 5/13 8/2 12/5 13/12 13/18 16/21 18/20 28/2 28/22 30/16 31/1 31/1 31/22 32/21 34/7 37/22 38/20 40/15 42/17 44/14 45/12 49/25 51/15 51/17 51/18 55/2 55/5 59/13 60/21 61/5 63/4 64/3 65/12 70/6 72/19 72/12 73/3 73/4 73/6 73/14 73/19 74/9 74/9 74/9 79/19 79/19 81/10 83/20 83/24 85/10 85/11 88/11 89/4 90/19 93/8 105/14 105/14 106/7 106/16 111/25 115/2
**appreciate [1]** 66/7
**appropriate [5]** 4/23

118/6 119/1 120/14 122/18
**anybody [2]** 22/24 37/2
**anymore [2]** 32/25 41/23
**anyone [2]** 38/20 76/25
**anyone's [1]** 70/4
**anything [13]** 4/10 19/5 26/19 27/14 28/15 28/22 30/19 31/2 45/6 78/11 108/9 117/15 118/10
**anywhere [4]** 93/14 108/6 110/13 111/3
**aol.com [1]** 1/25
**APA [2]** 124/6 124/9
**apologies [1]** 73/1
**apologize [2]** 101/12 103/6
**appeal [42]** 3/16 3/21 3/23 5/12 6/11 6/17 23/17 28/1 28/7 28/11 36/17 39/25 40/2 40/17 54/15 54/25 58/22 59/19 60/8 60/24 60/25 61/1 62/3 65/22 78/9 84/8 89/15 89/15 92/12 93/2 93/6 93/8 96/8 96/11 102/7 102/14 103/25 104/1 107/16 120/13 121/7 121/7
**appeal's [1]** 61/2
**appealable [1]** 23/1
**appealed [1]** 51/21
**appeals [2]** 19/3 54/19
**appear [2]** 61/7 64/25
**appearance [1]** 96/15
**appearances [3]** 1/22 2/1 3/9
**appeared [3]** 55/5 66/7 101/6
**appearing [1]** 103/24
**appears [1]** 67/4
**appellants [2]** 2/2 54/18
**appellate [2]** 40/3 54/13
**APPELLEE [2]** 2/11 112/20
**appendix [2]** 108/22 112/20
**apple [1]** 105/13
**applicability [2]** 55/15 55/15
**applicable [1]** 58/6
**application [8]** 18/17 20/5 31/13 31/14 31/15 31/18 65/23 65/24
**applications [1]** 21/10
**applied [4]** 19/21 38/10 57/19 65/20
**applies [11]** 16/23 16/25 18/9 19/23 19/24 48/20 48/21 48/22 103/7 115/22 121/24
**apply [7]** 18/15 20/4 20/6 20/6 25/4 25/5 115/23

22/4 76/6 90/20 111/24
**approved [9]** 7/12 7/15 7/23 12/18 37/3 41/14 41/22 67/25 112/17
**April [2]** 26/10 41/15
**area [1]** 28/23
**areas [1]** 5/24
**argue [5]** 16/19 19/22 24/16 68/22 97/6
**argued [3]** 99/11 103/19 109/16
**arguing [3]** 21/19 77/12 77/15
**argument [35]** 3/17 3/22 3/24 4/2 4/4 4/6 5/23 23/13 24/9 24/24 39/25 41/9 60/25 77/23 77/24 79/1 81/2 87/23 96/1 96/4 96/23 96/25 96/25 97/9 98/13 108/4 108/10 109/15 115/13 115/14 116/4 117/2 119/4 120/9 120/24
**arguments [9]** 3/12 82/15 88/7 98/13 105/9 108/15 112/6 121/2 121/15
**arise [2]** 18/22 54/19
**arising [3]** 69/14 71/12 76/8
**arose [2]** 23/7 47/6 76/4
**around [3]** 85/9 85/18 86/14
**arranged [1]** 85/23
**art [1]** 69/15
**articulating [1]** 29/13
**Asher [4]** 84/13 85/6 93/22 124/5
**aside [8]** 14/5 15/15 24/8 24/10 24/13 25/4 59/19 77/25
**ask [10]** 25/24 26/10 28/2 28/22 39/3 58/19 74/12 107/9 107/12 114/5
**asked [24]** 25/8 37/13 39/2 52/18 57/3 57/3 57/12 79/1 79/4 79/10 79/18 85/8 86/4 87/4 87/5 88/21 98/24 101/22 103/15 111/6 112/8 112/13 113/1 117/9
**asking [4]** 8/20 67/24 82/6 82/7
**asks [1]** 49/22
**assert [2]** 45/14 84/10
**asserted [2]** 55/6 83/25
**asserting [2]** 74/7 77/16
**assertions [3]** 108/5 108/12 108/14
**asserts [3]** 72/18 73/3 108/11
**assess [1]** 59/23
**asset [17]** 7/12 7/22 9/6 30/20 31/5 31/7 31/8 31/21 72/3 72/10 73/8

**A**

**asset... [6]** 74/18 74/20
75/17 81/12 87/21 105/3
**assets [27]** 7/14 8/22 9/5
9/6 11/12 22/6 29/20
31/21 43/12 47/12 47/22
69/7 69/21 73/6 73/7
73/15 73/23 74/11 75/10
75/13 75/15 75/20 76/2
76/9 112/23 123/20
124/6
**associated [3]** 61/21
62/21 63/18
**Association [1]** 63/14
**assume [5]** 45/16 79/12
80/1 102/11 102/12
**assumed [1]** 73/23
**assuming [2]** 62/6 88/16
**assumption [1]** 19/21
**assuredly [1]** 82/11
**assures [1]** 122/1
**attached [3]** 17/23 18/23
101/18
**attaches [3]** 17/15 84/1
106/15
**attacking [1]** 68/16
**attempt [5]** 58/10 86/2
86/2 86/2 118/25
**attempting [1]** 64/20
**attended [1]** 93/20
**attention [6]** 13/8 13/9
23/6 91/22 96/23 96/24
**attorney [1]** 3/19
**attorney's [2]** 60/22
84/12
**attorneys [1]** 13/11
**auction [2]** 93/12 93/19
**authentic [1]** 17/23
**authenticated [1]** 18/23
**authentication [3]** 17/16
17/19 114/1
**authority [1]** 77/6
**authorize [1]** 10/20
**authorizing [1]** 10/14
**automatically [1]**
114/13
**available [3]** 52/12
71/14 122/18
**Avenue [2]** 2/3 2/16
**avoid [3]** 102/17 103/5
116/20
**award [4]** 60/15 89/22
89/22 119/25
**aware [3]** 87/6 93/19
97/15
**away [3]** 23/20 82/22
83/13
**axiomatic [1]** 64/1

**B**

**B-Parser [13]** 8/6 8/19
25/20 31/2 31/13 72/2
72/19 73/4 73/6 73/6
79/13 85/10 87/24
**B-r-e-n-n-t-a-g [1]**
62/16

**back [22]** 21/25 23/5
30/21 54/5 60/6 60/8
60/15 60/16 60/17 61/8
65/9 72/13 76/21 79/6
89/2 91/25 91/25 92/25
104/22 121/19 121/22
122/24
**bailiwick [1]** 11/3
**balance [6]** 25/13 25/14
39/2 78/15 87/15 88/5
**balancing [3]** 63/18
85/19 88/12
**bank [1]** 85/9
**banker's [1]** 84/13
**bankrupt [2]** 69/21
109/19
**bankruptcy [123]** 4/3
6/11 6/23 10/13 10/15
12/6 12/8 12/9 12/19
14/11 14/12 16/22 20/8
21/21 22/3 22/5 23/1
23/25 24/3 24/7 24/16
24/21 27/21 28/2 29/3
32/11 32/15 32/18 32/20
32/21 33/1 33/6 33/8
36/24 37/3 37/3 41/20
42/3 42/6 42/10 42/14
43/2 43/10 43/18 45/14
46/22 46/25 47/2 47/5
48/2 48/11 48/17 48/24
54/13 54/20 55/13 58/6
64/9 67/8 69/5 69/10
69/15 69/20 69/22 69/24
70/1 72/16 72/17 73/10
74/13 75/24 76/19 77/2
78/7 82/14 83/4 83/5
83/8 83/17 84/3 84/7
85/22 85/23 85/24 86/22
86/23 87/9 87/13 87/16
88/16 90/20 92/4 93/21
94/7 95/10 96/7 96/9
96/11 102/21 104/17
106/2 106/25 107/13
110/7 111/24 112/2
114/24 115/15 115/20
115/23 115/24 116/2
116/19 117/5 117/24
117/25 119/13 120/10
120/12 120/19 120/25
121/14 121/16
**bar [2]** 91/16 91/17
**barn [1]** 78/21
**barred [1]** 74/7
**based [16]** 10/24 15/14
15/17 16/17 17/11 17/12
19/21 21/9 23/19 33/19
35/16 37/4 40/10 47/3
81/17 121/14
**bases [2]** 113/10 113/15
**basic [5]** 32/14 32/21
78/1 78/11 78/12
**basically [3]** 23/21 41/13
48/20
**basis [9]** 38/2 47/20
60/25 63/6 65/23 65/25
75/21 106/9 111/17

**battle [1]** 45/7
**Bay [1]** 2/9
**Beach [7]** 1/16 1/24 18/3
18/25 94/20 113/19
113/20
**became [1]** 57/13
**because [79]** 4/9 4/19
7/10 10/19 11/4 13/4
16/4 18/13 19/22 21/6
23/10 24/16 25/14 27/19
29/12 30/5 34/4 34/5
34/16 36/10 36/13 36/14
39/10 41/12 43/5 43/7
43/23 44/17 44/17 45/11
46/23 50/24 52/11 52/19
56/19 56/24 59/6 59/15
59/21 60/14 61/15 61/17
65/6 71/5 74/17 79/1
80/9 80/20 81/20 83/15
84/5 84/18 84/20 84/21
87/9 88/4 88/8 88/19
90/22 92/14 93/9 95/13
101/6 101/18 102/9
106/14 106/15 109/5
111/2 114/11 114/14
115/6 116/7 117/7
118/14 118/20 119/23
120/4 123/5
**because -- I [1]** 93/9
**become [1]** 85/25
**becomes [2]** 69/17 72/13
**before [63]** 1/20 4/1
9/22 10/12 10/24 12/8
12/12 13/6 13/6 13/15
13/23 13/24 15/6 17/6
19/17 20/9 20/13 22/19
23/16 27/14 27/20 28/8
28/9 28/10 28/22 29/16
30/14 32/23 34/24 35/18
38/14 39/6 39/25 41/15
49/3 50/15 50/19 51/15
51/18 51/19 54/12 54/13
55/13 58/6 62/21 64/8
66/7 68/7 85/5 90/18
93/20 99/23 99/24
100/24 102/20 103/24
107/17 112/5 113/15
115/10 117/9 118/1
121/6
**began [1]** 99/15
**begin [2]** 33/12 120/14
**beginning [2]** 15/18
16/10 39/9 67/5 114/16
**begins [2]** 91/5 120/11
**behalf [4]** 54/10 94/11
98/3 116/15
**behind [2]** 59/6 119/16
**being [31]** 5/12 5/25
5/25 7/13 8/9 8/10 8/24
8/25 9/3 20/17 24/6
24/20 33/1 38/20 41/1
42/18 51/21 58/14 63/3
64/10 66/8 89/14 89/16
90/8 90/16 93/17 102/19
103/25 104/23 106/12
121/5

**belief [1]** 56/16
**believe [19]** 3/10 17/9
36/16 42/2 48/12 55/12
56/18 56/25 59/18 59/23
67/19 82/16 86/9 91/1
104/18 104/24 118/24
120/20 121/8
**believed [3]** 4/22 56/16
97/15
**below [6]** 4/7 5/14 80/25
81/22 82/4 82/5
**Bend [3]** 15/7 20/19
92/21
**benefit [1]** 65/1
**Berger [1]** 2/16
**best [12]** 1/4 3/5 3/19
3/20 6/2 13/2 23/14 44/5
44/6 93/18 106/16
110/25
**better [1]** 58/17
**between [16]** 7/18 18/20
28/4 39/12 43/3 43/11
45/7 60/18 76/4 77/11
79/24 99/3 100/12 111/4
120/2 121/18
**between-the-lines [1]**
111/4
**beyond [7]** 11/1 12/20
12/20 17/19 33/2 33/8
53/22
**bias [1]** 124/5
**bid [1]** 93/18
**bidder [1]** 75/10
**bidders [1]** 93/13
**bids [1]** 93/13
**bifurcated [5]** 9/24 11/4
12/23 31/16 53/5
**bifurcation [5]** 49/6
53/8 103/16 105/24
108/13
**bigger [1]** 84/19
**bill [3]** 7/15 112/10
123/3
**billboard [3]** 24/2 24/8
25/6
**binary [12]** 9/10 26/18
27/2 27/7 27/9 27/23
31/15 39/13 39/21 44/13
117/16 117/17
**bind [1]** 58/10
**binding [2]** 97/7 97/7
**bit [5]** 76/14 82/13 82/14
107/23 114/9
**bite [1]** 105/12
**black [5]** 18/15 24/25
72/6 99/21 113/25
**Black's [1]** 39/11
**black-and-white [1]**
72/6
**blanche [1]** 14/7 30/22
30/25 35/20
**Bloom [13]** 2/2 3/23
54/5 54/7 54/10 88/21
89/8 89/11 95/8 96/14
97/6 99/11 118/10
**blows [1]** 16/22

**board [2]** 97/18 98/5
**Boca [9]** 18/2 18/3 18/24
19/6 91/12 93/20 94/20
113/19 113/21
**body [2]** 77/3 90/24
**BOLT [11]** 30/7 30/8
31/14 34/11 40/9 44/14
79/13 81/8 81/11 123/20
124/10
**bona [16]** 10/17 10/18
10/23 11/7 52/15 52/16
52/19 83/12 104/8 105/4
105/4 106/5 106/6 106/8
106/12 109/3
**bond [16]** 101/15 101/16
101/17 101/25 102/4
102/8 102/8 102/13
102/16 103/1 103/1
103/2 103/4 119/17
120/4 120/5
**bone [1]** 9/8
**Bonner [1]** 63/16
**both [26]** 6/1 6/2 7/1
13/11 14/22 14/22 43/6
48/12 48/12 48/18 48/16
48/20 48/22 52/10 54/19
54/21 77/14 77/15 82/18
97/25 101/12 103/7
106/19 107/23 110/9
120/2
**Both -- I [1]** 48/12
**bother [2]** 87/11 87/18
**bothered [1]** 94/1
**bottom [2]** 110/15
123/22
**bought [2]** 27/13 110/15
**boulevard [4]** 2/6 18/11
18/13 94/20
**bound [1]** 22/3
**Brauser [16]** 79/4 79/10
85/21 86/18 87/4 93/14
97/19 98/2 98/4 98/17
98/19 98/23 98/24 98/24
98/25 110/12
**Brauser's [1]** 99/18
**break [1]** 49/3
**breaking [1]** 23/13
**breaks [1]** 26/17
**Brenntag [3]**
121/23 122/13
**Brickell [2]** 2/9 2/16
**brief [24]** 10/6 11/9 12/2
13/17 18/8 18/12 21/4
25/24 28/3 28/7 39/9
40/3 41/4 53/2 53/3
68/25 69/1 79/17 89/11
108/17 112/13 113/24
115/14 116/1
**briefed [1]** 28/10
**briefing [1]** 38/17
**briefs [2]** 110/1 110/14
**bright [1]** 18/9
**bright-line [1]** 18/9
**bring [2]** 20/8 94/6
**brings [1]** 97/12
**broad [3]** 30/17 76/14

**B**

**broad...** [1] 109/20
**broader** [3] 66/24 94/21 122/2
**broadly** [1] 57/8
**brought** [9] 19/8 23/9 27/15 32/24 39/4 41/16 47/20 59/3 111/7
**bugs** [1] 80/21
**bunch** [1] 104/3
**burden** [18] 15/21 15/22 15/25 16/6 16/15 16/19 21/5 36/14 38/10 90/8 90/12 90/13 90/19 90/23 94/15 94/18 114/15 114/18
**burden's** [1] 16/3
**burdened** [1] 95/12
**burdens** [1] 33/21
**bureaus** [1] 89/21
**Burton** [1] 20/1
**business** [16] 8/15 31/4 69/22 72/21 73/5 73/6 73/7 81/13 82/3 102/4 102/5 107/13 108/10 115/18 117/16 117/17
**buts** [1] 72/6
**Buxton** [14] 11/8 11/14 11/17 21/25 22/7 45/8 46/20 46/21 47/4 48/13 48/15 74/24 111/19 111/21
**buy** [1] 84/8
**buyer** [10] 8/14 8/14 70/19 73/8 73/16 73/17 74/10 76/20 84/4 111/21
**buyer's** [2] 84/6 111/25
**buying** [1] 29/15
**buyout** [1] 25/7

**C**

**calendar** [1] 14/5
**calenders** [1] 39/17
**called** [11] 13/9 20/18 23/6 24/20 31/12 62/16 63/14 74/20 92/16 110/19 122/3
**calling** [1] 82/3
**calls** [3] 13/7 43/3 86/25
**came** [8] 23/4 36/4 57/6 85/18 91/25 91/25 111/9 122/16
**can't** [24] 14/16 20/14 21/11 23/13 23/18 24/16 41/23 58/19 58/21 59/19 60/15 60/16 65/6 65/9 76/21 77/13 78/21 98/14 117/6 117/15 117/23 118/3 120/13 122/6
**cancer** [1] 80/2
**candid** [3] 89/12 98/21 103/23
**cannot** [7] 9/22 10/20 28/14 62/25 64/3 81/10 119/8
**capital** [3] 9/4 9/5 14/1

**card** [1] 65/8
**care** [5] 87/12 87/12 87/17 87/17 88/4
**carries** [1] 64/15
**carte** [4] 14/7 30/22 30/25 35/20
**case** [106] 1/2 3/4 3/6 3/8 6/19 6/20 11/8 11/10 11/10 11/16 12/2 13/10 14/24 20/1 21/25 23/7 23/14 23/24 24/14 24/19 25/2 25/3 25/6 25/17 32/10 37/1 38/13 42/4 47/14 54/14 54/18 59/13 59/14 60/22 61/1 61/10 61/15 61/15 61/22 62/13 62/16 62/18 63/10 63/13 63/19 65/18 65/18 65/19 66/1 66/24 69/3 71/20 74/22 74/23 74/23 74/24 74/25 75/1 75/2 76/17 77/3 77/6 77/11 77/12 78/7 78/8 81/19 81/19 81/21 81/22 82/14 83/17 85/16 85/18 89/4 89/10 89/12 89/13 94/10 99/13 99/14 99/20 100/7 100/7 100/25 101/1 105/21 105/25 107/7 111/19 112/2 114/25 115/3 115/5 115/5 115/17 115/17 116/1 117/22 117/23 119/10 121/23 122/2 122/10 122/12 122/14
**cases** [23] 3/5 6/7 10/18 14/11 14/13 14/22 14/22 17/1 18/8 19/25 21/4 21/12 23/12 42/23 70/10 70/11 70/11 77/4 97/10 103/3 120/2 122/9 122/11
**cash** [1] 83/23
**categories** [1] 74/5
**cause** [2] 75/9 81/25
**caused** [1] 97/21
**Cel** [1] 32/10
**Cellular** [1] 119/24
**cent** [1] 84/15
**Center** [1] 2/13
**cents** [1] 82/25
**CEO** [2] 93/22 97/25
**certain** [7] 4/19 10/8 11/4 37/21 40/5 109/13 116/15
**certainly** [2] 57/18 99/6
**certainty** [1] 94/13
**certificate** [2] 87/7 125/8
**Certified** [1] 125/11
**certify** [1] 125/11
**cetera** [6] 15/12 15/12 62/8 105/5 109/4 109/4
**chairman** [2] 97/18 98/5
**challenge** [1] 21/1
**challenging** [3] 68/6

70/4 94/7
**championed** [1] 80/15
**chance** [4] 27/25 62/24 77/17 122/5
**change** [5] 91/14 92/18 99/21 101/3 101/21
**changed** [2] 104/5 105/25
**changes** [2] 83/21 84/9
**changing** [1] 91/8
**charge** [1] 107/2
**check** [3] 28/16 28/18 28/21
**Chemicals** [1] 62/17
**chief** [4] 23/24 34/9 56/9 98/7
**Christmas** [1] 28/4
**Circuit** [31] 6/8 6/19 6/22 15/22 17/17 22/10 42/1 42/7 42/24 45/2 48/15 48/25 62/17 62/19 62/23 63/11 63/13 63/17 69/3 70/20 70/24 89/12 102/17 109/17 114/2 115/19 115/25 121/23 122/10 122/10 122/15
**Circuit's** [2] 65/22 65/24
**circumstance** [2] 58/11 122/21
**circumstances** [3] 7/1 57/19 122/4
**citations** [1] 108/12
**cite** [16] 11/8 14/11 14/13 19/25 21/4 32/10 37/1 53/2 62/15 75/5 81/19 89/4 112/12 117/15 118/6 121/23
**cited** [25] 6/21 12/2 17/1 18/8 18/11 21/12 25/24 39/13 66/25 68/25 69/2 74/24 78/8 81/1 81/2 89/10 89/11 97/10 108/22 115/18 115/25 116/6 117/23 122/9 122/12
**cites** [5] 17/14 67/7 81/2 115/17 123/11
**Citibank** [1] 122/14
**citing** [2] 39/11 111/20
**city** [2] 19/1 92/21
**CIV** [2] 1/2 1/3
**Civil** [1] 58/5
**claim** [16] 38/23 49/9 60/12 60/14 71/10 74/9 76/10 85/10 90/13 94/8 106/13 106/15 106/20 111/3 111/21 119/10
**claimed** [2] 92/4 106/9
**claiming** [6] 27/19 43/25 44/2 44/10 44/11 48/6
**claims** [7] 38/20 55/5 60/5 86/24 94/1 94/2 123/2
**clarified** [1] 109/8
**clarity** [1] 44/10
**class** [1] 77/5

**clause** [1] 22/8
**clauses** [1] 47/4
**clear** [12] 17/11 26/23 35/21 52/6 59/2 71/25 73/8 83/10 88/1 104/24 106/3 120/2
**clearly** [5] 37/11 56/11 56/18 107/8 121/13
**Clematis** [1] 1/24
**clerical** [1] 55/22
**client** [21] 6/2 13/2 27/11 27/13 27/17 29/14 33/18 38/19 50/18 58/20 60/3 76/20 79/19 80/10 80/16 80/19 82/10 88/18 89/19 97/6 110/11
**client's** [1] 55/8
**clients** [2] 29/14 38/21
**close** [3] 78/21 106/21 107/15
**closing** [13] 7/24 8/15 9/12 12/12 13/23 13/24 39/3 39/6 73/14 73/16 75/15 75/17 75/19
**co** [1] 93/22
**co-CEO** [1] 93/22
**code** [75] 7/9 8/3 8/4 8/6 8/9 8/18 8/18 8/25 9/13 12/11 12/15 18/5 18/6 18/7 19/23 25/20 25/25 26/2 26/3 26/9 26/15 26/21 26/22 27/8 27/11 27/12 27/23 31/20 32/5 35/1 38/21 39/13 39/19 39/22 40/9 44/1 44/14 44/16 44/18 44/19 44/21 45/17 46/3 46/7 46/15 47/9 47/21 47/22 69/24 72/3 72/19 73/4 73/6 73/7 73/10 79/25 80/20 81/9 81/10 83/4 83/8 84/7 85/11 89/24 91/16 91/17 92/22 95/11 95/13 95/14 102/20 102/25 106/2 117/6 117/9
**codes** [2] 8/12 8/13
**Cogent** [2] 54/11 99/22
**collateral** [1] 101/25
**colleagues** [1] 94/22
**collectively** [1] 120/3
**colloquy** [1] 54/22
**color** [1] 122/21
**colorable** [2] 65/18 65/19
**comb** [1] 122/24
**combination** [1] 34/20
**combine** [1] 20/21
**combined** [1] 105/8
**comes** [3] 23/22 28/3 30/21
**comfort** [1] 102/1
**comfortable** [1] 66/13 66/15
**coming** [1] 19/16
**commenced** [1] 54/23
**commencing** [1] 74/8

**comment** [5] 28/25 44/23 49/16 57/16 117/19
**commented** [1] 32/2
**commenting** [1] 112/18
**common** [1] 120/2
**commonality** [1] 119/15
**communications** [1] 18/20
**companies** [6] 69/23 85/22 93/15 97/25 100/23 100/23
**company** [10] 40/14 44/3 61/12 65/14 84/14 84/15 86/3 93/22 100/1 110/18
**comparison** [1] 64/20
**compel** [1] 104/4
**compelling** [3] 65/5 65/18 66/1
**compensation** [1] 20/18
**competes** [1] 87/2
**competing** [1] 93/13
**competitive** [1] 106/16
**complaining** [1] 57/2
**complaint** [5] 55/18 58/13 58/14 58/17 68/9
**complete** [2] 106/1 123/11
**completed** [2] 32/15 82/20
**completely** [2] 14/25 18/10
**completing** [1] 107/13
**complex** [1] 37/11
**comply** [1] 61/13
**component** [2] 42/12 43/16
**components** [5] 31/13 31/14 31/15 31/18 42/8
**comport** [1] 62/1
**compounded** [2] 57/1 121/16
**computer** [9] 31/19 37/12 37/16 37/20 39/13 39/15 39/21 52/24 109/1
**computers** [6] 8/16 9/11 9/12 26/20 39/16 105/22
**concede** [1] 63/7
**conceded** [1] 106/6
**concept** [1] 21/14
**concern** [1] 47/1
**concerned** [2] 6/5 32/1
**concerning** [9] 13/13 14/7 26/14 34/19 105/5 109/20 110/5 110/6 118/7
**concluded** [1] 124/15
**concludes** [1] 110/3
**concluding** [1] 105/20
**conclusion** [8] 9/16 16/17 19/20 36/5 36/8 56/18 81/14 114/20
**conclusions** [7] 5/7 10/1 15/15 15/16 37/24 67/5 113/14

**C**

conclusively [1] 57/7
concrete [1] 76/1
conduct [3] 72/20 73/5 75/24
conducted [2] 67/11 67/11
confident [1] 98/20
confirmation [5] 32/23 41/13 41/14 41/22 48/1
conflict [1] 110/5
conjunction [1] 46/4
connection [2] 36/22 123/19
consequences [1] 106/12
consider [4] 51/6 52/9 67/9 99/7
consideration [1] 28/12
considerations [2] 64/21 69/13
considered [4] 10/11 27/1 113/21 120/25
considering [1] 9/16
considers [1] 30/1
consistent [4] 57/7 75/17 100/6 114/12
constitute [1] 62/22
constitutional [6] 6/1 21/14 32/13 115/21 116/20 119/13
constitutionally [1] 103/21
construction [1] 6/10
construe [2] 42/5 110/2
construed [1] 58/8
consulted [1] 93/5
consumer [1] 77/4
contacted [1] 101/19
contacts [1] 39/18
contain [1] 75/18
contains [1] 73/19
contempt [41] 11/12 11/19 28/24 29/2 29/15 30/14 30/16 37/4 47/18 48/3 48/13 48/25 49/1 49/19 50/6 50/18 50/22 50/24 50/25 51/5 54/24 55/4 59/9 59/10 69/6 70/8 76/17 76/24 77/1 77/6 77/8 87/13 87/14 88/1 88/9 89/9 106/25 107/3 110/8 110/9 111/17
contend [1] 64/10
contest [2] 43/3 43/11
contested [1] 54/23
context [7] 39/10 65/21 66/1 77/2 89/4 109/7 109/25
continue [3] 27/5 27/6 117/17
continues [1] 104/21
continuing [8] 41/20 42/7 42/25 43/10 43/19 73/21 74/8 76/11
contract [8] 29/20 29/21

60/18 86/21 86/21 89/7 98/2 123/4
contrary [6] 56/6 56/19 76/18 77/12 92/2 95/10
control [5] 38/22 73/14 73/16 86/2 95/11
controlling [1] 71/5
convene [1] 22/5
conversely [3] 79/11 79/11 79/12
convert [1] 116/15
converted [2] 29/3 29/4
converter [2] 72/19 73/4
converting [1] 12/18
convey [1] 8/3
conveyance [3] 7/19 8/22 12/3
conveyed [10] 8/9 8/11 8/24 8/25 9/2 9/4 29/7 29/10 45/17 46/4
conveys [1] 112/10
copy [1] 94/1
Coral [1] 2/7
core [1] 69/14
Corp [1] 89/20
corporate [13] 61/10 61/13 61/24 65/12 65/13 65/15 110/22 110/24 115/24 118/20 119/1 119/12 120/6
corporation [2] 58/14 119/24
correct [17] 4/4 9/2 18/10 23/18 45/18 46/8 46/11 46/15 46/16 48/8 70/5 78/14 79/17 80/20 111/2 113/17 125/12
correctly [5] 16/25 47/19 66/20 68/5 113/16
corrects [1] 18/25
corresponding [1] 58/16
corroborates [2] 114/9 114/13
cost [1] 105/22
costs [5] 60/1 60/15 60/16 61/21 119/23
couldn't [3] 56/14 93/2 98/11
counsel [23] 13/7 14/2 22/23 23/2 26/8 55/21 56/3 56/22 56/24 58/3 58/3 85/1 98/21 107/21 108/21 108/23 112/8 112/13 112/14 112/15 113/23 117/14 118/13
count [4] 22/1 49/21 49/22 111/11
counter [1] 119/22
counter-party [1] 119/22
counting [1] 60/2
country [3] 6/21 78/2 89/21
couple [4] 28/5 29/23 39/12 114/4

course [9] 7/18 21/6 26/3 28/25 69/20 69/25 70/2 74/3 74/14
court [201]
court's [6] 6/23 13/7 13/9 67/1 95/10 119/20
court-approved [1] 7/12
courtesy [1] 66/8
courtroom [1] 98/22
courts [8] 14/11 23/17 24/22 24/22 47/2 58/7 69/20 71/3
cover [1] 117/21
covered [3] 28/24 87/24 87/25
CPE [1] 1/23
create [3] 26/14 68/18 115/10
created [6] 25/7 30/7 69/7 69/10 102/2 102/21
credibility [2] 92/11 107/8
credible [4] 77/16 88/2 92/11 102/13
credit [1] 89/21
creditor [4] 75/8 82/25 84/22 84/23
creditor's [1] 43/15 110/7
creditors [10] 6/25 7/3 7/5 32/16 32/24 41/12 42/13 42/18 45/5 82/21
critical [4] 54/25 70/12 70/13 117/13
cross [1] 18/19
cross-examination [1] 18/19
CRR [2] 1/23 125/17
cube [1] 83/18
cure [3] 9/22 23/13 80/2
current [1] 27/18
customer [2] 81/23 82/3
cut [3] 3/25 48/19 107/22
Cutler [2] 2/12 66/6
cutoff [3] 41/21 41/22 41/24

**D**

damage [2] 25/16 122/16
Dan [4] 56/8 97/20 98/5 98/17
darn [1] 100/11
DATA [4] 1/7 1/15 3/6 3/7
database [1] 91/17
date [3] 47/8 75/7 104/17
Dated [1] 125/14
dates [1] 121/12
days [19] 19/7 22/22 22/25 23/2 27/14 28/5 69/22 81/15 82/20 83/18 93/2 94/5 94/6 105/15 105/16 105/17 107/5

117/7 122/25
de [2] 2/6 19/4
deal [8] 29/11 62/12 81/21 87/3 96/8 101/13 120/8 122/11
dealing [3] 11/25 22/1 87/16
deals [1] 115/2
dealt [2] 4/10 86/8
debt [3] 73/25 84/23 116/15
debtor [41] 10/19 11/21 13/12 14/20 15/5 15/8 15/9 17/4 17/5 20/12 20/16 20/17 22/13 31/4 32/17 32/19 32/22 32/24 34/8 34/10 42/11 42/20 42/21 44/1 44/20 45/3 45/17 46/2 69/13 69/24 70/17 71/23 72/3 72/20 73/5 73/24 82/19 83/18 101/16 105/15 106/2
debtor's [20] 6/24 7/13 7/16 9/7 13/7 22/23 23/2 31/8 34/9 43/20 43/21 43/24 44/1 91/22 93/25 109/22 109/24 110/5 112/13 112/14
debtors [1] 22/13
December [3] 22/21 26/1 50/19
December 13th [1] 22/21
decide [9] 30/4 30/5 30/6 30/8 34/4 41/25 45/11 46/23 50/22
decided [12] 4/20 11/1 23/24 27/21 50/9 51/10 51/21 52/1 52/3 53/20 71/18 105/21
decides [2] 30/2 60/8
deciding [6] 29/7 36/25 37/7 42/11 43/13 83/10
decision [18] 11/24 46/20 62/17 63/10 63/16 67/5 67/7 67/7 67/20 70/24 71/7 71/9 71/19 71/21 75/21 91/1 119/20 122/13
decisions [1] 63/11
declaration [2] 17/19 111/12
declarations [2] 124/8 124/10
declaratory [5] 49/21 111/3 111/6 111/9 111/15
declare [5] 20/9 49/23 111/13 111/13 111/14
declined [2] 103/2 113/3
decree [1] 96/11
decreed [2] 71/22 72/17
deed [20] 7/20 7/24 7/25 11/25 12/5 13/20 13/21 13/25 33/4 44/13 45/12 45/13 46/23 71/24 72/11

118/2 112/9 112/9 112/14 112/19
deemed [2] 31/4 73/7
deeply [1] 40/3
defend [4] 61/7 63/2 119/9 123/1
defendant [14] 1/9 1/16 14/19 16/3 16/15 48/24 55/2 55/20 61/20 82/2 100/13 101/16 102/18 117/11
defendant's [1] 108/20
defendants [10] 15/19 15/25 16/11 21/19 32/5 66/16 67/24 68/5 105/14 114/18
defended [1] 55/5
defending [2] 60/5 89/3
defense [6] 60/12 60/15 60/16 62/21 68/19 90/8
deferring [1] 4/18
define [1] 31/10
defined [12] 9/4 9/6 10/8 29/16 29/16 29/19 29/20 29/21 30/10 31/7 73/5 109/13
defines [2] 31/7 31/12
defining [1] 31/18
definition [3] 26/24 35/17 87/14
defy [1] 89/3
degree [1] 63/20
Delaware [1] 57/7
deliberate [1] 6/14
delineates [1] 52/13
deliver [1] 32/5
delivery [1] 93/11
demand [1] 80/18
demanding [1] 117/6
denial [9] 59/2 61/16 63/18 97/12 97/14 105/12 106/19 118/19 119/3
denied [9] 4/12 5/8 20/23 58/15 58/18 64/18 95/21 96/17 96/18
Dennis [2] 2/8 3/18
denying [2] 56/25 117/4
Department [1] 63/15
depended [1] 113/4
depends [2] 69/9 69/11
deposed [2] 98/23 99/3
deposition [8] 79/7 79/9 87/5 99/5 99/7 99/9 99/17 100/6
depositions [1] 105/9
deprivation [6] 9/20 9/22 21/14 23/14 32/8 80/8
deprive [3] 14/19 24/17 83/19
deprived [6] 13/4 14/14 24/18 25/10 38/6 53/15
Derek [1] 97/19
derived [1] 65/22
described [6] 7/14 30/20

**D**

described... [4] 53/3 57/11 92/16 94/5
description [4] 8/9 8/10 8/24 9/3
Desiree [1] 93/22
destroy [1] 89/25
detailed [1] 38/17
determination [9] 35/24 56/15 59/20 81/14 85/15 85/18 88/24 92/12 112/23
determinations [1] 107/8
determine [6] 4/23 10/16 11/6 67/11 88/22 111/24
determined [9] 58/3 59/8 68/1 68/2 68/4 74/17 93/17 102/10 109/2
determines [1] 64/2
determining [1] 106/4
detrimental [1] 81/12
devotes [1] 24/11
dichotomy [1] 52/6
dictionary [2] 39/11 39/14
didn't [62] 4/9 9/13 9/15 10/7 15/10 16/3 16/16 16/17 17/7 18/3 20/10 20/11 26/10 27/4 31/16 33/15 36/4 36/4 37/21 39/3 40/15 40/16 40/20 44/14 45/23 46/7 47/14 47/14 47/16 49/24 50/21 59/14 61/13 61/25 65/1 70/3 70/11 70/23 71/5 80/17 80/19 82/4 86/5 87/11 87/12 87/18 87/24 88/3 88/4 92/5 92/9 92/12 93/1 93/25 94/2 96/15 100/25 101/4 103/23 110/17 113/24 117/4
didn't -- I [1] 36/4
difference [5] 39/12 79/24 99/3 100/12 100/17
different [14] 9/16 18/25 29/12 59/1 60/21 63/11 70/10 80/12 82/4 91/10 92/23 100/21 100/23 104/2
differentiated [1] 56/12
differentiates [1] 55/1
difficult [1] 6/13
diligence [2] 9/10 36/5
direct [4] 71/4 87/12 91/18 97/24
directed [4] 20/8 51/14 73/15 97/20
directly [7] 74/10 85/5 87/8 92/13 92/14 92/19 94/3
directs [1] 5/22

**D**

discharge [1] 77/4
disclosure [2] 110/22 110/24
discovery [7] 34/3 34/14 104/6 105/6 107/5 109/5 109/9
discrete [2] 116/12 116/14
discuss [1] 42/23
discussed [2] 96/6 123/24
discussion [3] 62/7 107/24 114/17
discussions [1] 65/7
disjointed [1] 101/12
dismiss [4] 4/11 4/16 5/2 5/8
disposed [1] 54/21
dispositive [4] 96/5 103/3 103/20 106/11
dispute [33] 10/18 10/19 10/23 11/7 11/13 42/18 45/8 52/15 52/16 52/20 52/21 69/9 70/16 71/10 71/11 71/16 74/2 76/4 76/8 76/9 76/11 76/12 83/12 104/8 105/4 105/5 106/5 106/7 106/7 106/9 106/9 106/12 109/3
disputes [7] 38/5 71/12 71/15 71/17 109/20 109/23 110/6
disregarding [1] 14/3
dissolved [1] 32/25
distinct [1] 54/17
distinction [3] 7/17 70/13 75/16
distinctions [1] 77/11
distinguish [2] 74/23 111/19
distinguishes [1] 74/22
distributed [1] 45/6
district [17] 1/1 1/1 1/21 6/9 28/1 48/25 69/2 69/2 78/6 78/6 78/7 97/11 97/11 100/18 106/24 110/8 120/18
diversionary [1] 120/9
divorced [1] 78/24
docket [5] 55/12 55/13 104/15 104/17 122/25
doctor [1] 18/13
doctrine [3] 55/16 57/17 57/18
document [12] 14/20 15/3 18/22 25/25 26/2 26/4 26/14 34/8 34/10 34/17 114/1 116/6
documentary [1] 19/4 19/10
documentation [1] 36/3
documented [2] 26/1 39/20
documents [11] 8/3 8/5 8/21 17/15 17/23 17/25 27/3 34/12 34/14 34/25

57/5
Dodd [1] 2/2
does [34] 5/3 10/19 15/20 16/23 17/22 18/15 22/12 24/24 25/13 25/14 30/25 31/10 31/19 32/18 35/9 38/18 39/1 47/5 48/10 71/10 72/10 75/13 75/18 75/22 76/12 94/14 94/17 95/12 102/7 109/19 115/23 116/2 117/24 122/3
doesn't [25] 8/17 10/19 12/25 19/23 20/6 25/24 32/25 35/5 35/7 35/14 36/6 42/19 43/18 58/8 65/16 65/16 78/21 82/10 83/19 94/16 95/11 95/11 102/25 113/13 119/13
doing [3] 27/12 83/6 117/16
dollar [2] 82/25 102/9
dollars [3] 32/17 83/2 88/25
don't [57] 3/10 3/13 3/25 11/21 16/5 16/5 16/14 26/1 26/2 26/3 26/3 27/8 27/9 27/11 27/18 34/18 35/13 36/8 36/9 39/21 40/2 42/17 44/3 45/6 48/19 57/18 58/25 59/18 68/20 70/4 76/24 77/6 77/21 78/15 79/7 79/8 80/1 80/16 83/2 87/17 87/17 88/11 93/3 93/6 95/1 100/10 102/8 106/7 107/22 107/23 114/6 114/23 115/2 117/24 121/12 122/19 122/20
don't -- I [1] 79/8
done [4] 32/22 61/18 92/22 100/5
door [1] 84/11
door's [1] 78/21
Dorr [2] 2/13 66/6
doubt [2] 16/21 16/22
doubtful [1] 6/13
down [5] 23/22 34/3 59/23 72/22 91/21
dozens [1] 13/17
DR [1] 18/13
Dr. [1] 18/11
Dr. Hicks [1] 18/11
drafts [1] 26/8
drag [1] 114/6
draws [1] 46/25
drive [3] 2/9 18/12 18/14
drop [1] 120/16
Dubner [1] 97/19
due [50] 6/1 9/9 9/20 9/22 11/5 13/4 14/14 14/15 14/15 16/13 20/24 21/14 23/10 23/14 23/16 23/19 24/19 28/3 28/8

32/9 32/13 36/5 38/2 38/6 53/15 59/2 61/13 61/16 62/1 63/5 64/13 64/17 64/21 65/1 77/22 95/21 97/14 105/12 106/19 107/5 115/21 116/20 118/2 118/20 119/2 119/3 119/9 119/12 120/6 123/23
during [7] 22/23 36/22 84/25 85/23 98/24 112/18 112/21

**E**

e-mail [1] 1/25 92/17
e-mails [2] 39/18 101/23
each [7] 6/15 21/9 28/11 38/4 38/16 89/6 108/7
earlier [11] 4/11 30/17 50/22 86/17 87/8 104/16 106/2 106/11 119/20 121/16 123/15
early [3] 4/15 70/22 80/18
Earth [2] 38/20 38/20
easy [2] 77/22 96/2
economic [2] 62/20 62/22
economics [2] 83/20 83/20
edification [1] 67/1
Education [1] 63/15
effect [2] 79/15 84/2
effectively [1] 79/8
effort [1] 111/19
eight [4] 15/6 17/3 20/13 122/25
either [2] 17/25 66/15
elected [8] 13/20 25/20 26/10 45/13 46/23 64/12 115/11 115/11
element [1] 38/8
Eleventh [19] 6/8 6/19 6/22 15/21 17/17 22/10 42/1 42/7 42/24 45/2 48/15 48/25 70/20 70/24 102/17 109/17 114/2 115/19 115/25
elicited [1] 56/8
ellipsis [1] 73/22
else [10] 22/24 28/22 30/18 31/2 34/3 39/1 45/7 87/25 107/18 109/14
Elsevier [1] 93/16
emblematic [1] 81/20
emphasize [1] 28/14
employed [1] 63/17
employee [15] 12/21 23/17 30/5 30/8 40/11 40/14 40/22 41/1 41/1 50/8 73/25 74/4 81/24 82/2 98/6
employees [7] 17/9 73/25 81/18 81/23 86/8 86/10 98/18

employment [2] 81/24 81/25
end [7] 43/9 47/5 48/11 63/23 88/24 90/2 107/11
ended [1] 3/7
ends [1] 41/25
enforce [33] 10/25 11/11 11/18 21/12 23/11 42/4 42/5 50/5 54/24 55/3 59/10 64/11 64/20 68/11 68/12 69/5 70/8 71/4 72/16 74/15 74/16 76/13 76/16 78/3 78/13 80/11 82/9 107/3 110/2 111/8 111/8 111/22 123/6
enforceability [1] 67/9
enforceable [3] 23/21 68/14 87/2
enforced [2] 69/3 76/23
enforcement [2] 73/12 121/9
enforcing [1] 48/13
engage [1] 52/23
engaged [2] 54/22 107/2
engages [1] 114/16
engaging [1] 51/1
Engine [1] 63/10
enjoin [1] 107/13
enjoined [2] 74/7 74/18
enjoyment [1] 75/14
enormous [3] 99/25 101/8 101/9
enough [7] 24/13 62/22 89/12 116/19 116/19 117/21 122/7
enter [6] 69/19 69/20 70/2 70/7 74/14 76/15
entered [12] 4/18 22/20 32/23 51/24 54/20 59/17 71/1 76/22 76/25 77/9 96/15 98/10
entire [4] 19/5 24/11 84/25 109/22
entirely [2] 19/14 23/18 73/24
entities [3] 57/9 73/13 73/24
entitled [4] 78/3 80/12 84/19 125/13
entity [12] 8/22 11/21 47/24 47/25 58/20 69/7 95/9 97/16 100/3 100/9 100/22 117/3
entries [2] 55/13 122/25
entry [6] 23/1 54/16 55/12 61/23 75/7 78/3
envelope [4] 18/1 20/2 91/11 91/17
envision [1] 103/23
envisioned [1] 103/25
equal [1] 84/24
equipoise [1] 90/22
equitable [1] 122/5
equity [10] 24/22 40/20 74/1 74/3 82/22 83/1 84/23 93/16 94/9 116/16
equivocation [1] 79/17

**E**

**erroneous [10]** 15/15 15/16 19/20 21/9 56/4 56/5 56/5 56/18 59/18 107/8

**error [17]** 15/21 17/12 17/18 17/21 23/3 38/8 38/11 38/15 55/20 55/22 56/4 56/22 56/24 57/1 58/4 114/3 121/17

**errors [2]** 22/14 38/18

**escalate [1]** 76/7

**ESQ [7]** 2/2 2/2 2/5 2/8 2/11 2/12 2/15

**essential [1]** 71/10

**establish [5]** 16/12 56/10 57/7 69/14 118/1

**estate [34]** 6/24 7/3 7/8 11/12 22/6 22/10 42/8 42/9 42/10 42/25 43/1 43/12 43/13 43/21 44/17 45/4 46/9 46/13 46/14 46/15 46/18 46/21 47/12 48/2 53/21 68/2 69/21 82/25 84/17 84/18 94/14 105/3 109/23 111/22

**estate's [1]** 43/20

**estates [1]** 109/24

**estopped [1]** 74/7

**et [7]** 1/4 15/12 15/12 62/8 105/5 109/4 109/4

**et cetera [5]** 15/12 15/12 62/8 109/4 109/4

**even [48]** 4/1 8/1 8/25 10/7 11/5 12/9 14/4 19/17 20/6 21/4 22/6 23/14 23/18 23/18 25/9 28/6 30/21 30/22 32/23 32/25 36/1 36/1 40/16 42/3 42/6 44/6 49/19 57/8 58/1 58/2 59/2 59/9 61/8 61/15 63/3 83/10 83/14 84/8 88/19 93/20 94/3 100/16 104/7 110/18 111/4 111/4 113/14 119/17

**ever [18]** 4/6 19/5 23/6 23/8 25/8 26/19 26/19 30/21 31/2 51/10 55/3 59/9 76/17 81/25 83/25 93/6 114/24 117/9

**every [15]** 26/11 61/1 61/1 61/1 69/20 76/14 76/14 82/8 82/25 84/15 98/22 99/21 114/20 119/9 123/18

**everyday [1]** 39/15

**everyone [2]** 3/2 54/4

**everything [6]** 24/6 30/18 34/3 53/5 94/24 104/11

**evidence [63]** 9/16 10/11 10/20 10/24 13/19 16/18 17/9 19/5 19/9 19/10 26/19 30/3 30/6 35/25 36/11 37/22 40/4 40/5

40/19 40/21 40/23 41/1 41/2 41/3 49/22 50/19 50/21 51/17 52/16 52/21 56/6 56/7 56/19 57/5 80/14 81/16 82/17 90/2 90/18 90/21 90/22 90/24 92/6 94/23 101/8 101/9 105/14 105/17 111/12 113/7 114/7 114/8 114/10 114/12 117/14 118/1 118/2 118/5 118/7 124/1 124/3 124/4 124/10

**evident [1]** 64/14

**evidentiary [21]** 10/10 13/14 13/14 13/18 20/7 25/21 30/1 30/15 34/6 34/19 49/13 50/16 51/15 51/16 51/20 52/9 102/21 102/23 105/13 107/14 118/6

**ex [3]** 17/13 18/18 32/10

**Ex-Cel [1]** 32/10

**exact [2]** 83/2 94/18

**exactly [14]** 5/18 16/8 43/4 51/1 68/25 78/5 92/20 92/20 92/21 92/21 99/18 110/23 119/5 121/12

**examination [2]** 6/17 18/19

**example [14]** 4/20 9/9 11/7 11/8 18/10 23/14 26/18 40/6 76/1 77/2 77/4 83/17 98/9 108/9

**except [2]** 73/23 78/23

**exception [2]** 122/3 122/11

**excitement [1]** 108/10

**excluded [1]** 31/21

**excluding [1]** 31/22

**exclusion [1]** 31/20

**exclusive [6]** 11/16 11/20 11/22 12/15 45/9 111/15

**exclusively [1]** 68/3

**exclusivity [1]** 11/7

**execute [1]** 60/13

**exercising [1]** 47/3

**exhausted [2]** 60/24 61/2

**Exhibit [2]** 104/14 104/15

**exhibits [2]** 81/16 105/17

**exigency [1]** 32/11

**exist [6]** 10/19 32/18 32/25 89/9 110/18 122/4

**existed [1]** 30/10

**exists [1]** 57/19

**expand [1]** 104/3

**expanded [1]** 4/24

**expect [1]** 120/21

**expedite [1]** 28/7

**expense [1]** 60/4

**expenses [3]** 15/6 60/6

60/8

**experience [1]** 101/15

**expert [16]** 10/7 31/17 37/9 37/13 37/16 37/16 37/19 37/20 52/23 105/19 105/22 105/23 108/25 109/11 109/12 109/13

**experts [1]** 109/9

**expired [1]** 121/11

**expiring [1]** 121/17

**explain [1]** 73/10

**explains [2]** 112/21 115/5

**explanation [1]** 59/4

**explicit [4]** 70/21 73/19 116/21 123/15

**explicitly [1]** 72/2

**express [1]** 47/1

**expressed [1]** 113/20

**expresses [2]** 18/1 18/21

**expressing [1]** 118/13

**expressly [3]** 69/24 80/24 124/8

**extant [1]** 88/20

**extend [1]** 32/19

**extensions [1]** 28/2

**extensive [3]** 13/13 13/14 30/1

**extent [7]** 24/17 25/8 31/1 58/1 72/18 73/3 111/25

**extraneous [4]** 17/18 17/22 17/24 115/20

**Extraordinarily [1]** 80/12

**extraordinary [7]** 78/4 78/9 83/8 83/13 88/6 88/8 106/20

**extremely [1]** 118/15

**eye [1]** 92/10

**F**

**F.2d [1]** 63/16

**F.3d [1]** 62/18

**face [11]** 7/16 8/3 8/21 10/17 17/13 17/19 31/20 34/10 77/25 112/10 116/13

**faced [3]** 11/11 23/25 24/1

**facilitate [1]** 75/17

**fact [59]** 7/21 9/19 9/25 10/3 10/5 11/2 12/14 12/18 13/8 19/3 19/4 21/1 24/11 28/6 29/23 31/20 34/2 35/19 35/20 36/18 36/22 37/24 38/5 38/12 39/2 39/3 39/5 40/6 44/25 50/10 55/17 55/21 58/12 58/12 58/17 60/9 63/12 64/21 72/9 80/25 81/15 87/6 91/5 91/9 92/7 92/8 94/9 108/5 109/1 109/18 112/11 112/18 113/1

113/9 118/4 119/5 120/2 120/21 122/17

**factor [3]** 6/5 12/25 121/13

**factors [5]** 25/15 42/15 62/9 65/19 78/19

**facts [8]** 36/10 54/15 78/23 78/24 81/21 93/3 100/20 112/7

**factual [7]** 15/11 15/15 36/15 41/4 56/15 56/17 108/14

**factually [1]** 116/5

**fail [1]** 83/18

**failed [2]** 15/19 16/12

**failure [6]** 20/7 20/8 81/20 97/9 114/21 120/9

**fair [7]** 6/13 21/23 29/24 43/7 106/23 112/4 116/23

**faith [11]** 34/23 35/4 35/8 35/13 35/16 36/5 52/15 68/4 84/8 104/7 109/3

**fall [1]** 6/5

**fallen [1]** 8/10

**fantasy [1]** 93/3

**far [3]** 6/4 32/1 113/4

**fashion [2]** 24/22 25/2

**fashions [1]** 25/3

**fault [1]** 99/12

**feared [1]** 119/23

**feature [1]** 121/4

**February [2]** 26/2 104/1

**federal [8]** 57/5 58/5 71/8 71/9 71/11 96/7 109/19 120/14

**fee [1]** 119/25

**feed [1]** 96/5

**feel [3]** 66/13 66/15 93/2

**fees [19]** 59/25 60/7 60/17 60/23 61/20 84/12 84/13 88/17 88/25 89/3 89/5 89/7 102/9 102/10 102/11 102/12 107/15 119/23 122/23

**felt [1]** 4/20

**few [3]** 28/17 32/16 34/12

**fide [16]** 10/17 10/18 10/23 11/7 52/15 52/16 52/19 83/12 104/8 105/4 105/5 106/5 106/7 106/8 106/12 109/3

**fifth [10]** 14/14 20/23 24/18 63/11 63/13 63/17 65/22 65/24 99/11 116/20

**figure [1]** 69/8

**figured [1]** 23/5

**file [7]** 14/16 28/7 28/8 53/7 96/13 96/15 96/21 113/23 122/23

**filed [33]** 3/20 7/12 12/9 26/13 49/20 50/4 50/5 50/11 53/3 55/8 80/25 83/6 91/14 94/10 96/12

96/17 96/18 96/19 97/1 97/4 97/5 97/17 99/15 100/5 110/16 110/22 111/1 111/11 111/16 114/24 114/25 117/10 117/11

**files [3]** 98/11 98/15 100/24

**filing [3]** 92/15 93/10 93/21

**final [12]** 24/15 54/19 56/2 59/11 60/1 60/11 62/24 64/6 70/25 121/10 122/6 122/22

**finally [5]** 34/25 80/11 107/10 121/21 123/25

**financial [2]** 56/9 98/7

**finding [19]** 11/14 14/7 17/12 21/16 34/19 35/21 38/3 40/9 59/7 81/15 94/21 110/10 113/3 113/15 114/7 114/9 114/13 116/21 117/1

**findings [27]** 9/25 10/2 12/14 13/13 15/11 15/15 15/17 15/24 21/8 21/9 36/15 37/24 40/5 51/16 90/25 91/5 91/9 92/7 92/8 95/10 96/18 97/4 105/10 107/7 113/1 113/9 123/16

**finds [8]** 16/4 29/23 60/10 81/6 94/18 94/19 94/23 123/17

**fine [5]** 66/14 66/18 108/2

**firm [8]** 40/20 91/21 91/21 91/22 91/22 92/23 93/16 122/23

**Firsenbaum [1]** 2/12

**first [47]** 4/1 4/3 5/12 5/24 10/22 15/3 15/20 22/18 23/8 28/18 29/7 30/2 30/6 30/8 34/4 39/4 42/15 50/7 50/9 59/1 64/23 66/22 77/21 79/2 80/7 81/6 88/19 90/15 91/4 91/11 96/9 96/20 100/10 101/5 101/19 105/24 109/8 111/16 113/9 116/5 118/13 118/19 120/10 120/12 120/22 120/24 121/14

**five [12]** 10/4 30/10 33/8 33/9 37/14 47/6 52/17 108/1 108/19 108/24 109/10 118/17

**fix [2]** 26/18 80/23

**FL [4]** 2/4 2/7 2/10 2/17

**flaw [1]** 24/15

**flawed [1]** 24/15

**flipping [1]** 72/8

**FLORIDA [15]** 1/1 1/16 1/24 6/9 12/4 14/11 15/5 17/3 18/2 18/4 58/14 63/14 78/7 91/12 113/6

**F**

flowing [1] 60/1
focus [2] 5/23 5/24
follow [1] 88/20
following [13] 11/14 13/1 30/9 32/3 54/3 69/25 70/16 75/7 79/10 85/14 93/21 96/10 123/17
follows [2] 11/9 114/20
footnote [5] 21/17 59/4 67/4 67/6 124/2
Footnote 11 [1] 124/2
Footnote 110 [1] 67/4
Footnote 112 [1] 21/17
Footnote 2 [1] 59/4
footnotes [1] 13/17
force [1] 84/1
Ford [1] 115/22
Ford's [1] 115/18
foregoing [2] 73/2 125/11
forever [4] 22/12 26/23 38/24 74/6
forget [1] 38/5
forgive [1] 65/7
forgot [1] 41/8
form [7] 15/9 20/17 56/7 69/15 80/12 91/14 121/11
formed [1] 85/22
former [7] 63/11 63/13 63/16 65/24 73/25 74/4 81/23
formerly [1] 86/10
forms [4] 17/5 91/3 91/10 115/18
formula [1] 80/2
formulated [1] 61/4
forth [7] 10/5 33/9 42/7 42/12 51/3 109/21 124/6
fortiori [1] 70/6
forward [2] 25/22 72/1
forwarded [3] 15/12 17/10 92/3
fought [1] 105/18
found [14] 10/23 40/8 43/5 48/18 48/24 50/18 62/18 89/13 90/21 90/21 104/7 104/9 104/10 106/8
four [12] 30/9 52/13 63/8 63/12 63/20 63/22 65/25 67/15 93/9 94/6 118/17 119/18
four-part [4] 63/12 63/20 63/22 65/25
fours [2] 11/10 61/15
fourth [2] 65/19 94/4
Franklin [4] 1/23 125/10 125/16 125/17
frankly [5] 65/5 69/22 101/14 104/22 109/6
fraud [5] 34/16 34/21 52/14 104/10 104/24
fraudulent [2] 99/24 118/24

free [4] 35/21 73/8 83/9 106/3
Friday [1] 107/1
front [5] 96/14 97/5 104/12 104/19 106/22
fulfill [1] 23/10
full [24] 6/17 6/17 7/5 21/20 21/23 28/7 28/12 29/24 32/24 40/3 40/17 41/4 42/13 43/7 43/16 58/22 59/19 60/22 84/4 91/1 102/11 106/1 112/4 116/23
fully [1] 5/4
function [1] 46/24
functions [1] 32/15
fundamental [1] 31/25
Funeral [1] 11/17
further [9] 32/21 34/7 42/9 59/24 103/9 109/23 118/25 119/3 121/9
future [1] 109/20

**G**

Gables [1] 2/7
Garcia [4] 6/7 6/10 63/12 65/19
Garcia-Mir [4] 6/7 6/10 63/12 65/19
gave [2] 104/16 111/10
general [9] 8/8 8/10 8/13 14/2 26/15 115/15 115/19 116/1 116/18
generality [1] 73/2
generous [1] 118/15
genuine [3] 6/16 39/24 52/21
genuinely [1] 79/8
gets [6] 51/4 62/2 80/11 89/22 100/14 113/15
getting [10] 43/3 44/3 44/23 79/25 86/21 90/18 92/5 93/7 100/15 105/23
give [11] 16/8 26/17 40/6 42/6 62/15 75/4 76/1 88/11 98/9 102/1 123/10
given [4] 3/9 24/4 103/21 107/22
givens [1] 14/8
gives [1] 65/17
glasses [1] 83/22
GM [2] 69/4 69/6
God [1] 99/22
goes [20] 22/9 31/6 67/25 71/6 71/12 73/10 73/11 73/11 73/12 73/18 74/1 75/11 80/17 82/14 91/7 92/19 95/23 105/11 118/22 124/7
going [82] 3/17 3/21 5/4 6/12 10/6 12/20 20/25 25/4 25/4 25/5 27/5 27/6 28/2 28/17 30/4 30/5 30/6 30/8 30/12 30/13 33/6 33/8 34/4 34/21 36/12 36/13 37/7 37/8 37/15 37/15 37/17 37/23 38/19 48/2 49/8 49/10 49/13 49/18 51/9 52/8 52/12 52/18 52/22 52/25 53/12 58/23 59/5 59/21 61/25 62/7 68/22 72/1 72/5 72/10 72/23 73/22 75/4 80/4 83/18 86/5 86/7 87/3 88/16 88/20 93/12 95/9 99/25 100/11 104/1 104/6 104/21 107/3 107/15 107/16 108/7 108/15 110/11 115/16 118/3 119/2 122/24 123/2
Gold [1] 65/21
Gold's [1] 63/10
Goldstein [4] 91/23 91/24 92/16 92/18
gone [5] 22/10 60/14 65/9 65/9 86/11
good [21] 3/2 23/19 31/10 34/23 35/4 35/8 35/13 35/16 36/5 41/9 52/15 54/10 66/5 68/4 68/12 68/13 84/8 98/13 104/7 107/23 109/3
good-faith [6] 34/23 35/4 35/8 35/13 35/16 52/15
got [18] 19/17 36/10 49/4 51/9 72/7 82/1 84/21 88/21 92/3 93/4 93/7 93/11 94/24 105/12 105/14 107/4 107/6 115/7
gotta [1] 24/20
gotten [10] 20/11 82/21 82/23 85/4 87/8 87/10 88/15 101/2 101/11 101/22
governing [2] 6/20 42/2
government [1] 12/1
grant [4] 64/1 66/8 109/21 122/4
granted [4] 30/16 37/25 60/14 81/7
grasp [1] 41/10
gratitude [1] 118/14
gray [1] 18/17
great [1] 54/12
greater [3] 32/8 59/3 64/16
greatly [1] 54/17
Greenberg [1] 2/3
Greenwich [1] 2/14
ground [1] 6/14
grounds [2] 54/16 97/12
grown [1] 72/25
guess [3] 3/4 5/9 47/23
gun [1] 34/25
Gypsum [12] 1/9 7/6 42/2 42/24 70/12 70/13 70/16 74/22 75/22 109/15 109/17 111/20

**H**

hac [1] 66/8
hadn't [5] 23/5 51/23 87/8 104/23 109/6
Hale [2] 2/13 66/6
half [3] 13/6 14/5 115/10
hand [5] 35/14 35/14 76/5 76/5 84/15
handed [1] 7/24
handling [1] 116/15
hands [5] 35/3 35/10 35/13 36/7 43/1
happen [2] 20/10 100/25
happened [8] 25/6 29/2 48/17 76/22 85/21 86/14 89/10 106/24
happens [1] 13/16
happy [2] 54/9 66/11
hard [1] 77/22
harder [1] 36/14
hardships [1] 63/18
harm [32] 26/24 38/19 38/24 38/25 58/23 62/13 62/20 62/22 62/23 63/6 63/8 63/25 64/3 65/5 78/17 78/25 81/18 82/1 82/11 85/19 88/5 88/9 88/12 88/18 89/25 95/8 102/17 102/24 103/5 121/22 122/8 122/16
harmed [3] 32/6 64/11 80/25
harms [5] 25/13 25/15 39/2 87/15 88/5
hasn't [1] 96/5
hat [1] 55/9
haven't [5] 28/10 28/15 32/2 88/15 101/11
having [11] 10/9 25/10 37/23 38/22 59/3 72/24 101/2 101/21 107/1 107/10
he'd [1] 85/24
he'll [1] 95/16
he's [10] 16/15 16/19 24/19 29/9 29/10 59/5 75/21 96/12 108/10 111/7
head [1] 22/17
heading [1] 91/6
Health [1] 63/15
hear [6] 3/11 5/6 49/22 50/21 117/4 117/8
heard [12] 30/5 50/19 54/12 81/15 81/16 82/15 105/18 108/14 112/6 117/13 118/5 121/22
hearing [46] 1/19 10/10 10/23 13/5 13/7 13/14 13/15 13/16 13/18 14/4 14/6 14/9 14/18 23/16 25/21 30/1 30/15 34/6 34/20 34/25 35/23 35/25 40/24 49/13 50/16 51/15 51/17 51/20 52/1 52/9 52/10 52/18 70/1 102/24 104/19 105/13 107/14 108/23 112/19 115/9 115/11 118/6 123/19 124/3 124/4 125/3
hearings [1] 41/23
hearsay [3] 19/13 19/15 114/2
heat [1] 108/4
heavily [1] 76/21
height [1] 87/13
held [16] 9/21 18/14 37/4 50/25 61/9 61/22 62/19 69/4 70/20 74/3 80/24 90/20 90/23 97/11 110/24 115/25
help [1] 39/10
helped [1] 46/19
helpful [3] 3/14 66/12 123/12
here [56] 3/4 3/19 6/20 7/1 10/22 11/12 20/6 20/23 22/2 22/16 23/12 23/22 24/1 24/7 24/9 24/25 28/5 29/2 31/18 32/14 36/11 37/13 43/5 45/7 48/5 57/20 62/6 64/18 66/2 67/24 70/13 71/20 71/21 76/2 77/13 78/12 82/4 82/17 83/24 87/15 88/5 91/10 91/16 106/21 108/7 108/18 110/4 110/10 110/11 112/2 114/4 117/3 119/1 122/19 122/20 123/22
here's [3] 80/18 85/20 87/7
hereby [1] 74/6
hey [1] 78/20
Hicks [2] 18/11 18/13
hidden [1] 80/3
highest [3] 69/15 93/17 106/16
Highland [5] 18/3 18/25 94/20 113/19 113/20
highly [1] 81/12
hinted [1] 111/4
hire [2] 111/14 111/14
hired [1] 86/15
hit [1] 118/17
hold [5] 48/2 69/6 70/8 77/8 77/17
holder [3] 74/3 82/23 116/2
holders [2] 73/25 74/1
holding [7] 44/3 70/20 76/17 83/22 91/3 107/14 109/18
holdings [10] 48/14 56/13 56/13 57/9 57/10 57/13 57/24 101/24 102/11 118/21
holds [5] 31/1 72/18 73/3 76/18 89/4
Homes [1] 11/17
Honor [111] 3/18 4/5 4/8 5/18 7/10 10/13 16/9

**H**

**Honor... [104]** 19/3
27/24 28/16 30/16 32/2
36/17 37/10 38/4 39/25
41/17 41/6 42/22 43/17
43/23 44/10 44/15 44/24
46/16 48/8 49/5 50/17
51/7 54/9 54/10 55/4
55/9 55/19 56/5 57/21
59/1 59/8 59/22 60/8
60/10 61/4 62/4 63/22
64/15 65/2 65/6 66/4
66/5 66/7 66/10 66/20
67/4 67/17 68/7 68/21
69/17 70/5 70/15 73/21
75/3 76/23 77/19 78/23
79/6 80/6 81/4 82/13
83/23 84/16 85/12 86/8
87/24 88/5 88/16 89/1
89/24 90/11 91/1 91/4
91/4 95/24 96/3 98/1
98/20 99/5 99/12 101/11
103/8 103/11 103/14
103/15 103/23 104/14
104/16 105/21 106/20
106/21 107/19 107/25
111/6 112/8 118/8
118/12 119/19 120/14
123/8 123/10 123/14
123/15 124/12
**Honor's [3]** 61/3 101/7
118/14
**HONORABLE [1]** 1/20
**hope [1]** 118/17
**hopefully [2]** 94/22
107/17
**horse [1]** 124/8
**hour [1]** 107/24
**hours [1]** 105/7
**house [2]** 92/4 118/3
**However [3]** 36/12
70/24 109/23
**huh [2]** 103/17 111/8
**Huh-uh [1]** 111/8
**human [1]** 38/20
**hundred [2]** 15/24 24/5
**hung [1]** 55/10
**Hyman [48]** 4/18 9/15
9/24 10/1 10/9 13/6 13/9
15/10 15/19 32/4 35/7
43/5 53/12 54/20 55/10
56/14 56/21 57/1 57/3
57/4 57/12 57/15 59/22
60/14 62/21 66/23 67/23
69/19 71/22 74/3 76/11
80/24 90/7 90/13 92/8
96/15 97/3 97/9 104/5
104/13 104/19 105/15
112/21 113/2 116/22
123/21 124/2 124/7
**Hyman's [12]** 3/16 4/10
14/3 35/17 59/4 59/21
60/11 64/6 71/21 76/9
76/13 123/16
**hypothesized [1]** 119/7

**I**

**I'd [2]** 28/25 103/8
**I'll [12]** 6/3 16/8 23/12
63/7 66/16 74/6 81/3
83/5 94/24 106/21 115/9
124/13
**I'm [73]** 3/21 5/18 8/20
16/20 20/25 22/16 25/24
28/14 28/17 30/4 30/5
30/6 30/8 30/12 30/13
34/4 34/21 35/6 36/12
36/13 37/7 37/8 42/18
48/2 49/3 50/6 51/19
52/4 52/8 52/12 54/9
57/1 61/17 62/6 65/3
66/11 67/18 67/21 68/22
70/23 71/7 72/8 72/9
73/22 75/4 76/24 83/5
83/22 84/19 85/12 86/7
87/3 87/4 88/20 91/7
93/2 94/21 95/18 95/18
98/20 99/5 100/11
101/16 102/4 104/16
107/3 108/6 108/15
110/11 110/16 113/5
114/15 118/3
**I've [16]** 3/16 30/5 34/13
36/10 49/4 65/7 66/7
82/15 83/5 94/4 100/17
101/12 107/22 108/22
114/23 114/24
**i.e [1]** 105/3
**ice [1]** 83/18
**idea [5]** 40/15 65/11
93/8 98/14 119/11
**ideas [1]** 104/2
**identify [1]** 3/12
**identity [1]** 56/10
**IDI [78]** 1/11 3/7 3/24
44/2 44/6 44/7 54/11
54/16 55/1 55/5 55/20
56/10 56/12 56/13 56/13
57/8 57/9 57/9 57/10
57/13 57/21 57/24 57/25
59/5 60/3 60/10 64/23
64/24 64/25 66/11 79/3
79/15 90/8 90/10 95/3
95/5 95/9 95/10 96/13
96/13 96/18 97/1 97/8
97/14 97/16 97/17 98/5
98/7 98/11 98/11 98/14
98/18 98/25 99/12 99/14
99/16 99/16 99/19 99/21
100/2 100/5 100/22
100/25 101/5 101/6
101/24 102/1 102/6
102/22 103/7 110/17
110/19 110/20 110/21
110/25 118/20 118/21
120/9
**ignored [2]** 14/25 38/14
**ignores [1]** 27/12
**III [1]** 2/10
**illustration [2]** 31/11
61/16
**illustrative [1]** 20/1

**Imagine [2]** 76/2 76/4
**immediately [3]** 80/20
86/19 92/18
**impending [1]** 123/24
**implication [1]** 36/6
**important [4]** 55/15
75/15 85/15 85/17
**impossible [2]** 96/21
120/20
**impracticability [2]**
120/24 121/3
**impracticable [3]**
120/18 120/22 121/19
**impractical [1]** 121/13
**impression [1]** 51/9
**improper [1]** 118/23
**improperly [2]** 38/10
38/10
**inability [1]** 81/11
**inactive [1]** 88/23
**inadmissible [3]** 17/20
114/1 114/10
**INC [75]** 1/4 1/8 1/11
1/15 3/5 3/6 3/7 3/8 3/20
3/20 3/24 6/2 13/2 44/2
44/6 44/6 44/6 44/7
54/11 54/11 54/16 55/1
55/5 55/20 55/20 56/10
56/12 57/9 57/9 57/13
57/13 57/21 57/23 57/25
58/14 59/6 60/3 60/10
64/23 64/24 64/25 90/8
90/10 95/9 95/11 98/5
98/8 98/11 98/14 98/18
98/25 99/12 99/14 99/16
99/17 99/19 99/21 99/22
100/2 100/5 100/12
100/14 100/15 100/22
100/25 101/3 101/5
101/6 102/6 110/19
110/20 110/25 111/1
118/20 120/10
**Inc.'s [2]** 79/3 97/17
**incented [1]** 84/4
**incident [1]** 71/16
**include [5]** 7/8 10/5
13/12 14/6 31/19
**included [7]** 8/25 12/6
70/25 81/11 108/22
124/4 124/9
**includes [4]** 30/9 37/25
37/25 75/6
**including [6]** 67/10
69/12 73/24 76/16 83/24
123/20
**inconsistent [1]** 56/15
**incorporated [4]** 98/12
100/9 100/10 124/8
**incorrect [2]** 33/20
116/6
**incorrectly [1]** 90/7
**incur [5]** 60/4 89/3
105/22 122/23 122/24
**incurrence [1]** 89/5
**indeed [5]** 54/19 64/16
71/6 76/23 106/20

**indefinitely [1]** 47/3
**independent [2]** 38/17
71/15
**indicated [3]** 53/12
55/22 56/3
**indication [1]** 58/2
**indirectly [1]** 74/10
**individual [5]** 23/15
25/5 61/11 100/21
115/23
**individually [1]** 119/22
**informed [2]** 13/5 30/24
**infringement [1]** 61/21
**ingredient [1]** 71/10
**inherently [1]** 24/22
**initially [4]** 49/10 49/12
80/21 120/18
**injunction [10]** 51/3
63/19 66/1 73/19 74/19
75/19 82/2 87/3 89/15
89/16
**injunctions [1]** 77/5
**injury [9]** 80/7 80/13
80/14 81/7 82/10 89/6
95/15 95/16 102/19
**innuendo [2]** 119/1
120/6
**inquired [2]** 108/24
115/16
**inquiry [3]** 6/14 116/2
116/19
**insert [1]** 34/19
**inside [1]** 15/3
**insisted [1]** 72/4
**Insofar [1]** 6/18
**insolvency [3]** 122/3
122/11 122/19
**insolvent [5]** 69/21
89/17 89/21 122/1 122/1
**instance [3]** 29/7 64/23
101/5
**instead [2]** 18/12 30/13
**instructions [1]** 14/3
**instructs [1]** 13/11
**instrument [1]** 7/19
**integrity [1]** 24/16
**intellectual [25]** 11/13
11/17 11/20 12/16 34/11
45/10 46/21 65/8 65/10
65/10 79/5 79/14 79/20
81/1 84/21 85/2 85/6
85/11 85/20 86/18 87/1
88/14 93/23 98/3 106/13
**intend [2]** 107/25 109/5
**intended [4]** 35/15 75/16
106/8 108/25
**interest [57]** 7/14 7/17
9/7 12/1 12/7 13/3 13/13
25/10 25/11 27/22 29/1
29/18 29/21 31/1 31/2
31/8 32/1 32/7 32/8 33/4
34/11 35/18 42/9 42/25
44/12 45/1 45/4 52/24
64/19 64/19 65/2 66/20
72/19 73/3 75/8 82/12
83/1 83/10 83/11 83/13

**83/21 83/24 84/6 84/10
85/10 88/7 106/4 106/4
106/10 111/25 112/11
112/16 112/24 115/1
115/2 115/6 116/2**
**interested [2]** 95/18
95/19
**interesting [4]** 21/16
24/1 32/14 87/25
**interests [12]** 13/5 13/8
13/19 14/7 14/10 14/10
14/13 14/21 35/22 51/15
73/9 118/7
**interfere [1]** 75/9
**interference [3]** 73/19
75/12 75/14
**interfering [3]** 47/25
48/3 48/7
**interim [1]** 89/2
**internal [1]** 26/8
**internally [2]** 12/10 39/5
**International [2]** 62/16
122/14
**internecine [1]** 43/3
**interpret [2]** 22/8 42/5
**interpretation [3]** 48/15
69/11 71/9
**interrupt [1]** 22/16
**invalidate [1]** 61/22
**invariably [1]** 101/15
**invented [2]** 12/22 40/12
**inversion [1]** 114/15
**inverted [1]** 38/10
**invited [1]** 103/1
**involve [1]** 104/25
**involved [3]** 22/12 48/13
58/20
**involving [1]** 76/8
**IP [7]** 30/8 40/10 44/14
81/8 81/11 123/20
124/10
**Iran [1]** 122/17
**irreparable [23]** 26/24
38/19 38/24 38/25 58/23
62/13 62/22 63/6 63/8
65/5 78/17 78/25 81/7
82/1 88/18 89/5 95/8
95/15 95/16 101/10
121/21 122/8 122/16
**irreparably [1]** 32/6
**IRS [3]** 15/9 17/5 20/17
**Isicoff [4]** 23/25 23/25
24/14 117/22
**Isicoff's [1]** 25/1
**isn't [9]** 35/12 59/13
79/24 87/20 87/22 91/9
97/7 99/7 102/1
**issuance [1]** 63/18
**issue [55]** 4/10 4/23 5/1
6/23 11/6 13/3 15/1 19/2
19/18 21/2 22/3 22/15
31/16 32/20 33/11 33/24
34/15 34/16 35/3 35/10
36/7 37/2 37/15 37/17
41/11 42/14 42/19 42/23
47/6 47/18 52/5 53/11**

**I**

**issue... [23]** 58/13 66/20 67/12 70/11 76/7 76/8 77/21 87/25 90/8 95/3 105/6 105/14 107/17 109/5 109/6 112/5 116/17 119/2 121/21
**issued [4]** 30/14 34/20 50/18 52/8
**issues [68]** 4/19 4/21 4/24 4/25 4/25 5/24 6/5 6/15 6/16 9/25 10/4 10/8 10/10 11/1 11/3 11/5 12/23 20/25 27/1 28/10 28/12 28/13 33/2 33/5 33/7 33/8 33/9 33/9 35/2 35/10 36/10 36/13 37/8 37/9 37/14 37/17 37/20 38/1 38/5 38/7 38/16 39/23 39/24 40/24 41/4 41/21 43/19 49/6 49/9 50/20 52/2 52/13 52/13 52/17 52/19 52/25 53/19 64/16 90/4 104/6 106/6 108/6 108/19 108/24 109/7 109/10 109/10 116/9
**it's [116]** 5/6 6/21 8/17 9/8 13/24 14/1 16/9 16/10 18/8 18/16 19/12 19/24 20/18 21/3 21/6 22/4 22/11 26/20 26/23 27/21 28/8 28/9 32/18 35/19 35/19 36/1 38/23 42/9 42/13 43/23 44/2 44/24 44/24 44/25 49/4 49/21 53/11 62/14 62/15 62/17 63/9 64/10 64/11 64/13 65/5 65/8 65/9 65/10 65/10 65/16 66/13 67/4 67/19 68/12 68/13 68/13 70/12 72/4 75/3 75/3 76/9 77/7 77/22 77/23 78/2 78/20 78/20 78/25 81/17 81/20 82/5 84/6 84/8 86/24 88/6 88/6 88/7 88/9 89/8 90/1 90/21 94/4 94/5 97/19 97/19 97/19 98/15 99/12 99/22 100/8 101/3 101/14 101/18 101/23 102/3 102/5 102/12 104/15 104/17 104/19 106/14 106/15 106/25 108/16 108/16 108/17 108/18 109/2 112/3 112/20 113/11 113/11 117/13 119/2 120/16 122/12
**it's -- I [1]** 44/24
**item [1]** 9/1
**items [2]** 31/9 31/9
**iteration [1]** 119/3
**itself [1]** 89/5
**IV [1]** 91/7

**J**

**Jackson [1]** 2/6
**January [6]** 22/25 23/6 25/25 26/1 50/5 50/6
**January 17th [2]** 22/25 23/6
**Jet [5]** 6/8 6/9 63/10 65/21 78/7
**job [1]** 10/15
**Joe [6]** 100/11 100/12 100/13 100/16 100/21 101/3
**John [1]** 2/2
**joined [1]** 102/22
**joint [1]** 3/20
**journal [1]** 39/14
**judge [124]** 1/21 3/16 4/10 4/18 4/23 9/15 9/24 10/1 10/9 10/13 10/22 11/9 11/14 12/12 13/6 13/9 14/3 14/18 15/10 15/18 15/25 16/22 21/25 23/24 23/25 24/14 25/1 25/21 29/3 32/3 34/13 34/18 34/20 35/2 35/7 35/16 35/23 36/10 36/20 37/14 38/24 43/5 45/10 46/20 47/4 48/17 48/24 49/7 50/9 51/14 51/14 52/24 53/3 53/12 54/20 55/10 56/14 56/21 57/1 57/3 57/4 57/12 57/15 59/4 59/21 59/22 60/11 60/14 62/21 63/10 64/6 65/21 66/23 67/23 69/19 71/21 71/21 74/3 75/1 75/2 75/6 75/11 76/9 76/10 76/13 76/14 76/21 76/25 77/8 77/9 77/11 80/24 81/15 90/7 90/13 92/8 96/14 97/3 97/9 104/5 104/13 104/19 105/15 106/24 108/23 111/20 111/21 112/15 112/15 112/17 112/17 112/20 112/21 113/1 114/16 114/18 115/9 116/21 117/21 123/16 123/21 123/21 124/2 124/6
**judge's [1]** 10/15
**judges [1]** 106/22
**judgment [48]** 49/21 54/20 55/11 56/2 59/3 59/11 59/17 59/24 60/2 60/9 60/11 61/1 61/10 61/12 61/18 61/23 64/4 64/7 78/2 82/6 82/8 82/9 88/8 88/20 96/10 96/14 98/10 100/1 100/14 100/15 100/16 100/24 101/2 101/5 101/16 101/20 102/3 102/6 111/2 111/3 111/7 111/9 111/16 119/18 120/4 121/10 122/22 123/6

**judgment-proof [1]** 100/1
**judicata [4]** 21/24 22/2 43/6 112/4
**judicial [12]** 55/11 55/16 57/4 57/4 57/12 57/16 57/17 57/20 57/22 96/25 97/7 119/7
**July [1]** 26/11
**jumped [1]** 86/19
**June [4]** 26/11 104/15 104/19 108/23
**June 3rd [2]** 104/19 108/23
**jurisdiction [57]** 4/3 4/16 4/22 5/2 5/6 5/8 5/13 5/25 6/4 6/18 6/23 11/15 22/5 22/7 33/3 41/20 41/25 42/5 42/7 43/11 43/19 45/15 47/3 47/4 47/5 48/10 49/1 49/24 51/6 53/22 66/21 66/23 67/3 67/9 68/18 68/23 69/5 69/14 69/16 69/19 70/2 70/7 70/7 70/21 71/3 72/17 74/14 74/15 75/25 76/11 76/14 79/2 109/19 110/1 110/8 110/9 111/23
**jurisdictional [9]** 41/11 48/10 48/14 53/19 72/13 72/14 74/12 77/21 109/21
**jurisdictionally [1]** 45/11
**just [59]** 3/12 5/5 5/11 5/14 8/17 10/19 13/24 14/16 14/25 18/15 22/17 24/25 25/13 26/10 28/15 36/8 37/21 39/8 39/20 44/10 44/14 45/8 45/24 46/25 52/1 67/1 67/1 69/3 70/14 77/16 80/3 84/14 84/24 92/3 92/4 100/11 100/16 103/11 108/14 108/15 108/20 109/16 111/20 112/6 112/12 112/14 112/16 113/24 114/11 115/8 117/14 118/16 119/2 120/5 120/8 123/10 123/11 123/11 124/1
**justice [2]** 58/8 58/8
**justices [1]** 61/9
**justify [1]** 119/11

**K**

**K-1 [1]** 20/18
**KAM [2]** 1/2 1/3
**keep [14]** 10/13 12/8 37/10 38/4 39/17 39/18 44/3 44/24 47/8 77/17 84/9 101/10 102/14 102/15
**keeping [2]** 80/3 80/3
**KENNETH [1]** 1/20

**kept [1]** 84/13
**key [1]** 113/11
**keywords [1]** 113/7
**Kimball [7]** 11/9 21/25 45/10 47/4 75/6 75/11 111/21
**Kimball's [4]** 46/20 75/1 75/2 77/11
**kind [12]** 19/17 31/1 35/12 35/14 41/23 48/7 49/8 72/19 73/4 74/9 77/12 78/22
**kinda [2]** 3/25 39/7
**kinds [1]** 11/1
**knew [21]** 13/23 17/4 20/12 20/19 34/22 34/22 35/1 35/19 35/24 47/23 47/23 48/4 52/14 85/3 93/8 93/24 93/24 96/13 100/17 105/1 105/1
**know [45]** 3/13 5/11 5/14 15/10 16/5 16/14 19/22 21/1 25/7 25/15 26/16 28/3 30/16 30/18 34/13 34/22 35/12 35/25 37/2 39/6 40/18 40/20 44/3 47/12 50/4 55/7 62/9 77/2 77/7 77/10 77/14 77/14 78/20 78/20 80/2 80/4 96/16 96/17 98/6 98/9 98/11 100/10 102/8 106/15 115/7
**knowing [1]** 121/7
**knowingly [1]** 87/16
**knowledge [7]** 18/20 35/17 40/13 115/15 115/20 116/1 116/18
**known [13]** 12/11 39/6 54/11 56/13 57/23 58/6 98/12 99/15 105/1 105/2 105/2 110/21 118/21
**knows [8]** 76/22 86/25 94/12 94/12 99/22 100/8 100/9 100/11

**L**

**labor [1]** 32/21
**lack [5]** 4/16 5/2 5/8 26/14 39/6
**lacked [1]** 4/3
**lacks [1]** 75/24
**laid [2]** 52/11 110/23
**land [2]** 24/2 93/3
**landlord [3]** 70/18 76/5 76/6
**landlord's [1]** 70/18
**language [5]** 30/17 67/15 70/22 75/7 120/11
**large [1]** 6/20
**last [2]** 102/2 124/7
**lasted [2]** 6/23 122/12
**late [1]** 22/11
**later [15]** 4/24 19/8 22/22 29/5 36/25 37/1 37/19 44/7 50/4 52/9 80/22 109/8 110/2

**110/18 111/9
**laughed [1]** 85/13
**law [46]** 5/7 10/1 11/25 12/4 14/15 14/16 17/12 19/2 21/10 26/22 27/20 28/12 28/13 32/9 33/5 36/18 37/24 38/5 38/13 39/11 39/24 40/6 50/24 66/25 67/5 68/24 71/8 71/17 71/18 76/19 77/3 77/6 77/25 78/2 81/14 91/21 91/22 91/22 113/13 113/14 113/14 113/25 114/25 115/3 115/5 116/18 52/9
**lawsuit [11]** 12/10 19/8 26/13 32/23 62/1 79/12 79/23 85/3 94/6 94/9 97/15
**lawyer [4]** 81/2 93/5 105/7 114/24
**lawyers [2]** 28/4 54/6
**lay [2]** 28/11 52/10
**layman [1]** 37/11
**lead [1]** 6/20
**leaded [1]** 113/11
**leading [2]** 89/20 93/15
**leads [1]** 70/6
**learned [1]** 25/19
**lease [1]** 76/7
**leasehold [1]** 76/3
**least [8]** 4/22 8/3 64/7 65/18 68/14 69/9 106/8 116/4
**leave [2]** 38/18 39/1
**leaves [3]** 38/18 39/1 43/21
**lecturn [1]** 115/4
**left [17]** 6/24 7/3 7/8 11/12 19/20 19/20 22/6 42/8 43/1 43/12 44/16 45/4 46/13 46/21 53/21 86/16 98/6
**left -- you [1]** 98/6
**legal [23]** 15/15 15/16 20/25 27/1 36/10 36/13 39/14 41/3 88/7 88/17 88/25 89/3 89/5 89/7 95/17 98/14 100/9 100/22 102/9 102/10 102/11 105/9 122/18
**legally [1]** 19/20
**legitimate [5]** 6/16 20/22 27/1 31/25 104/8
**Lemco [28]** 6/19 6/22 7/5 11/9 22/11 42/2 42/12 42/24 43/8 43/9 43/15 45/2 45/11 46/24 46/24 47/2 48/12 48/15 48/17 70/12 70/13 70/16 74/22 75/22 77/11 109/15 109/17 111/20
**lend [1]** 85/24
**lender [1]** 94/8
**length [1]** 54/12
**lengthy [7]** 3/16 5/3

**L**

**lengthy... [5]** 12/13 12/13 12/13 29/16 122/24
**Leon [1]** 2/6
**less [1]** 65/5
**let [27]** 13/2 14/4 29/12 41/8 52/5 58/19 66/19 67/13 68/8 68/17 68/22 72/25 75/3 76/1 79/6 82/13 85/17 86/20 88/12 90/17 90/17 95/2 95/24 99/11 105/17 114/11 115/7
**let's [23]** 26/5 47/17 53/25 70/13 72/13 78/25 79/10 79/11 80/1 80/6 80/7 80/14 81/19 95/5 95/23 96/3 97/14 100/8 100/20 101/10 102/10 102/12 102/23
**letter [4]** 26/8 113/25 117/6 117/7
**letters [1]** 14/1
**LexisNexus [1]** 93/16
**library [1]** 79/14
**license [7]** 9/12 27/14 27/6 39/20 39/20 44/13 47/24
**licenses [3]** 31/22 31/23 31/24
**life [1]** 72/25
**lift [1]** 107/9
**lifting [1]** 82/7
**lifts [1]** 88/17
**likelihood [9]** 6/6 6/10 28/25 38/9 62/4 62/8 63/20 63/23 95/25
**likely [1]** 96/22
**limine [1]** 19/17
**limit [1]** 49/18
**limited [8]** 4/19 4/25 7/16 11/4 25/9 33/10 73/24 108/19
**limiting [1]** 73/2
**line [3]** 18/9 46/25 110/15
**lines [1]** 111/4
**list [3]** 81/24 81/25 82/3
**listed [5]** 9/1 10/4 31/9 31/22 31/23
**lit [1]** 22/17
**litigate [9]** 12/6 21/20 29/25 32/20 49/8 49/10 53/9 112/5 116/24
**litigated [2]** 35/18 53/9
**litigation [10]** 6/14 69/4 82/8 86/9 86/9 98/24 99/24 103/19 105/7 119/8
**litigator [1]** 83/5
**little [3]** 9/8 82/13 82/14
**live [2]** 18/3 82/20
**lived [2]** 72/25 105/7
**lives [1]** 107/18
**living [1]** 93/3

**LLP [3]** 2/6 2/13 2/16
**loan [1]** 85/23
**long [6]** 6/23 23/10 28/1 71/24 73/21 83/11
**longer [9]** 42/10 42/10 42/13 42/20 43/13 43/13 43/24 75/11 80/8
**looked [4]** 34/16 92/10 117/19 121/23
**looks [1]** 22/14
**lose [4]** 59/14 59/14 90/23 96/22
**loses [2]** 60/22 106/13
**lost [6]** 26/23 26/23 38/23 38/24 89/2 105/19
**lot [2]** 46/19 108/14
**Lothian [1]** 69/8
**lots [2]** 92/3 108/5
**Luis [1]** 2/5

**M**

**MacLachlan [6]** 56/8 56/11 86/9 97/20 98/6 98/17
**MacLachlan's [1]** 57/8
**magnitude [1]** 106/17
**mail [11]** 1/25 15/11 16/24 17/2 17/9 90/12 90/12 90/17 92/3 92/17 113/17
**mailed [3]** 15/2 15/4 19/6
**mailing [7]** 38/11 90/5 90/16 91/21 92/6 92/22 94/19
**mails [2]** 39/18 101/23
**maintaining [1]** 27/24
**major [1]** 93/15
**makes [5]** 27/10 72/12 118/19 118/23 120/24
**making [6]** 3/23 64/22 77/10 102/2 112/22 112/23
**management [1]** 118/21
**manager [6]** 17/13 17/15 17/22 18/18 19/12 113/20
**mandatory [1]** 57/4
**manner [2]** 58/8 74/9
**March [13]** 23/9 26/4 26/7 34/9 39/4 41/15 47/15 50/6 50/7 50/13 117/10 117/10 117/12
**March 2015 [1]** 39/4
**Mark [2]** 2/2 54/10
**MARRA [1]** 1/20
**massive [1]** 82/9
**material [1]** 54/15
**matter [24]** 4/16 5/2 5/6 5/13 5/25 6/4 6/18 22/25 32/18 34/2 54/23 64/19 66/21 66/23 67/2 67/2 91/23 93/3 94/5 116/12 116/14 116/14 116/24 125/13
**matters [3]** 12/20 87/22

116/13
**maybe [8]** 28/4 36/3 42/18 80/10 102/16 105/8 114/8 114/9
**me [45]** 3/14 13/2 13/11 14/4 28/19 29/12 36/2 40/25 41/7 41/9 45/11 52/5 58/19 64/13 65/7 66/16 66/19 67/13 68/8 68/15 68/22 72/25 75/3 76/1 79/6 82/13 84/24 85/17 86/20 87/3 88/12 90/9 90/17 90/18 91/25 94/23 95/2 95/24 97/5 97/12 97/23 99/11 101/19 102/1 120/15
**mean [18]** 3/25 5/12 8/7 19/23 28/3 29/9 35/11 35/14 36/4 36/6 39/16 45/18 48/19 56/20 57/20 62/3 68/19 80/1
**means [5]** 14/16 14/17 16/15 119/25 121/5
**meant [4]** 16/20 24/19 106/21 109/13
**meat [1]** 9/8
**Medical [1]** 63/14
**meeting [1]** 93/20
**meets [1]** 38/8
**member [2]** 15/9 20/18
**members [2]** 40/20 116/15
**mention [2]** 21/5 121/4
**mentioned [9]** 8/6 8/8 14/24 15/3 21/4 21/6 67/15 104/22 121/16
**mentions [2]** 21/3 35/2
**mere [2]** 62/20 62/22
**merely [1]** 19/22
**Merit [1]** 125/10
**merits [16]** 6/6 6/12 23/19 62/2 62/8 62/1 63/21 63/24 72/14 82/1 82/14 95/23 96/1 96/5 97/13 107/11
**met [1]** 94/17
**meter [1]** 63/23
**meting [1]** 83/18
**Miami [3]** 2/4 2/10 2/17
**Michael [6]** 97/19 98/2 98/4 98/17 98/23 98/23
**Microsoft [7]** 39/16 39/19 39/22 98/10 98/11 98/12 98/12
**might [5]** 4/1 79/22 83/12 119/24 121/25
**million [25]** 60/2 60/12 60/13 60/16 72/5 76/20 82/11 82/22 82/24 83/3 84/11 84/14 84/17 85/9 86/4 88/25 93/13 94/10 94/11 94/13 102/12 102/13 102/13 119/17 123/2
**millions [1]** 83/1
**mind [7]** 10/13 12/8

37/10 38/4 47/8 104/5 105/25
**mine [1]** 109/14
**minimum [3]** 74/3 100/3 104/9
**minute [6]** 15/16 22/9 37/20 38/5 53/25 109/12
**minutes [2]** 108/1 118/17
**Mir [4]** 6/7 6/10 63/12 65/19
**misapplication [1]** 33/21
**misapplied [1]** 57/17
**misread [1]** 18/13
**missed [3]** 4/11 5/9 22/16
**misstate [1]** 79/8
**mistake [4]** 55/23 110/17 110/19 110/21
**mixed [4]** 19/2 36/18 40/5 44/4
**MMH [3]** 23/24 23/25 117/23
**modified [1]** 37/25
**moment [5]** 7/24 25/14 70/14 103/11 110/6
**Monday [1]** 106/25
**monetary [1]** 89/14
**money [34]** 60/12 61/1 63/2 82/19 84/14 84/20 88/8 88/20 89/1 89/18 89/22 89/22 106/17 119/18
**month [6]** 13/6 26/11 27/12 27/16 84/25 103/25
**months [16]** 12/9 15/6 17/3 17/6 19/8 20/13 25/23 41/15 41/15 50/3 84/17 84/18 86/17 87/8 94/14 111/9
**moral [1]** 94/13
**moreover [1]** 58/11
**morning [4]** 3/2 54/10 66/5 118/15
**most [10]** 10/4 20/11 66/12 66/20 72/25 75/5 82/11 85/15 85/17 85/21
**motion [81]** 1/19 3/15 3/21 4/2 4/11 4/12 4/15 5/1 5/7 11/11 12/24 14/16 15/2 19/7 19/17 20/11 20/15 21/12 22/18 23/11 40/2 42/4 47/18 47/18 47/20 49/19 50/4 50/5 54/23 55/3 55/21 55/25 56/1 56/3 56/25 57/2 59/10 59/25 65/21 66/9 66/11 68/7 68/11 78/8 80/24 81/5 83/4 83/8 87/10 91/11 92/15 93/11 94/1 96/12 96/13 96/15 96/17 96/17 96/19 96/22 97/3 97/4 99/6 101/18 102/22 104/14 104/18 106/25 108/18

112/2 111/8 111/8 111/22 113/8 114/25 116/9 120/23 121/1 121/2 123/18 125/3
**motions [6]** 48/13 101/13 104/3 104/4 104/4 104/4
**mouth [1]** 88/3
**movant [2]** 6/12 78/10
**move [4]** 15/7 53/25 96/9 120/12
**moved [6]** 17/3 17/4 20/12 32/19 91/18 113/6
**moving [2]** 15/6 119/19
**Mr [1]** 85/20
**Mr. [107]** 3/23 4/20 12/21 14/7 14/9 15/8 15/9 16/5 23/22 23/23 34/4 36/3 38/21 47/22 54/5 54/7 54/22 56/11 57/8 58/21 71/23 74/2 74/24 79/4 79/10 79/14 79/18 79/22 80/17 81/2 82/22 83/2 83/25 84/19 85/1 85/1 85/8 85/8 85/21 86/15 86/15 86/17 86/18 87/4 87/4 87/19 88/21 89/8 89/11 91/24 92/2 92/2 92/9 92/16 92/16 92/18 92/20 93/1 93/4 93/14 94/6 94/11 94/17 95/8 96/14 97/6 98/19 98/24 98/25 99/11 99/11 101/19 101/23 103/22 104/12 104/22 106/6 106/9 106/12 108/4 108/17 108/21 109/8 111/6 114/22 115/13 116/4 116/7 116/8 116/11 116/12 116/14 117/2 117/3 117/4 117/5 117/8 117/9 118/5 118/7 118/10 118/18 120/10 120/20 121/4 121/10 121/22
**Mr. Anchor's [2]** 108/21 109/8
**Mr. Anker [13]** 108/4 111/6 114/22 115/13 117/4 117/8 118/5 118/18 120/10 120/20 121/4 121/10 121/22
**Mr. Anker's [1]** 108/17
**Mr. Bloom [11]** 3/23 54/5 54/7 88/21 89/8 89/11 95/8 96/14 97/6 99/11 118/10
**Mr. Brauser [9]** 79/4 79/10 85/21 84/18 87/4 93/14 98/19 98/24 98/25
**Mr. Brauser's [1]** 99/18
**Mr. Goldstein [3]** 91/24 92/16 92/18
**Mr. MacLachlan [1]** 56/11
**Mr. MacLachlan's [1]**

**M**

**Mr. MacLachlan's... [1]** 57/8

**Mr. Poulsen [42]** 4/20 12/21 14/7 14/9 15/8 15/9 16/5 23/22 23/23 34/4 36/3 38/21 47/22 58/21 74/2 79/14 79/18 82/22 83/2 84/19 85/1 85/8 85/8 86/15 86/15 86/17 87/4 92/2 92/9 92/16 92/20 93/4 94/11 94/17 103/22 106/12 116/8 116/12 117/2 117/3 117/5 117/9

**Mr. Poulsen's [3]** 83/25 106/9 118/7

**Mr. Richard [12]** 54/22 71/23 74/24 81/2 87/19 92/2 93/1 101/19 101/23 104/12 104/22 106/6

**Mr. Richard's [1]** 80/17

**Mr. Richards [1]** 79/22

**Mr. Salazar [6]** 85/1 94/6 116/4 116/7 116/11 116/14

**Ms. [3]** 85/6 124/5 124/5

**Ms. Asher [2]** 85/6 124/5

**Ms. Yoast [1]** 124/5

**much [11]** 5/19 5/20 29/4 60/2 64/8 67/25 68/6 86/6 86/14 93/14 123/8

**muddy [1]** 48/5

**must [3]** 71/14 96/9 120/12

**muster [1]** 119/14

**myself [1]** 22/16

**N**

**N/K/A [1]** 55/20

**name [12]** 3/18 11/17 11/22 14/20 15/2 24/20 59/3 62/15 64/12 92/20 99/21 100/10

**named [6]** 50/7 55/2 64/24 99/12 90/14 115/8

**names [1]** 100/13

**naming [2]** 23/9 65/13

**narrow [2]** 20/5 121/24

**narrower [1]** 54/17

**nationwide [1]** 77/5

**near [1]** 93/14

**nearly [1]** 81/8

**necessarily [1]** 114/11

**necessary [2]** 13/25 111/23

**need [29]** 3/10 5/20 22/15 24/22 25/1 25/2 26/20 27/1 27/9 27/11 27/18 37/16 41/24 52/23 58/21 59/20 68/20 70/19 72/22 80/16 80/19 80/20 80/23 80/23 95/1 101/4 102/8 109/7 121/20

**needs [3]** 24/16 26/5 37/13

**negative [3]** 14/17 16/1 114/19

**negotiate [1]** 76/21

**neither [5]** 14/24 21/22 21/23 22/4 29/24

**Nelson [26]** 61/9 61/14 61/17 65/17 99/13 100/7 100/8 100/9 100/11 100/12 100/12 100/13 100/14 100/15 100/16 100/21 100/22 100/25 101/2 101/3 119/6 119/10 119/15 119/22 119/23 120/1

**Networks [4]** 6/8 6/9 65/21 78/7

**never [58]** 4/21 8/5 10/11 10/12 14/9 21/2 21/5 26/9 29/15 30/2 30/24 32/11 32/12 35/2 35/2 35/3 35/9 35/10 36/19 39/2 44/1 44/16 44/17 44/21 45/21 46/9 46/14 51/16 51/17 55/1 55/5 57/21 57/25 58/1 60/3 60/4 61/6 63/4 64/5 64/12 64/13 66/7 76/10 76/10 81/8 85/2 89/19 91/25 93/7 94/1 100/12 100/17 101/17 101/21 103/2 108/9 109/11 117/8

**nevertheless [1]** 93/25

**new [12]** 2/14 17/10 34/21 69/2 71/12 72/25 82/3 92/17 106/23 106/24 114/23 121/18

**newly [1]** 69/7

**next [5]** 15/1 16/22 86/20 86/25 115/21

**nine [5]** 61/9 84/17 84/18 84/25 94/14

**nine-month [1]** 84/25

**no [104]** 7/10 7/20 8/5 10/11 11/5 11/15 14/14 20/10 22/22 22/19 26/19 27/17 28/21 28/21 29/17 30/3 32/8 32/20 34/11 35/15 35/17 36/6 36/17 37/17 38/19 38/19 38/23 40/4 40/13 40/25 41/19 42/9 42/9 42/10 42/13 42/19 42/25 43/10 43/12 43/13 43/23 46/6 47/8 47/9 48/4 48/8 49/1 49/17 50/1 50/24 52/25 56/19 59/3 59/6 59/9 60/5 64/16 68/13 68/13 72/6 74/2 75/8 75/11 77/6 77/7 77/19 77/19 79/5 79/15 79/17 80/8 86/24 88/18 88/19 90/19 93/6 93/8 94/15 94/15 97/17 97/18 97/24 97/24

**98/14 101/4 102/9 106/7 109/9 110/6 110/8 110/9 111/2 111/21 115/3 116/13 118/4 118/5 118/19 119/18 120/4 123/3 123/3 123/4 123/4**

**no-if-ands-or-buts [1]** 72/6

**nobody [2]** 23/5 23/6

**non [5]** 7/18 55/15 58/9 87/2 116/5

**non-applicability [1]** 55/15

**non-competes [1]** 87/2

**non-quitclaim [1]** 7/18

**noncompetition [3]** 86/11 86/13 86/16

**none [12]** 12/23 13/17 30/10 39/18 40/19 60/18 60/19 87/22 102/3 102/5 108/9 125/6

**nonparty [3]** 54/11 58/10 58/10

**normal [1]** 88/8

**Nos [1]** 1/2

**notes [5]** 28/16 28/18 103/8 119/21 124/2

**nothing [9]** 26/18 53/5 83/16 84/9 91/25 94/14 109/14 109/24 116/16

**notice [58]** 4/21 4/23 11/2 14/17 15/1 15/11 15/18 15/20 15/23 16/4 16/5 16/10 16/12 16/16 16/17 24/4 33/11 33/13 34/5 34/6 38/1 49/13 49/17 49/18 51/8 52/9 57/4 57/5 57/13 57/16 65/14 69/20 90/4 90/10 90/14 90/25 90/25 91/4 91/5 91/6 91/8 91/10 92/6 93/11 94/4 94/24 103/21 109/2 114/7 114/17 114/19 115/16 116/3 116/9 116/19 123/16 123/18 123/23

**notification [1]** 92/23

**notion [2]** 105/12 109/25

**notwithstanding [1]** 112/5

**November [6]** 1/17 20/15 20/15 71/1 103/24 125/14

**November 23rd [1]** 71/1

**November 6th [1]** 20/15

**November 8th [2]** 20/15 103/24

**novo [1]** 19/4

**now-Chief [1]** 23/24

**number [21]** 3/6 3/8 4/25 9/21 9/24 15/18 15/24 17/2 18/22 19/2 33/5 33/6 37/6 37/7 54/14 55/12 104/7 108/4 108/13 109/15 **Number 16-81690 [1]**

**3/6**

**Number 16-81691 [1]** 3/8

**Number 166 [1]** 104/17

**number 3 [2]** 37/6 37/7

**Number 333 [1]** 55/12

**Number 81691 [1]** 54/14

**number one [2]** 9/21 15/24

**NY [1]** 2/14

**O**

**Oak [1]** 20/3

**objected [3]** 19/15 19/15 19/16

**objection [2]** 21/3 105/18

**obligated [2]** 56/21 89/23

**obtains [1]** 64/9

**obviously [2]** 29/13 100/21

**occupied [2]** 63/1 122/7

**occur [2]** 83/4 116/10

**occurred [2]** 21/12 93/24

**Ocean [1]** 94/19

**October [5]** 27/14 27/15 49/20 110/15 121/11

**October 2014 [1]** 27/14

**off [8]** 3/25 48/19 49/7 88/19 89/17 90/15 107/22 118/22

**offer [4]** 62/14 86/1 86/1 86/1

**offered [3]** 101/17 103/2 115/9

**office [2]** 17/8 110/16

**officer [4]** 34/9 56/9 77/24 98/7

**officers [1]** 118/21

**offices [2]** 76/4 93/21

**Official [1]** 1/23

**oh [7]** 32/3 33/22 51/7 52/4 87/11 101/20 103/14

**Ohio [1]** 119/24

**okay [19]** 3/25 4/6 4/9 4/14 5/9 5/21 30/4 33/22 44/8 46/6 46/17 49/2 50/2 51/25 53/17 54/7 95/20 95/23 108/2

**old [1]** 121/19

**omitted [1]** 121/4

**once [15]** 26/23 38/23 42/13 65/8 78/20 80/4 83/6 83/7 85/2 102/10 104/7 104/9 109/18 109/23 110/6

**one [98]** 1/4 3/5 3/19 3/20 3/20 5/6 5/25 5/25 6/2 6/7 8/18 9/21 9/23 12/3 13/2 13/18 15/18 15/24 17/2 17/10 17/25

**18/22 19/22 19/25 20/17 21/17 21/22 21/23 22/14 22/3 25/15 28/3 28/23 30/9 33/6 33/11 35/17 36/24 37/6 37/13 38/4 38/19 38/19 38/23 42/2 44/4 44/6 44/6 47/8 47/9 49/2 63/8 65/3 66/11 70/14 76/2 76/5 76/17 81/4 81/23 83/15 86/3 86/8 88/12 88/13 89/20 91/23 93/15 94/4 94/20 94/22 95/7 95/7 95/13 96/2 98/13 98/16 99/19 101/8 103/11 103/14 103/25 104/21 106/6 108/4 108/13 108/15 110/16 110/25 111/4 111/20 114/9 114/11 116/18 116/20 121/19 122/12 124/7**

**one-month [1]** 103/25

**ones [1]** 8/16

**ongoing [1]** 102/12

**only [44]** 6/20 7/13 10/8 12/1 14/5 14/23 16/25 18/9 19/4 19/9 19/24 27/4 30/20 32/2 32/16 33/11 40/4 40/4 49/8 52/8 52/20 56/4 56/6 60/7 60/17 63/9 64/2 71/8 75/4 77/7 80/20 99/17 101/2 103/20 109/12 110/13 112/10 112/24 114/4 114/5 114/6 115/22 121/24

**open [9]** 34/21 36/20 36/21 52/12 78/21 104/6 105/6 109/5 113/21

**opened [8]** 35/23 37/14 38/7 49/9 49/10 105/25 106/6 108/24

**opening [1]** 34/14

**opens [1]** 52/17

**operate [1]** 26/16

**operate -- you [1]** 26/16

**operated [2]** 76/3 80/21

**operating [3]** 8/15 8/17 17/8

**operation [1]** 80/21

**opinion [18]** 17/13 17/18 17/23 17/24 18/1 18/21 19/11 19/12 19/14 21/3 40/11 67/3 90/19 91/6 92/8 94/16 113/20 114/1

**opportunity [10]** 21/20 21/23 29/24 38/2 43/7 61/7 86/19 112/5 116/23 119/8

**opposed [5]** 11/7 16/16 51/5 58/20 72/14

**opposing [1]** 98/21

**opposite [2]** 40/4 115/17

**opposition [1]** 104/18

**oral [2]** 39/25 112/6

**order [170]**

**O**

ordered [3]  71/22 87/18 90/2
orders [4]  67/9 69/20 71/4 106/17
ordinarily [3]  96/9 120/12 120/15
ordinary [1]  69/25
Oregon [13]  15/7 15/12 17/3 17/4 17/5 85/5 91/18 92/4 92/14 92/14 92/17 92/21 113/7
organized [1]  22/12
original [4]  68/3 70/2 71/21 71/22
Orlando [1]  20/19
osmosis [1]  65/15
others [1]  84/19
otherwise [2]  5/23 74/8
ought [2]  6/16 120/3
our [71]  11/10 12/2 21/3 23/7 24/9 25/24 26/14 27/11 27/13 27/17 27/18 29/14 29/14 38/17 38/18 38/21 38/22 39/17 39/18 39/18 42/15 50/18 52/8 53/2 54/15 54/25 59/3 60/3 60/7 60/16 61/15 61/15 62/7 62/15 63/8 63/23 65/4 65/7 65/10 65/11 66/8 68/11 68/25 69/1 72/7 78/24 79/16 81/18 82/5 92/24 93/23 99/12 99/15 100/20 102/19 104/2 104/14 104/18 105/18 105/23 107/15 107/18 110/11 112/2 112/12 112/18 112/20 112/21 118/14 120/23 121/2
ours [1]  107/11
outcome [1]  119/7
Outlook [3]  39/15 39/16 39/19
outset [4]  33/25 34/1 34/2 103/18
outside [4]  33/2 108/5 108/6 108/6
over [23]  7/25 10/18 11/13 30/13 38/22 45/9 64/15 74/21 76/5 76/11 83/3 89/25 93/13 95/13 95/14 104/9 104/10 105/18 122/24
overcome [2]  20/7 36/15
overemphasize [1]  20/14
oversees [1]  6/1
overwhelming [3]  90/21 90/24 92/7
owed [2]  88/18 88/25
own [37]  7/20 9/13 9/13 9/17 12/10 12/10 25/19 26/2 26/3 26/4 26/12 26/12 27/3 27/4 35/17 36/2 44/14 45/17 46/7 64/22 67/9 71/23 74/20 84/14 85/24 86/17 87/1 89/7 92/24 93/23 95/11 96/19 96/21 98/15 105/23 117/6 117/24 118/16
owned [32]  11/13 29/9 34/12 34/17 35/1 36/4 36/21 37/12 40/8 44/6 44/18 45/3 45/24 46/3 46/10 46/22 49/23 49/23 51/18 53/21 70/17 72/3 74/18 89/19 97/15 97/16 98/16 100/10 104/9 109/18 110/24 124/9
owner [5]  24/2 24/3 24/7 56/12 85/25
ownership [32]  8/2 9/25 10/2 10/3 10/5 10/7 10/8 10/9 10/16 10/18 11/2 11/6 26/14 27/19 37/8 37/15 39/7 43/20 45/25 48/6 48/7 52/19 52/23 52/24 53/11 71/16 103/16 104/13 105/5 105/8 105/11 124/1
owns [9]  12/4 29/19 36/25 42/11 42/21 52/21 93/16 100/14 111/13

**P**

P.A [1]  2/3
page [37]  1/22 7/12 15/2 16/9 16/11 21/17 21/18 63/16 67/3 67/4 67/15 69/1 70/24 71/8 73/20 73/21 78/8 79/16 81/6 91/5 91/7 91/8 91/9 104/20 104/21 108/17 112/20 113/5 113/18 119/11 120/23 122/13 122/13 123/16 123/21 123/22 124/2
page 1 [1]  7/12
page 11 [1]  104/20
page 12 [2]  104/21 108/17
page 15 [1]  124/2
page 20 [3]  91/5 91/8 123/16
page 203 [1]  63/16
page 250 [1]  122/13
page 27 [1]  73/20
page 28 [1]  73/21
page 3 [1]  78/8
page 31 [1]  113/5
page 36 [1]  113/18
page 42 [2]  91/7 91/9
page 471 [1]  119/11
page 6 [1]  79/16
page 62 [2]  67/3 67/4
page 64 [2]  21/17 21/18
page 65 [2]  16/9 16/11
page 7 [2]  69/1 112/20
page 74 [1]  123/21
page 788 [1]  70/24
page 789 [1]  71/8
page 9 [1]  81/6
pages [6]  91/1 91/9 105/10 105/10 105/11 119/20
paid [17]  6/25 7/5 15/5 32/16 32/24 41/12 42/13 42/18 43/15 45/5 80/10 82/11 83/23 88/15 89/24 94/12 106/17
pale [1]  64/20
Palm [2]  1/16 1/24
papers [4]  13/22 62/15 96/24 101/18
paragraph [15]  30/22 30/25 43/9 58/16 58/16 71/25 72/12 72/18 73/13 73/20 75/6 75/16 75/18 108/16 110/3
paragraph 19 [1]  73/13
Paragraph 25 [1]  73/20
paragraph 3 [2]  58/16 58/16
Paragraph 7 [3]  75/6 75/16 75/18
parameters [1]  10/14
parcel [1]  105/4
parent [9]  56/12 57/10 57/14 61/10 61/13 65/14 97/8 100/4 110/25
Parser [13]  8/6 8/19 25/20 31/2 31/13 72/2 72/19 73/4 73/6 73/6 79/13 85/10 87/24
parte [2]  17/13 18/18
participant [2]  85/22 87/9
participate [7]  21/20 21/23 43/8 64/25 88/22 95/17 116/22
participated [1]  21/22
participates [1]  7/4
particular [3]  52/7 67/3 92/5
particularly [2]  11/25 108/18
parties [12]  3/19 60/18 62/24 69/6 76/17 110/4 110/4 112/1 112/3 121/8 121/18 122/6
partners [1]  91/23
parts [2]  6/21 88/13
party [37]  12/5 35/18 43/4 43/5 43/14 45/12 57/21 57/22 58/9 59/15 60/3 60/22 61/6 61/6 61/25 64/1 64/4 64/9 64/12 71/13 78/8 82/8 84/5 84/9 89/13 89/16 90/9 90/14 95/19 96/9 97/1 103/5 119/9 119/22 120/12 121/25
party's [3]  83/10 83/11 106/3
pass [1]  119/13
passing [5]  55/14 55/18
57/23 58/2 58/9
patent [1]  61/21
Paul [1]  2/15
pay [11]  27/5 60/22 72/5 84/4 84/12 84/13 86/4 86/5 89/1 93/14 119/24
paying [2]  96/23 96/24
pays [2]  76/20 89/7
pending [10]  3/15 3/21 4/19 40/2 65/22 78/8 96/11 102/7 102/14 120/13
Penthouse [1]  2/7
people [5]  40/21 41/2 87/16 97/20 118/22
perceived [2]  67/23 68/5
percent [2]  15/24 24/5
perhaps [2]  85/21 104/1
period [3]  84/25 93/8 110/8
permanently [1]  74/7
permitted [1]  64/11
person [9]  14/14 14/19 21/13 21/14 91/17 115/7 115/7 115/8 115/8
person's [2]  14/12 14/12
personal [2]  70/17 115/23
personally [2]  100/13 101/4
persons [2]  73/13 73/24
petitioner [1]  120/1
Philip [2]  2/11 66/6
phonetic [1]  124/5
phrase [1]  107/6
pick [1]  74/6
Pickering [2]  2/12 66/6
piece [3]  92/5 94/4 121/3
pieces [1]  86/9
pierce [4]  65/12 65/13 65/15 118/25
piercing [3]  111/3 119/12 120/6
Pincus [1]  93/15
place [8]  22/4 22/22 41/12 41/18 48/1 102/16 102/16 102/23
placed [1]  121/6
places [3]  7/11 108/14 114/18
plaintiff [10]  1/12 7/2 56/8 56/9 81/22 81/22 82/1 100/8 101/2 101/15
PLAINTIFFS [1]  1/5
plan [1]  92/15
play [1]  96/19
pleading [7]  22/19 24/20 98/15 99/15 100/24 110/20 111/10
pleadings [6]  52/2 53/7 58/7 61/19 61/25 94/10
please [4]  3/2 54/4 100/15 123/13
plenary [6]  28/1 28/11 30/1 36/17 39/25 40/17
plus [3]  38/16 82/25
102/12
point [21]  22/15 27/10 41/22 42/23 56/6 70/12 75/5 80/1 80/17 84/3 86/16 95/3 98/16 98/17 99/11 101/11 103/6 118/19 120/8 123/22 123/25
pointed [4]  11/15 30/17 108/19 108/19
pointing [1]  120/25
points [7]  11/9 22/11 95/2 117/22 117/22 118/17 119/19
policy [3]  47/1 64/16 64/17
Ponce [1]  2/6
posit [1]  80/6
position [16]  21/18 23/15 42/15 45/16 45/18 45/21 46/2 46/5 46/6 53/5 62/25 63/9 65/4 85/6 93/23 93/25
positions [2]  77/15 122/7
possession [5]  44/20 47/11 47/13 73/14 73/15
possible [2]  64/25 84/5
post [21]  17/8 55/11 59/24 61/10 61/12 61/18 75/19 75/24 82/8 101/17 102/8 102/8 102/13 103/1 103/1 103/2 103/4 111/24 119/16 120/4 120/5
post-closing [1]  75/19
post-judgment [5]  55/11 59/24 61/10 61/12 61/18
post-sale [2]  75/24 111/24
postal [9]  17/9 17/13 17/15 17/22 17/24 18/24 19/11 91/15 113/19
posting [1]  102/4
posts [2]  101/15 101/16
posttrial [2]  55/10 60/23
potential [2]  78/17 118/23
Poulsen [102]  3/20 4/20 6/2 12/21 13/3 13/4 14/7 14/9 14/21 14/23 15/8 15/9 15/19 16/5 16/11 16/12 17/3 18/2 19/6 20/17 21/19 22/22 23/9 23/22 23/23 25/10 26/5 26/6 26/8 27/13 29/24 30/4 30/7 31/1 33/11 33/13 34/4 34/12 34/19 36/3 38/21 39/5 40/11 43/6 44/5 46/10 47/10 47/12 47/22 47/24 49/13 49/16 49/17 49/18 50/7 54/18 57/3 58/21 72/18 73/3 74/2 79/14 79/18 82/22 83/2 84/19 85/1 85/8 85/8 85/20 86/15

**P**

**Poulsen... [31]** 86/15 86/17 87/4 92/2 92/9 92/16 92/20 93/4 94/11 94/17 98/3 98/18 103/22 106/12 112/3 113/6 113/8 114/17 116/8 116/12 116/22 116/25 117/2 117/3 117/5 117/9 117/11 117/19 123/18 123/21 123/23
**Poulsen's [11]** 13/8 13/13 13/19 35/21 44/2 51/15 65/6 83/25 106/9 115/14 118/7
**power [3]** 77/8 109/22 117/25
**practice [1]** 106/22
**pre [2]** 63/16 85/23
**pre-bankruptcy [1]** 85/23
**pre-Bonner [1]** 63/16
**preamble [1]** 55/19
**precise [2]** 20/19 50/25
**precisely [5]** 31/13 51/3 57/1 64/17 95/7
**preclusive [1]** 116/25
**predicate [2]** 94/9 96/4
**predictions [1]** 119/7
**predominant [1]** 5/24
**prefer [1]** 21/7
**prejudgment [2]** 82/7 101/21
**preliminary [5]** 63/19 65/25 89/14 89/16 96/4
**prepared [1]** 9/9
**presale [1]** 12/24
**presence [1]** 112/13
**present [4]** 31/16 37/22 52/20 71/10
**presented [5]** 12/24 16/18 34/18 51/17 118/7
**presently [1]** 73/13
**preserve [3]** 78/1 78/12 117/17
**preserved [1]** 24/17
**president [3]** 79/3 97/18 120/1
**presumably [2]** 113/8 113/10
**presumption [18]** 16/23 16/24 18/7 18/9 18/9 18/15 18/17 19/21 19/23 19/24 20/3 20/5 38/11 90/5 90/16 113/10 113/17 114/15
**presumptions [1]** 113/5
**presumptively [1]** 122/22
**pretrial [1]** 34/24
**pretty [2]** 64/8 98/13
**prevailed [1]** 107/10
**prevailing [3]** 6/6 28/25 38/9
**preventing [1]** 82/2
**previously [1]** 62/25

**price [1]** 106/16
**primary [1]** 81/12
**principal [1]** 68/25
**principle [2]** 69/4 71/5
**prior [12]** 9/9 14/9 19/3 25/18 25/20 25/21 29/17 53/3 93/10 93/11 99/17 112/12
**private [1]** 93/16
**pro [1]** 66/8
**probably [3]** 41/8 60/15 108/1
**problem [4]** 24/9 64/22 72/24 84/6
**problems [2]** 80/22 117/15
**procedural [3]** 11/5 53/15 64/17
**Procedure [2]** 58/5 96/8
**procedures [2]** 17/8 91/15
**proceed [1]** 88/16
**proceeding [42]** 4/16 9/19 9/21 14/22 15/4 20/7 20/9 21/11 22/6 23/8 24/21 27/15 32/11 36/22 37/18 38/13 41/16 47/9 50/8 50/12 52/7 52/8 53/1 53/20 54/21 55/2 59/12 74/9 82/17 83/7 102/20 107/4 112/18 112/21 114/22 115/1 115/8 115/20 117/10 117/11 122/21 123/5
**proceedings [20]** 1/19 21/22 21/24 27/25 33/10 43/8 54/3 54/12 59/24 59/25 60/23 62/21 64/24 88/17 88/22 95/17 98/14 121/9 124/15 125/12
**proceeds [6]** 45/5 84/1 106/15 117/20 117/20 118/4
**process [51]** 6/1 9/20 9/22 11/5 13/4 14/14 14/15 14/15 16/13 20/24 21/15 23/10 23/14 23/16 23/19 24/19 28/6 32/9 32/13 38/3 38/6 53/15 59/2 61/13 61/16 62/1 63/5 64/13 64/17 64/21 65/1 67/2 95/22 97/14 103/25 104/3 105/12 106/16 106/20 107/6 115/21 116/20 116/22 118/2 118/20 119/2 119/3 119/9 119/12 120/7 123/23
**processes [1]** 71/14
**produced [1]** 34/25
**product [1]** 27/18
**Products [1]** 119/24
**profit [1]** 79/20
**program [2]** 8/15 8/18
**programs [3]** 8/17 27/8

39/17
**prohibit [1]** 75/14
**prohibits [1]** 75/12
**prominent [1]** 43/15
**prong [1]** 63/8
**pronounces [1]** 13/10
**proof [4]** 90/12 90/14 100/1 102/3
**proper [4]** 16/12 57/19 60/10 90/16
**properly [6]** 16/23 38/2 65/20 67/10 67/11 68/24
**property [82]** 6/24 7/3 7/7 11/14 11/17 11/20 12/16 14/12 14/15 14/19 22/10 24/4 24/6 32/9 34/11 42/8 42/9 42/25 43/20 43/20 43/21 43/24 44/1 44/2 44/18 45/3 45/10 46/12 46/21 48/3 53/21 65/8 65/10 65/11 68/1 68/2 69/25 70/17 70/17 70/18 70/19 71/17 71/23 72/7 74/10 79/5 79/14 80/9 81/1 82/5 82/6 82/10 83/9 83/21 83/22 84/2 84/9 84/10 84/21 85/2 85/7 85/11 85/14 85/20 86/18 86/23 87/2 88/14 93/23 98/3 104/9 105/3 106/3 106/13 107/10 109/18 109/20 109/23 110/6 111/13 111/25 117/21
**property's [1]** 71/13
**proponent [1]** 15/22
**proposal [1]** 24/12
**propose [1]** 66/10
**proposed [2]** 37/24 113/1
**proposition [8]** 64/14 64/15 69/17 115/18 115/19 121/24 122/2 122/10
**prosecuting [1]** 74/8
**protective [1]** 104/4
**prove [6]** 15/19 16/1 16/3 16/7 16/16 114/19
**proved [1]** 24/12
**proverbial [2]** 11/10 83/17
**provide [6]** 38/17 70/23 71/6 73/11 73/12 101/25 103/10 106/22
**provided [3]** 7/23 22/21 123/23
**provides [2]** 61/4 69/24
**providing [1]** 65/14
**proving [1]** 15/23
**provision [11]** 16/6 16/9 25/3 25/5 25/7 25/9 72/1 73/18 73/22 75/12 83/9
**provisions [1]** 109/21
**public [13]** 29/1 32/1 32/7 57/6 57/12 64/16 64/17 64/19 65/2 65/14 82/12 88/7 110/18

**pun [2]** 35/15 106/7
**punch [1]** 18/24
**purchase [10]** 7/12 7/22 9/7 30/21 31/7 31/21 43/11 75/18 87/21 98/2
**purchased [3]** 38/22 44/7 81/7
**purchaser [21]** 11/18 13/12 24/6 25/16 27/2 34/23 35/5 35/8 35/13 35/16 43/2 43/4 43/12 45/8 46/22 47/13 47/14 52/15 69/13 75/13 110/5
**purported [6]** 8/3 14/10 52/22 79/15 97/8 98/18
**purpose [3]** 85/3 94/7 102/2
**purposes [6]** 3/13 42/14 52/19 62/6 94/19 99/6
**pursuant [1]** 73/9
**pursuing [2]** 64/4 74/8
**put [23]** 9/8 15/15 30/23 37/16 37/19 39/9 39/10 51/15 58/13 63/23 73/22 77/25 78/5 90/13 91/16 91/17 91/21 92/24 105/14 105/19 107/5 116/2 121/6
**puts [4]** 15/25 83/22 114/18 115/16
**putting [3]** 16/15 16/19 90/7

**Q**

**qualifier [2]** 113/11 113/12
**quantify [1]** 88/17
**quash [1]** 104/4
**question [32]** 5/15 20/10 24/1 46/19 49/3 57/18 61/3 61/4 66/22 66/22 66/24 68/2 68/23 69/17 71/11 71/17 72/13 72/14 72/15 72/15 74/12 74/13 75/23 77/14 77/22 86/4 86/24 100/4 101/7 103/16 103/20 112/9
**questioning [1]** 56/11
**questions [14]** 6/12 20/23 28/18 28/19 28/22 32/1 36/18 40/5 41/6 88/21 101/22 103/9 103/10 106/22
**quick [3]** 28/6 118/17 123/14
**quickly [6]** 72/23 84/12 118/11 118/12 118/16 123/13
**quitclaim [36]** 7/11 7/18 7/18 7/24 7/25 11/16 11/25 12/3 12/5 12/18 13/20 13/21 13/25 22/2 22/9 25/22 29/4 33/3 36/23 36/24 37/4 37/5 44/13 45/12 45/13 46/23 71/24 72/4 112/8 112/9

112/9 112/14 112/19 112/22 113/2 115/12
**quite [1]** 20/1
**quo [7]** 26/25 27/2 27/24 78/1 78/12 82/5 117/18
**quote [21]** 52/11 62/23 67/8 69/9 71/3 71/4 71/8 72/18 73/13 74/6 75/7 96/9 109/18 112/23 113/9 113/21 123/17
**quote-unquote [2]** 112/23 113/9
**quoted [2]** 68/25 79/16
**quotes [3]** 67/7 67/8 120/11
**quoting [5]** 67/19 70/24 71/7 75/12 78/6

**R**

**raise [6]** 6/16 87/25 95/7 95/24 101/11 103/15
**raised [5]** 5/12 5/13 5/14 6/12 34/15 54/18 101/21 118/18
**raises [1]** 99/13
**raising [1]** 39/23
**rank [2]** 19/13 19/15
**rather [1]** 91/14
**rationale [1]** 59/6
**Raton [8]** 18/2 18/3 18/24 19/6 91/12 94/20 113/19 113/21
**re [1]** 69/3
**re-enforced [1]** 69/3
**reach [9]** 4/21 33/8 37/15 37/17 39/25 52/18 52/22 52/25 66/23
**reached [3]** 35/2 36/19 37/23
**reaches [3]** 35/3 35/10 113/14
**reaching [2]** 37/8 38/6
**read [14]** 3/16 8/16 24/5 66/20 87/18 87/23 88/3 90/18 93/5 93/7 96/24 108/15 109/16 111/18
**readily [1]** 63/7
**reading [2]** 16/4 113/5
**real [2]** 20/22 71/16
**really [14]** 26/15 56/6 63/12 64/22 65/3 69/18 77/17 78/25 81/21 84/22 120/5 120/22 121/20 123/14
**Realtime [1]** 125/11
**reason [12]** 21/2 21/6 23/3 26/16 36/13 42/24 63/9 109/9 109/12 111/1 113/24 119/21
**reasons [5]** 55/4 77/20 83/15 106/19 123/17
**rebut [2]** 107/25 108/7
**rebuttal [2]** 5/18 118/18
**recall [1]** 92/5
**recasts [1]** 24/9

**R**

**receipt** [2]  10/24 90/14
**receive** [8]  15/20 16/3
16/5 16/12 16/16 16/17
40/20 114/19
**received** [15]  10/11
15/11 15/23 16/24 40/19
40/24 45/6 81/9 82/25
83/1 83/3 113/8 113/18
114/17 123/18
**receives** [1]  14/20
**recently** [1]  69/3
**recess** [2]  53/25 54/2
**recharacterized** [2]
84/23 94/8
**recognize** [2]  3/13 122/3
**recognizes** [1]  32/4
**reconsideration** [5]
67/10 67/21 67/22 68/10
68/15
**record** [40]  9/14 19/5
19/10 32/19 40/4 56/19
78/24 79/8 80/18 80/19
81/3 82/18 85/12 85/13
86/1 87/23 88/6 88/7
91/13 97/22 98/8 98/20
99/4 99/8 99/9 100/2
101/8 101/9 101/17
101/22 102/22 105/16
108/5 110/12 110/14
114/7 117/14 122/25
123/11 125/12
**recorded** [1]  39/5
**recording** [1]  12/10
**records** [3]  57/6 57/12
92/18
**recourse** [1]  60/5
**recover** [5]  60/17 61/20
119/25 123/3 123/4
**recovery** [1]  121/25
**Reed** [1]  93/16
**refer** [2]  6/3 59/5
**reference** [7]  55/14
55/18 56/4 56/5 57/23
58/2 58/9
**references** [1]  118/23
**referred** [3]  62/19 65/7
118/24
**referring** [1]  14/18
**reflect** [1]  108/11
**reflected** [1]  7/11
**reflects** [1]  59/5
**refusing** [1]  57/15
**regarding** [2]  90/4 120/9
**Registered** [1]  125/10
**regret** [1]  62/14
**rejected** [4]  21/18
109/25 121/1 121/15
**rejecting** [1]  111/22
**rejects** [2]  21/21 21/24
**relate** [3]  8/14 25/12
43/19
**related** [2]  11/21 75/19
**relates** [3]  6/2 11/24
25/10
**relating** [1]  11/1 11/2

**relation** [2]  83/7 107/16
**relationship** [2]  40/13
98/25
**relatively** [1]  28/6
**relevant** [1]  75/5
**relief** [10]  55/3 59/9
64/2 69/11 82/7 89/15
96/10 120/17 121/2
122/5
**relies** [1]  19/14
**relieve** [1]  89/14
**rely** [2]  17/20 63/9
**remains** [1]  88/14
**remedies** [1]  122/18
**remedy** [6]  24/23 25/2
25/2 60/10 78/4 78/9
**remember** [4]  16/6 83/2
84/16 93/6
**remind** [1]  3/14
**removal** [3]  70/23 70/25
71/6
**remove** [1]  70/19
**removed** [1]  113/3
**rent** [2]  76/5 76/7
**reorganization** [1]
92/15
**reorganize** [1]  32/22
**reorganized** [1]  22/13
**reorganizing** [1]  69/23
**repaid** [1]  85/25
**repay** [2]  89/18 89/23
**repeat** [2]  3/11 39/10
**repeatedly** [1]  25/19
**replete** [1]  86/1
**report** [1]  26/11
**reported** [2]  75/3 75/4
**reporter** [6]  1/23 1/23
3/10 72/22 125/10
125/11
**reports** [1]  9/10
**represent** [3]  64/7 83/5
116/12
**representation** [2]  56/21
56/24
**representations** [3]  7/21
69/12 124/9
**representative** [1]  92/23
**represented** [1]  85/1
**request** [8]  26/5 26/9
47/14 47/15 47/16 59/24
73/17 119/16
**requested** [2]  47/9 47/13
**require** [3]  38/14 71/6
118/18
**required** [10]  14/23
25/21 30/15 30/23 38/13
74/21 110/23 115/1
120/4 122/23
**requirement** [2]  70/25
103/4
**requirements** [2]  32/13
115/21
**requires** [5]  23/16 58/7
65/3 78/9 89/24
**res** [4]  21/24 22/2 43/6
112/4

**rescheduled** [1]  59/23
**reserve** [1]  5/17
**resolution** [4]  62/24
69/9 71/15 122/6
**resolve** [3]  45/15 107/17
109/10
**resolved** [4]  36/7 71/14
109/7 110/7
**respect** [4]  54/16 73/23
77/22 121/10
**respectfully** [1]  32/7
**respond** [2]  113/23
113/24
**responded** [1]  109/4
**response** [10]  14/24 21/2
28/9 69/1 104/14 115/3
115/4 116/6 118/5
120/23
**responsibilities** [1]
32/22
**restructuring** [1]  109/22
**result** [3]  41/19 82/24
96/19
**resulted** [1]  51/20
**retain** [2]  42/5 71/3
**retained** [2]  116/8
116/11
**retains** [1]  67/8 94/6
**retention** [5]  22/7 47/3
110/1 111/23 116/7
**retire** [1]  107/17
**retroactively** [1]  119/11
**return** [6]  90/3 90/3
91/20 92/24 107/12
107/12
**returned** [4]  19/7 62/25
92/1 122/6
**reversal** [1]  21/5
**reversed** [6]  49/1 84/8
89/22 92/12 100/19
110/9
**reverses** [2]  15/21 89/1
**reversible** [11]  15/21
17/18 17/20 38/8 38/11
38/15 38/18 114/3 114/8
114/11 114/13
**reviewed** [1]  19/4
**revolution** [1]  122/17
**revolutionary** [2]  70/3
122/20
**revolutionize** [1]  76/19
**Richard** [16]  2/8 2/9 2/9
3/18 54/22 71/23 74/24
81/2 87/19 92/2 93/1
101/19 101/23 104/12
104/22 106/6
**Richard's** [1]  80/17
**Richards** [1]  79/22
**right** [87]  3/4 3/9 3/15
5/11 5/22 7/13 7/16 8/1
9/7 10/16 11/22 12/1
12/6 18/15 24/18 25/9
25/11 27/22 28/9 29/17
29/21 31/6 31/8 33/4
33/14 33/15 33/18 33/23
40/25 41/5 41/17 42/17

43/25 44/8 44/9 44/12
45/1 45/4 45/9 45/25
47/17 48/4 48/9 48/23
49/2 49/14 53/16 53/24
54/1 54/7 57/2 59/16
62/6 62/7 62/11 65/16
65/16 66/3 68/14 71/9
76/3 76/6 76/24 77/10
78/5 78/11 80/9 85/1
88/20 91/7 92/20 92/21
92/21 92/22 99/7 99/18
102/8 108/3 112/10
112/11 112/16 112/24
116/13 118/9 121/13
123/9 124/13
**rights** [10]  7/8 12/15
23/20 48/7 69/10 71/16
80/11 85/16 117/2 117/3
**rise** [1]  111/10
**risk** [12]  1/7 1/14 3/5 3/7
12/3 12/5 12/11 13/22
13/23 13/24 39/6 45/13
**RMR** [2]  1/23 125/17
**road** [1]  59/24
**Rockwell** [1]  122/14
**Roman** [2]  91/7 91/8
**room** [1]  16/23
**Ross** [1]  2/12
**royalty** [1]  27/5
**rule** [17]  24/24 57/5
58/5 58/7 61/19 68/6
71/8 71/18 71/20 78/11
78/12 89/6 89/8 96/7
96/8 115/22 120/17
**ruled** [3]  4/12 19/3
115/19
**rules** [5]  23/2 58/5 96/7
110/23 120/14
**ruling** [6]  4/18 5/1 55/10
55/10 55/11 124/14
**run** [7]  27/9 39/17 91/16
97/19 97/19 97/20 123/2
**running** [4]  26/20 31/19
82/19 91/23
**runs** [1]  27/8
**Runtime** [1]  79/13

**S**

**salary** [2]  40/19 40/21
**Salazar** [8]  2/5 2/6 85/1
94/6 116/4 116/7 116/11
116/14
**sale** [182]
**sale's** [1]  25/25
**sales** [1]  83/4
**same** [33]  15/8 18/5 18/6
18/7 18/21 19/12 19/23
19/24 27/12 27/16 54/19
59/13 61/23 63/20 64/15
65/23 65/24 66/16 75/22
84/1 86/14 94/21 96/19
97/16 97/20 99/19 100/3
101/9 113/21 113/24
117/1 120/17 121/2
**sanction** [4]  47/18 47/20
48/2 60/1

**sanctions** [5]  60/19 63/3
63/3 89/8 123/5
**Sandy** [2]  20/2 20/3
**sat** [1]  118/22
**satisfy** [2]  85/10 115/20
**saw** [1]  86/19
**say** [64]  5/3 5/3 9/20
10/18 11/19 12/25 14/11
14/22 14/22 17/18 17/22
21/7 21/11 21/24 28/22
29/12 30/4 30/11 30/12
30/25 32/3 35/7 35/9
35/25 36/11 36/12 36/13
42/20 45/3 45/24 46/25
49/24 50/8 53/11 55/16
57/3 61/15 65/24 67/16
71/2 71/7 71/12 71/24
73/18 76/13 76/19 77/19
83/12 85/12 87/13 87/17
88/12 93/4 98/15 100/11
106/23 110/20 114/23
116/4 117/6 118/3
121/20 121/22 124/7
**saying** [34]  24/12 26/11
29/9 29/11 29/18 29/18
35/21 40/22 41/11 41/19
48/20 49/7 49/7 51/10
51/25 52/5 53/8 53/19
53/21 59/14 68/13 75/21
75/22 77/6 78/15 81/24
99/6 99/16 99/18 100/5
100/24 103/3 111/7
117/8
**says** [86]  5/5 5/7 7/12
10/19 11/21 12/2 12/14
14/21 15/1 15/19 16/2
16/11 17/17 17/23 17/24
19/12 21/21 22/11 24/14
24/25 25/2 25/3 27/11
30/25 31/3 31/6 31/12
31/17 31/21 31/21 32/10
35/1 35/4 36/21 36/23
37/1 37/7 42/1 42/24
43/2 43/10 45/2 46/20
47/4 47/10 47/11 51/2
52/20 52/25 67/8 72/2
81/5 83/4 83/9 84/7
86/22 87/1 87/19 87/20
91/17 92/9 93/1 93/6
95/16 96/8 96/12 100/15
101/3 104/20 106/2
109/15 110/17 112/10
112/15 112/15 113/19
114/2 114/18 114/25
115/17 115/22 116/13
117/16 120/17 120/22
122/4
**scale** [5]  30/18 63/13
63/17 65/23 65/25
**schedule** [4]  14/4 31/10
31/23 31/23
**scheduled** [2]  52/6 59/23
**scheme** [1]  85/24
**scientist** [1]  109/1
**scientists** [1]  52/24
**seated** [2]  3/3 54/4

**S**

**second [21]** 5/25 15/4 22/19 42/12 55/17 62/17 62/18 62/23 69/3 81/4 85/17 89/12 92/13 96/23 105/12 106/2 119/18 121/17 121/23 122/10 122/15
**secondary [1]** 38/2
**seconds [1]** 123/11
**secret [3]** 26/22 26/23 80/2
**secret's [1]** 65/9
**secretaries [1]** 23/3
**secretary [2]** 23/4 57/6
**secrets [1]** 81/20
**section [10]** 10/14 10/15 11/3 24/11 52/20 69/23 73/9 84/7 109/21 123/19
**secured [3]** 84/22 84/22 94/8
**securities [1]** 73/25
**seeing [1]** 36/2
**seek [7]** 60/19 64/2 65/15 76/24 120/10 120/18 121/14
**seeking [5]** 10/25 68/15 72/16 101/24 111/11
**seeks [1]** 59/25
**seem [2]** 42/19 65/16
**seemed [1]** 66/16
**seems [2]** 68/15 99/21
**seen [1]** 34/14
**self [1]** 64/14
**self-evident [1]** 64/14
**sell [8]** 45/7 47/24 48/6 69/24 79/15 83/9 117/23 118/3
**seller [4]** 9/11 25/19 27/3 29/19
**seller's [1]** 112/11
**selling [3]** 69/21 85/19 112/24
**semblance [1]** 63/5
**send [2]** 26/10 39/18
**sender [1]** 19/7
**senior [1]** 86/10
**sent [12]** 15/8 15/8 17/2 17/5 20/12 20/17 20/18 26/9 92/17 113/17 117/5 117/8
**sentence [7]** 5/4 5/6 109/24 111/20 114/20 115/22 124/7
**sentences [2]** 5/10 109/17
**separate [9]** 52/4 54/17 57/9 73/18 84/7 91/3 95/9 97/18 97/18
**September [3]** 15/7 20/15 20/16
**sequitur [1]** 116/5
**series [6]** 7/11 17/1 38/17 57/10 74/5 88/22
**serious [4]** 6/12 6/16 39/23 107/2

**serve [2]** 20/14 64/12
**served [11]** 22/18 22/24 23/4 23/5 34/5 34/5 34/6 60/4 63/4 91/13 93/1
**service [10]** 17/13 17/15 17/24 18/25 19/11 87/7 91/15 91/16 91/21 113/20
**set [11]** 10/5 14/5 24/8 24/10 24/13 25/4 33/9 51/3 59/19 109/21 124/6
**sets [2]** 42/7 42/12
**seven [2]** 25/23 47/7
**Seventh [1]** 122/10
**several [5]** 4/25 50/3 69/7 77/20 124/9
**severe [1]** 81/18
**SFranklinUSDC [1]** 1/25
**shades [1]** 18/16
**shall [5]** 14/14 31/4 73/7 74/6 75/8
**share [1]** 84/20
**shareholder [5]** 61/11 61/12 61/20 61/24 120/1
**shares [1]** 118/20
**shell [1]** 102/1
**shenanigans [2]** 99/25 118/25
**shifting [4]** 90/13 90/19 90/20 94/15
**shoe [1]** 120/16
**short [4]** 6/3 107/4 121/8 121/17
**short -- I [1]** 121/8
**short-term [1]** 121/17
**should [26]** 13/10 25/11 33/5 33/7 43/2 57/3 58/17 59/19 60/9 60/11 65/24 71/3 71/17 82/16 84/23 99/12 99/20 100/4 103/3 105/1 105/1 105/2 105/6 105/16 115/16 117/19
**shouldn't [5]** 22/11 48/5 61/2 77/16 84/22
**show [3]** 13/18 95/25 122/7
**showed [1]** 96/14
**showing [1]** 78/10
**shown [2]** 6/10 57/11
**shows [6]** 18/23 94/23 113/7 115/9 116/6 116/11
**shred [1]** 90/2
**shutting [1]** 34/3
**sic [4]** 16/22 39/14 63/10 79/16
**side [7]** 53/18 77/23 82/15 83/19 89/7 99/16 105/10
**sides [3]** 52/10 105/8 107/23
**sign [1]** 30/24
**signed [2]** 14/1 81/24
**significant [1]** 108/18

**signing [2]** 37/24 86/21
**signs [1]** 98/2
**similar [3]** 24/1 41/3 91/20
**Similarly [1]** 63/25
**simple [2]** 90/3 107/4
**simply [10]** 55/18 55/22 56/23 59/5 65/12 83/20 92/12 119/11 119/16 123/5
**simultaneous [1]** 61/23
**since [2]** 8/15 79/13
**Singerman [2]** 2/15 2/16
**single [9]** 5/4 13/18 40/6 49/21 49/21 85/15 85/21 98/22 111/11
**sir [1]** 87/6
**sisters [1]** 84/13
**sit [2]** 28/15 108/7
**sitting [4]** 77/13 80/3 85/1 85/9
**situation [2]** 122/19 122/20
**six [7]** 25/23 81/15 105/13 105/15 105/17 107/5 122/25
**six-day [1]** 105/13
**Sixty [3]** 67/15 67/17 67/18
**Sixty-four [1]** 67/15
**Sixty-two [2]** 67/17 67/18
**slept [3]** 85/16 117/2 117/3
**sliding [4]** 63/13 63/17 65/23 65/25
**slow [1]** 72/22
**slowly [1]** 73/1
**smiled [1]** 85/13
**smoking [1]** 34/25
**so-called [1]** 122/3
**software [7]** 27/13 37/11 37/12 72/20 73/4 81/10 81/12
**sold [25]** 7/13 24/3 24/6 44/2 44/4 44/5 45/1 47/21 47/22 52/22 68/3 69/7 71/13 72/4 73/8 84/21 85/14 86/23 104/23 105/2 106/3 109/1 109/11 109/23 124/6
**sole [3]** 61/11 61/19 120/1
**soliciting [1]** 82/3
**solution [1]** 25/7
**SOLUTIONS [1]** 1/7 1/15 3/6 3/8
**somebody [2]** 18/13 26/5
**someday [1]** 99/23
**somehow [2]** 25/14 94/2
**someone [4]** 13/10 24/17 70/8 77/8
**someone's [2]** 83/13 107/2

**something [14]** 12/19 17/25 18/10 26/17 29/4 29/15 36/1 37/5 42/20 63/12 78/20 87/25 107/18 109/16
**somewhat [1]** 120/9
**somewhere [1]** 41/21
**soon [1]** 124/14
**sooner [1]** 28/7
**sorry [14]** 22/16 35/6 49/3 50/6 52/4 55/19 61/18 67/18 67/21 72/9 87/4 101/16 104/16 114/15
**sort [5]** 36/25 37/1 77/13 77/17 93/3
**sorted [1]** 27/20
**sought [13]** 55/3 56/10 59/9 60/13 63/3 89/14 89/16 102/11 104/2 119/21 119/25 120/17 121/25
**sound [1]** 77/15
**source [59]** 7/8 8/2 8/4 8/6 8/9 8/12 8/13 8/18 8/18 8/25 9/13 12/11 12/15 25/20 25/25 26/2 26/9 26/15 26/20 26/22 27/8 27/11 27/11 27/22 31/19 32/5 35/1 38/21 39/13 39/19 39/22 40/8 44/1 44/14 44/16 44/18 44/19 44/21 45/17 46/3 46/7 46/15 47/9 47/21 47/21 72/3 79/25 80/20 81/9 81/10 85/11 89/24 95/11 95/13 95/14 102/20 102/25 117/6 117/9
**South [2]** 15/5 94/19
**Southeast [1]** 2/3
**SOUTHERN [5]** 1/1 6/9 69/2 78/6 106/24
**speak [4]** 35/14 70/11 75/23 118/13
**specific [7]** 21/13 51/1 66/22 88/20 102/9 115/6 115/7
**specifically [4]** 8/8 9/1 37/13 94/23
**specificity [1]** 30/15
**specify [1]** 72/10
**speculate [1]** 89/25
**speculation [1]** 90/1
**spelled [2]** 18/14 62/16
**spend [1]** 63/2
**spent [2]** 60/12 105/8
**spoke [1]** 76/10
**sponte [1]** 34/15
**spot [1]** 94/18
**Spring [1]** 116/1
**stage [2]** 6/11 64/24
**stakes [1]** 110/7
**stalking [1]** 124/8
**stand [10]** 36/11 71/23 77/24 79/4 81/17 91/24

**92/10 93/4 98/4 98/18
**standard [7]** 6/7 17/8 65/23 78/5 91/15 96/20 96/20
**standing [1]** 69/23
**standpoint [6]** 44/17 46/12 46/14 47/21 48/10 53/20
**stands [1]** 122/2
**Star [2]** 75/4 75/5
**starkly [1]** 61/16
**start [7]** 66/10 66/11 66/19 73/1 79/1 86/7 109/9
**started [4]** 4/1 13/5 49/7 86/10
**starting [1]** 73/20
**state [8]** 11/24 22/18 33/5 57/6 71/17 71/18 71/18 92/21
**stated [1]** 119/10
**statement [5]** 90/16 110/22 110/25 113/25 113/25
**statements [1]** 95/8
**states [6]** 1/1 1/21 63/14 67/6 67/7 76/15
**status [7]** 26/25 27/2 27/24 78/1 78/12 82/5 117/18
**statute [4]** 10/17 60/19 89/8 123/4
**stay [46]** 3/15 3/21 22/12 40/2 54/16 58/21 58/25 59/20 60/25 61/2 64/1 65/21 66/2 70/3 78/1 78/3 78/8 80/24 81/5 81/7 82/7 88/17 89/15 96/10 96/17 97/12 99/6 101/13 101/14 102/7 102/14 102/15 102/15 102/22 103/4 107/9 119/17 120/10 120/13 120/23 121/3 121/9 121/9 121/14 121/18 123/6
**stayed [4]** 64/4 84/15 84/17 84/18
**stays [1]** 94/13
**step [2]** 57/11 57/11
**Stephen [1]** 1/23 125/10 125/16 125/17
**steroids [1]** 107/6
**still [3]** 20/6 32/18 64/25
**stood [1]** 104/12
**stop [1]** 27/7
**straight [1]** 77/25
**straightforward [1]** 69/18
**street [3]** 1/24 2/14 92/20
**strongest [1]** 63/8
**strongly [1]** 28/14
**struggled [1]** 6/22
**stuff [3]** 30/13 88/10 110/15

**S**

**sua [1]** 34/15

**subject [16]** 4/16 5/2 5/13 5/25 6/4 6/18 18/19 18/19 42/4 43/6 53/7 59/11 66/21 66/23 67/2 86/15

**subjects [1]** 91/8

**submission [1]** 12/14

**submit [1]** 6/15 6/19 10/7 20/22 32/8 32/9 39/24 68/24 69/18 76/11 113/23

**submitted [1]** 10/1

**subsidiary [7]** 55/8 55/8 57/23 89/20 95/12 95/13 98/16

**subsidiary's [1]** 65/11

**substantial [12]** 6/6 6/13 20/22 25/16 28/24 38/9 39/24 60/4 62/24 78/9 122/5 122/23

**substantially [1]** 123/20

**substitute [1]** 119/8

**succeeded [1]** 34/2

**success [7]** 6/10 62/5 62/8 62/11 63/21 63/24 96/1

**successful [1]** 75/10

**successor [1]** 110/20

**such [14]** 7/21 13/16 14/4 17/19 51/16 52/19 71/15 71/17 73/6 73/8 73/16 79/11 96/12 96/13

**suddenly [2]** 22/5 45/14

**sue [2]** 64/2 64/12

**sued [5]** 11/18 63/4 64/5 64/23 100/17

**suffer [5]** 38/19 58/23 63/5 64/3 81/6

**sufficient [5]** 69/14 85/10 106/18 115/15 115/20

**sufficiently [1]** 24/12

**suggested [1]** 36/3

**suggestion [1]** 111/5

**suggests [1]** 120/15

**suing [3]** 65/13 81/23 100/8

**Suite [3]** 2/4 2/10 2/16

**summarize [1]** 41/9

**superseded [1]** 114/21

**supervise [1]** 109/22

**supplemental [1]** 112/20

**supplies [3]** 71/8 71/18 71/20

**supply [1]** 109/19

**support [3]** 4/2 36/12 114/7

**supposed [2]** 51/2 51/2

**supposedly [1]** 44/4

**Supreme [8]** 61/7 61/8 61/22 99/13 100/7 100/18 119/6 119/20

**sure [10]** 5/18 16/20 41/9 47/19 58/24 62/10

65/3 90/6 90/11 103/13

**surely [2]** 64/20 107/12

**surfaced [2]** 34/8 34/13

**surrender [1]** 73/15

**survive [2]** 7/19 65/16

**suspect [2]** 68/21 99/25

**sworn [2]** 86/19 124/5

**system [2]** 18/25 80/23

**Systems [1]** 122/14

**T**

**Tab [1]** 104/18

**take [22]** 12/5 13/20 22/21 35/21 45/13 49/3 49/17 53/25 57/4 57/12 57/15 75/8 79/12 83/13 85/6 93/4 105/16 107/5 115/12 116/21 117/25 123/11

**taken [4]** 41/18 49/16 54/2 75/9

**takes [7]** 12/3 12/3 13/3 21/25 23/23 83/20 116/18

**taking [10]** 13/21 13/22 13/23 23/20 23/20 53/4 82/2 86/8 86/10 103/6

**talk [13]** 25/13 47/2 78/25 80/7 80/14 81/19 85/17 95/5 96/3 97/14 100/20 101/10 113/13

**talked [1]** 119/6

**talking [12]** 9/19 51/20 71/12 75/23 80/7 80/8 80/10 85/19 100/20 100/22 100/23 101/1

**talks [1]** 113/13

**target [2]** 114/25 115/6

**targeted [6]** 13/5 13/8 14/10 14/13 24/20 35/20

**targeting [1]** 14/21

**TBO [64]** 6/3 21/19 23/22 29/14 29/23 36/4 38/3 43/6 47/23 49/16 50/18 54/18 55/20 55/22 56/10 56/13 57/3 57/13 57/23 58/14 59/5 65/6 66/10 69/1 74/20 79/4 79/19 85/20 94/17 95/10 96/12 96/12 96/17 96/18 97/2 97/4 97/5 97/5 97/7 97/16 97/16 97/17 97/18 98/3 98/15 98/25 99/15 99/18 100/5 100/22 100/24 101/19 102/7 103/7 108/23 110/15 110/18 110/20 110/21 111/1 112/3 116/25 118/21 121/15

**TBO's [6]** 65/10 79/3 81/5 102/22 104/14 121/1

**technology [1]** 34/9

**teed [10]** 10/12 12/23 30/2 51/11 51/11 51/12 51/13 51/22 51/23 52/1

**tell [3]** 62/14 77/13 82/13

**telling [2]** 36/2 97/23

**tend [1]** 105/5

**tendered [2]** 109/11 109/12

**tens [2]** 83/1 83/1

**term [5]** 9/4 29/19 30/10 69/15 121/17

**terminated [2]** 7/23 23/15

**termination [1]** 23/18

**terms [9]** 8/8 10/8 37/21 59/2 62/13 63/23 63/25 111/9 100/13

**test [6]** 63/12 63/20 63/22 65/25 66/24 66/25

**testified [14]** 27/17 40/10 88/10 88/10 91/24 92/2 92/9 92/19 92/24 93/10 98/7 98/19 105/9 106/17

**testimony [26]** 37/21 40/10 56/7 56/15 56/16 57/8 79/7 80/18 80/19 81/3 81/9 81/16 81/17 86/19 88/2 88/2 88/3 91/13 91/19 91/20 92/11 99/17 99/18 100/6 108/25 123/1

**tests [1]** 65/20

**thank [11]** 5/14 53/24 66/3 66/4 107/19 107/20 118/9 123/7 123/9 124/12 124/13

**Thanks [1]** 54/1

**Thanksgiving [3]** 28/4 28/8 28/9

**that's [93]** 3/6 3/8 4/3 8/16 9/23 11/10 13/10 15/3 16/16 16/18 16/20 17/25 18/23 19/9 19/9 20/1 23/21 29/22 30/10 30/20 31/18 33/3 33/14 33/24 34/1 34/12 37/2 37/6 38/14 38/24 39/21 41/23 42/15 44/9 44/20 45/10 45/14 45/18 45/20 46/16 48/23 51/21 52/4 52/25 53/16 58/20 59/6 59/12 60/9 61/5 62/11 63/15 65/2 66/18 69/15 71/4 71/20 72/10 76/7 76/8 81/14 83/12 83/23 85/25 89/17 92/11 92/19 93/23 95/14 96/20 99/18 100/1 102/17 105/3 106/11 107/2 108/2 108/13 112/15 112/16 112/17 113/9 113/10 114/10 115/17 116/6 117/14 119/5 119/10 121/20 122/7 122/13 123/7

**the 27th [1]** 121/11

**themself [1]** 108/11

**theory [1]** 77/7

**there'd [1]** 83/16

**there's [61]** 16/21 19/25 20/9 22/15 26/19 28/21 28/23 32/16 36/11 41/19 41/21 42/17 42/19 43/16 49/17 51/5 53/18 59/6 60/18 74/2 74/5 77/3 83/12 83/15 84/5 86/3 86/24 87/19 87/21 88/18 88/19 88/19 89/7 90/1 91/3 91/12 93/9 94/10 94/21 97/17 99/2 101/7 101/9 101/13 102/9 106/7 107/15 114/8 114/9 114/12 114/14 114/15 115/3 118/6 118/19 119/15 119/17 120/4 120/15 121/3 122/5

**thereafter [2]** 7/14 73/17

**therefore [9]** 11/5 43/13 68/5 89/17 90/22 93/2 95/21 116/24 119/25

**they'd [1]** 39/8

**they're [16]** 10/25 18/21 27/5 27/6 35/4 43/12 44/22 53/4 77/12 80/3 80/9 88/10 110/12 110/13 120/5 123/5

**they've [9]** 45/6 60/13 80/16 88/9 88/10 88/21 95/21 101/17 117/16

**thing [16]** 7/13 15/20 30/20 32/2 40/16 48/11 75/22 86/3 88/12 89/2 101/9 103/14 104/21 110/14 114/5 114/11

**things [29]** 9/21 18/22 19/19 20/21 27/12 30/2 30/9 34/20 37/5 39/12 39/15 41/17 47/12 49/8 50/9 50/12 51/10 51/11 51/21 52/1 53/9 77/17 95/5 108/8 110/10 111/12 111/15 114/4 121/6

**think [77]** 3/10 9/19 20/18 22/15 32/2 41/15 42/17 49/3 50/4 55/15 56/23 57/17 59/2 60/9 61/3 61/14 62/19 64/1 65/5 65/17 65/20 66/1 66/5 66/19 66/24 67/23 67/25 68/5 68/20 70/4 75/5 76/23 76/23 76/24 77/21 77/22 77/23 78/14 78/14 79/6 79/8 85/11 86/5 87/24 88/11 90/18 91/4 94/5 96/4 98/12 98/20 99/2 99/20 103/10 104/13 104/22 105/6 105/16 106/5 106/7 106/22 106/23 107/22 109/7 118/13 118/18

**theory [1]** 77/7

118/23 119/5 119/16 120/8 120/13 121/4 121/11 121/20 121/22 122/23 122/25

**thinking [1]** 64/8

**third [17]** 22/20 43/4 43/5 43/14 43/16 71/13 83/10 83/11 84/5 84/9 90/10 98/23 106/3 110/4 110/4 111/25 112/3

**those [40]** 5/9 7/11 10/2 11/3 15/17 15/24 17/25 19/19 21/24 26/3 33/5 33/7 33/9 34/20 35/2 37/16 37/20 37/23 38/16 39/16 41/17 52/13 52/17 52/25 54/17 55/4 60/5 60/6 62/5 78/19 78/23 90/9 90/25 102/10 102/11 106/19 110/10 115/5 118/22 124/10

**though [15]** 8/1 8/21 9/1 21/4 22/6 25/9 36/1 59/9 63/4 90/19 94/3 100/16 104/7 119/16 119/17

**thought [10]** 12/22 23/4 40/18 40/22 50/11 51/25 87/24 103/15 104/23 109/6

**thousand [1]** 32/16

**threatened [1]** 74/19

**threatening [1]** 74/18

**three [28]** 10/10 14/13 17/5 19/2 22/22 29/3 29/25 30/9 30/14 34/24 40/10 40/12 41/2 42/15 60/7 60/17 65/18 80/10 80/22 81/8 88/15 89/20 91/3 91/10 93/9 99/22 120/8 122/9

**through [12]** 13/3 23/23 24/3 49/16 49/18 57/10 60/23 61/24 71/14 86/6 91/7 91/16

**thus [2]** 6/14 124/8

**tie [1]** 13/2

**title [19]** 7/13 7/16 9/7 12/1 12/7 25/9 25/11 27/22 29/17 29/21 31/8 33/4 44/12 45/1 45/4 49/17 112/11 112/16 112/24

**TLO [7]** 34/10 76/3 86/11 86/16 98/6 123/22 124/9

**TLO's [3]** 91/22 93/20 123/20

**TLOs [1]** 85/7

**today [8]** 26/25 66/17 68/22 76/8 96/25 103/24 119/4 123/8

**together [1]** 121/6

**told [7]** 13/10 30/22 33/7 40/25 85/5 93/5 93/22

**tomorrow [1]** 76/4

**tons [1]** 105/8

(WITNESSNAME)                                                                                                                                                          Index: too - whatsoever

**T**

**too [3]** 22/11 23/10 40/3
**took [11]** 13/24 41/12
47/25 79/4 81/16 86/10
91/24 92/10 98/4 98/18
105/17
**total [4]** 64/8 64/9
108/24 116/5
**totally [2]** 82/4 116/12
**touch [1]** 51/2
**touched [1]** 40/1
**touching [1]** 5/23
**towards [1]** 43/9
**Tower [1]** 2/10
**TRAD [1]** 52/14
**trade [4]** 2/13 26/22
26/23 81/20
**TRADS [71]** 7/2 7/4
7/25 8/13 9/9 10/1 12/10
12/14 12/15 15/1 18/21
21/2 21/10 21/19 23/9
23/9 24/9 25/16 25/18
25/20 25/22 25/24 27/2
27/10 27/15 29/10 30/23
30/23 32/19 33/3 34/2
34/22 34/25 35/7 36/4
38/14 39/2 39/5 39/20
40/8 40/11 44/21 48/4
50/4 52/11 53/2 55/6
56/8 60/6 62/19 63/25
64/8 68/4 76/2 76/4 81/6
81/7 81/10 86/11 86/12
86/23 86/23 102/24
103/19 109/3 113/1
117/4 118/25 120/22
122/1 122/21
**TRADS' [16]** 13/17 14/1
14/24 21/18 24/12 26/8
45/16 45/20 47/21 59/25
64/19 73/20 81/12 81/13
108/20 112/13
**transactions [1]** 57/11
**transcend [1]** 32/12
**transcended [1]** 44/25
**transcript [7]** 1/19
34/18 104/15 104/21
112/19 124/3 125/12
**transfer [4]** 75/10 75/13
76/9 99/24
**transferred [2]** 48/4
72/10
**transferring [1]** 12/1
**transfers [1]** 118/24
**TRANSUNION [8]** 1/7
1/14 3/5 3/7 79/12 87/1
89/20 102/24
**Traurig [1]** 2/3
**traveling [1]** 6/7
**treated [1]** 84/22
**trial [52]** 4/19 4/21 9/25
11/4 11/6 16/9 19/5
19/15 19/18 21/7 21/17
22/23 24/11 34/24 36/20
36/21 40/9 54/19 56/2
59/4 60/1 64/6 64/10
79/3 79/7 79/18 81/15

82/19 85/8 87/5 92/24
98/4 98/19 99/2 99/3
99/8 99/9 99/17 101/1
101/22 104/12 105/13
106/1 107/1 107/1 107/5
113/5 118/22 123/1
123/16 124/4 124/11
**tried [5]** 4/24 40/24 53/6
85/22 107/7
**true [4]** 7/1 95/9 103/18
110/10
**trump [2]** 32/12 44/25
**truncated [1]** 107/4
**trustee [2]** 71/13 104/25
**truth [1]** 124/11
**try [8]** 31/11 38/2 41/9
66/22 67/13 94/24 108/7
124/14
**trying [12]** 10/3 10/4
24/8 24/10 27/7 44/24
47/24 48/5 48/6 53/16
94/21 120/5
**turn [9]** 21/1 30/12
47/11 47/12 51/2 70/13
74/21 95/12 95/14
**turnover [2]** 47/11
88/14
**turns [2]** 83/25 84/5
**tutorial [1]** 109/13
**two [46]** 3/5 5/9 5/24 6/7
9/4 9/20 9/24 14/11
17/15 18/22 19/7 19/19
19/25 27/12 30/9 33/6
37/6 42/8 42/15 47/6
59/23 63/11 67/17 67/18
83/15 88/13 91/23 93/13
93/15 95/2 95/5 98/17
99/23 100/4 100/23
105/16 107/4 108/13
109/15 109/16 110/4
110/4 111/18 115/5
122/10 122/11
**type [5]** 12/5 39/14
40/16 48/11 64/18

**U**

**U.S [3]** 99/13 100/7
100/18
**uh [2]** 103/17 111/8
**Uh-huh [1]** 103/17
**ultimately [8]** 7/4 26/13
89/1 89/22 100/18 104/5
109/2 110/19
**unable [1]** 119/24
**unanimous [1]** 61/8
**unanimously [1]** 61/22
**uncertain [1]** 122/18
**unclean [4]** 35/3 35/10
35/13 36/6
**uncontradicted [1]** 56/7
**uncontroverted [4]**
82/18 91/12 91/18 91/25
**undeliverable [2]** 19/9
92/1
**undelivered [1]** 92/25
**under [24]** 6/9 8/10 9/12

10/15 12/4 14/13 15/21
17/7 23/1 24/18 27/6
28/24 32/10 45/11 57/5
58/7 65/17 65/20 76/6
86/24 91/6 91/15 122/21
123/17
**underlying [5]** 76/15
76/16 80/21 88/13
106/13
**underneath [1]** 113/18
**underscores [1]** 123/22
**understand [2]** 8/20
8/23 37/12 37/21 39/8
41/24 47/19 53/17 53/23
87/15 87/22 114/22
**understandable [1]**
37/11
**understands [1]** 10/6
**understood [5]** 68/24
17/2 17/4 26/7 35/19
36/1 44/20
**uniform [1]** 77/7
**UNITED [4]** 1/1 1/21
63/14 76/15
**unless [6]** 4/11 5/17 5/22
89/7 89/8 106/21
**unlike [1]** 61/5
**unquote [2]** 112/23
113/9
**unstayed [1]** 122/22
**until [12]** 5/2 22/25 23/6
23/7 39/4 61/2 77/17
91/9 102/15 109/9 116/8
117/11
**update [2]** 81/10 81/11
**upon [14]** 10/24 15/14
16/17 17/11 17/12 19/21
37/4 40/10 47/3 62/24
70/1 83/1 121/14 122/5
**urge [1]** 21/10
**urged [1]** 21/10
**urging [1]** 105/25
**us [27]** 21/25 34/15
39/15 39/16 39/18 53/4
59/10 60/13 62/13 62/20
63/3 65/17 68/3 72/4
74/19 74/19 74/21 81/18
88/6 88/11 89/25 99/16
107/17 120/5 120/24
121/13 122/1
**used [8]** 33/1 51/11
58/10 72/20 73/4 91/15
111/16 120/20
**useful [4]** 31/3 31/4
72/20 73/5
**using [12]** 27/5 27/6
27/7 27/10 27/18 44/21
44/22 79/4 79/13 79/19
79/25 88/10
**utter [1]** 90/1

**V**

**vacated [2]** 60/9 60/11
**vacation [1]** 23/4
**vacuum [1]** 57/16

**valid [7]** 51/5 68/12
83/11 83/21 83/25 106/4
122/22
**validity [2]** 68/6 84/1
**Valley [1]** 116/1
**vehicle [1]** 33/2
**veil [7]** 65/12 65/13
65/15 111/2 119/1
119/12 120/6
**verbatim [1]** 30/24
**versus [11]** 3/5 3/7
14/20 16/4 61/9 61/14
61/17 63/14 113/19
119/6 122/14
**very [35]** 4/25 5/3 12/12
12/13 15/18 18/8 18/8
21/16 30/17 31/12 32/5
38/25 39/9 43/9 50/25
67/25 70/21 72/23 73/21
77/16 84/11 86/10 86/14
86/25 114/16 115/16
115/21 118/11 118/12
118/16 120/13 120/22
121/24 123/18 123/19
**victory [3]** 64/8 64/10
64/11
**view [1]** 108/20 108/20
**vigorously [1]** 77/15
**vindication [1]** 65/3
**violated [2]** 23/19 69/6
**violation [2]** 70/8 77/4
**virginity [1]** 65/8
**virtually [1]** 34/3
**virtue [3]** 13/21 38/22
53/14
**vis [4]** 104/24 104/24
111/25 111/25
**vis-a-vis [2]** 104/24
111/25
**void [5]** 14/24 21/13
23/12 115/3 118/3

**W**

**W-2 [1]** 40/16
**wait [5]** 22/9 58/21
59/19 59/21 60/24
**waited [1]** 23/10
**waiting [1]** 54/5
**walked [1]** 82/22
**want [31]** 5/14 14/19
21/1 26/16 27/19 28/19
28/22 34/22 35/21 36/9
40/2 41/24 54/8 66/11
66/21 79/7 88/23 90/11
94/18 101/3 101/11
101/20 102/6 102/7
102/15 107/22 107/23
109/16 114/6 118/10
118/16
**wanted [6]** 5/11 79/1
79/2 97/6 103/14 105/15
**wanting [1]** 26/17
**wants [1]** 71/24
**Warburg [1]** 93/15
**warrant [1]** 7/20
**warranties [5]** 7/19 7/21

7/22 8/2 69/12
**warranty [3]** 29/5 29/11
72/11
**wasn't [21]** 8/10 9/1
18/5 18/6 24/8 29/13
35/18 40/22 49/19 49/23
51/12 51/13 68/10 71/5
86/3 86/5 88/2 93/14
95/19 96/25 102/4
**waters [1]** 48/5
**ways [2]** 60/7 60/17
**we'd [2]** 26/15 39/7
**we'll [9]** 5/20 6/15 28/5
34/5 53/8 53/25 60/5
89/1 107/12
**we're [40]** 6/6 9/19 10/6
19/20 24/10 27/7 27/10
27/17 28/2 28/6 31/17
31/22 37/4 37/15 37/17
39/23 43/13 44/10 44/11
49/8 52/25 53/19 53/21
54/5 80/7 80/8 80/9
80/12 80/22 82/6 82/7
88/25 90/2 100/20
100/22 100/23 101/1
107/1 107/1 123/2
**we've [15]** 12/2 16/25
18/8 21/12 24/12 25/8
25/24 40/1 59/8 59/10
60/11 97/10 105/21
115/25 118/5
**week [2]** 102/2 107/1
**weeks [4]** 34/24 59/23
99/22 99/23
**weigh [1]** 78/22
**Welfare [1]** 63/15
**well [55]** 8/1 8/7 11/23
12/8 13/10 13/19 15/1
15/3 16/14 21/7 21/9
22/7 25/3 25/18 26/16
26/22 29/6 29/8 29/13
31/15 32/6 35/4 36/9
45/16 45/23 50/24 51/10
52/5 53/23 55/7 56/14
58/6 58/19 67/14 72/9
78/14 79/22 80/6 80/21
83/15 86/14 93/1 95/25
96/16 97/3 97/24 99/2
100/11 111/7 114/5
114/11
**went [17]** 11/1 23/3
25/22 46/13 53/13 71/2
82/24 84/11 85/4 86/6
89/17 92/13 94/3 105/10
105/15 117/5 121/22
**weren't [10]** 10/3 44/21
51/10 51/11 51/22 52/1
52/2 59/15 72/5 87/6
**West [1]** 1/16 1/24
**Westlaw [2]** 75/4 122/13
**what's [5]** 25/2 31/18
32/14 58/22 99/3
**whatever [6]** 14/6 29/19
45/3 45/3 66/12 66/13
**whatsoever [4]** 63/5

**W**

**whatsoever... [3]** 64/3 105/15 116/16
**where [45]** 8/21 10/6 12/17 12/22 16/2 16/2 16/6 16/8 20/1 21/18 22/1 22/2 22/3 23/15 27/2 34/18 43/15 45/8 45/10 56/9 58/11 60/22 64/24 69/4 69/8 69/10 70/11 75/22 76/3 76/12 79/1 85/24 93/3 94/23 100/24 101/1 101/14 102/21 108/12 118/5 120/22 121/24 122/4 122/21 124/2
**where's [2]** 41/21 41/24
**whereas [6]** 18/2 25/1 29/17 86/22 86/22 86/23
**wherever [1]** 27/21
**whether [38]** 5/11 5/14 10/16 10/17 12/21 13/4 20/23 20/25 34/23 35/24 40/14 45/9 46/20 50/22 51/4 51/5 51/8 52/14 52/15 77/3 83/11 88/1 96/21 96/22 103/20 104/6 104/8 104/10 104/25 105/2 105/3 106/4 106/14 108/25 113/4 114/17 122/18 123/25
**while [10]** 5/23 7/17 18/1 26/25 27/25 27/25 30/7 70/22 104/24 121/12
**whit [1]** 36/11
**white [4]** 18/16 24/25 72/6 99/21
**who's [2]** 3/17 100/21
**whole [7]** 74/5 77/3 84/3 85/3 96/23 105/11 106/18
**wholly [5]** 46/22 89/19 98/16 100/3 118/23
**wholly-owned [1]** 98/16
**whom [7]** 23/23 64/4 89/13 89/16 119/9 119/22 121/25
**whose [2]** 14/19 108/21
**why [32]** 13/19 23/10 26/16 27/18 29/6 32/18 38/24 39/8 58/19 58/21 58/21 59/13 59/19 59/20 60/21 60/24 61/1 61/5 61/5 63/9 73/10 80/17 90/1 92/14 92/19 99/14 101/24 102/8 109/25 111/6 115/6 117/13
**widely [1]** 6/21
**willing [5]** 28/7 86/3 93/14 101/25 101/25
**Wilmer [2]** 2/12 66/6
**win [4]** 62/7 78/12 82/4 96/22
**winning [1]** 103/5

**wins [2]** 78/2 79/12
**within [10]** 6/5 11/2 11/6 19/7 22/4 23/2 27/14 81/11 94/5 117/7
**without [28]** 10/20 13/13 14/15 14/23 19/19 21/11 23/13 30/14 30/15 32/9 34/19 57/16 65/12 65/13 72/1 72/5 73/2 81/10 83/10 83/14 106/4 106/14 118/1 118/2 119/1 119/2 119/12 120/6
**witness [7]** 10/7 37/9 81/17 91/24 92/10 98/4 105/20
**witness' [1]** 88/3
**witnesses [5]** 37/13 40/10 81/17 105/9 105/18
**won [6]** 79/22 81/22 82/1 82/5 82/6 93/12
**won't [2]** 62/12 95/12
**words [16]** 8/13 9/4 12/11 13/14 26/3 31/17 32/6 68/1 71/11 71/15 108/16 108/17 108/21 109/8 109/14 116/23
**work [1]** 111/14
**working [2]** 30/7 79/19
**world [2]** 2/13 80/4
**worse [1]** 58/17
**worth [2]** 86/5 117/21
**worthy [1]** 56/16
**wouldn't [2]** 60/24 89/9
**writes [1]** 75/6
**wrong [8]** 19/6 22/18 22/19 42/18 90/14 90/17 103/15 104/17
**wrote [5]** 13/20 13/22 86/12 108/21 117/7

**Y**

**yeah [5]** 16/8 28/17 44/5 46/1 117/10
**year [3]** 17/10 39/3 104/16
**years [16]** 10/10 29/3 29/25 30/14 47/6 47/6 47/7 69/7 80/11 80/15 80/22 81/8 83/6 88/15 107/4 114/24
**yep [1]** 99/18
**yes [29]** 4/5 4/8 8/4 8/11 9/25 10/9 19/11 28/23 36/10 41/14 42/22 43/23 44/9 46/4 50/13 50/17 51/7 54/9 55/9 62/4 68/21 78/16 78/18 79/21 85/14 87/6 87/10 87/10 95/4
**Yoast [1]** 124/5
**York [7]** 2/14 20/2 69/2 72/25 106/23 106/25 114/23
**you'll [2]** 67/6 91/7

**you're [36]** 11/25 16/19 22/1 27/19 35/13 36/2 41/11 41/19 42/10 43/25 44/1 44/23 47/25 48/19 49/7 50/25 51/2 51/2 58/23 59/14 62/7 68/14 72/23 75/23 77/10 77/14 77/15 77/16 78/14 79/19 80/4 85/19 96/22 99/7 112/24 115/6
**you've [7]** 3/9 4/2 5/15 87/17 102/1 103/10 115/7
**yours [1]** 76/14
**yourself [3]** 3/12 74/13 102/2

**Z**

**zero [2]** 82/21 82/23
**zeros [1]** 8/16
**zip [5]** 18/5 18/6 18/7 19/23 92/22